Exhibit A

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION
 3   ONE UNITY INVESTMENT,   §
     L.L.C.,                 §
 4                           §
         Plaintiff,          §
 5                           §
     v.                      §CIVIL ACTION NO. 4:23-cv-02455
 6                           §
     AXIS SURPLUS INSURANCE  §
 7   COMPANY,                §
                             §
 8       Defendant.          §
 9
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
10
11              REMOTE ORAL DEPOSITION OF
                 BRANDON BENJAMIN ALLEN
                   February 7, 2025
12
      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
13       REMOTE ORAL DEPOSITION OF BRANDON BENJAMIN ALLEN,
14   produced as a witness and duly sworn, was taken in the
15   above-styled and numbered cause on February 7, 2025,
16   from 3:01 p.m. until 4:43 p.m., before Suzanne Kelly,
17   CSR Number 1260, in and for the State of Texas,
18   reported by stenographic method with all participants
19   appearing remotely and pursuant to the Federal Rules
20   of Civil Procedure and the provisions stated on the
21   record, if any.
22
23
24   Reported by:  Suzanne Kelly, RDR, CRR
25   Job: HOU 7146621
```

Page 1

```
 1              APPEARANCES
 2    FOR THE PLAINTIFF:
 3    Jay Simon, Esq.
      CHAD T. WILSON LAW FIRM, P.L.L.C.
 4    455 East Medical Center Boulevard
      Suite 555
 5    Webster, Texas 77598
      713.222.6000
 6    jsimon@cwilsonlaw.com
 7
      FOR THE DEFENDANT:
 8
      Artis G. Ulmer, III, Esq.
 9    SHACKELFORD, MCKINLEY & NORTON, L.L.P.
      717 Texas Avenue
10    27th Floor
      Houston, Texas 77002
11    832.415.1801
      aulmer@shackelford.law
12
13    Witness:
14    Brandon Benjamin Allen
      brandon@allenconsultingservice.com
15
16
17
18
19
20
21
22
23
24
25
                                        Page 2
```

```
 1              INDEX (Continued)
              EXHIBITS (Continued)
 2
      NO.       DESCRIPTION        PAGE
 3
      Exhibit 5   A copy of a none-page      56
 4              document entitled,
                "Defendant AXIS Surplus
 5              Insurance Company's First
                Supplemental Designation of
 6              Expert Witnesses"
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                        Page 4
```

```
 1              INDEX
 2                        PAGE
 3    Appearances            2
 4    BRANDON BENJAMIN ALLEN
 5        Examination by Mr. Simon     6
 6        Examination by Mr. Ulmer    66
 7    Signature and Changes        77
 8    Reporter's Certificate        79
 9
10            EXHIBITS
11    NO.      DESCRIPTION       PAGE
                                         9
12    Exhibit 1   A six-page copy of a
                letter to Chad T. Wilson
13              from Bruce R. Wilkin dated
                April 25, 2023 re:
14              Claim number: AWAX22110018
15    Exhibit 2   A five-page copy of a      18
                letter to Chad T. Wilson
16              from Bruce R. Wilkin dated
                April 25, 2023 re:  Claim
17              number AWAX22110018
18    Exhibit 3   A copy of a printout of an    38
                e-mail Bates labeled
19              AXIS 000280
20    Exhibit 4   A copy of a 39-page printout   40
                entitled, "Notes for
21              AWAX22110018"
22
23
24
25
                                        Page 3
```

```
 1         P R O C E E D I N G S
 2        MR. SIMON: My name is Jay Simon.
 3   I represent the Plaintiff, One Unity Investment
 4   in this matter. I'm taking the deposition. My
 5   e-mail is "j," just the letter,
 6   simon@cwilsonlaw.com.
 7        MR. ULMER: Artis Ulmer
 8   representing AXIS Surplus Insurance Company with
 9   the law firm Shackelford, McKinley & Norton. My
10   e-mail address is in the Chat box.
11        THE COURT REPORTER: Thank you.
12   Thank you.
13        If the witness would please raise
14   your right hand, I'll administer the witness's
15   oath to you.
16        Do you solemnly swear or affirm
17   that the testimony which you give in this case
18   will be the truth, the whole truth and nothing
19   but the truth, so help you God?
20        THE WITNESS: I do.
21        THE COURT REPORTER: Thank you.
22        BRANDON BENJAMIN ALLEN,
23   having sworn to testify the truth, the whole
24   truth, and nothing but the truth testifies upon
25   his oath as follows:
                                        Page 5
```

2 (Pages 2 - 5)

1          EXAMINATION
2  BY MR. SIMON:
3      Q. Can you state your full name for the
4  record?
5      A. Brandon Benjamin Allen.
6      Q. Do you prefer that I call you
7  "Brandon," or "Mr. Allen," or do you care?
8      A. I don't care.
9      Q. I'll go with "Brandon" then.
10     A. Okay.
11     Q. Brandon, you understand why you're here
12 today?
13     A. I do.
14     Q. Okay. This is a lawsuit between my
15 client, One Unity and their insurance, AXIS
16 Insurance.
17         Do you understand that we've
18 Noticed you to be here today?
19     A. I do, yes, sir.
20     Q. With respect to this case, it's my
21 understanding that you were an adjustor who was
22 retained by the insurance company to inspect
23 this premises and formulate an opinion. Is that
24 correct?
25     A. Correct.

Page 6

1      Q. Okay. So, I got the right guy here?
2      A. Correct.
3      Q. Do you know if were you the only person
4  who inspected on behalf of the insurance
5  company, AXIS, in this case?
6      A. I don't know.
7      Q. It's also my understanding that you no
8  longer -- I guess, well, when you were involved
9  in this case, you're working for a company --
10 you weren't working for AXIS. Correct?
11     A. Correct. I was an independent adjustor
12 for Straight Line Global.
13     Q. Okay. So, you have never worked for
14 AXIS Insurance. That's correct?
15     A. Not directly.
16     Q. And I meant directly.
17         You worked for a company called
18 "Straight Line Global," and I'm assuming what
19 they are an independent adjusting company?
20     A. Correct.
21     Q. And why don't you explain to a jury
22 what that means, when you're from an independent
23 adjusting company?
24     A. Sure. Independent adjusting companies
25 are retained by carriers to have a third-party

Page 7

1  independent inspection, and recommendation for a
2  claim.
3         So, we -- just like your carrier
4  adjustor would, we go out, do an inspection,
5  prepare a report and make recommendations.
6         Then, that goes to the carrier who
7  ultimately decides coverage and payment.
8      Q. Do you still work for Straight Line
9  Global?
10     A. No.
11     Q. When you worked for them, were you an
12 employee or around independent contractor? How
13 was that relationship?
14     A. 1099 subcontractor.
15     Q. Okay. When did your relationship with
16 them terminate?
17     A. I don't know the date but it was
18 regarding this claim. This was the last claim I
19 ever worked with them.
20     Q. Did they fire you, or did you quit
21 working for them?
22     A. I resigned.
23     Q. And it was in relationship to what
24 happened on this claim?
25     A. Yes.

Page 8

1      Q. What is it that happened on this claim
2  that made you resign from working for Straight
3  Line Global?
4      A. So, I did my normal process of calling
5  the -- the -- I think it was a public adjustor
6  on this one, called him, set up an inspection,
7  inspected the property, prepared a report with
8  my photos.
9         I submitted that to Straight Line
10 Global and they rejected the report and
11 requested me to make some changes I didn't agree
12 with. So, I quit.
13     Q. Is that a common -- was that a common
14 practice working with Straight Line Global?
15     A. Yes. Not to this extent, but, yes.
16     Q. And with respect to -- had you worked
17 other claims for AXIS Insurance before?
18     A. I'm not 100 percent positive if I have.
19 But I was adjustor with Vericlaim and I believe
20 we had some AXIS work. I'm not 100 percent
21 sure, but I am fairly certain.
22     Q. I'm going to show you a document. I'm
23 going to mark it as Exhibit 1 here.
24         MR. SIMON: Sharing is not turned
25 on, can you turn Sharing on, Suzi?

Page 9

3 (Pages 6 - 9)

1          THE COURT REPORTER: Yes.
2          Sorry. Can you try it now?
3          MR. SIMON: Yeah. I am.
4          THE COURT REPORTER: Okay. Great.
5          MR. SIMON: Just trying to keep a
6  tab so that you get the right exhibits. Yeah.
7  BY MR. SIMON:
8      Q. Okay. Can you see the document I have
9  in front of me? This is a --
10     A. Yes.
11     Q. -- document dated April 25th, 2023.
12 From the Shackelford Law Firm.
13         Do you see that?
14     A. I do.
15     Q. I will go slower. It's a response to a
16 statutory notice letter that my firm had sent
17 over. I don't know -- have you seen this letter
18 before?
19     A. I have not.
20     Q. I'll go through slowly so you can kind
21 of -- I want you to kind of -- there's parts of
22 it I want you to have time to read.
23         Okay. Are you able to read it on
24 the screen?
25     A. I can, yes.

1      Q. Did anyone talk to you before they
2  elected responsibility for you about that?
3      A. No.
4      Q. Did you know that -- did you know that
5  that had occurred in this case at that time?
6      A. I had no idea there was even a lawsuit
7  at this time.
8      Q. On the April 25th date of this letter,
9  were you still working for Straight Line Global
10 at that time?
11     A. No, I don't think so. I don't remember
12 the date that I quit, but it was around the date
13 of the first report. So, whenever that was.
14     Q. And --
15     A. I don't think so.
16     Q. Your -- and I noticed in the file there
17 was a phone number and address that's associated
18 with you, those are still the same. Right?
19     A. Yeah. Nothing has changed.
20     Q. Okay. Because I noticed there was a --
21 there was a -- there was at least a document
22 where you gave a card to Glenn Ruston, the
23 business card to Glenn Ruston that he
24 photographed at your inspection that looked like
25 it had your contact information?

1      Q. Okay. Just tell me when to kind of
2  scroll on. It's not going to be a quiz, but I
3  want you to have familiarity with what we're
4  discussing.
5      A. Can you go to the next page?
6      Q. (Counsel complies.)
7      A. Scroll.
8      Q. (Counsel complies.)
9      A. Okay. I'm through that.
10         All right. Scroll.
11     Q. (Counsel complies.)
12     A. Okay. Got it.
13     Q. First thing that I'm going to ask you,
14 there's a section here on this last page called
15 "Election of Responsibility."
16         Do you see that?
17     A. I do.
18     Q. Okay. It mentions there that -- that
19 they stand by the claim, investigation
20 adjustment of Straight Line Global and its
21 adjustor and its representatives, AXIS,
22 therefore, elects responsibility for Straight
23 Line Global, and its adjustor Brandon Allen.
24         Do you see that?
25     A. I do.

1      A. It's all the same.
2      Q. Did anyone ever contact you?
3          Well, let me put it this way: You
4  know we contacted you last week about trying to
5  set up this deposition date. Correct?
6      A. Yes.
7      Q. Prior to my contacting you, had anyone
8  on behalf of Defendant ever contacted you about
9  coordinating this deposition?
10     A. No.
11     Q. Next, I see -- I'm going up to Page 2,
12 that's the only part of the letter that I've
13 seen besides the bottom part, that referenced
14 you.
15     A. Okay. Right.
16     Q. Is that your understanding, too?
17     A. Agreed, yes.
18     Q. Okay. In this letter where it talks
19 about what you found, I believe it's in the
20 second paragraph under the investigation of the
21 claim.
22         Were those your findings as stated
23 in the letter?
24     A. No. No.
25     Q. Do you know who changed them?

Veritext Legal Solutions
346-293-7000

Page 14

1    A. I don't know who changed them.
2  Somebody at Globe did. That's kind of the
3  normal, pretty -- pretty normal process for
4  them.
5    Q. What do you mean by that?
6    A. Straight Line Global is a company that
7  values cycle time more than quality or what's in
8  their file. So, if there's changes that need to
9  be made, it was very common for them to make
10  those changes regardless if it changed the
11  outcome.
12        That happened several times before.
13  However, not to this extent. Most of the time,
14  it was. We'll take something out of the
15  estimate we don't like, or -- or we'll revise
16  the report to say something with verbiage
17  different.
18        In this case, it was the entire
19  coverage decision that was changed.
20    Q. What was your coverage determination on
21  this claim?
22    A. I guess my recommendation --
23    Q. Or recommendation, I guess?
24        MR. ULMER: Objection. Form.
25        THE WITNESS: So, my recommendation

Page 15

1  was noted that we had collateral damage, hail
2  damage, size of hail, weather reports with hail.
3  I recommended we retain an expert to determine
4  if the hail was cosmetic or functional and what
5  was causing the interior damage.
6  BY MR. SIMON:
7    Q. Without the engineer, did you have
8  opinions as to whether this appeared to be a
9  covered loss?
10    A. I did. However, with the cosmetic
11  exclusions everybody approaches them being
12  differently, it's very common to bring in an
13  expert to assist with the coverage
14  determination. Especially, when we have two
15  things here that are commonly -- especially in
16  commercial call an expert for A, is it cosmetic
17  or functional? And B, is the hail damage the
18  cause of the interior damage.
19    Q. And it says the field adjustor which
20  would be you, did not observe hail bruising to
21  the roof.
22        Did you observe hail damages to the
23  roof?
24    A. Yes.
25    Q. Was it across the roof or limited to a

Page 16

1  certain area?
2    A. It was across the roof.
3    Q. One of the items in this case is
4  that -- well, that when you did your inspection
5  that you met with a public adjustor from -- on
6  behalf of Plaintiffs, a Glenn Ruston. Is that
7  correct?
8    A. Yes. That's correct.
9    Q. Do you know Glenn besides that
10  encounter with him?
11    A. Yes. I -- I won't say I know him but
12  we have crossed paths before.
13    Q. He had made a comment that he was under
14  the understanding that you had -- you had told
15  him that you had found hail -- hail markings to
16  the roof.
17        Is that -- is he correct in that
18  assessment?
19    A. We were standing -- yeah. He is
20  correct. We were standing, looking at them
21  together.
22    Q. I will stop sharing for a minute.
23        Have you seen the final report that
24  went out to the insurance company on your behalf
25  in this case?

Page 17

1    A. I have.
2    Q. That report, well, let's... first,
3  let's just talk about your inspection.
4        So, you were retained by One Unity
5  to investigate the -- sorry. You were retained
6  by AXIS Insurance to investigate the property.
7  Correct?
8    A. At Straight Line, yes.
9    Q. How do you usually get that assignment?
10    A. Straight Line usually calls to see if
11  you are interested in the claim, first. And
12  then, if so, they send it to you. I believe
13  they come in to do an analysis.
14    Q. So, you accept the assignment. Then,
15  at that point, they would send you claim terms
16  and such?
17    A. You get a notification that there is an
18  assignment for you in Xactimate, and you go into
19  Xactimate and download it.
20        Once you have it downloaded, you
21  will have access to whatever documents were
22  uploaded for you to review. A lot of times,
23  that's going to be your policy or your dec page
24  for claims if there is any.
25        From there, I just proceed with the

5 (Pages 14 - 17)

1  inspection.
2      Q. Okay. Did you investigate weather, or
3  did someone else provide with you weather data
4  information?
5      A. I believe I did. I don't recall. I
6  don't recall for sure, but... I believe I did.
7  I don't know if that's what made the report, but
8  I did research.
9      Q. I'm going to now show you what I will
10 mark as Exhibit -- we will mark as Exhibit 2 to
11 your deposition. It shows Straight Line. It's
12 on a document entitled, "First Report." It's
13 Bates stamped 187 to 191.
14      Take a look at that. And tell me
15 kind of when I can continue scrolling down.
16      A. Yeah. Go ahead.
17      Q. Okay.
18      A. It's good. You can scroll.
19      Okay. Okay. Got it.
20      Q. First off, is that your signature on
21 the report?
22      A. It is.
23      Q. Is it your e-signature or you actually
24 signed that?
25      A. It's an e-signature when I sent out the

*Page 18*

1      Q. I don't think I sent it to you.
2      A. Somebody did.
3      Q. I don't think I sent it to you.
4      All right. That's something I
5  don't remember sending to you.
6      You have seen this recently, this
7  report?
8      A. Yes.
9      Q. All right. Can you tell me what parts
10 of the reports were changed?
11      A. Sure. I think we are good through the
12 risk caption, the caption. I think we start to
13 see the changes happen around the circumstances
14 of loss.
15      Q. I'm trying to follow through it.
16      A. The paragraph above the photo or the
17 photo for that matter. Those things, both. I
18 actually did not write the explanations of the
19 report.
20      Q. Under this Adjustment section?
21      A. Correct.
22      Q. What did you write?
23      A. On the roof portion, I believe, I wrote
24 the first two sentences.
25      Q. Do you know who wrote the other parts

*Page 20*

1  report, it goes up as a Word document. So, they
2  are able to receive it. But that is my
3  signature, yes.
4      Q. For the e-mail address, still a working
5  e-mail for you?
6      A. Yes.
7      Q. Now, this report, was this the report
8  you submitted, or is this a report that had been
9  changed?
10      A. This is the report that's been changed.
11      Q. Date of inspection of 11-28 of '22.
12      Does that seem correct?
13      A. It does.
14      Q. As we sit here today just in general,
15 were you able to review any documents prior to
16 your deposition today?
17      A. No.
18      Q. Sometimes with people who no longer
19 work with a company, they aren't given access to
20 documents before the deposition. So, you
21 haven't reviewed anything regarding this claim
22 in two years, then. Correct?
23      A. I have not. Correct. Although, I did
24 see the report at some point. Maybe you sent it
25 to me. I got it somehow.

*Page 19*

1  of it?
2      A. No idea.
3      Q. Were you given the report in this
4  format to review before your signature was
5  affixed to it?
6      MR. ULMER: Objection. Form.
7      THE WITNESS: Never saw any of
8  that stuff after I sent out my report, my
9  initial report.
10 BY MR. SIMON:
11      Q. Do you know where your initial report
12 is?
13      MR. ULMER: Objection. Form.
14 BY MR. SIMON:
15      Q. Do you know where your initial report
16 is, now?
17      A. No idea.
18      Q. Who took it over?
19      A. When I quit, it was in the beginning
20 stages, so I didn't keep it. I moved on from
21 it.
22      Q. Do you know if Straight Line Global,
23 kept a copy of that report?
24      A. I'm not sure if they have it. I would
25 hope so.

*Page 21*

6 (Pages 18 - 21)

1    Q. So, how was your report different in
2 this adjustment section as best you can
3 remember two years later, how was your report
4 different?
5    A. Most importantly, I didn't make any
6 decisions here. I was being contracted to as an
7 expert to determine the severity and whether the
8 hail has caused functional damage. So, I
9 wouldn't have written any stuff about hail
10 issues, did not observe hail bruising.
11        None of that was reflected, nor
12 about the cause of loss at the opening. That
13 was the reason I wanted an expert to determine
14 this, the significance of the hail as well as
15 what caused the interior damage.
16        So, I wouldn't have written to
17 make these decisions. It was like whoever wrote
18 this did because I wasn't doing that. He didn't
19 make -- there is an opinion, "This
20 policy carries the Limitations on Coverage for
21 Roof Surfacing Endorsement, which excludes
22 coverage for the damage pointed out by the
23 Public Adjuster, as it is only superficial
24 damage."
25    Q. Did you feel that the damages you

Page 22

1 roof from a covered cause of loss, to cause any
2 opening."
3        Was that your finding?
4    A. No.
5    Q. It talks about the interior.  "We
6 inspected the interior of the bank and observed
7 minor water damage to the ceilings in the
8 office."
9        "In addition, we observed water
10 staining on the carpet in the vacant and rear
11 offices."
12        "Per the tenant, the water damaged
13 carpet results from ground water from the
14 parking lot. The stains on the ceiling are
15 roof-related, leaks from wind-driven rain."
16        Was that your finding?
17    A. No.
18    Q. Did you recommend -- in terms of
19 recommending the expert inspect the interior to
20 determine the origin, did you suggest maybe an
21 engineer go out and look at the property?
22    A. I did. But in this case, whoever wrote
23 this makes the coverage decision and says we
24 need an engineer.
25    Q. Why would you bring in an engineer to

Page 24

1 observed were only superficial damage?
2    A. No. And I wouldn't have written a
3 horrible sentence like that either. But no, I
4 didn't.
5    Q. And were these damages only pointed out
6 by the public adjustor? Or were they also
7 observed by you, too?
8    A. By me, too. He would assess some
9 stuff, but I walked around the roof and
10 evaluated on my own. We did it together. And
11 if I didn't think it was legitimate, I would
12 take a picture of it. There was the presence of
13 legitimate impacts on the roof.
14    Q. The sentence that says, "This would
15 place the damages as cosmetic damages which
16 would not be allowed as it still exists as a
17 barrier to the elements."
18        Did you write that?
19    A. No.
20    Q. Was that your finding?
21    A. No.
22    Q. Bruising to the roof. Is that your
23 finding?
24    A. No.
25    Q. "We did not observe any damage to the

Page 23

1 determine it wasn't related?
2    A. It doesn't make any sense.
3    Q. That's what's kind of confusing. Look
4 at the top paragraph of this last page of '191.
5 Was that something that you wrote?
6    A. Absolutely not. Recommendations and
7 determinations are premature at this point.
8    Q. Well, or conversely, it seems to
9 indicate that someone else has there, reached a
10 determination before the engineer has even gone
11 out there of what the result is going to be?
12        MR. ULMER: Objection. Form.
13        THE WITNESS: The words that were
14 given to me from Straight Line Global was just:
15 Write it as a denial to get it off of your
16 desk.
17 BY MR. SIMON:
18    Q. And you didn't feel that was
19 appropriate?
20    A. It's not ethical. I won't do it for
21 anybody.
22    Q. Okay. Did you only inspect the
23 property once?
24    A. Yes.
25    Q. In terms of this writing as a denial,

Page 25

7 (Pages 22 - 25)

1 it seems like it was written as a denial. But
2 you are saying you didn't write that part? You
3 left it in the original format, and they changed
4 it?
5     A. I didn't make any coverage
6 recommendation of it. It was given to an expert
7 to make loss determinations. I wouldn't have
8 recommended an expert and told them what's
9 covered and what's not because: Why would I get
10 an expert if I was going to do that?
11     Q. Did you do any attempts at making
12 changes to the report or just said: I'm not
13 going to do any change. Here is my original
14 report. I'm not changing anything?
15     A. It was a little bit of a hoopla between
16 the folks at Straight Line. I don't remember.
17 I may have changed some verbiage, but I didn't
18 change anything substantial.
19         And then, when they come and get
20 the denial to get it off your desk, I just
21 refused to do anything else.
22     Q. Well, did they tell you your job
23 depended upon it or anything like that?
24     A. It's only -- it wasn't a big deal to
25 just do it. And I said, "No. You are welcome

Page 26

1 to do the taking it off. I won't do it."
2     Q. That was the last time you ever worked
3 for them?
4     A. Last time I ever worked for them. Hung
5 up the phone call and haven't talked to anybody
6 up there since.
7     Q. I'm going to show you that document.
8 I'm not going to mark it as an exhibit, but this
9 is a Motion for Summary Judgment filed by the
10 Defendant in this matter.
11         One of the things for the Motion
12 for Summary Judgment -- I'm just scrolling
13 down here. Appears to be that same that's
14 got different Bates stamp numbers. I believe
15 it's the exact same report that we just went
16 over what you wrote. And it's this Exhibit
17 A-2.
18         I can let you scroll, but it's the
19 same -- this will be a little bigger now.
20     A. Then I didn't write it.
21     Q. Okay. So then, if they say that this
22 is your report, that's inaccurate. Is that
23 correct?
24     A. Absolutely inaccurate. Yes, sir.
25     Q. It does not represent your findings on

Page 27

1 that, your inspection. Is that correct?
2     A. No. It does not represent them at
3 all.
4     Q. It's always tricky to scroll through a
5 bunch of exhibits in these depositions. I have
6 something I'm going to show you from photographs
7 from your inspection.
8     A. Okay.
9     Q. Is it large enough where you can see
10 it? Need to make it --
11     A. You are good.
12     Q. That's the other thing, I can never
13 tell how big -- I can see is it on my screen,
14 but I don't know what everyone else has to look
15 at.
16         There is a bunch of photographs.
17 These were attached to your report, done on
18 11-28-22 by Brandon Allen.
19     A. Yes.
20     Q. Do you see that?
21     A. That's my car on the top photo on the
22 left. That's me.
23     Q. Okay. First off, it looks like there
24 is about 100 or so pages from the same date,
25 culminated with public adjustor's card.

Page 28

1         So these, quickly, do these seem to
2 be your photos?
3     A. They do. They have the date stamp
4 that I use, and those appear to be the ones I
5 took.
6     Q. A question I have about this: It looks
7 like, next to the photos, there is like a little
8 overview; or, you know, are these things that
9 you put in there?
10     A. I haven't reviewed the whole photo
11 report, but those would come on their side as
12 well. So, maybe.
13     Q. Okay. That's what I want to ask. I
14 see certain things like "hailing damage, AC
15 vent"?
16     A. Yes.
17     Q. Was that accurate of what you found?
18     A. Yes.
19     Q. "Small dings on vents."
20         Would that have been the way you
21 would have characterized it?
22     A. Probably.
23     Q. "Hail damage to AC unit"?
24     A. Yeah.
25     Q. And that is accurate to what you would

Page 29

8 (Pages 26 - 29)

1  have described?
2      A. It appears so, yeah.
3      Q. There are a bunch of marks that say
4  "hail marks." Seems to be a little bit
5  different than the way you described it
6  earlier.
7          Were these, for example, on these
8  circles in 36 and 37, are those -- did you write
9  the hail mark circle by PA?
10     A. I don't remember.
11     Q. Would you have distinguished in your
12 photos what was circled by the PA versus by
13 you?
14     A. Certainly would have if I didn't agree
15 with him. I wouldn't have circled that area. I
16 wouldn't have called it "hail."
17     Q. Is it your contention that these show
18 hail or that these are not evidence of hail?
19     A. No. I think those -- that's a great
20 representation of a hail bruise on the roof.
21 Absolutely.
22     Q. Is that typical of what you saw across
23 the roof as hail?
24     A. It is.
25     Q. Did you do these hail damage/no hail

*Page 30*

1  damage identified notes? Are those yours?
2      A. I never used that phrase in my life.
3      Q. Would you have called these "overview
4  shots" or something different or not?
5      A. I would call them something different.
6  I think you're too far away to tell if there is
7  hail damage or not there. I never would have
8  said that on an overview like that. Those
9  were -- for example, those were photos 43 and
10 44.
11     Q. And same thing in 45, 46, 47?
12     A. Yes.
13     Q. 48?
14     A. Yes.
15     Q. 50 and 51, you say, "Marked as hail by
16 PA." Is that your characterization?
17     A. No.
18     Q. Do you know who would have adjusted it
19 or changed that characterization?
20     A. Somebody at Straight Line had to.
21     Q. It's the same markings as 52, 53, 54.
22 Correct?
23     A. Yes, sir.
24     Q. Within your --
25         MR. ULMER: Objection. Form.

*Page 31*

1  BY MR. SIMON:
2      Q. Those were hail marks?
3      A. Yes.
4      Q. It says "minor hail damage." Were
5  those your characterizations or were those
6  changed, as well?
7      A. I'm not sure. It was accurate,
8  though.
9      Q. These marks by PA seem to suggest that
10 he thought those were marked and you thought
11 that they were not hail indicative. Do you have
12 an opinion on that?
13     A. Not what I said.
14     Q. Those are changes?
15     A. Yes. I do think they are hail
16 indicative. I am curious why they would think
17 the PA did it and didn't circle these. I don't
18 know why they would do that. Something is off
19 there.
20     Q. Same if there was damage they would
21 have noted? Were those your comment areas on
22 there?
23     A. I'm not sure all of that is verbiage I
24 use. Looking at these photos, I don't think
25 they are accurate, though. I don't believe I

*Page 32*

1  put that on there. I see too many anomalies to
2  say "no claim damage here." When I am engaging
3  an expert to make this determination, I wouldn't
4  have put that.
5      Q. It looks as, perhaps, some chalking
6  that was done, "no hail damage to wall coping."
7  Was that your comments there?
8      A. No. I can see dents in 116.
9      Q. Okay. That's on 115 and 116?
10     A. Yes.
11     Q. Those statements? Do you believe that
12 was changed from your opinions?
13     A. Yes.
14     Q. On 120, did you write the "functional
15 damage to coping" on there?
16     A. I don't remember. I think that's
17 unclear, as well.
18     Q. We are at 125 and 126. You don't see
19 those as being circled. Correct?
20     A. I don't.
21     Q. Do those look like hail marks, things
22 that you would have considered hail?
23     A. I would have considered it for sure.
24     Q. You weren't disagreeing with the PA's
25 assessment that that was his assessment.

*Page 33*

9 (Pages 30 - 33)

1 Correct?
2     A. I'm not disagreeing.
3     Q. 130, where it talks about the bitumen
4 roof. No claim related to the stucco roof.
5     A. I don't remember. It's something of
6 the roof, though. There we go. I don't think
7 so, no.
8     Q. You don't think that you wrote those
9 comments?
10     A. I don't. No.
11     Q. You do you remember if you found claim
12 related damage to the awning on the front?
13     A. I don't think I did.
14     Q. Do you remember if you found any
15 damages to the exterior of the property
16 besides --
17     A. I don't think there was a whole lot
18 there that was susceptible to hail so much.
19 Real stucco and metal, pretty good. I don't
20 see any window or anything we looked too closely
21 at, you know, for hail damage, down spouts, that
22 was it.
23     Q. Water damage on ceiling tile. Did you
24 observe those?
25     A. Yes.

Page 34

1     Q. Did you make a conclusion as to how it
2 entered the property or how it got in there?
3     A. I left it open. Requesting the --
4     Q. That's something you can do, but since
5 you -- is it something you couldn't do, or is it
6 something you can do but since you were
7 recommending an engineer, you said: I will wash
8 my hands of it?
9     A. If I can't identify where the actual
10 roof leak is, which is pretty difficult on a
11 flat roof with a steel deck like this, most of
12 the time, I'm going to get an expert to make
13 that determination.
14         If I can make the determination, I
15 have the evidence of where it's coming from.
16 Absolutely I can.
17         In a case like this, absolutely, I
18 would call an expert just about every time to
19 make that call.
20     Q. "Caused damage to carpet by
21 groundwater." Did someone tell you that?
22     A. They did. Outside of that room is
23 kind of a low spot in the parking lot where
24 water builds up. They say heavy rains would
25 come in.

Page 35

1     Q. Okay. So, that was something that was
2 agreed to by you?
3     A. Yes. I would agree with that, yes.
4     Q. But on -- they were like they are
5 actually your photos. It's not like someone
6 else took them. Is that correct?
7     A. I believe they are my photos. Although
8 the caption -- the captions have been changed,
9 but the photos themselves, are mine.
10     Q. I'm going to show you another document.
11 This is Defendant AXIS Surplus Insurance's
12 Response to Plaintiff's Interrogatories. Do you
13 see that?
14     A. No.
15     Q. No, you don't. You don't see anything
16 because I didn't share my screen.
17         Now, do you see it?
18     A. Yes.
19     Q. I would ask you to look at
20 Interrogatory Number 8.
21     A. Okay.
22     Q. And it says, "No, nothing has been
23 changed." You don't agree with that. Do you?
24     A. It's not true.
25         MR. ULMER: Object. Form.

Page 36

1 BY MR. SIMON:
2     Q. Now, when we look at the date of your
3 report, it looks like your report was dated
4 December 23rd of '24.
5         You saw that? I'm sorry.
6     A. I didn't see that. But I believe you.
7     Q. I'm going to put it back up here.
8         You now, see the report in front of
9 you?
10     A. I see it.
11     Q. Do you see that?
12     A. I do.
13     Q. It's about a month after your
14 inspection. Correct?
15     A. Yes.
16     Q. Now, typically speaking, when they --
17 when the insurance company would get your
18 report, this is the first communication they
19 would have of your opinions on the claim.
20 Correct?
21     A. Yes. Normally, yes.
22     Q. Okay. So, if you were recommending an
23 engineer, the first time they would have seen
24 that an engineer was needed in the way you would
25 have handled your claims, would have been the

Page 37

10 (Pages 34 - 37)

1  date that they received or reviewed this report?
2      A. Correct.
3      Q. And I'm going to show you some e-mails,
4  Bates stamped 280, which I'm going to mark as
5  Exhibit 3.
6          Can you read those?
7      A. I can.
8      Q. What's interesting to me was on Monday,
9  December 19th, 2022, four days before your
10  report came out, there was something from AXIS
11  that says, "Please retain an engineer to assist
12  with causation."
13         How would they know four days
14  before that to ask for an engineer?
15         MR. ULMER: Objection. Form.
16  BY MR. SIMON:
17     Q. You would have handled the claim and
18  they would know four days before they received
19  the report?
20         MR. ULMER: Objection. Form.
21         THE WITNESS: Yes.
22  BY MR. SIMON:
23     Q. I'll show you another document noted
24  as, "Defendant AXIS Surplus Insurance Company's
25  Initial Disclosures."

Page 38

1      A. No. No.
2      Q. No one attempted to enter into any
3  lawyer relationship with you regarding this
4  matter on this case?
5      A. I didn't even know who they were.
6      Q. Did you ever prepare an estimate or
7  anything like that for damages in this case?
8      A. No.
9      Q. I will put up another exhibit here.
10  This is Bates stamped -- I'm going to mark
11  this as Exhibit 4. It starts at Bates stamp
12  AXIS 000746. It goes on to Bates stamp '776.
13         It looks like the Claim Diary by
14  AXIS in this case, have you ever seen this
15  document?
16     A. No. I didn't have access to it.
17     Q. You know what a Claim Diary is? You
18  have heard of them?
19     A. I do, yes.
20         MR. ULMER: Objection. Form.
21  BY MR. SIMON:
22     Q. I would like to discuss certain -- I
23  would like to discuss certain issues.
24         It looks like running through it, it
25  kind of has the additional -- it looks like it

Page 40

1          Do you see that?
2      A. I can.
3      Q. It appears to be dated the 21st day of
4  November of 2023.
5          Do you see that?
6      A. I do.
7      Q. I see your name. Your name is on
8  Section B there.
9      A. I do.
10     Q. "Brandon Allen, an employee of Straight
11  Line Global, inspected the building on behalf of
12  AXIS."
13         Do you see that?
14     A. I do.
15     Q. It says, "Care of Shackelford, McKinley
16  & Norton." Did they represent you in this
17  matter?
18     A. Not that I'm aware of.
19     Q. Did they ever talk to you about
20  whether they were going to represent you in this
21  matter?
22     A. No.
23     Q. Did you ever direct them to accept
24  service for you or only be contacted through
25  them in this matter?

Page 39

1  was originally assigned to a guy named Michael
2  Hazlewood.
3          Do you know who he is?
4      A. I don't.
5      Q. That was around November 11th. But
6  then it looks like it was assigned to you on the
7  12th.
8          Maybe he rejected the claim or
9  something like that?
10     A. Yes. Likely.
11     Q. There was Moises Camacho.
12     A. Moises was around during that. He
13  didn't have any contact request motions during
14  this claim at all. He left the company. It
15  may have been in the middle of this. I don't
16  know.
17     Q. That seems to be correct, though,
18  around 11-12, you were assigned the claim?
19     A. Ballpark, sure.
20     Q. It looks like he set up an inspection
21  for 10-21.
22     A. Right.
23     Q. It was rescheduled for 11-27. Do you
24  see that?
25     A. Yes.

Page 41

11 (Pages 38 - 41)

1    Q. Does that seem correct to you?
2    A. It does.
3    Q. Did you have a -- was there a guideline
4 of your company for how long it should take for
5 a report to be done after an inspection
6 occurred?
7    A. Every carrier kind of had their own
8 guidelines. However, Straight Line Global
9 really wanted it within 24 to 48 hours.
10    Q. It looks like on 12-2, Emily Winstead.
11 Was she like an officer person?
12    Do you know who she is?
13    A. Yeah. She is their micro-manager.
14 As you can see, she starts to follow you from
15 the second you finish the inspection. That's
16 Straight Line and their cycle time issues.
17    Q. I guess, the first one kind of, how we
18 can assist you report? This kind of thing? To
19 assist you with your report. That type of
20 thing?
21    A. She asked me to -- usually with that,
22 but yeah.
23    Q. Looks like there was some communication
24 on the 2nd that says she will have the reporting
25 uploaded shortly. Correct? Do you see that?

Page 42

1 estimate prepared?
2    A. I did not write a estimate, which would
3 be what you're supposed to do if you don't have
4 a coverage termination yet.
5    Q. Okay. Says, "Pending IA's report" on
6 12-5 even -- do you know if your report came --
7 when your report came in?
8    A. I think 12-5 is when it came in.
9 That's when it says, "Estimate Received."
10    Q. Okay. "Review Accepted."
11    Next line down, it looks like
12 nine days later from 12-5 to 12-14. There is a
13 jump.
14    A. So, you send it. Xactimate Analysis,
15 which is the online system for Xactimate, it
16 shows us pending reviewing it.
17    So, basically it's like waiting for
18 somebody to review me and then he click "accept"
19 and you'd see the note come up.
20    Q. I guess, it's unusual to me and I'm
21 hoping you can help me answer that question.
22    This is from the AXIS Claim Diary;
23 but there is a lot of activities that are going
24 on, you know, with Straight Line Global.
25    So, how is AXIS able to see

Page 44

1    A. I don't have access to this system.
2 I'm not sure where it's coming from.
3    Q. I am showing you on the screen, so.
4    A. Yeah. I think that sounds right.
5    Q. It says, "Jason Lankford" and "Fatir
6 Muhammad."
7    Do you know who Jason Lankford and
8 Fatir Muhammad are?
9    A. I knew Jason. I don't think I worked
10 with Fatir Muhammad before this.
11    Q. The next thing I see on 12-5, it says,
12 "Estimate Received."
13    It looks like it was received on
14 12-4-22.
15    Do you see that?
16    A. So, what I think, this is from
17 Xactimate. It says, you know, Xactimate, and it
18 says that when you create a file.
19    So, in order for them to see my
20 report, I'm sending them -- they're not notified
21 unless they hit the "Complete" button in
22 Xactimate. And that's what the notes are going
23 to be, is Xactimate received, even though there
24 is a no estimate.
25    Q. So, it's not like there is some

Page 43

1 what's going on internally with Straight Line
2 Global?
3    MR. ULMER: Objection. Form.
4    THE WITNESS: So, a lot of times,
5 these systems will be tied in together. So, the
6 claims management system Straight Line uses will
7 be tied in to theirs.
8    However, it looks like most of the
9 communication from Straight Line has come
10 through Xactimate. So, if you look at the
11 time of the notes, it says, "Xactimate
12 Analysis." I believe that's what it's telling
13 you that's coming from Straight Line.
14    Q. I have never seen your original report,
15 but you would have uploaded your original report
16 to Xactimate Analysis. Right?
17    A. Right.
18    Q. If items are synced, AXIS would have
19 had the ability to have your original report in
20 the file?
21    A. Not necessarily. So, there are things
22 that Straight Line can do. They are going to
23 make it visible.
24    Yes, they can see the -- those are
25 shared but not necessarily the documents. In

Page 45

12 (Pages 42 - 45)

1  order for them to see the documents in Xactimate
2  Analysis, usually an IA firm has to approve them
3  first. There are some carriers I work with that
4  can see them either way.
5          However, the great majority of the
6  ones that I work with, it has to be approved
7  first. And they can see they are there. But
8  they can't get it, as well.
9      Q. And then, I see there on Note Number
10  51 -- we are on Page 756. There is an entry by
11  Fatir where he talks -- he was the one who
12  contacted Glenn. Not you?
13      A. Definitely not me.
14      Q. Do you know why it was him and not
15  you?
16      A. I'm guessing I quit somewhere around
17  the 5th. Somewhere earlier. And so, I'm
18  guessing I was already gone by this point.
19      Q. Well, I think you got a few more
20  entries, though. I'm not -- I know you haven't
21  seen this. That's why I'm trying to -- does
22  this mean anything to you in 50?
23      A. Once they hit the "approve" button,
24  then it becomes visible to the carrier.
25      Q. So, that was on 12-14 of '22?
Page 46

1      A. Yes.
2      Q. All right. Here is where I see some
3  issues come up: The issue that came up that's,
4  I guess, what got me to take your deposition
5  here today, is I start seeing these, this Number
6  54 and 55.
7          Take a second to look at that.
8      A. Got it.
9      Q. Okay. It looks like at least on 12-5,
10  there is an e-mail exchange between Jason and
11  you and Fatir.
12      A. Sir, I don't remember the date
13  everything went down but yeah, this is -- I
14  remember this e-mail.
15      Q. What were the -- is the Number 54
16  accurate about what he wanted you to change, or
17  is it kind of, you know, is there more he
18  wanted to you change than what was written
19  here?
20      A. No. It says he modified the report
21  right there in the first sentence.
22          I didn't touch the report.
23  Whatever change is there, he did it. And I,
24  basically, took this request and called
25  management to discuss it with them.
Page 47

1      Q. I am curious about the second part
2  where it says, "We should go ahead and add some
3  line items to address the direct hail damage
4  observed to the estimate. I've reached out to
5  the PA about the lease. He says he will send it
6  over, in the meantime:"
7          "1. Add the replacement of a rain cap
8  exhaust cover."
9          "2. Add comb condenser fins for 6
10  large A/C units."
11          Do you see that?
12      A. I do.
13      Q. Looks to me like, I guess the way I
14  read those is, there has to be an estimate
15  because those are kinds of things that get put
16  in an estimate, not a report?
17      A. Yeah. He's asking me to write the
18  estimate.
19      Q. So, he would request an estimate
20  written but none had been written?
21      A. He wanted this estimate including these
22  items which would have been, I don't know,
23  $9,000 below deductible. So, got us nowhere.
24          So, I would never write "comb
25  condenser fins for 6 large a/c units" unless I
Page 48

1  looked at the units.
2          So, I would not take the liberty
3  to write it that way. I would write it
4  correctly.
5      Q. "With all the covered damage estimated
6  we can send this to the carrier as complete, and
7  they can make a coverage determination to the
8  insured."
9          Does this look like your response
10  at Number 55?
11      A. Yes.
12      Q. So, that was your, I guess, stating
13  that you wanted some expert to look at it to
14  address the damages you found?
15      A. Yes.
16      Q. And here is -- the next line of 56,
17  there is a Managerial Note. Is that right?
18      A. Yes.
19      Q. And it says, "IA has recommend engineer
20  via report. Please review and respond to have
21  IA secure the engineer."
22          Do you see that?
23      A. I do.
24          MR. ULMER: Objection. Form.
25  BY MR. SIMON:
Page 49

13 (Pages 46 - 49)

Page 50

1    Q. 12-19 of '22?
2    A. I had already -- I remember getting
3 that message after I quit and smiling, "Look at
4 that. They are going to hire an engineer anyway
5 just like I knew they would."
6    Q. How were they be able to do that four
7 days of getting the date of your report?
8    A. Somebody talked to them. I didn't. I
9 knew something about what was going on. I had
10 no contact with AXIS at all.
11    Q. IA would be the internal company,
12 someone from AXIS. Right?
13    A. That would be me, company adjustor.
14    Q. That's you, "Recommended engineer via
15 report. Please review and respond."
16        I guess based on the date of the
17 report, there should have been no report at that
18 time. Correct?
19    A. Correct.
20    Q. Is it your understanding this is the
21 time when you --
22    A. I was already -- yeah, I got this
23 e-mail about hiring the engineer after I quit.
24    Q. They just hadn't taken you off of their
25 system yet?

Page 51

1    A. Well, it's connected to me through
2 Xactimate Analysis.
3    Q. Now, it appears there was an e-mail
4 sent on 12-20-22. This is Item Number 60 on
5 Bates '759.
6        Please take a second to read that.
7    A. I don't remember this e-mail.
8    Q. So, it looks like it went to your
9 personal e-mail anyway, so you would have
10 still gotten it even if you left them at that
11 time?
12    A. Right. Correct.
13    Q. And I guess, how do you feel about the
14 statements made by Jason Lankford in this
15 entry?
16    A. Well, he's trying to desk adjust this
17 claim. And not in good faith. I mean, he's
18 sitting there saying: Remove the recommendation
19 for expert engineer, which is very important to
20 this claim.
21        He stated that he thinks the PA
22 is going to hire one. I'm not sure where he
23 got that because I never got that from Glenn
24 Ruston.
25        In fact, I don't know major PAs who

Page 52

1 would not want to incur that expense when the
2 carrier is likely to hire an expert.
3        So, nothing he says here is
4 consistent with how normal commercial claims are
5 handled with cosmetic damage.
6        And he's admittedly had very little
7 experience with commercial work and that was one
8 of the reasons he said they assigned it to me
9 because I was experienced.
10        However, he didn't want to listen
11 to the recommendations and as far as, you know,
12 he had never been to the property or visited the
13 property.
14    A. Correct.
15    Q. And his findings from this desk
16 adjustment don't match what you observed at the
17 property itself. Is that correct?
18    A. Correct.
19    Q. And I'm -- it looks like the claim
20 was reassigned?
21    A. Yes.
22    Q. What does that mean, 61, to reassign?
23    A. That means it was taken out of my name
24 in Xactimate so they could revise it,
25 themselves.

Page 53

1    Q. If you went three days before the
2 technical date of the report, it had your name
3 signed on it?
4    A. Correct.
5    Q. I guess, we don't see a review by the
6 AXIS of the report until January 4th of 2023
7 which looks like they are just cutting and
8 pasting in the report we discussed?
9    A. Yes.
10    Q. And on this date, on the action plan,
11 they are saying draft denial for the roof.
12        Do you see that?
13    A. I do.
14    Q. And certainly, if there was no
15 engineering inspection, you didn't have the
16 information to deny the roof? Is that correct?
17 At that time?
18    A. Right.
19        MR. ULMER: Objection. Form.
20        THE WITNESS: Coming from a
21 recommendation from whoever changed my report.
22 BY MR. SIMON:
23    Q. Does it fall under cosmetic? Do you
24 think it was proper to have a denial if they
25 were hiring an engineer but the engineer hasn't

14 (Pages 50 - 53)

1 inspected yet?
2        MR. ULMER: Objection. Form.
3        THE WITNESS: Not properly. I want
4 the proper thing here as the carrier would have
5 been to issue the Reservation of Rights letter
6 and move on with the investigation.
7 BY MR. SIMON:
8    Q. And it looks like there is a, I guess,
9 we don't know if it was sent in error or not,
10 that asked about the retention of the engineer.
11 Correct?
12    A. It looks like a mistake to me, too.
13    Q. The next one says -- this has been
14 about a month after the first engineer on
15 January 20th. It looked like they are now
16 asking the IA to retain an engineer.
17        Do you see that?
18    A. Yes.
19    Q. Here is the interesting -- I want you
20 to read this response from Glenn Ruston at the
21 bottom of Page 768, please.
22    A. I don't blame them for being confused.
23 I would have been confused if I was looking,
24 too.
25        We were telling them it was all

Page 54

1 26th.
2    Q. Okay.
3    A. Yeah. Two months after the incident.
4    Q. All right. I would like to show you
5 another document here.
6        Besides the efforts we talked
7 about, did you have any other involvement with
8 this claim?
9    A. No.
10    Q. I'm going to show you a document title,
11 "Defendant AXIS Surplus Insurance Company's
12 First Supplemental Designation of Expert
13 Witnesses."
14        So, I'm going to mark this document
15 as Exhibit 5, please.
16        I want you to see where your name
17 is and kind of tell me when you want me to
18 scroll down. I want you to read about it.
19    A. Scroll. Okay.
20    Q. Okay. Do you feel comfortable to talk
21 about all of those areas upon which you have
22 been designated in this case?
23    A. I mean, I have a limited scope here.
24 So, I was the initial inspector who made a
25 recommendation that didn't go any further. A

Page 56

1 cosmetic and we discussed that it wasn't --
2 it wasn't, for sure, wasn't confirmed it was
3 all cosmetic damage. We needed somebody else
4 to look at it. I would have been confused as
5 well because this is not what we talked about.
6    Q. Is the -- if you inspected on November
7 28th, is there a reason why it should have taken
8 until January 20th to start retaining the
9 engineer?
10    A. No.
11    Q. Is that longer than it should take to
12 complete a claim investigation?
13        MR. ULMER: Objection. Form.
14        THE WITNESS: Absolutely.
15 Absolutely. Especially to move forward to make
16 a coverage determination.
17        You know, we haven't done it yet
18 and we are trying to hire an engineer to help us
19 with that and it's 50 something days left of the
20 inspection. It's crazy.
21 BY MR. SIMON:
22    Q. It looks like the status report
23 finally, comes out to, I guess, goes into
24 Xactimate were you're investigating?
25    A. It looks like the e-mail is from the

Page 55

1 lot of it, I can answer. But...
2    Q. In terms of this matter, they also
3 mention general things here that says, like,
4 for example, you can talk about the claims
5 process, claims handling, the extensive nature
6 of damages, the conditions of the property,
7 the insurance policy, the building design and
8 construction, the finishing building systems.
9        You can talk about damages
10 attributable to hail versus not attributable to
11 hail, what's pre-existing causation issues.
12    A. Yeah.
13    Q. Do you feel comfortable to talk about
14 all of that?
15    A. I do.
16    Q. You are qualified to talk about pricing
17 of repairs and replacements? And the process to
18 make repairs?
19    A. Definitely. I think I am qualified for
20 pricing the process or similar repairs, I'm not
21 the repair guy.
22    Q. I know you did not prepare a --
23    A. I didn't.
24    Q. Says you may testify as to Plaintiff's
25 failure to mitigate damages.

Page 57

15 (Pages 54 - 57)

Page 58

```
 1        Did you find that?
 2     A. No.
 3     Q. Did you find any lack of improper
 4  replacement, repairs done?
 5     A. No.
 6     Q. Did you find any occurrence of any
 7  unrelated or unreasonable costs and expenses for
 8  remediation and other repairs?
 9     A. No.
10     Q. It says, "Mr. Allen may further
11  testify regarding the duties in the event of a
12  loss under the AXIS Policy, including prompt
13  notice."
14        Did you review that?
15     A. No.
16     Q. "No protection/preservation and
17  cooperation."
18        Do you see that?
19     A. I do.
20     Q. It says, "Mr. Allen may also testify
21  in response to any opinions, testimony, or
22  evidence offered by Plaintiff or any of its
23  expert witnesses concerning any of the above or
24  related areas, as well as the opinions,
25  statements and conclusions set forth in
```

Page 59

```
 1  Plaintiff's experts' reports."
 2        Have you ever seen our expert
 3  report?
 4     A. I have not.
 5     Q. "He may also offer expert opinions in
 6  response to any rebuttal reports or deposition
 7  testimony of Plaintiff's expert witnesses, as
 8  well as any additional documents that are
 9  produced or provided to him."
10        Do you see all of that?
11     A. I do.
12     Q. They didn't know go over this with you
13  before they designated you in terms of what you
14  were going to be designated on?
15     A. No.
16     Q. Do you see it?
17     A. Yes.
18     Q. You used Xactimate as estimating
19  software?
20     A. Yes.
21     Q. To make payments?
22     A. Yes.
23     Q. Still industry standard?
24     A. It is.
25     Q. Now, I'm going to show you another
```

Page 60

```
 1  document, I guess you haven't seen it before.
 2        This is what we will represent to
 3  you is the expert report in this matter prepared
 4  by our expert, Dave Wilson.
 5     A. Okay.
 6     Q. Does this look like he used the exact
 7  same Xactimate software that you would have used
 8  to do the pricing?
 9     A. Yes.
10     Q. And I'm not going to nitpick line
11  items, but I kind of want you to look through
12  it. You know, if you need to look at
13  specifics, I just want you to kind of generally
14  see what I'm going to show you, in general. And
15  then, we can kind of go back if you need me to
16  show you anything. Okay?
17     A. Okay.
18     Q. So, an estimate prepared by Mr. Wilson
19  in this case, for various work done. I guess,
20  would your estimate have looked like this?
21     A. It's normal.
22     Q. Haven't plugged it all in. But for
23  replacing a roof, air conditioner work,
24  insulation, and whatever general items, if you
25  remember, have you prepared an estimate for
```

Page 61

```
 1  those things? Knowing that you didn't come
 2  up with that conclusion, would the $346,000
 3  number seem like kind of what you would expect
 4  to see for a building of this size for work?
 5     A. It is. And just a quick review of the
 6  line items, I don't see anything that sticks out
 7  to me as incorrect or crazy.
 8     Q. Crazy?
 9     A. Crazy. Exactly.
10     Q. But you haven't studied it either?
11     A. I haven't.
12     Q. But your -- if you would have
13  prepared an estimate, you would be using the
14  same database? You just may have -- your scope
15  of work would have been different, but you
16  would have used the same pricing data
17  operation?
18     A. Yes.
19     Q. Depending on the month you prepared the
20  estimate?
21     A. Correct.
22     Q. And when, you prepare an estimate and
23  would have done it for Straight Line Global,
24  would you go back to the data from loss, or
25  would your instructions be to kind of use the
```

16 (Pages 58 - 61)

Page 62

1  database at the time you were presenting the
2  work?
3      A. I used the database, the database at
4  the time I prepared the estimate.
5      Q. Because if you did it back to the time
6  of loss, it wouldn't really help them make
7  repairs at the current time?
8      A. No.
9          MR. ULMER: Objection. Form.
10         THE WITNESS: It's not accurate.
11 For instance, also the last couple of years we
12 get intel every month and we expect the prices
13 to be different.
14 BY MR. SIMON:
15     Q. That's industry standard?
16     A. Yes.
17     Q. And I would like to talk with you a
18 little bit about your background. Tell me about
19 your background in adjusting.
20     A. I started with Crawford Company around
21 2002, came into their catastrophe adjustor
22 training program.
23         They took us to their home office
24 at the time, in Atlanta, for a week training,
25 which the first week was policy and

Page 63

1  understanding policy, things like that.
2          Second week was Xactimate policy.
3          Then they put me into a branch in
4  Memphis, Tennessee, for a year to learn in the
5  field, which I did.
6          And then after that, I started
7  working storms, hurricanes. Hurricane Isabel
8  was my first one. And that was the last
9  hurricane ever for Crawford Company.
10         I went 1099 with other companies
11 after that.
12         Also, spent some time in Florida as
13 an adjustor for Citizens, for their managed
14 claims model program, which means you acted as
15 the field and desk adjustor for about three
16 years.
17         And I moved back to Texas.
18         Been doing a mixture of mainly data
19 work with some catastrophe work in the area as
20 well, continually working as an adjustor since I
21 got into the business.
22     Q. As a catastrophe adjustor or claims
23 like this, hail, winds, those things, that's
24 your typical claim?
25     A. During my time with Vericlaim, which is

Page 64

1  a company that is about 90 percent commercial
2  quality adjusting. And that was during
3  Hurricane Harvey, so I got to deal with a lot of
4  stuff.
5      Q. How many roofs like the one in this
6  case, have you inspected for wind and hail
7  damages?
8      A. Thousands. Bitumen roofs are super
9  common.
10     Q. In the commercial section?
11     A. Yes.
12     Q. And is it something you feel
13 comfortable being able to identify, hail damage
14 to these roofs?
15     A. Assessment.
16     Q. I gather for this you aren't
17 particularly -- well, you mentioned, you
18 observed damage on the roof in this case.
19 Correct?
20     A. Correct.
21     Q. Well, did -- I take it your opinion is
22 in terms of how the claim was handled, that you
23 don't feel it was handled well --
24         MR. ULMER: Form.
25 BY MR. SIMON:

Page 65

1      Q. -- regarding how the claim was
2  handled?
3          MR. ULMER: Objection. Form.
4          THE WITNESS: How the claim was
5  handled?
6  BY MR. SIMON:
7      Q. Was it typically, people would have you
8  revise your reports to this nature?
9      A. Not to this nature. Usually, if you
10 have revisions, it's going to be line items,
11 carrier guidelines, things that they want to see
12 differently. Not things they want to change
13 completely like this.
14     Q. Are there any other companies where you
15 ever left for these reasons?
16     A. Yes.
17     Q. And you haven't worked with them since
18 this claim?
19     A. I have not.
20     Q. How long had you worked with them
21 before this claim?
22     A. They were never one of my major
23 income producers but they needed somebody in the
24 area.
25     Q. Thank you for your time, Mr. Allen.

17 (Pages 62 - 65)

1          MR. SIMON: No further questions.
2              EXAMINATION
3  BY MR. ULMER:
4      Q. I understand you believe your report
5  was done and your opinions are as outlined by
6  counsel?
7      A. I don't believe I have...
8      Q. Let me show you something.
9          Can you are see the report for
10 Straight Line?
11     A. Yes.
12     Q. Can you see the report from Straight
13 Line?
14     A. I can see it.
15     Q. Okay. Now, even though you didn't
16 determine cause -- Am I right?
17     A. Correct.
18     Q. That's also in the final paragraph of
19 your report. Correct?
20     A. To some extent, it is. However, it's
21 not for the same reasons.
22     Q. The biggest part of this claim, that
23 part --
24     A. I'm not an expert.
25     Q. Right. The final version of the report

Page 66

1  recommends and determines the cause of loss.
2      A. Yes.
3          THE COURT REPORTER: Could we go
4  off the record for just a moment?
5          (Conversation held off the record.)
6  BY MR. ULMER:
7      Q. My last question was: The final
8  version of the report recommends and determines
9  the cause of loss.
10         Your answer was "yes." Is that
11 correct?
12         MR. SIMON: Objection. Leading,
13 form.
14         THE WITNESS: No. My answer was:
15 Yes, it's in there.
16         However, they have already made a
17 determination of coverage for the last loss. We
18 are working on denying that and bringing the
19 expert in later, which is not the way things are
20 done.
21 BY MR. ULMER:
22     Q. I don't see a coverage determination
23 here. Anything about the coverage denied?
24         MR. SIMON: Objection. Form.
25         THE WITNESS: Literally says it in

Page 67

1  the first sentence of the paragraph, clearly.
2  BY MR. ULMER:
3      Q. The coverage determination?
4          MR. SIMON: Objection. Form.
5          THE WITNESS: Wear and tear and
6  determination of the roof.
7  BY MR. ULMER:
8      Q. Of course, he is telling you that, but
9  not that we recommend. Right?
10     A. Wasn't me.
11         MR. SIMON: Objection. Leading.
12 BY MR. ULMER:
13     Q. Is all you do as an independent
14 adjustor?
15     A. As an independent adjustor.
16     Q. All right. An expert is employed.
17 Correct?
18         MR. SIMON: Object. Form, leading.
19         THE WITNESS: It does say that, but
20 it's too late.  He has made the coverage
21 determination.
22 BY MR. ULMER:
23     Q. All right. You says he recommended?
24     A. I'm not denying that.
25     Q. That's the same recommendation you had

Page 68

1  in your initial report. Isn't that correct?
2          MR. SIMON: Object. Form, leading.
3          THE WITNESS: I didn't tell him it
4  wasn't covered first. We need to wait for the
5  recommendations to determine coverage.
6          So, no. It's not at all the same
7  thing I'm asking for.
8  BY MR. ULMER:
9      Q. Okay. That's not what I asked you.
10         Can you do me a favor? Let your
11 counsel object first, and then answer.
12         I am only asking you: We already
13 established this report recommends the hiring of
14 an expert to determine coverage. Right?
15         MR. SIMON: Objection. Form,
16 leading.
17         THE WITNESS: Please ask me the
18 question.
19 BY MR. ULMER:
20     Q. You already established this report
21 recommends hiring an expert. Right?
22         MR. SIMON: Objection. Form,
23 leading.
24         THE WITNESS: I answered that about
25 four times.

Page 69

18 (Pages 66 - 69)

1  BY MR. ULMER:
2      Q. I'm only asking you this one question:
3  Your initial draft recommends the hiring of an
4  expert. Right?
5          MR. SIMON: Object. Form, leading.
6          THE WITNESS: Yes.
7  BY MR. ULMER:
8      Q. Okay. And are you aware that EFI was
9  hired as an expert. Right?
10     A. Apparently so.
11     Q. All right. And after an engineer
12 inspected this property, he found there was no
13 hail damage. Do you see that?
14     A. I see it.
15         MR. SIMON: Objection. Form,
16 leading.
17 BY MR. ULMER:
18     Q. You are not an engineer. Right?
19     A. I'm not an engineer.
20     Q. All right. So, you have no reason
21 why -- no reason to believe this is incorrect.
22 Correct?
23         MR. SIMON: Objection. Form,
24 leading.
25         THE WITNESS: No. I don't have any

Page 70

1  reason to believe it's incorrect.
2  BY MR. ULMER:
3      Q. Why --
4      A. That's not complete, though I find it
5  laughable they did not observe any hail damage
6  to the roof because they did. My assignment
7  would have been completely different.
8      Q. I'm not asking if there is hail on the
9  roof, because I see it myself but what I'm
10 asking is:  Is the hail functional? And did you
11 call it interior damage?
12     A. So, the fact he said he did not observe
13 damage on the roof, I find that laughable. He
14 sees it.  We have visible hail damage on the
15 roof, and he is saying he did not observe any?
16         Yeah, I got to question him there.
17 Absolutely.
18     Q. But -- of that --
19         MR. SIMON: Objection. Form,
20 leading.
21 BY MR. ULMER:
22     Q. Did you go to engineering school?
23         MR. SIMON: Objection. Form,
24 leading.
25         MR. ULMER: How is that leading?

Page 71

1  BY MR. ULMER:
2      Q. Did you go to engineering school?
3          MR. SIMON: That's why it's
4  leading. I think it's a yes-or-no question. He
5  is your witness not mine. You can't ask him a
6  leading question. Every question you have asked
7  is bad. You couldn't ask these at trial.
8  BY MR. ULMER:
9      Q. Did you go to engineering school?
10     A. I did not.
11         MR. SIMON: Objection. Form,
12 leading.
13 BY MR. ULMER:
14     Q. Do you have any engineering training?
15     A. Yes.
16     Q. And are you certified?
17     A. Certified training through Haag
18 Engineering for commercial roofs just like this
19 one.
20     Q. Okay. But how are you trained as an
21 engineer?
22     A. What's that?
23     Q. How are you trained in engineering if
24 you are not an engineer?
25     A. Trained for hail damage. I'm not an

Page 72

1  engineer nor am I claiming to be, however, I
2  have been trained for this.
3      Q. That's not what I asked you. I didn't
4  ask you: Did you ever receive training?
5          Have you received engineering
6  training?
7          MR. SIMON: Objection. Form.
8          THE WITNESS: I guess I don't
9  understand the question.
10 BY MR. ULMER:
11     Q. Okay.
12     A. I have already said I'm not an
13 engineer. Nor am I claiming to be.
14     Q. Okay. Thank you.
15         Earlier, you testified regarding
16 date of loss pricing versus pricing at the time
17 of the inspection.
18         Do you recall that?
19     A. You were cutting out at the beginning
20 of the question. Can you repeat for me?
21     Q. You talked about, earlier, date of loss
22 pricing versus pricing at the time of the
23 inspection?
24     A. Yes.
25     Q. And I believe your opinion was?

Page 73

19 (Pages 70 - 73)

Page 74

1    A. It is what I normally use.
2    Q. Are you aware that policies require
3  certain things?
4    A. Some policies require the date of loss.
5  Unless there is something you want me to look
6  at.
7    Q. How would you acquire date of loss
8  pricing? Would you be limited to that?
9        MR. SIMON: Objection. Form.
10  Calls for a legal conclusion.
11        THE WITNESS: I feel like if this
12  had been a claim that was handled and paid in a
13  reasonable time. But here we are years later
14  and the 2022 price is absolutely ludicrous.
15  BY MR. ULMER:
16    Q. And regarding the Xactimate estimate,
17  isn't it true that it is based on what you put
18  into Xactimate?
19    A. Yes.
20    Q. Okay. And you also select an option
21  such as "date of loss" or "date of pricing" on
22  there as well. Right?
23        MR. SIMON: Objection. Form.
24        THE WITNESS: No. You can't select
25  a pricing on a database. That's not how it

Page 75

1  works.
2        If you make any changes to
3  Xactimate pricing, I was going to ask for that
4  line item. You are going to know it.
5        If I ever do that as an adjustor,
6  I always put an estimate note of why I did it.
7        If you -- if you use pricing other
8  than Xactimate, that's pretty industry standard
9  to explain why you did it.
10  BY MR. ULMER:
11    Q. That's not what I asked.
12        I asked you: Is there an option in
13  Xactimate to select date of loss pricing?
14    A. No. I can download. Okay. I can
15  download whatever price list I want. I can
16  tell it to download the March of '22 price list
17  or the most recent. I can't tell the date of
18  loss. I know it does that, but I can go and
19  download that.
20    Q. Which kind of proves my point that you
21  can change the pricing based upon the date.
22  Right?
23    A. You can change the pricing.
24  Absolutely.
25    Q. You had questions about being an

Page 76

1  expert. You understand you are not retained as
2  an expert by AXIS. Right?
3    A. I do.
4        MR. ULMER: I pass the witness.
5        MR. SIMON: No further questions at
6  this time.
7        THE COURT REPORTER: Do you all
8  want to discuss signature of the witness?
9        MR. ULMER: I guess he can read and
10  sign. You can send it directly to him.
11        So, Brandon, do you have an address
12  where you want her to send a copy of the
13  transcript to?
14        THE WITNESS: Can she e-mail it?
15        Yes. I will put my e-mail in the
16  Chat box.
17        MR. ULMER: Ms. Kelly, I would like
18  a copy of the transcript, also. And my e-mail
19  is in the Chat box.
20        (Deposition concluded at 4:43 p.m.)
21
22
23
24
25

Page 77

1        CHANGES AND SIGNATURE
2    TO THE REMOTE ORAL DEPOSITION OF
3        BRANDON BENJAMIN ALLEN
4        February 7, 2025
5  Page  Line  Change        Reason
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

20 (Pages 74 - 77)

**Page 78**

1    I, BRANDON BENJAMIN ALLEN, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4  _____
5           (Signature of witness)
6  STATE OF _____
7  COUNTY OF _____
8  Before me _____ on this day
9  personally appeared BRANDON BENJAMIN ALLEN, known to
10  me (proved to me under oath or through
11  _____) (description of identity card
12  or other document) to be the person whose name is
13  subscribed to the foregoing instrument and
14  acknowledged to me that he executed the same for the
15  purposes and consideration therein expressed.
16     (Seal)   Given under my hand and seal of office
17  this _____ day of _____, 2025.
18
19
20
21  _____
22           Notary Public in and for
23  _____ the State of _____
24
25

**Page 79**

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
2            HOUSTON DIVISION
3  ONE UNITY INVESTMENT, §
   L.L.C.,            §
4                     §
     Plaintiff,       §
5                     §
     v.               §CIVIL ACTION NO. 4:23-cv-02455
6                     §
   AXIS SURPLUS INSURANCE §
7  COMPANY,           §
                      §
8     Defendant.      §
9
      DEPOSITION OF BRANDON BENJAMIN ALLEN
10           February 7, 2025
11    I, Suzanne Kelly, RDR, CRR, in and for the State
   of Texas hereby certify to the following:
12
      That the witness, BRANDON BENJAMIN ALLEN, was
13  duly sworn by the officer and that the transcript of
   the videotaped oral deposition is a true record of the
14  testimony given by the witness;
15     That the deposition transcript was submitted on
   the _____ day of _____, 2025, to the witness for
16  examination, signature and return to Suzanne Kelly by
   the _____ day of _____, 2025;
17
      That the amount of time used by each party at the
18  deposition is as follows:
19     Mr. Simon: One hour and 28 minutes used;
       Mr. Ulmer: Twelve minutes used;
20
      That pursuant to the information given to the
21  deposition officer at the time said testimony was
   taken, the following includes counsel for all parties
22  of record:
23
24
25

**Page 80**

1  Jay Simon, Esq.
   CHAD T. WILSON LAW FIRM, P.L.L.C.
2  455 East Medical Center Boulevard
   Suite 555
3  Webster, Texas 77598
   713.222.6000
4  jsimon@cjwilsonlaw.com
   Artis G. Ulmer, III, Esq.
5  SHACKELFORD, MCKINLEY & NORTON, L.L.P.
   717 Texas Avenue
6  27th Floor
   Houston, Texas 77002
7  832.415.1801
   aulmer@shackelford.law
8
9    I further certify that I am neither counsel for,
   related to, nor employed by any of the parties or
10  attorneys in the action in which this proceeding was
   taken, and further that I'm not financially or
11  otherwise interested in the outcome of the action.
12    In witness whereof, I have this date subscribed my
   name on this 10th day of February, 2025.
13
14
15
       Suzanne Kelly, CSR
16     Registered Diplomate Reporter
       Certificate Number: 1260
17     Expiration Date: 11/30/2025
       Registered Diplomate Reporter
18     Certified Realtime Reporter
       Realtime Systems Analyst
19     Certificate of Merit Reporter
       Certified Livenote Reporter
20     VERITEXT LEGAL SOLUTIONS
       Firm Registration No. 571
21     300 Throckmorton Street
       Suite 1600
22     Fort Worth, Texas 76102
       817.336.3042 1.800.336.4000
23
24
25

**Page 81**

1  brandon@allenconsultingservice.com
2       February 10, 2025
3  One Unity Investment, LLC v. Axis Surplus Insurance Company
4  DEPOSITION OF: Brandon Allen (# 7146621)
5     The above-referenced witness transcript is
6  available for read and sign.
7     Within the applicable timeframe, the witness
8  should read the testimony to verify its accuracy. If
9  there are any changes, the witness should note those
10  on the attached Errata Sheet.
11     The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14     According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18          Yours,
19          Veritext Legal Solutions
20
21
22
23
24
25

21 (Pages 78 - 81)

**[& - 717]**

| & |
|---|
| **&**  2:9 5:9 39:16 80:5 |

| 0 |
|---|
| **000280**  3:19 |
| **000746**  40:12 |
| **02455**  1:5 79:5 |

| 1 |
|---|
| **1**  3:12 9:23 48:7 |
| **1.800.336.40...** 80:22 |
| **10**  81:2 |
| **10-21**  41:21 |
| **100**  9:18,20 28:24 |
| **1099**  8:14 63:10 |
| **10th**  80:12 |
| **11-12**  41:18 |
| **11-27**  41:23 |
| **11-28**  19:11 |
| **11-28-22**  28:18 |
| **11/30/2025** 80:17 |
| **115**  33:9 |
| **116**  33:8,9 |
| **11th**  41:5 |
| **12-14**  44:12 46:25 |
| **12-19**  50:1 |

**12-2**  42:10
**12-20-22**  51:4
**12-4-22**  43:14
**12-5**  43:11 44:6 44:8,12 47:9
**120**  33:14
**125**  33:18
**12567**  80:15
**126**  33:18
**1260**  1:17 80:16
**12th**  41:7
**130**  34:3
**1600**  80:21
**18**  3:15
**187**  18:13
**191**  18:13 25:4
**19th**  38:9

| 2 |
|---|
| **2**  3:3,15 13:11 18:10 27:17 48:9 |
| **2002**  62:21 |
| **2022**  38:9 74:14 |
| **2023**  3:13,16 10:11 39:4 53:6 |
| **2025**  1:11,15 77:4 78:17 79:10,15,16 80:12 81:2 |

**20th**  54:15 55:8
**21st**  39:3
**22**  19:11 46:25 50:1 75:16
**23rd**  37:4
**24**  37:4 42:9
**25**  3:13,16
**25th**  10:11 12:8
**26th**  56:1
**27th**  2:10 80:6
**28**  79:19
**280**  38:4
**28th**  55:7
**2nd**  42:24

| 3 |
|---|
| **3**  3:18 38:5 |
| **300**  80:21 |
| **346,000**  61:2 |
| **36**  30:8 |
| **37**  30:8 |
| **38**  3:18 |
| **39**  3:20 |
| **3:01**  1:16 |

| 4 |
|---|
| **4**  3:20 40:11 |
| **40**  3:20 |
| **43**  31:9 |
| **44**  31:10 |
| **45**  31:11 |
| **455**  2:4 80:2 |
| **46**  31:11 |
| **47**  31:11 |

**48**  31:13 42:9
**4:23**  1:5 79:5
**4:43**  1:16 76:20
**4th**  53:6

| 5 |
|---|
| **5**  4:3 56:15 |
| **50**  31:15 46:22 55:19 |
| **51**  31:15 46:10 |
| **52**  31:21 |
| **53**  31:21 |
| **54**  31:21 47:6 47:15 |
| **55**  47:6 49:10 |
| **555**  2:4 80:2 |
| **56**  4:3 49:16 |
| **571**  80:20 |
| **5th**  46:17 |

| 6 |
|---|
| **6**  3:5 48:9,25 |
| **60**  51:4 |
| **61**  52:22 |
| **66**  3:6 |

| 7 |
|---|
| **7**  1:11,15 77:4 79:10 |
| **713.222.6000** 2:5 80:3 |
| **7146621**  1:25 81:4 |
| **717**  2:9 80:6 |

Page 1

[756 - appears]

**756**  46:10
**759**  51:5
**76102**  80:22
**768**  54:21
**77**  3:7
**77002**  2:10
  80:7
**77598**  2:5 80:3
**776**  40:12
**79**  3:8

**8**

**8**  36:20
**817.336.3042**
  80:22
**832.415.1801**
  2:11 80:7

**9**

**9**  3:12
**9,000**  48:23
**90**  64:1

**a**

**ability**  45:19
**able**  10:23 19:2
  19:15 44:25
  50:6 64:13
**above**  1:15
  20:16 58:23
  78:3 81:5
**absolutely**  25:6
  27:24 30:21
  35:16,17 55:14
  55:15 71:17

74:14 75:24
**ac**  29:14,23
**accept**  17:14
  39:23 44:18
**accepted**  44:10
**access**  17:21
  19:19 40:16
  43:1
**accuracy**  81:8
**accurate**  29:17
  29:25 32:7,25
  47:16 62:10
**acknowledged**
  78:14
**acquire**  74:7
**acted**  63:14
**action**  1:5
  53:10 79:5
  80:10,11
**activities**  44:23
**actual**  35:9
**actually**  18:23
  20:18 36:5
**add**  48:2,7,9
**addition**  24:9
**additional**
  40:25 59:8
**address**  5:10
  12:17 19:4
  48:3 49:14
  76:11
**adjust**  51:16
**adjusted**  31:18

**adjuster**  22:23
**adjusting**  7:19
  7:23,24 62:19
  64:2
**adjustment**
  11:20 20:20
  22:2 52:16
**adjustor**  6:21
  7:11 8:4 9:5,19
  11:21,23 15:19
  16:5 23:6
  50:13 62:21
  63:13,15,20,22
  68:14,15 75:5
**adjustor's**
  28:25
**administer**
  5:14
**admittedly**
  52:6
**affirm**  5:16
**affix**  78:2
**affixed**  21:5
**agree**  9:11
  30:14 36:3,23
**agreed**  13:17
  36:2
**agreements**
  81:14
**ahead**  18:16
  48:2
**air**  60:23
**allen**  1:11,13
  2:14 3:4 5:22

6:5,7 11:23
28:18 39:10
58:10,20 65:25
77:3 78:1,9
79:9,12 81:4
**allenconsulti...**
  2:14 81:1
**allotted**  81:15
**allowed**  23:16
**amount**  79:17
**analysis**  17:13
  44:14 45:12,16
  46:2 51:2
**analyst**  80:18
**anomalies**  33:1
**answer**  44:21
  57:1 67:10,14
  69:11
**answered**
  69:24
**anybody**  25:21
  27:5
**anyway**  50:4
  51:9
**apparently**
  70:10
**appear**  29:4
**appearances**
  2:1 3:3
**appeared**  15:8
  78:9
**appearing**  1:19
**appears**  27:13
  30:2 39:3 51:3

Veritext Legal Solutions
346-293-7000

**applicable** 81:7 81:14
**approaches** 15:11
**appropriate** 25:19
**approve** 46:2 46:23
**approved** 46:6
**april** 3:13,16 10:11 12:8
**area** 16:1 30:15 63:19 65:24
**areas** 32:21 56:21 58:24
**artis** 2:8 5:7 80:5
**asked** 42:21 54:10 69:9 72:6 73:3 75:11,12
**asking** 48:17 54:16 69:7,12 70:2 71:8,10
**assess** 23:8
**assessment** 16:18 33:25,25 64:15
**assigned** 41:1,6 41:18 52:8
**assignment** 17:9,14,18 71:6

**assist** 15:13 38:11 42:18,19
**associated** 12:17
**assuming** 7:18
**atlanta** 62:24
**attached** 28:17 81:10,12
**attempted** 40:2
**attempts** 26:11
**attorneys** 80:10
**attributable** 57:10,10
**aulmer** 2:11 80:8
**available** 81:6
**avenue** 2:9 80:6
**aware** 39:18 70:8 74:2
**awax22110018** 3:14,17,21
**awning** 34:12
**axis** 1:6 3:19 4:4 5:8 6:15 7:5,10,14 9:17 9:20 11:21 17:6 36:11 38:10,24 39:12 40:12,14 44:22 44:25 45:18 50:10,12 53:6 56:11 58:12 76:2 79:6 81:3

**b**

**b** 15:17 39:8
**back** 37:7 60:15 61:24 62:5 63:17
**background** 62:18,19
**bad** 72:7
**ballpark** 41:19
**bank** 24:6
**barrier** 23:17
**based** 50:16 74:17 75:21
**basically** 44:17 47:24
**bates** 3:18 18:13 27:14 38:4 40:10,11 40:12 51:5
**beginning** 21:19 73:19
**behalf** 7:4 13:8 16:6,24 39:11
**believe** 9:19 13:19 17:12 18:5,6 20:23 27:14 32:25 33:11 36:7 37:6 45:12 66:4,7 70:21 71:1 73:25
**benjamin** 1:11 1:13 2:14 3:4

5:22 6:5 77:3 78:1,9 79:9,12
**best** 22:2
**big** 26:24 28:13
**bigger** 27:19
**biggest** 66:22
**bit** 26:15 30:4 62:18
**bitumen** 34:3 64:8
**blame** 54:22
**bottom** 13:13 54:21
**boulevard** 2:4 80:2
**box** 5:10 76:16 76:19
**branch** 63:3
**brandon** 1:11 1:13 2:14,14 3:4 5:22 6:5,7 6:9,11 11:23 28:18 39:10 76:11 77:3 78:1,9 79:9,12 81:1,4
**bring** 15:12 24:25
**bringing** 67:18
**bruce** 3:13,16
**bruise** 30:20
**bruising** 15:20 22:10 23:22

Page 3

**[building - clearly]**

**building** 39:11
57:7,8 61:4
**builds** 35:24
**bunch** 28:5,16
30:3
**business** 12:23
63:21
**button** 43:21
46:23

**c**

**c** 5:1 48:10,25
**call** 6:6 15:16
27:5 31:5
35:18,19 71:11
**called** 7:17 9:6
11:14 30:16
31:3 47:24
**calling** 9:4
**calls** 17:10
74:10
**camacho** 41:11
**cap** 48:7
**caption** 20:12
20:12 36:8
**captions** 36:8
**car** 28:21
**card** 12:22,23
28:25 78:11
**care** 6:7,8
39:15
**carpet** 24:10,13
35:20

**carrier** 8:3,6
42:7 46:24
49:6 52:2 54:4
65:11
**carriers** 7:25
46:3
**carries** 22:20
**case** 5:17 6:20
7:5,9 12:5
14:18 16:3,25
24:22 35:17
40:4,7,14
56:22 60:19
64:6,18
**catastrophe**
62:21 63:19,22
**causation**
38:12 57:11
**cause** 1:15
15:18 22:12
24:1,1 66:16
67:1,9
**caused** 22:8,15
35:20
**causing** 15:5
**ceiling** 24:14
34:23
**ceilings** 24:7
**center** 2:4 80:2
**certain** 9:21
16:1 29:14
40:22,23 74:3
**certainly** 30:14
53:14

**certificate** 3:8
80:16,19
**certified** 72:16
72:17 80:18,19
81:16
**certify** 79:11
80:9
**chad** 2:3 3:12
3:15 80:1
**chalking** 33:5
**change** 26:13
26:18 47:16,18
47:23 65:12
75:21,23 77:5
**changed** 12:19
13:25 14:1,10
14:19 19:9,10
20:10 26:3,17
31:19 32:6
33:12 36:8,23
53:21
**changes** 3:7
9:11 14:8,10
20:13 26:12
32:14 75:2
77:1 81:9
**changing** 26:14
**characterizati...**
31:16,19
**characterizati...**
32:5
**characterized**
29:21

**chat** 5:10 76:16
76:19
**circle** 30:9
32:17
**circled** 30:12
30:15 33:19
**circles** 30:8
**circumstances**
20:13
**citizens** 63:13
**civil** 1:5,20
79:5
**claim** 3:14,16
8:2,18,18,24
9:1 11:19
13:21 14:21
17:11,15 19:21
33:2 34:4,11
37:19 38:17
40:13,17 41:8
41:14,18 44:22
51:17,20 52:19
55:12 56:8
63:24 64:22
65:1,4,18,21
66:22 74:12
**claiming** 73:1
73:13
**claims** 9:17
17:24 37:25
45:6 52:4 57:4
57:5 63:14,22
**clearly** 68:1

Page 4

**[click - counsel]**

**click** 44:18
**client** 6:15
**closely** 34:20
**collateral** 15:1
**comb** 48:9,24
**come** 17:13
26:19 29:11
35:25 44:19
45:9 47:3 61:1
**comes** 55:23
**comfortable**
56:20 57:13
64:13
**coming** 35:15
43:2 45:13
53:20
**comment** 16:13
32:21
**comments** 33:7
34:9
**commercial**
15:16 52:4,7
64:1,10 72:18
**common** 9:13
9:13 14:9
15:12 64:9
**commonly**
15:15
**communication**
37:18 42:23
45:9
**companies** 7:24
63:10 65:14

**company** 1:7
5:8 6:22 7:5,9
7:17,19,23
14:6 16:24
19:19 37:17
41:14 42:4
50:11,13 62:20
63:9 64:1 79:7
81:3
**company's**
38:24
**company's** 4:5
56:11
**complete** 43:21
49:6 55:12
71:4
**completely**
65:13 71:7
**complies** 11:6,8
11:11
**concerning**
58:23
**concluded**
76:20
**conclusion** 35:1
61:2 74:10
**conclusions**
58:25
**condenser** 48:9
48:25
**conditioner**
60:23
**conditions** 57:6

**confirmed** 55:2
**confused** 54:22
54:23 55:4
**confusing** 25:3
**connected** 51:1
**consideration**
78:15
**considered**
33:22,23
**consistent** 52:4
**construction**
57:8
**contact** 12:25
13:2 41:13
50:10
**contacted** 13:4
13:8 39:24
46:12
**contacting** 13:7
**contention**
30:17
**continually**
63:20
**continue** 18:15
**continued** 4:1,1
**contracted**
22:6
**contractor** 8:12
**conversation**
67:5
**conversely** 25:8
**cooperation**
58:17

**coordinating**
13:9
**coping** 33:6,15
**copy** 3:12,15,18
3:20 4:3 21:23
76:12,18 81:16
**correct** 6:24,25
7:2,10,11,14,20
13:5 16:7,8,17
16:20 17:7
19:12,22,23
20:21 27:23
28:1 31:22
33:19 34:1
36:6 37:14,20
38:2 41:17
42:1,25 50:18
50:19 51:12
52:14,17,18
53:4,16 54:11
61:21 64:19,20
66:17,19 67:11
68:17 69:1
70:22 78:3
**correctly** 49:4
**cosmetic** 15:4
15:10,16 23:15
52:5 53:23
55:1,3
**costs** 58:7
**counsel** 11:6,8
11:11 66:6
69:11 79:21
80:9

Veritext Legal Solutions
346-293-7000

**[county - designation]**

| | | | |
|---|---|---|---|
| **county** 78:7 | **cwilsonlaw.c...** | 19:11 28:24 | 79:8 |
| **couple** 62:11 | 2:6 80:4 | 29:3 37:2 38:1 | **definitely** 46:13 |
| **course** 68:8 | **cwilsonlaw.c...** | 47:12 50:7,16 | 57:19 |
| **court** 1:1 5:11 | 5:6 | 53:2,10 73:16 | **denial** 25:15,25 |
| 5:21 10:1,4 | **cycle** 14:7 | 73:21 74:4,7 | 26:1,20 53:11 |
| 67:3 76:7 79:1 | 42:16 | 74:21,21 75:13 | 53:24 |
| **cover** 48:8 | **d** | 75:17,21 80:12 | **denied** 67:23 |
| **coverage** 8:7 | | 80:17 | **dents** 33:8 |
| 14:19,20 15:13 | **d** 5:1 | **dated** 3:13,16 | **deny** 53:16 |
| 22:20,22 24:23 | **damage** 15:1,2 | 10:11 37:3 | **denying** 67:18 |
| 26:5 44:4 49:7 | 15:5,17,18 | 39:3 | 68:24 |
| 55:16 67:17,22 | 22:8,15,22,24 | **dave** 60:4 | **depended** |
| 67:23 68:3,20 | 23:1,25 24:7 | **day** 39:3 78:8 | 26:23 |
| 69:5,14 | 29:14,23 30:25 | 78:17 79:15,16 | **depending** |
| **covered** 15:9 | 31:1,7 32:4,20 | 80:12 | 61:19 |
| 24:1 26:9 49:5 | 33:2,6,15 | **days** 38:9,13,18 | **deposition** 1:10 |
| 69:4 | 34:12,21,23 | 44:12 50:7 | 1:13 5:4 13:5,9 |
| **crawford** 62:20 | 35:20 48:3 | 53:1 55:19 | 18:11 19:16,20 |
| 63:9 | 49:5 52:5 55:3 | **deal** 26:24 64:3 | 47:4 59:6 |
| **crazy** 55:20 | 64:13,18 70:13 | **dec** 17:23 | 76:20 77:2 |
| 61:7,8,9 | 71:5,11,13,14 | **december** 37:4 | 78:2 79:9,13 |
| **create** 43:18 | 72:25 | 38:9 | 79:15,18,21 |
| **crossed** 16:12 | **damaged** 24:12 | **decides** 8:7 | 81:4 |
| **crr** 1:24 79:11 | **damages** 15:22 | **decision** 14:19 | **depositions** |
| **csr** 1:17 80:15 | 22:25 23:5,15 | 24:23 | 28:5 |
| **culminated** | 23:15 34:15 | **decisions** 22:6 | **described** 30:1 |
| 28:25 | 40:7 49:14 | 22:17 | 30:5 |
| **curious** 32:16 | 57:6,9,25 64:7 | **deck** 35:11 | **description** |
| 48:1 | **data** 18:3 61:16 | **deductible** | 3:11 4:2 78:11 |
| **current** 62:7 | 61:24 63:18 | 48:23 | **design** 57:7 |
| **cutting** 53:7 | **database** 61:14 | **defendant** 1:8 | **designated** |
| 73:19 | 62:1,3,3 74:25 | 2:7 4:4 13:8 | 56:22 59:13,14 |
| **cv** 1:5 79:5 | **date** 8:17 12:8 | 27:10 36:11 | **designation** 4:5 |
| | 12:12,12 13:5 | 38:24 56:11 | 56:12 |

Page 6

**[desk - established]**

desk   25:16
   26:20 51:16
   52:15 63:15
**determination**
   14:20 15:14
   25:10 33:3
   35:13,14 49:7
   55:16 67:17,22
   68:3,6,21
**determinations**
   25:7 26:7
**determine**   15:3
   22:7,13 24:20
   25:1 66:16
   69:5,14
**determines**
   67:1,8
**diary**   40:13,17
   44:22
**different**   14:17
   22:1,4 27:14
   30:5 31:4,5
   61:15 62:13
   71:7
**differently**
   15:12 65:12
**difficult**   35:10
**dings**   29:19
**diplomate**
   80:16,17
**direct**   39:23
   48:3
**directly**   7:15,16
   76:10

**disagreeing**
   33:24 34:2
**disclosures**
   38:25
**discuss**   40:22
   40:23 47:25
   76:8
**discussed**   53:8
   55:1
**discussing**   11:4
**distinguished**
   30:11
**district**   1:1,1
   79:1,1
**division**   1:2
   79:2
**document**   4:4
   9:22 10:8,11
   12:21 18:12
   19:1 27:7
   36:10 38:23
   40:15 56:5,10
   56:14 60:1
   78:12
**documents**
   17:21 19:15,20
   45:25 46:1
   59:8
**doing**   22:18
   63:18
**download**
   17:19 75:14,15
   75:16,19

**downloaded**
   17:20
**draft**   53:11
   70:3
**driven**   24:15
**duly**   1:14 79:13
**duties**   58:11

**e**

**e**   3:18 5:1,1,5
   5:10 18:23,25
   19:4,5 38:3
   47:10,14 50:23
   51:3,7,9 55:25
   76:14,15,18
**earlier**   30:6
   46:17 73:15,21
**east**   2:4 80:2
**efforts**   56:6
**efi**   70:8
**either**   23:3 46:4
   61:10
**elected**   12:2
**election**   11:15
**elects**   11:22
**elements**   23:17
**emily**   42:10
**employed**
   68:16 80:9
**employee**   8:12
   39:10
**encounter**
   16:10

**endorsement**
   22:21
**engaging**   33:2
**engineer**   15:7
   24:21,24,25
   25:10 35:7
   37:23,24 38:11
   38:14 49:19,21
   50:4,14,23
   51:19 53:25,25
   54:10,14,16
   55:9,18 70:11
   70:18,19 72:21
   72:24 73:1,13
**engineering**
   53:15 71:22
   72:2,9,14,18,23
   73:5
**enter**   40:2
**entered**   35:2
**entire**   14:18
**entitled**   3:20
   4:4 18:12
**entries**   46:20
**entry**   46:10
   51:15
**errata**   81:10,12
   81:13
**error**   54:9
**especially**
   15:14,15 55:15
**esq**   2:3,8 80:1,5
**established**
   69:13,20

Page 7

Appx.0028

[estimate - floor]

| | | | |
|---|---|---|---|
| **estimate** 14:15 | **exhaust** 48:8 | **explanations** | **file** 12:16 14:8 |
| 40:6 43:12,24 | **exhibit** 3:12,15 | 20:18 | 43:18 45:20 |
| 44:1,2,9 48:4 | 3:18,20 4:3 | **expressed** | **filed** 27:9 |
| 48:14,16,18,19 | 9:23 18:10,10 | 78:15 | **final** 16:23 |
| 48:21 60:18,20 | 27:8,16 38:5 | **extensive** 57:5 | 66:18,25 67:7 |
| 60:25 61:13,20 | 40:9,11 56:15 | **extent** 9:15 | **finally** 55:23 |
| 61:22 62:4 | **exhibits** 3:10 | 14:13 66:20 | **financially** |
| 74:16 75:6 | 4:1 10:6 28:5 | **exterior** 34:15 | 80:10 |
| **estimated** 49:5 | **existing** 57:11 | **f** | **find** 58:1,3,6 |
| **estimating** | **exists** 23:16 | | 71:4,13 |
| 59:18 | **expect** 61:3 | **fact** 51:25 | **finding** 23:20 |
| **ethical** 25:20 | 62:12 | 71:12 | 23:23 24:3,16 |
| **evaluated** | **expense** 52:1 | **fails** 81:15 | **findings** 13:22 |
| 23:10 | **expenses** 58:7 | **failure** 57:25 | 27:25 52:15 |
| **event** 58:11 | **experience** 52:7 | **fairly** 9:21 | **finish** 42:15 |
| **everybody** | **experienced** | **faith** 51:17 | **finishing** 57:8 |
| 15:11 | 52:9 | **fall** 53:23 | **fins** 48:9,25 |
| **evidence** 30:18 | **expert** 4:6 15:3 | **familiarity** | **fire** 8:20 |
| 35:15 58:22 | 15:13,16 22:7 | 11:3 | **firm** 2:3 5:9 |
| **exact** 27:15 | 22:13 24:19 | **far** 31:6 52:11 | 10:12,16 46:2 |
| 60:6 | 26:6,8,10 33:3 | **fatir** 43:5,8,10 | 80:1,20 |
| **exactly** 61:9 | 35:12,18 49:13 | 46:11 47:11 | **first** 4:5 11:13 |
| **examination** | 51:19 52:2 | **favor** 69:10 | 12:13 17:2,11 |
| 3:5,6 6:1 66:2 | 56:12 58:23 | **february** 1:11 | 18:12,20 20:24 |
| 79:16 | 59:2,5,7 60:3,4 | 1:15 77:4 | 28:23 37:18,23 |
| **example** 30:7 | 66:24 67:19 | 79:10 80:12 | 42:17 46:3,7 |
| 31:9 57:4 | 68:16 69:14,21 | 81:2 | 47:21 54:14 |
| **except** 78:3 | 70:4,9 76:1,2 | **federal** 1:19 | 56:12 62:25 |
| **exchange** 47:10 | **experts'** 59:1 | **feel** 22:25 25:18 | 63:8 68:1 69:4 |
| **excludes** 22:21 | **expiration** | 51:13 56:20 | 69:11 |
| **exclusions** | 80:17 | 57:13 64:12,23 | **five** 3:15 |
| 15:11 | **explain** 7:21 | 74:11 | **flat** 35:11 |
| **executed** 78:14 | 75:9 | **field** 15:19 63:5 | **floor** 2:10 80:6 |
| | | 63:15 | |

Veritext Legal Solutions
346-293-7000
Appx.0029

**[florida - hail]**

| | | | |
|---|---|---|---|
| **florida** 63:12 | **four** 38:9,13,18 | **globe** 14:2 | **ground** 24:13 |
| **folks** 26:16 | 50:6 69:25 | **go** 6:9 8:4 | **groundwater** |
| **follow** 20:15 | **front** 10:9 | 10:15,20 11:5 | 35:21 |
| 42:14 | 34:12 37:8 | 17:18 18:16 | **guess** 7:8 14:22 |
| **following** 79:11 | **full** 6:3 | 24:21 34:6 | 14:23 42:17 |
| 79:21 | **functional** 15:4 | 48:2 56:25 | 44:20 47:4 |
| **follows** 5:25 | 15:17 22:8 | 59:12 60:15 | 48:13 49:12 |
| 79:18 | 33:14 71:10 | 61:24 67:3 | 50:16 51:13 |
| **foregoing** 78:1 | **further** 56:25 | 71:22 72:2,9 | 53:5 54:8 |
| 78:13 | 58:10 66:1 | 75:18 | 55:23 60:1,19 |
| **form** 14:24 | 76:5 80:9,10 | **god** 5:19 | 73:8 76:9 |
| 21:6,13 25:12 | **g** | **goes** 8:6 19:1 | **guessing** 46:16 |
| 31:25 36:25 | | 40:12 55:23 | 46:18 |
| 38:15,20 40:20 | **g** 2:8 5:1 80:5 | **going** 9:22,23 | **guideline** 42:3 |
| 45:3 49:24 | **gather** 64:16 | 11:2,13 13:11 | **guidelines** 42:8 |
| 53:19 54:2 | **general** 19:14 | 17:23 18:9 | 65:11 |
| 55:13 62:9 | 57:3 60:14,24 | 25:11 26:10,13 | **guy** 7:1 41:1 |
| 64:24 65:3 | **generally** 60:13 | 27:7,8 28:6 | 57:21 |
| 67:13,24 68:4 | **getting** 50:2,7 | 35:12 36:10 | **h** |
| 68:18 69:2,15 | **give** 5:17 | 37:7 38:3,4 | |
| 69:22 70:5,15 | **given** 19:19 | 39:20 40:10 | **haag** 72:17 |
| 70:23 71:19,23 | 21:3 25:14 | 43:22 44:23 | **hail** 15:1,2,2,4 |
| 72:11 73:7 | 26:6 78:16 | 45:1,22 50:4,9 | 15:17,20,22 |
| 74:9,23 | 79:14,20 | 51:22 56:10,14 | 16:15,15 22:8 |
| **format** 21:4 | **glenn** 12:22,23 | 59:14,25 60:10 | 22:9,10,14 |
| 26:3 | 16:6,9 46:12 | 60:14 65:10 | 29:23 30:4,9 |
| **formulate** 6:23 | 51:23 54:20 | 75:3,4 | 30:16,18,18,20 |
| **fort** 80:22 | **global** 7:12,18 | **good** 18:18 | 30:23,25,25 |
| **forth** 58:25 | 8:9 9:3,10,14 | 20:11 28:11 | 31:7,15 32:2,4 |
| **forward** 55:15 | 11:20,23 12:9 | 34:19 51:17 | 32:11,15 33:6 |
| **found** 13:19 | 14:6 21:22 | **gotten** 51:10 | 33:21,22 34:18 |
| 16:15 29:17 | 25:14 39:11 | **great** 10:4 | 34:21 48:3 |
| 34:11,14 49:14 | 42:8 44:24 | 30:19 46:5 | 57:10,11 63:23 |
| 70:12 | 45:2 61:23 | | 64:6,13 70:13 |

Page 9

**[hail - interrogatory]**

71:5,8,10,14
72:25
**hailing** 29:14
**hand** 5:14
  78:16
**handled** 37:25
  38:17 52:5
  64:22,23 65:2
  65:5 74:12
**handling** 57:5
**hands** 35:8
**happen** 20:13
**happened** 8:24
  9:1 14:12
**harvey** 64:3
**hazlewood** 41:2
**heard** 40:18
**heavy** 35:24
**held** 67:5
**help** 5:19 44:21
  55:18 62:6
**hire** 50:4 51:22
  52:2 55:18
**hired** 70:9
**hiring** 50:23
  53:25 69:13,21
  70:3
**hit** 43:21 46:23
**home** 62:23
**hoopla** 26:15
**hope** 21:25
**hoping** 44:21
**horrible** 23:3

**hou** 1:25
**hour** 79:19
**hours** 42:9
**houston** 1:2
  2:10 79:2 80:7
**hung** 27:4
**hurricane** 63:7
  63:9 64:3
**hurricanes**
  63:7

**i**

**ia** 46:2 49:19
  49:21 50:11
  54:16
**ia's** 44:5
**idea** 12:6 21:2
  21:17
**identified** 31:1
**identify** 35:9
  64:13
**identity** 78:11
**iii** 2:8 80:5
**impacts** 23:13
**important**
  51:19
**importantly**
  22:5
**improper** 58:3
**inaccurate**
  27:22,24
**incident** 56:3
**includes** 79:21

**including** 48:21
  58:12
**income** 65:23
**incorrect** 61:7
  70:21 71:1
**incur** 52:1
**independent**
  7:11,19,22,24
  8:1,12 68:13
  68:15
**index** 3:1 4:1
**indicate** 25:9
**indicative**
  32:11,16
**industry** 59:23
  62:15 75:8
**information**
  12:25 18:4
  53:16 79:20
**initial** 21:9,11
  21:15 38:25
  56:24 69:1
  70:3
**inspect** 6:22
  24:19 25:22
**inspected** 7:4
  9:7 24:6 39:11
  54:1 55:6 64:6
  70:12
**inspection** 8:1
  8:4 9:6 12:24
  16:4 17:3 18:1
  19:11 28:1,7
  37:14 41:20

42:5,15 53:15
  55:20 73:17,23
**inspector** 56:24
**instance** 62:11
**instructions**
  61:25
**instrument**
  78:13
**insulation**
  60:24
**insurance** 1:6
  4:5 5:8 6:15,16
  6:22 7:4,14
  9:17 16:24
  17:6 37:17
  38:24 56:11
  57:7 79:6 81:3
**insurance's**
  36:11
**insured** 49:8
**intel** 62:12
**interested**
  17:11 80:11
**interesting**
  38:8 54:19
**interior** 15:5,18
  22:15 24:5,6
  24:19 71:11
**internal** 50:11
**internally** 45:1
**interrogatories**
  36:12
**interrogatory**
  36:20

Page 10

**[investigate - line]**

**investigate**
17:5,6 18:2
**investigating**
55:24
**investigation**
11:19 13:20
54:6 55:12
**investment**  1:3
5:3 79:3 81:3
**involved**  7:8
**involvement**
56:7
**isabel**  63:7
**issue**  47:3 54:5
**issues**  22:10
40:23 42:16
47:3 57:11
**item**  51:4 75:4
**items**  16:3
45:18 48:3,22
60:11,24 61:6
65:10

**j**

**j**  5:5
**january**  53:6
54:15 55:8
**jason**  43:5,7,9
47:10 51:14
**jay**  2:3 5:2 80:1
**job**  1:25 26:22
**jsimon**  2:6 80:4
**judgment**  27:9
27:12

**jump**  44:13
**jury**  7:21

**k**

**keep**  10:5 21:20
**kelly**  1:16,24
76:17 79:11,16
80:15
**kept**  21:23
**kind**  10:20,21
11:1 14:2
18:15 25:3
35:23 40:25
42:7,17,18
47:17 56:17
60:11,13,15
61:3,25 75:20
**kinds**  48:15
**knew**  43:9 50:5
50:9
**know**  7:3,6
8:17 10:17
12:4,4 13:4,25
14:1 16:9,11
18:7 20:25
21:11,15,22
28:14 29:8
31:18 32:18
34:21 38:13,18
40:5,17 41:3
41:16 42:12
43:7,17 44:6
44:24 46:14,20
47:17 48:22

51:25 52:11
54:9 55:17
57:22 59:12
60:12 75:4,18
**knowing**  61:1
**known**  78:9

**l**

**l.l.c.**  1:3 79:3
**l.l.p.**  2:9 80:5
**labeled**  3:18
**lack**  58:3
**lankford**  43:5,7
51:14
**large**  28:9
48:10,25
**late**  68:20
**laughable**  71:5
71:13
**law**  2:3 5:9
10:12 80:1
**lawsuit**  6:14
12:6
**lawyer**  40:3
**leading**  67:12
68:11,18 69:2
69:16,23 70:5
70:16,24 71:20
71:24,25 72:4
72:6,12
**leak**  35:10
**leaks**  24:15
**learn**  63:4

**lease**  48:5
**left**  26:3 28:22
35:3 41:14
51:10 55:19
65:15
**legal**  74:10
80:20 81:19
**legitimate**
23:11,13
**letter**  3:12,15
5:5 10:16,17
12:8 13:12,18
13:23 54:5
**liberty**  49:2
**life**  31:2
**likely**  41:10
52:2
**limitations**
22:20
**limited**  15:25
56:23 74:8
**line**  7:12,18 8:8
9:3,9,14 11:20
11:23 12:9
14:6 17:8,10
18:11 21:22
25:14 26:16
31:20 39:11
42:8,16 44:11
44:24 45:1,6,9
45:13,22 48:3
49:16 60:10
61:6,23 65:10
66:10,13 75:4

Page 11

**[line - moment]**

77:5
list  75:15,16
listen  52:10
literally  67:25
little  26:15
  27:19 29:7
  30:4 52:6
  62:18
livenote  80:19
llc  81:3
long  42:4 65:20
longer  7:8
  19:18 55:11
look  18:14
  24:21 25:3
  28:14 33:21
  36:19 37:2
  45:10 47:7
  49:9,13 50:3
  55:4 60:6,11
  60:12 74:5
looked  12:24
  34:20 49:1
  54:15 60:20
looking  16:20
  32:24 54:23
looks  28:23
  29:6 33:5 37:3
  40:13,24,25
  41:6,20 42:10
  42:23 43:13
  44:11 45:8
  47:9 48:13
  51:8 52:19

53:7 54:8,12
  55:22,25
loss  15:9 20:14
  22:12 24:1
  26:7 58:12
  61:24 62:6
  67:1,9,17
  73:16,21 74:4
  74:7,21 75:13
  75:18
lot  17:22 24:14
  34:17 35:23
  44:23 45:4
  57:1 64:3
low  35:23
ludicrous  74:14

**m**

made  9:2 14:9
  16:13 18:7
  51:14 56:24
  67:16 68:20
mail  3:18 5:5
  5:10 19:4,5
  47:10,14 50:23
  51:3,7,9 55:25
  76:14,15,18
mails  38:3
major  51:25
  65:22
majority  46:5
make  8:5 9:11
  14:9 22:5,17
  22:19 25:2

26:5,7 28:10
  33:3 35:1,12
  35:14,19 45:23
  49:7 55:15
  57:18 59:21
  62:6 75:2
makes  24:23
making  26:11
managed  63:13
management
  45:6 47:25
manager  42:13
managerial
  49:17
march  75:16
mark  9:23
  18:10,10 27:8
  30:9 38:4
  40:10 56:14
marked  31:15
  32:10
markings  16:15
  31:21
marks  30:3,4
  32:2,9 33:21
match  52:16
matter  5:4
  20:17 27:10
  39:17,21,25
  40:4 57:2 60:3
mckinley  2:9
  5:9 39:15 80:5
mean  14:5
  46:22 51:17

52:22 56:23
means  7:22
  52:23 63:14
meant  7:16
medical  2:4
  80:2
memphis  63:4
mention  57:3
mentioned
  64:17
mentions  11:18
merit  80:19
message  50:3
met  16:5
metal  34:19
method  1:18
michael  41:1
micro  42:13
middle  41:15
mine  36:9 72:5
minor  24:7
  32:4
minute  16:22
minutes  79:19
  79:19
mistake  54:12
mitigate  57:25
mixture  63:18
model  63:14
modified  47:20
moises  41:11
  41:12
moment  67:4

Page 12

**[monday - operation]**

| | | | |
|---|---|---|---|
| **monday** 38:8 | 51:23 52:12 | 51:4 61:3 | **occurrence** |
| **month** 37:13 | 65:22 | 80:16 | 58:6 |
| 54:14 61:19 | **nine** 44:12 | **numbered** 1:15 | **offer** 59:5 |
| 62:12 | **nitpick** 60:10 | **numbers** 27:14 | **offered** 58:22 |
| **months** 56:3 | **normal** 9:4 | **o** | **office** 24:8 |
| **motion** 27:9,11 | 14:3,3 52:4 | | 62:23 78:16 |
| **motions** 41:13 | 60:21 | o 5:1 | **officer** 42:11 |
| **move** 54:6 | **normally** 37:21 | **oath** 5:15,25 | 79:13,21 |
| 55:15 | 74:1 | 78:10 | **offices** 24:11 |
| **moved** 21:20 | **norton** 2:9 5:9 | **object** 36:25 | **okay** 6:10,14 |
| 63:17 | 39:16 80:5 | 68:18 69:2,11 | 7:1,13 8:15 |
| **muhammad** | **notarize** 81:11 | 70:5 | 10:4,8,23 11:1 |
| 43:6,8,10 | **notary** 78:22 | **objection** 14:24 | 11:9,12,18 |
| **n** | **note** 44:19 46:9 | 21:6,13 25:12 | 12:20 13:15,18 |
| | 49:17 75:6 | 31:25 38:15,20 | 18:2,17,19,19 |
| n 5:1 | 81:9 | 40:20 45:3 | 25:22 27:21 |
| **name** 5:2 6:3 | **noted** 15:1 | 49:24 53:19 | 28:8,23 29:13 |
| 39:7,7 52:23 | 32:21 38:23 | 54:2 55:13 | 33:9 36:1,21 |
| 53:2 56:16 | 78:3 | 62:9 65:3 | 37:22 44:5,10 |
| 78:12 80:12 | **notes** 3:20 31:1 | 67:12,24 68:4 | 47:9 56:2,19 |
| **named** 41:1 | 43:22 45:11 | 68:11 69:15,22 | 56:20 60:5,16 |
| **nature** 57:5 | **notice** 10:16 | 70:15,23 71:19 | 60:17 66:15 |
| 65:8,9 | 58:13 | 71:23 72:11 | 69:9 70:8 |
| **necessarily** | **noticed** 6:18 | 73:7 74:9,23 | 72:20 73:11,14 |
| 45:21,25 | 12:16,20 | **observe** 15:20 | 74:20 75:14 |
| **need** 14:8 24:24 | **notification** | 15:22 22:10 | **once** 17:20 |
| 28:10 60:12,15 | 17:17 | 23:25 34:24 | 25:23 46:23 |
| 69:4 | **notified** 43:20 | 71:5,12,15 | **ones** 29:4 46:6 |
| **needed** 37:24 | **november** 39:4 | **observed** 23:1 | **online** 44:15 |
| 55:3 65:23 | 41:5 55:6 | 23:7 24:6,9 | **open** 35:3 |
| **neither** 80:9 | **number** 1:17 | 48:4 52:16 | **opening** 22:12 |
| **never** 7:13 21:7 | 3:14,17 12:17 | 64:18 | 24:2 |
| 28:12 31:2,7 | 36:20 46:9 | **occurred** 12:5 | **operation** |
| 45:14 48:24 | 47:5,15 49:10 | 42:6 | 61:17 |

Veritext Legal Solutions
346-293-7000

**[opinion - prepared]**

| | | | |
|---|---|---|---|
| **opinion** 6:23 | **pa's** 33:24 | **payment** 8:7 | **plaintiff's** 59:1 |
| 22:19 32:12 | **page** 3:2,11,12 | **payments** | 59:7 |
| 64:21 73:25 | 3:15,20 4:2,3 | 59:21 | **plan** 53:10 |
| **opinions** 15:8 | 11:5,14 13:11 | **pending** 44:5 | **please** 5:13 |
| 33:12 37:19 | 17:23 25:4 | 44:16 | 38:11 49:20 |
| 58:21,24 59:5 | 46:10 54:21 | **people** 19:18 | 50:15 51:6 |
| 66:5 | 77:5 | 65:7 | 54:21 56:15 |
| **option** 74:20 | **pages** 28:24 | **percent** 9:18,20 | 69:17 |
| 75:12 | 81:12 | 64:1 | **plugged** 60:22 |
| **oral** 1:10,13 | **paid** 74:12 | **person** 7:3 | **point** 17:15 |
| 77:2 79:13 | **paragraph** | 42:11 78:12 | 19:24 25:7 |
| **order** 43:19 | 13:20 20:16 | **personal** 51:9 | 46:18 75:20 |
| 46:1 | 25:4 66:18 | **personally** 78:9 | **pointed** 22:22 |
| **origin** 24:20 | 68:1 | **phone** 12:17 | 23:5 |
| **original** 26:3 | **parking** 24:14 | 27:5 | **policies** 74:2,4 |
| 26:13 45:14,15 | 35:23 | **photo** 20:16,17 | **policy** 17:23 |
| 45:19 | **part** 13:12,13 | 28:21 29:10 | 22:20 57:7 |
| **originally** 41:1 | 26:2 48:1 | **photographed** | 58:12 62:25 |
| **outcome** 14:11 | 66:22,23 | 12:24 | 63:1,2 |
| 80:11 | **participants** | **photographs** | **portion** 20:23 |
| **outlined** 66:5 | 1:18 | 28:6,16 | **positive** 9:18 |
| **outside** 35:22 | **particularly** | **photos** 9:8 29:2 | **practice** 9:14 |
| **overview** 29:8 | 64:17 | 29:7 30:12 | **pre** 57:11 |
| 31:3,8 | **parties** 79:21 | 31:9 32:24 | **prefer** 6:6 |
| **own** 23:10 42:7 | 80:9 | 36:5,7,9 | **premature** 25:7 |
| | **parts** 10:21 | **phrase** 31:2 | **premises** 6:23 |
| **p** | 20:9,25 | **picture** 23:12 | **prepare** 8:5 |
| | **party** 7:25 | **place** 23:15 | 40:6 57:22 |
| **p** 5:1 | 79:17 | **plaintiff** 1:4 2:2 | 61:22 |
| **p.l.l.c.** 2:3 80:1 | **pas** 51:25 | 5:3 58:22 79:4 | **prepared** 9:7 |
| **p.m.** 1:16,16 | **pass** 76:4 | **plaintiff's** | 44:1 60:3,18 |
| 76:20 | **pasting** 53:8 | 36:12 57:24 | 60:25 61:13,19 |
| **pa** 30:9,12 | **paths** 16:12 | **plaintiffs** 16:6 | 62:4 |
| 31:16 32:9,17 | | | |
| 48:5 51:21 | | | |

Veritext Legal Solutions
346-293-7000

**[presence - recommended]**

| | | | |
|---|---|---|---|
| presence 23:12 | prompt 58:12 | question 29:6 | 71:1 77:5 |
| presenting 62:1 | proper 53:24 | 44:21 67:7 | reasonable |
| preservation | 54:4 | 69:18 70:2 | 74:13 |
| 58:16 | properly 54:3 | 71:16 72:4,6,6 | reasons 52:8 |
| pretty 14:3,3 | property 9:7 | 73:9,20 | 65:15 66:21 |
| 34:19 35:10 | 17:6 24:21 | questions 66:1 | reassign 52:22 |
| 75:8 | 25:23 34:15 | 75:25 76:5 | reassigned |
| price 74:14 | 35:2 52:12,13 | quick 61:5 | 52:20 |
| 75:15,16 | 52:17 57:6 | quickly 29:1 | rebuttal 59:6 |
| prices 62:12 | 70:12 | quit 8:20 9:12 | recall 18:5,6 |
| pricing 57:16 | protection | 12:12 21:19 | 73:18 |
| 57:20 60:8 | 58:16 | 46:16 50:3,23 | receive 19:2 |
| 61:16 73:16,16 | proved 78:10 | quiz 11:2 | 73:4 |
| 73:22,22 74:8 | proves 75:20 | **r** | received 38:1 |
| 74:21,25 75:3 | provide 18:3 | r 3:13,16 5:1 | 38:18 43:12,13 |
| 75:7,13,21,23 | provided 59:9 | rain 24:15 48:7 | 43:23 44:9 |
| printout 3:18 | provisions 1:20 | rains 35:24 | 73:5 |
| 3:20 | public 9:5 16:5 | raise 5:13 | recent 75:17 |
| prior 13:7 | 22:23 23:6 | rdr 1:24 79:11 | recently 20:6 |
| 19:15 | 28:25 78:22 | reached 25:9 | recommend |
| probably 29:22 | purposes 78:15 | 48:4 | 24:18 49:19 |
| procedure 1:20 | pursuant 1:19 | read 10:22,23 | 68:9 |
| proceed 17:25 | 79:20 | 38:6 48:14 | recommendat... |
| proceeding | put 13:3 29:9 | 51:6 54:20 | 8:1 14:22,23 |
| 80:10 | 33:1,4 37:7 | 56:18 76:9 | 14:25 26:6 |
| process 9:4 | 40:9 48:15 | 78:1 81:6,8 | 51:18 53:21 |
| 14:3 57:5,17 | 63:3 74:17 | real 34:19 | 56:25 68:25 |
| 57:20 | 75:6 76:15 | really 42:9 62:6 | recommendat... |
| produced 1:14 | **q** | realtime 80:18 | 8:5 25:6 52:11 |
| 59:9 | qualified 57:16 | 80:18 | 69:5 |
| producers | 57:19 | rear 24:10 | recommended |
| 65:23 | quality 14:7 | reason 22:13 | 15:3 26:8 |
| program 62:22 | 64:2 | 55:7 70:20,21 | 50:14 68:23 |
| 63:14 | | | |

Page 15

**[recommending - return]**

**recommending**
24:19 35:7
37:22
**recommends**
67:1,8 69:13
69:21 70:3
**record** 1:21 6:4
67:4,5 79:13
79:22
**referenced**
13:13 81:5
**reflected** 22:11
**refused** 26:21
**regarding** 8:18
19:21 40:3
58:11 65:1
73:15 74:16
**regardless**
14:10
**registered**
80:16,17
**registration**
80:20
**rejected** 9:10
41:8
**related** 24:15
25:1 34:4,12
58:24 80:9
**relationship**
8:13,15,23
40:3
**remediation**
58:8

**remember**
12:11 20:5
22:3 26:16
30:10 33:16
34:5,11,14
47:12,14 50:2
51:7 60:25
**remote** 1:10,13
77:2
**remotely** 1:19
**remove** 51:18
**repair** 57:21
**repairs** 57:17
57:18,20 58:4
58:8 62:7
**repeat** 73:20
**replacement**
48:7 58:4
**replacements**
57:17
**replacing** 60:23
**report** 8:5 9:7
9:10 12:13
14:16 16:23
17:2 18:7,12
18:21 19:1,7,7
19:8,10,24
20:7,19 21:3,8
21:9,11,15,23
22:1,3 26:12
26:14 27:15,22
28:17 29:11
37:3,3,8,18
38:1,10,19

42:5,18,19
43:20 44:5,6,7
45:14,15,19
47:20,22 48:16
49:20 50:7,15
50:17,17 53:2
53:6,8,21
55:22 59:3
60:3 66:4,9,12
66:19,25 67:8
69:1,13,20
**reported** 1:18
1:24
**reporter** 5:11
5:21 10:1,4
67:3 76:7
80:16,17,18,19
80:19
**reporter's** 3:8
**reporting**
42:24
**reports** 15:2
20:10 59:1,6
65:8
**represent** 5:3
27:25 28:2
39:16,20 60:2
**representation**
30:20
**representatives**
11:21
**representing**
5:8

**request** 41:13
47:24 48:19
**requested** 9:11
**requesting** 35:3
**require** 74:2,4
**rescheduled**
41:23
**research** 18:8
**reservation**
54:5
**resign** 9:2
**resigned** 8:22
**respect** 6:20
9:16
**respond** 49:20
50:15
**response** 10:15
36:12 49:9
54:20 58:21
59:6
**responsibility**
11:15,22 12:2
**result** 25:11
**results** 24:13
**retain** 15:3
38:11 54:16
**retained** 6:22
7:25 17:4,5
76:1
**retaining** 55:8
**retention** 54:10
**return** 79:16
81:12

Page 16

**[review - sent]**

**review** 17:22
19:15 21:4
44:10,18 49:20
50:15 53:5
58:14 61:5
**reviewed** 19:21
29:10 38:1
**reviewing**
44:16
**revise** 14:15
52:24 65:8
**revisions** 65:10
**right** 5:14 7:1
10:6 11:10
12:18 13:15
20:4,9 41:22
43:4 45:16,17
47:2,21 49:17
50:12 51:12
53:18 56:4
66:16,25 68:9
68:16,23 69:14
69:21 70:4,9
70:11,18,20
74:22 75:22
76:2
**rights** 54:5
**risk** 20:12
**roof** 15:21,23
15:25 16:2,16
20:23 22:21
23:9,13,22
24:1,15 30:20
30:23 34:4,4,6

35:10,11 53:11
53:16 60:23
64:18 68:6
71:6,9,13,15
**roofs** 64:5,8,14
72:18
**room** 35:22
**rules** 1:19
81:14
**running** 40:24
**ruston** 12:22
12:23 16:6
51:24 54:20

**s**

**s** 5:1
**saw** 21:7 30:22
37:5
**saying** 26:2
51:18 53:11
71:15
**says** 15:19
23:14 24:23
32:4 36:22
38:11 39:15
42:24 43:5,11
43:17,18 44:5
44:9 45:11
47:20 48:2,5
49:19 52:3
54:13 57:3,24
58:10,20 67:25
68:23

**school** 71:22
72:2,9
**scope** 56:23
61:14
**screen** 10:24
28:13 36:16
43:3
**scroll** 11:2,7,10
18:18 27:18
28:4 56:18,19
**scrolling** 18:15
27:12
**seal** 78:16,16
**second** 13:20
42:15 47:7
48:1 51:6 63:2
**section** 11:14
20:20 22:2
39:8 64:10
**secure** 49:21
**see** 10:8,13
11:16,24 13:11
17:10 19:24
20:13 28:9,13
28:20 29:14
33:1,8,18
34:20 36:13,15
36:17 37:6,8
37:10,11 39:1
39:5,7,13
41:24 42:14,25
43:11,15,19
44:19,25 45:24
46:1,4,7,9 47:2

48:11 49:22
53:5,12 54:17
56:16 58:18
59:10,16 60:14
61:4,6 65:11
66:9,12,14
67:22 70:13,14
71:9
**seeing** 47:5
**seem** 19:12
29:1 32:9 42:1
61:3
**seems** 25:8 26:1
30:4 41:17
**seen** 10:17
13:13 16:23
20:6 37:23
40:14 45:14
46:21 59:2
60:1
**sees** 71:14
**select** 74:20,24
75:13
**send** 17:12,15
44:14 48:5
49:6 76:10,12
**sending** 20:5
43:20
**sense** 25:2
**sent** 10:16
18:25 19:24
20:1,3 21:8
51:4 54:9

Page 17

**[sentence - straight]**

**sentence** 23:3
23:14 47:21
68:1
**sentences** 20:24
**service** 39:24
**set** 9:6 13:5
41:20 58:25
**several** 14:12
**severity** 22:7
**shackelford** 2:9
5:9 10:12
39:15 80:5
**shackelford.l...**
2:11 80:8
**share** 36:16
**shared** 45:25
**sharing** 9:24,25
16:22
**sheet** 81:10
**shortly** 42:25
**shots** 31:4
**show** 9:22 18:9
27:7 28:6
30:17 36:10
38:3,23 56:4
56:10 59:25
60:14,16 66:8
**showing** 43:3
**shows** 18:11
44:16
**side** 29:11
**sign** 76:10 81:6
81:11

**signature** 3:7
18:20,23,25
19:3 21:4 76:8
77:1 78:2,5
79:16 80:15
**signed** 18:24
53:3 81:17
**significance**
22:14
**similar** 57:20
**simon** 2:3 3:5
5:2,2,6 6:2
9:24 10:3,5,7
15:6 21:10,14
25:17 32:1
37:1 38:16,22
40:21 49:25
53:22 54:7
55:21 62:14
64:25 65:6
66:1 67:12,24
68:4,11,18
69:2,15,22
70:5,15,23
71:19,23 72:3
72:11 73:7
74:9,23 76:5
79:19 80:1
**sir** 6:19 27:24
31:23 47:12
**sit** 19:14
**sitting** 51:18
**six** 3:12

**size** 15:2 61:4
**slower** 10:15
**slowly** 10:20
**small** 29:19
**smiling** 50:3
**software** 59:19
60:7
**solemnly** 5:16
**solutions** 80:20
81:19
**somebody** 14:2
20:2 31:20
44:18 50:8
55:3 65:23
**sorry** 10:2 17:5
37:5
**sounds** 43:4
**southern** 1:1
79:1
**speaking** 37:16
**specifics** 60:13
**spent** 63:12
**spot** 35:23
**spouts** 34:21
**stages** 21:20
**staining** 24:10
**stains** 24:14
**stamp** 27:14
29:3 40:11,12
**stamped** 18:13
38:4 40:10
**stand** 11:19
**standard** 59:23
62:15 75:8

**standing** 16:19
16:20
**start** 20:12
47:5 55:8
**started** 62:20
63:6
**starts** 40:11
42:14
**state** 1:17 6:3
78:6,23 79:11
**stated** 1:20
13:22 51:21
**statements**
33:11 51:14
58:25
**states** 1:1 79:1
**stating** 49:12
**status** 55:22
**statutory** 10:16
**steel** 35:11
**stenographic**
1:18
**sticks** 61:6
**stop** 16:22
**storms** 63:7
**straight** 7:12
7:18 8:8 9:2,9
9:14 11:20,22
12:9 14:6 17:8
17:10 18:11
21:22 25:14
26:16 31:20
39:10 42:8,16
44:24 45:1,6,9

Page 18

**[straight - thinks]**

45:13,22 61:23
66:10,12
**street** 80:21
**stucco** 34:4,19
**studied** 61:10
**stuff** 21:8 22:9
23:9 64:4
**styled** 1:15
**subcontractor**
8:14
**submitted** 9:9
19:8 79:15
**subscribed**
78:13 80:12
**substantial**
26:18
**suggest** 24:20
32:9
**suite** 2:4 80:2
80:21
**summary** 27:9
27:12
**super** 64:8
**superficial**
22:23 23:1
**supplemental**
4:5 56:12
**supposed** 44:3
**sure** 7:24 9:21
18:6 20:11
21:24 32:7,23
33:23 41:19
43:2 51:22
55:2

**surfacing** 22:21
**surplus** 1:6 4:4
5:8 36:11
38:24 56:11
79:6 81:3
**susceptible**
34:18
**suzanne** 1:16
1:24 79:11,16
80:15
**suzi** 9:25
**swear** 5:16
**sworn** 1:14
5:23 79:13
**synced** 45:18
**system** 43:1
44:15 45:6
50:25
**systems** 45:5
57:8 80:18

**t**

**t** 2:3 3:12,15
80:1
**tab** 10:6
**take** 14:14
18:14 23:12
42:4 47:4,7
49:2 51:6
55:11 64:21
**taken** 1:14
50:24 52:23
55:7 79:21
80:10

**talk** 12:1 17:3
39:19 56:20
57:4,9,13,16
62:17
**talked** 27:5
50:8 55:5 56:6
73:21
**talks** 13:18
24:5 34:3
46:11
**tear** 68:5
**technical** 53:2
**tell** 11:1 18:14
20:9 26:22
28:13 31:6
35:21 56:17
62:18 69:3
75:16,17
**telling** 45:12
54:25 68:8
**tenant** 24:12
**tennessee** 63:4
**terminate** 8:16
**termination**
44:4
**terms** 17:15
24:18 25:25
57:2 59:13
64:22
**testified** 73:15
**testifies** 5:24
**testify** 5:23
57:24 58:11,20

**testimony** 5:17
58:21 59:7
79:14,21 81:8
**texas** 1:1,17 2:5
2:9,10 63:17
79:1,11 80:3,6
80:7,22
**thank** 5:11,12
5:21 65:25
73:14
**theirs** 45:7
**thing** 11:13
28:12 31:11
42:18,20 43:11
54:4 69:7
**things** 15:15
20:17 27:11
29:8,14 33:21
45:21 48:15
57:3 61:1 63:1
63:23 65:11,12
67:19 74:3
**think** 9:5 12:11
12:15 20:1,3
20:11,12 23:11
30:19 31:6
32:15,16,24
33:16 34:6,8
34:13,17 43:4
43:9,16 44:8
46:19 53:24
57:19 72:4
**thinks** 51:21

Veritext Legal Solutions
346-293-7000

**[third - vent]**

| | | | |
|---|---|---|---|
| **third** 7:25 | 62:23 | **typically** 37:16 | 63:1 |
| **thought** 32:10 | **top** 25:4 28:21 | 65:7 | **unit** 29:23 |
| 32:10 | **touch** 47:22 | **u** | **united** 1:1 79:1 |
| **thousands** 64:8 | **trained** 72:20 | **ulmer** 2:8 3:6 | **units** 48:10,25 |
| **three** 53:1 | 72:23,25 73:2 | 5:7,7 14:24 | 49:1 |
| 63:15 | **training** 62:22 | 21:6,13 25:12 | **unity** 1:3 5:3 |
| **throckmorton** | 62:24 72:14,17 | 31:25 36:25 | 6:15 17:4 79:3 |
| 80:21 | 73:4,6 | 38:15,20 40:20 | 81:3 |
| **tied** 45:5,7 | **transcript** | 45:3 49:24 | **unreasonable** |
| **tile** 34:23 | 76:13,18 79:13 | 53:19 54:2 | 58:7 |
| **time** 10:22 12:5 | 79:15 81:5,16 | 55:13 62:9 | **unrelated** 58:7 |
| 12:7,10 14:7 | **trial** 72:7 | 64:24 65:3 | **unusual** 44:20 |
| 14:13 27:2,4 | **tricky** 28:4 | 66:3 67:6,21 | **uploaded** 17:22 |
| 35:12,18 37:23 | **true** 36:24 | 68:2,7,12,22 | 42:25 45:15 |
| 42:16 45:11 | 74:17 78:3 | 69:8,19 70:1,7 | **use** 29:4 32:24 |
| 50:18,21 51:11 | 79:13 | 70:17 71:2,21 | 61:25 74:1 |
| 53:17 62:1,4,5 | **truth** 5:18,18 | 71:25 72:1,8 | 75:7 |
| 62:7,24 63:12 | 5:19,23,24,24 | 72:13 73:10 | **used** 31:2 59:18 |
| 63:25 65:25 | **try** 10:2 | 74:15 75:10 | 60:6,7 61:16 |
| 73:16,22 74:13 | **trying** 10:5 | 76:4,9,17 | 62:3 79:17,19 |
| 76:6 79:17,21 | 13:4 20:15 | 79:19 80:5 | 79:19 81:16 |
| 81:15 | 46:21 51:16 | **ultimately** 8:7 | **uses** 45:6 |
| **timeframe** 81:7 | 55:18 | **unclear** 33:17 | **using** 61:13 |
| **times** 14:12 | **turn** 9:25 | **under** 13:20 | **usually** 17:9,10 |
| 17:22 45:4 | **turned** 9:24 | 16:13 20:20 | 42:21 46:2 |
| 69:25 | **twelve** 79:19 | 53:23 58:12 | 65:9 |
| **title** 56:10 | **two** 15:14 | 78:10,16 | **v** |
| **today** 6:12,18 | 19:22 20:24 | **understand** | **v** 1:5 79:5 81:3 |
| 19:14,16 47:5 | 22:3 56:3 | 6:11,17 66:4 | **vacant** 24:10 |
| **together** 16:21 | **tx** 81:13 | 73:9 76:1 | **values** 14:7 |
| 23:10 45:5 | **type** 42:19 | **understanding** | **various** 60:19 |
| **told** 16:14 26:8 | **typical** 30:22 | 6:21 7:7 13:16 | **vent** 29:15 |
| **took** 21:18 29:5 | 63:24 | 16:14 50:20 | |
| 36:6 47:24 | | | |

Veritext Legal Solutions
346-293-7000

**[vents - yeah]**

**vents**  29:19
**verbiage**  14:16
  26:17 32:23
**vericlaim**  9:19
  63:25
**verify**  81:8
**veritext**  80:20
  81:12,19
**veritext.com.**
  81:13
**version**  66:25
  67:8
**versus**  30:12
  57:10 73:16,22
**videotaped**
  79:13
**visible**  45:23
  46:24 71:14
**visited**  52:12

**w**

**wait**  69:4
**waiting**  44:17
**walked**  23:9
**wall**  33:6
**want**  10:21,22
  11:3 29:13
  52:1,10 54:3
  54:19 56:16,17
  56:18 60:11,13
  65:11,12 74:5
  75:15 76:8,12
**wanted**  22:13
  42:9 47:16,18

  48:21 49:13
**wash**  35:7
**water**  24:7,9,12
  24:13 34:23
  35:24
**way**  13:3 29:20
  30:5 37:24
  46:4 48:13
  49:3 67:19
**we've**  6:17
**wear**  68:5
**weather**  15:2
  18:2,3
**webster**  2:5
  80:3
**week**  13:4
  62:24,25 63:2
**welcome**  26:25
**went**  16:24
  27:15 47:13
  51:8 53:1
  63:10
**whereof**  80:12
**wilkin**  3:13,16
**wilson**  2:3 3:12
  3:15 60:4,18
  80:1
**wind**  24:15
  64:6
**window**  34:20
**winds**  63:23
**winstead**  42:10
**witness**  1:14
  2:13 5:13,20

  14:25 21:7
  25:13 38:21
  45:4 53:20
  54:3 55:14
  62:10 65:4
  67:14,25 68:5
  68:19 69:3,17
  69:24 70:6,25
  72:5 73:8
  74:11,24 76:4
  76:8,14 78:5
  79:12,14,15
  80:12 81:5,7,9
  81:11,15
**witness's**  5:14
**witnesses**  4:6
  56:13 58:23
  59:7
**word**  19:1
**words**  25:13
**work**  8:8 9:20
  19:19 46:3,6
  52:7 60:19,23
  61:4,15 62:2
  63:19,19
**worked**  7:13,17
  8:11,19 9:16
  27:2,4 43:9
  65:17,20
**working**  7:9,10
  8:21 9:2,14
  12:9 19:4 63:7
  63:20 67:18

**works**  75:1
**worth**  80:22
**write**  20:18,22
  23:18 25:15
  26:2 27:20
  30:8 33:14
  44:2 48:17,24
  49:3,3
**writing**  25:25
**written**  22:9,16
  23:2 26:1
  47:18 48:20,20
**wrote**  20:23,25
  22:17 24:22
  25:5 27:16
  34:8

**x**

**xactimate**
  17:18,19 43:17
  43:17,22,23
  44:14,15 45:10
  45:11,16 46:1
  51:2 52:24
  55:24 59:18
  60:7 63:2
  74:16,18 75:3
  75:8,13

**y**

**yeah**  10:3,6
  12:19 16:19
  18:16 29:24
  30:2 42:13,22
  43:4 47:13

Page 21

Appx.0042

**[yeah - years]**

```
48:17 50:22
56:3 57:12
71:16
year  63:4
years  19:22
22:3 62:11
63:16 74:13
```

Veritext Legal Solutions
346-293-7000

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f) (1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Exhibit B

Neil B. Hall    January 16, 2025

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ONE UNITY INVESTMENT, LLC )
                          )
    Plaintiff,            )
                          )
VS.                       ) CIVIL ACTION
                          ) NO. 4:23-cv-02455
AXIS SURPLUS INSURANCE    )
COMPANY,                  )
                          )
    Defendant.            )

**************************************************** **

ORAL AND VIDEOTAPED DEPOSITION OF

NEIL B. HALL

JANUARY 16, 2025

(Taken Via Remote Videoconference)

**************************************************** **

        ORAL AND VIDEOTAPED DEPOSITION OF NEIL B. HALL,
produced as a witness at the instance of the DEFENDANT,
and duly sworn, was taken in the above-styled and
numbered cause on the 16th of January, 2025, from
10:00 a.m. to 11:57 a.m., before Mona S. Whitmarsh,
Certified Shorthand Reporter, in and for the State of
Texas, reported by machine shorthand via Zoom
videoconference, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

**Page 2**

```
1            A P P E A R A N C E S
2        (ALL APPEARING VIA ZOOM)
3
   FOR THE PLAINTIFF:
4     Mr. Jay Scott Simon
      THE CHAD T. WILSON LAW FIRM, PLLC
5     455 East Medical Center Blvd., Suite 555
      Webster, Texas 77598
6     833-942-0678
         jsimon@cwilsonlaw.com
7
8  FOR THE DEFENDANT:
      Mr. Artis G. Ulmer, III
9     SHACKELFORD, McKINLEY & NORTON, LLP
      717 Texas Avenue, 27th Floor
10    Houston, Texas 77002
      832-415-1801
11    832-565-9030 (fax)
      aulmer@shackelford.law
12
13 VIDEO TECHNICIAN:
      Mr. Christian Barrett
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1                   INDEX
                              PAGE
2
   Appearances                  2
3
   Stipulations                 5
4
   NEIL B. HALL
5     Examination by Mr. Ulmer    5
6  Changes and Signature          67
7  Reporter's Certificate         69
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1                 EXHIBITS
   NO. DESCRIPTION              PAGE
2
   Exhibit A                    12
3     Plaintiff's Designation of Expert Witnesses
   Exhibit B                    14
4     Neil Hall's Expert Report
   Exhibit C                    19
5     Roof Photo
   Exhibit D                    23
6     Map of Hail Strikes, Photo 1
   Exhibit E                    25
7     Hail Strikes Southeast Corner, Photo 8
   Exhibit F                    25
8     Hail Strikes Southwest Corner, Photo 23
   Exhibit G                    25
9     Hail Strikes Opposite South Parapet,
      Photo 16
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1  (Pages 1 to 4)

Worldwide Court Reporters, Inc.
(800) 745-1101

Neil B. Hall   January 16, 2025

Page 5

1    THE VIDEOGRAPHER: Today is January 16th,
2  2025. The time is 10:00 a.m. and we are on the record.
3    THE REPORTER: Counsel, any stipulations?
4    MR. ULMER: By the Rules.
5    THE REPORTER: All right. Thank you.
6    For the record, my name is Mona Whitmarsh,
7  Texas CSR 3986. I am located in Clear Lake Shores,
8  Texas.
9    Mr. Hall, if you would please raise your
10  right hand.
11    NEIL B. HALL,
12  having been first duly sworn, testified as follows:
13    EXAMINATION
14  BY MR. ULMER:
15    Q Good morning, Dr. Hall. My name is Artis
16  Ulmer. I represent Axis Insurance Company.
17    How are you doing today?
18    A I'm fine. Thank you.
19    Q You're welcome.
20    Can I get you to state your full name for the
21  record, please?
22    A Neil Bradley Hall.
23    Q And your date of birth, sir?
24    A September 18, 1948.
25    Q What is your current address?

Page 6

1    A I'm sorry. Business or home?
2    Q Business is fine.
3    A 1923 Corporate Square Boulevard, Suite B, as
4  in bravo, Slidell, Louisiana 70458.
5    Q All right. And what is your occupation?
6    A I am a consulting architect and engineer.
7    Q Are you licensed as an engineer in the state
8  of Texas?
9    A Both as an architect and an engineer, yes.
10    Q Okay. And how long have you been licensed as
11  an engineer in Texas?
12    A I have been licensed as an architect since
13  '78. As an engineer since '81. If you ask me Texas, I
14  would have to look it up. I think in each case it's
15  around 2000 -- between 2000, 2010.
16    Q Okay. And have you ever been subjected to
17  discipline by the Texas board of engineers?
18    A One time during COVID. I didn't get --
19  because the website went down, I didn't renew my Texas
20  firm license in time. I signed out a report with my
21  Texas PE stamp, but it -- the letterhead wasn't valid
22  because it wasn't a Texas firm for that period of time.
23    I self-reported myself to the Texas PE board.
24  They fined me, I think, $127, which was the lowest fine
25  possible, and told me "don't do that again; get back to

Page 7

1  work."
2    Q Gotcha.
3    Okay. And how -- did you -- were you
4  suspended or did you just receive a fine?
5    A No. I just paid a fine. It was not
6  suspended.
7    Q Okay. All right. And your CV shows that you
8  have a bachelor's degree and a master's degree in
9  architecture. Do you have a degree in engineering?
10    A If I may, the -- it's a bachelor of science in
11  architecture and a bachelor of architecture, which is
12  called the first professional degree. It involves a
13  fifth year and a thesis, but it's not the master's
14  level. But in architecture it's called the first
15  professional degree.
16    I don't have a degree in engineering. My
17  architecture school was embedded in a school of
18  engineering. At the time we were a department, not a
19  school. So I had to take every engineering course the
20  civil engineers took with the exception of surveying.
21    When I graduated, we had just become, six
22  months earlier, the school of architecture. So because
23  I graduated from a school of architecture, I technically
24  did not graduate from a school of engineering, but I
25  took all of the civil engineering courses in the school

Page 8

1  of engineering while I was in my undergraduate work.
2    Q What about any engineering certifications? Do
3  you have any?
4    A I am a licensed engineer in six states.
5    Q Okay. What about any seminars or anything
6  like that other than what you took in college?
7    A Oh, yeah. I mean, I have attended seminars.
8  I have taught at seminars. I am speaking in two weeks
9  at the windstorm conference in Dallas, if you are
10  coming. So, yeah, I mean, all that to me is icing on
11  the cake. We are required to take about 20 hours of
12  continued education every year to maintain our licenses.
13    I am an architect, an engineer, and a
14  landscape architect, so I have got to take about 60
15  hours of continuing ed every year. I don't -- every
16  time you take a continuing ed course, you learn
17  something new, but I don't -- I don't make a big deal
18  about that.
19    Q What about meteorology? Do you have any
20  degrees in meteorology?
21    A No, I don't have a degree in meteorology.
22  Under the Texas practice law for engineers, engineers
23  are allowed to use what's called natural and physical
24  science in the pursuit of their work so long as we don't
25  stray outside our area of expertise.

2  (Pages 5 to 8)

Neil B. Hall     January 16, 2025

Page 9

1    The American Society of Civil Engineers under
2  their manual of practice program has a manual of
3  practice to understand and interpret weather radar, so
4  there is some aspects of meteorology I feel comfortable
5  working in. I do not forecast.
6    The forte of a meteorologist is putting
7  together all the pieces of the puzzle to forecast future
8  events. I limit myself to researching past events which
9  have been established by meteorological principles,
10  generally by government sources, and I use that -- I
11  assume that's meteorology, but it's not meteorology as
12  in the practice of meteorology by a professional
13  meteorologist.
14    **Q What about any certifications in meteorology?**
15  **Do you have any of those?**
16    A No. I have taken courses from the National
17  Weather Service. In fact, they have a course that I
18  took that's titled -- I am paraphrasing -- use of NEXRAD
19  radar for non-meteorologists. So even the National
20  Weather Service recognizes that non-meteorologists have
21  a need to use meteorological tools. It doesn't make us
22  a meteorologist. I am not a meteorologist.
23    Best way I can say it, Bob Dylan said, "you
24  don't need to be a weatherman to know which way the wind
25  blows. So I can look at a weather report and tell you

Page 10

1  what the report says. I don't know how to put that
2  report together.
3    **Q Gotcha.**
4    **Do you have any training or certifications in**
5  **roof construction?**
6    A I'm sorry. In what, sir?
7    **Q I'm sorry. Do you have any training or**
8  **certifications in roof construction?**
9    A Not that I can hang on the wall. By virtue of
10  being an architect, I learned more in architecture
11  school in roof systems than engineers would learn about
12  roof systems. The engineers in their schooling learn
13  about the forces that keep the roof standing up. An
14  architect learns how to put it together.
15    When you go down to the buildings department
16  and -- whether it's a residential, commercial building,
17  you have a set of drawings. The A drawings is
18  architecture, the S drawings is structural, P is
19  plumbing, E is electrical.
20    The roof system is on the A drawings. It's
21  considered to be architecture. That's why it's
22  important I am dual-registered because Texas is not an
23  incidental practice state. In some states engineers can
24  practice architecture, architects can practice
25  engineering. Not Texas. Texas is not an incidental

Page 11

1  practice state. Roof systems are kind of in the crack
2  between engineering and architecture. I have myself
3  covered because I am dual-licensed.
4    **Q Okay. What about any experience constructing**
5  **a roof? Do you have any?**
6    A I constructed roofs while in the military. I
7  put five years in the Army Corps of Engineers, 15 years
8  in the Navy Seabees. I supervised crews to put on
9  roofs. I did not have the hammer in my hand. You would
10  likely consider me more to be the Gucci general
11  contractor than the worker in the field with the roof.
12  But, yeah, I have designed, I have supervised, and I
13  have observed roof construction.
14    **Q All right. But just a second ago, you said**
15  **you constructed roofs in the military?**
16    A In the military. Since 1992 when I retired
17  from the military, I've observed roof construction. I
18  have repaired my own house, but I am not a roofing
19  contractor.
20    **Q Okay. All right. And I believe you answered**
21  **this question already, but could you explain what you do**
22  **for a living?**
23    A I'm always asked that question. If I go to a
24  conference -- an engineering conference and one guy is
25  saying he built a bridge across the river and the other

Page 12

1  guy is talking about building a hundred-story
2  skyscraper, I have to confess I climbed the roof with a
3  piece of chalk and circled hail hits.
4    That said, it still requires engineering
5  expertise. It's still important. What I do is forensic
6  engineering, which means something fell down, blew up,
7  burned to the ground. It's my job to go in and tell you
8  what happened, when it happened, why it happened, and so
9  far as how to fix it.
10    **Q That makes sense.**
11    **All right. Could you tell me how you became**
12  **involved in this matter?**
13    A Initially I received a communication from the
14  Chad Wilson Law Firm from the office of Jay -- Jay
15  Simon; likely an e-mail to my office intercepted by my
16  secretary who passed it on to me. That would have been
17  on April 27, 2023.
18    **Q Okay. I am going to share my screen with you**
19  **and I am going to introduce this document as Exhibit A.**
20  **One second.**
21    **(EXHIBIT A WAS MARKED.)**
22    **Q You should be seeing a six-page designation of**
23  **expert witness by plaintiff. I will show you all six**
24  **pages for the record.**
25    **All right. And this is signed by attorney**

3  (Pages 9 to 12)

Worldwide Court Reporters, Inc.
(800) 745-1101

Appx.0049

Neil B. Hall    January 16, 2025

## Page 13

1   Simon here. And on Page 1 you are listed as the
2   plaintiff's expert engineer. And essentially you have
3   been designated as an expert to testify regarding the
4   state of the plaintiff's property following the
5   hailstorm and windstorm event and the amount of funds
6   necessary to repair the property to its original
7   condition.
8      What was the property's original condition?
9    A   At the time of the storm, it was 14 to 16
10   years old. The roof system had a modified bitumen cap
11   sheet. It showed evidence of wear and tear. There was
12   evidence of repairs, but repairs simply mean that you
13   have an active maintenance program for repair.
14      I don't have any report of roof leaks at the
15   property until shortly after the date of loss, by which
16   I inferred that the roof at some location started to
17   leak as a result of the hailstorm on the date of loss.
18    Q   Okay. And how many reports have you prepared
19   in connection with this matter?
20    A   I prepared one report and hopefully you
21   received an errata sheet.
22    Q   Yes.
23    A   I quipped it wouldn't be a whole report
24   without typo errors. I apologize for that. On the
25   bottom of Page 2, there is a -- it's not a substantive

## Page 14

1   error, but it's a -- it's a pretty good-sized error.
2   Apparently I did not complete my thought when I was
3   drafting the report, and I completed it on the errata
4   sheet. The other two locations I will blame on
5   carpenter thumbs. I hit a 1 when I should have hit a 2.
6    Q   Right. And it's actually here on Page 56. I
7   attached it to the end of your report. Is this the
8   errata sheet you are talking about?
9    A   Yes, sir.
10    Q   Okay. I will go through the entire thing just
11   to show you what I am introducing and it will be
12   Exhibit B, the engineer report.
13      (EXHIBIT B WAS MARKED.)
14      THE REPORTER: Counsel, can I interrupt
15   real quick? Mr. Ulmer, you are sounding kind of muddy
16   to me like --
17      Christian, are you -- are you hearing what
18   I'm hearing where it's not super clear audio?
19      THE WITNESS: A little. I was going to
20   blame my speaker.
21      THE REPORTER: Yeah.
22      THE VIDEOGRAPHER: Do you want to go off
23   the record for a second?
24      THE REPORTER: Can we go off? I'd like to
25   fix that before we go too much further.

## Page 15

1      THE VIDEOGRAPHER: Okay. The time is
2   10:13 a.m. and we are off the record.
3      (OFF-THE-RECORD TECHNICAL DISCUSSION.)
4      THE VIDEOGRAPHER: The time is 10:13 a.m.
5   and we are back on the record.
6    Q   (BY MR. ULMER) All right. So I am showing you
7   56 pages of your engineering report. It will be
8   introduced as Exhibit B.
9    A   Yes, sir.
10    Q   And I am just going to go through all of the
11   pages so that you will see that I am not introducing
12   something else.
13      (Counsel scrolling through Exhibit B.)
14      All right. So this will be Exhibit B. And
15   back to your errata sheet. Just to confirm, the only
16   errors that we are talking about were just simply typos
17   and you forgot, I guess, a part of the paragraph, but
18   there is nothing substantive that changed regarding your
19   opinion; is that correct?
20    A   That's correct.
21      Sir, I have one change on the -- what you
22   showed me as my report. Let me find where I can see it.
23      Okay. In subsequent reports I have added it
24   as a footnote to my report. If you go back to the
25   attachment to the radar... Oh, you can stop right

## Page 16

1   there. What you will notice is you will see a bunch of
2   Xs with white boxes. On my report that was sent out,
3   those boxes are covered by boxes that I added which show
4   the Maximum Estimated Size Hail.
5      You will notice in the upper left corner, it
6   says, number in box shows Maximum Estimated Size Hail.
7   I started to notice years ago that different editions of
8   Adobe pull up the information differently. And in cases
9   such as this, my information was not pulling up on your
10   screen. It was sent out with those -- that information.
11   Somehow it did not show up for you with that
12   information. My apologies.
13      I have started to correct that in subsequent
14   reports where what I do is I put a white box around the
15   north arrow and then I say in my report, "if you don't
16   see a white box around the north arrow, you are missing
17   information; contact my office."
18      This report was old enough -- it was before we
19   discovered the problem. I don't know how you want me to
20   deal with that. I could deal with that -- I am holding
21   up the same page to show you what I am looking at, which
22   is where I have superimposed those yellow boxes that
23   have the Maximum Estimated -- Estimated Size Hail.
24      If you want, I can stop and have my secretary
25   resend it. I don't know how you want me to deal with

4   (Pages 13 to 16)

Worldwide Court Reporters, Inc.
(800) 745-1101

Neil B. Hall     January 16, 2025

## Page 17

1  that.
2      Q  Yeah. If you don't mind e-mailing that to me
3  or having Jay e-mail that to me. We can go off the
4  record and I will add whatever you send me to the back
5  of this report as an addendum, and then we can enter it
6  as the report which includes what you are about to send
7  me.
8      A  Okay. Fine. If you allow me -- let me step
9  aside to get that done in the front office and I will
10  have that sent to both you gentleman.
11      Q Okay.
12          THE WITNESS: Mr. Simon, do you want me to
13  send it through you?
14          MR. SIMON: I don't know if you have his
15  e-mail so why don't you send it to me and I will send it
16  right over to him so that will --
17          THE WITNESS: Fair enough.
18          MR. SIMON: -- that will skip the step of
19  you trying to figure that part out.
20          THE VIDEOGRAPHER: Do you want to go off
21  the record?
22          MR. ULMER: Yes.
23          MR. SIMON: Sure.
24          THE VIDEOGRAPHER: The time is 10:18 a.m.
25  and we are off the record.

## Page 18

1          (RECESS FROM 10:18 A.M. TO 10:42 A.M.)
2          THE VIDEOGRAPHER: The time is 10:42 a.m.
3  and we are back on the record.
4      Q (BY MR. ULMER) Okay, Mr. Hall. Let me share
5  my screen with you again. One second. All right. And
6  just for clarity on the record, we have added five pages
7  to Exhibit B; is that correct?
8      A Yes.
9      Q All right. And this is attached as Exhibit B,
10  your expert report?
11      A Yes, sir.
12      Q All right. Give me one second.
13          All right. So I want to go over the geology
14  of the building. And I believe it's Page 7 of your
15  report. Okay. Hold on one second.
16          All right. So according to your report
17  here -- and I am going to zoom in to picture number 1.
18  Okay. This building -- the front of the building faces
19  south; is that right?
20      A Say it again. I'm sorry.
21      Q The front of the building, which is right here
22  where I am circling --
23      A That's correct.
24      Q -- it faces south.
25      A Yes.

## Page 19

1      Q A south direction, right?
2      A That's correct.
3      Q Right. And there is, I guess, a compass here
4  indicating that the rear of the building is on the north
5  side.
6      A That's correct.
7      Q All right. So this is a glass penthouse, I
8  believe, right here? And this would be the southwest
9  side; is that right?
10      A Yes.
11      Q And there is a -- not really a penthouse over
12  here but some structure on the southeast side of the
13  roof; is that right?
14      A Yes.
15      Q All right. And there is only one glass
16  structure on the roof, right? Let me go to Page 8 here,
17  photo number 3 of your report.
18      A Yes. Meaning a glass wall under the roof;
19  that's correct.
20      Q Right. All right. And I have a better
21  picture here as Exhibit C I will introduce.
22          (EXHIBIT C WAS MARKED.)
23      Q And I believe it's a penthouse -- I saw it
24  referenced in someone's report -- but this glass
25  structure or this glass wall under the roof like you

## Page 20

1  just said?
2      A  Right. Structures like that above the roof
3  level we refer to as a penthouse.
4      Q  Okay. And this is going to be Exhibit C.
5          All right. And could you walk me through your
6  inspection?
7      A  I arrived at the building and I met Mr. --
8  Mr. La, Tony La. He walked me briefly around the
9  interior, allowed me into some rooms. And then I went
10  up to the roof where I spent most of the time doing the
11  investigation.
12          It's a -- it's not a dead flat roof. It's
13  what we call a flat roof, but it has a slope to it for
14  drainage. But it's a flat roof with a modified bitumen
15  cap sheet. I presume a two-ply modified bitumen system
16  over some substrate. And it has a granule coating on
17  it. And I looked at the roof system to show evidence of
18  hail damage.
19      Q Okay. Did you look at anything in particular
20  before getting off the roof? I'm sorry. Before getting
21  on the roof.
22      A No. As I recall, I was taken into several
23  units. Mr. La said that the tiles had been changed out.
24  He identified that there were previous leaks sometime
25  after the storm, which I later identified as being

5  (Pages 17 to 20)

Worldwide Court Reporters, Inc.
(800) 745-1101

Neil B. Hall    January 16, 2025

## Page 21

1  related to an area he claimed was repaired after the
2  storm on the back side or the north side of the roof.
3  Other than that, I concentrated on the roof covering and
4  not the interior.
5      Q Okay. And at what point did you decide there
6  was hail damage to the roof?
7      A  When I noted -- well, the first indication was
8  when I noted hail -- when I decided there was hail
9  damage on the roof was when I did my investigation and
10  noticed what we call "hail strikes" in the asphalt
11  modified bitumen.
12      I consider a hail strike to be a mark the size
13  and shape of impacting hail that removes a sufficient
14  number of granules to expose the underlying membrane to
15  the effects of an ultraviolet radiation, which will
16  eventually lead, if not corrected, to shrinking,
17  cracking, and water penetration.
18      Q Okay. All right. Did you decide there was
19  hail damage before or after you chalked the three test
20  squares?
21      A I saw indications of hail damage before I
22  chalked the test squares. I confirmed the severity of
23  hail based on the number in the test square after I
24  chalked the test squares.
25      Q Okay. And why do you do a test square?

## Page 22

1      A  It gives you an indication of the frequency of
2  damage on the roof. Example: I found 19 hail strikes
3  in one test square.  That's -- a test square is a
4  hundred square feet, usually -- usually 10 by 10.
5  Sometimes if you are on a sloped roof, you have to come
6  up with a discombobulated shape, but on a flat roof,
7  it's usually a square, 10 by 10.
8      19 hail strikes is well above the consensus
9  for replacing the system. There is argument when you
10  get down to five to ten, you get five adjusters in the
11  room, each one is going to argue differently about is
12  that the threshold to replace the roof. When you are up
13  to 19 hits in a test square, I don't know anybody in
14  this industry who argues against replacing the roof
15  system.
16      Q And why does the frequency within a test
17  square matter?
18      A Well, for that reason. If -- one, it might
19  help you confirm the event. If you had an event -- if
20  you are looking at a date of loss which had very light
21  frequency of hail descending, you wouldn't expect to see
22  a heavy frequency of hail strikes on the roof itself.
23  That's one thing.
24      More importantly, it gives you a rule of thumb
25  to determine when you want to actually replace the roof.

## Page 23

1  Are you going to replace a roof because there is one
2  hail strike within a test square? Likely not. If you
3  were going to -- if you were up to 19, I have found as
4  many as 20 -- 21 hail strikes within a test square,
5  that's a high enough degree of damage that you are
6  necessarily going to have to replace the roof system.
7      Q Okay. I'm -- give me one second. I am going
8  to share photo 1 from your report. It's attached
9  separately as Exhibit D. And I just want to confirm
10  what you just mentioned about the hail strikes that you
11  found.
12      (EXHIBIT D WAS MARKED.)
13      Q So here in your report it says in the
14  southeast corner, you found 19 hail strikes, which is
15  referenced in photos 8 through 13; is that right?
16      A That's correct. I -- just for the record, I
17  think the annotations were put on after I published that
18  photograph, but it has the correct information.
19      Q Oh, no. I added this right here.
20      A Okay, sir.
21      Q Yeah, yeah. This right here -- 19, 16, 21
22  hail strikes -- this is what I added. These are my
23  annotations. Okay.
24      All right. And there were 16 hail strikes in
25  this area here which is opposite this south parapet?

## Page 24

1      A  I am looking at both my Page 4 and also my --
2  the captions on my photographs. I called 11 hail
3  strikes in that area.
4      Q  All right. One second. Let's see here.
5      A  Last paragraph, Page 4 of my report.
6      Q Okay. You are right. That's a mistake. So
7  it's 11, not 16.
8      All right. And here in the southwest corner
9  over by the penthouse, the glass penthouse, there were
10  21 hail strikes referenced in photos 23 through 27 of
11  your report; is that right?
12      A That's correct.
13      Q All right.
14      A Well --
15      Q I'm sorry. Go ahead.
16      A No. You're right. You're right. I called it
17  the southwest corner. It's as close as you could get to
18  the southwest corner on the flat roof because the
19  penthouse is actually at the southwest corner.
20      Q Okay. And I am actually going to get to that
21  point in a second. Give me one minute.
22      All right. So let's talk about each of these
23  sections. So on the southeast corner, you counted 19
24  hail strikes right here, right?
25      A Yes.

6  (Pages 21 to 24)

Worldwide Court Reporters, Inc.
(800) 745-1101

Neil B. Hall    January 16, 2025

## Page 25

1    Q All right. Let me introduce Exhibit E.
2        (EXHIBIT E WAS MARKED.)
3    Q And this is Exhibit E, photo 8 from your
4    report?
5    A Yes.
6    Q All right. Now, because this glass penthouse
7    is depicted, wouldn't this be the southwest side and not
8    necessarily the southeast side?
9    A Let me check. You may be right. Let me take
10   a look.
11       (Witness reviewing document.)
12       Looking quickly through my report, I believe
13   you are correct.
14       (EXHIBIT F WAS MARKED.)
15   Q Okay. All right. And I am going to show you
16   Exhibit F, which is photo number 23 from your report,
17   which is the other side of the glass penthouse where you
18   found, what was it, 21 hail strikes. And, again, this
19   is not necessarily the southwest corner, but it's dead
20   center, I guess, the west side of the roof, right?
21   A Yeah. It's the southwest corner of the flat
22   roof. It's not the southwest corner of the building.
23   Q Gotcha. Understood.
24       All right. And Exhibit G here -- one second.
25       (EXHIBIT G WAS MARKED.)

## Page 26

1    Q And these are the remaining 11 hail strikes
2    south of the parapet, right?
3    A That's correct.
4    Q All right. So because we agree that photo 8
5    is the southwest side and not the southeast side, would
6    you agree that there are no test squares on the east
7    side of the roof?
8    A Yes.
9    Q Okay. And do you agree that there are no test
10   squares on the north side of the roof?
11   A Correct.
12   Q And do you agree that there are no test
13   squares in the center of the roof?
14   A Correct.
15   Q So let's talk about these 11 hail strikes
16   south of the parapet. In this photo there are several
17   blue circles. I'm not sure if you can make it out. I
18   think it's better in your report. Let me go to your
19   report, photo number 16.
20       It's a little better. Are you able to make
21   that out?
22   A Yes. It looks like I may have taken this
23   photo before I marked the test squares but that's --
24   Q Yes.
25   A -- the location where I marked the test

## Page 27

1    squares.
2    Q Right, right.
3        So there are several blue circles and these
4    are the circles that you drew, right, or you circled?
5    A Yes. What -- those aren't circles. What you
6    are looking at are the four corners of the test square.
7    They look like little Ls. That's the corner of the test
8    square.
9    Q Right. I do see that, but what about here and
10   here and here (indicating)? Are these blue circles or
11   what is that?
12   A Yeah. I am looking -- I'm looking at my hard
13   copy photo. Those blue circles are the locations of the
14   hail strikes.
15   Q Okay.
16   A So I did take the picture after -- after I
17   marked the hail strikes.
18   Q Okay. And that kind of answers my question
19   because my question was, what do the blue circles
20   signify? And your answer is what again?
21   A They show the locations of the hail strikes as
22   depicted in photos 17, 18, 19, 20, 21, 22.
23   Q Okay. And below the blue markings, there is
24   this dark area along the roof here. What does that
25   signify?

## Page 28

1    A That's an area of granule loss unrelated to
2    the hail strike.
3    Q Okay. So would that be considered wear and
4    tear or deterioration?
5    A It's likely wear --
6        MR. SIMON: Objection, form.
7    A -- and tear.
8        THE WITNESS: I'm sorry. I spoke over
9    you.
10       MR. SIMON: Go ahead. I just objected to
11   the form.
12       THE WITNESS: Oh.
13   A It's wear and tear over a period of time.
14   Likely there is a small rise there at the overlap and it
15   just allowed enough of an elevation difference for
16   wind -- wind crossing that location to remove the
17   granules.
18   Q Okay. And earlier you testified that the
19   absence of granules could lead to water penetration; is
20   that right?
21   A Yes.
22   Q Okay. All right. One second. All right.
23       And according to your report, you found no
24   hail strikes on the metal vent hoods or the metal
25   parapet covers; is that right?

7  (Pages 25 to 28)

Neil B. Hall    January 16, 2025

## Page 29

1    A That's correct.
2    Q Okay. And in photo 8 -- let me pull it up one
3    second.
4        All right. So here in photo 8, the 19 hail
5    strikes that you observed, these are directly next to
6    the parapet, right?
7    A Yes.
8    Q All right. So how is it possible that you
9    have 19 hail strikes here, but nothing on the metal
10   parapet cover?
11   A Well, the parapet cover is heavy-gauge metal;
12   whereas, the modified bit is a 14- to 16-year-old roof
13   system. It's more susceptible to hail strikes.
14   Q Okay. Could you explain what a modified
15   bitumen roof is and what it consists of?
16   A Generally, it consists of a two-ply system; a
17   base sheet and a cap sheet. The system itself is
18   typically a -- some type of mat, which may be a
19   fiberglass mat or another product, impregnated with
20   asphalt or bitumen. And then on top of the cap sheet,
21   you imbed granules into the bitumen on the top of the
22   cap sheet.
23   Q Okay. And how is it that hail could penetrate
24   a bitumen roof but it couldn't penetrate a metal cap
25   sheet?

## Page 30

1    A Well, it didn't penetrate the roof. It
2    removed the granules. The granules are sitting on top
3    of the bitumen. And just a matter of friction, when the
4    hailstone hits, the impact is going to remove those
5    granules. It doesn't mean you are going to have a
6    fracture. It may mean you have a fracture.
7        Typically, if you have a fracture, it's going
8    to be on the underside of the system because fractures
9    occur due to tensile -- tensile movement. So as the mat
10   pushes down, it will crack at the bottom. You can't see
11   it. So that's one reason when I look for granule --
12   when I look for hail damage, I go by the granule loss.
13   I can see the granule loss. Granule loss of itself is a
14   sufficient mode of damage.
15       This is even pointed out in the RICOWI report
16   that EFI used in their report. There is two times of
17   damage. There is fracture of the mat, which typically
18   you have to see by looking underneath -- that's said in
19   the RICOWI report -- or granule loss, which you can see
20   from above. That's pointed out in the RICOWI report.
21   Q Okay.
22       THE WITNESS: If I may, for the court
23   reporter, RICOWI is R-i-c-o-w-i.
24   Q All right. And, likewise, in photo
25   number 3 -- let me pull it up. Sorry. Photo 23. Give

## Page 31

1    me a second.
2        The 21 hail strikes that you observed in the
3    southwest corner of the roof is also directly next to
4    the metal parapet cover, correct?
5    A Correct.
6    Q And, again, there is no metal -- there is no
7    damage from hail to the metal parapet cover; is that
8    right?
9    A That's correct.
10   Q Okay. All right. And photos 31 through 36,
11   give me -- let me pull those up. One second. You also
12   point out what you believe to be hail damage to the HVAC
13   fins; is that right?
14   A Yes.
15   Q But would you agree that there is no hail
16   spatter on the actual HVAC system?
17   A I didn't find any, but I don't -- I don't
18   consider spatter to be a smoking gun whether hail
19   occurred. In the first place, if you think of your
20   kitchen, it's hard to clean your countertop using a dry
21   sponge.
22       So if the hail fell outside of a period of
23   liquid precipitation, it's what we call dry hail instead
24   of wet hail. The dry hail will leave an impression, but
25   it's not going to leave a splatter mark.

## Page 32

1    Q And you used the word "splatter" versus
2    "spatter." Is there a difference?
3    A Yeah. I'm probably the odd man out. Most
4    people in the industry say "spatter." But if you get
5    into forensics, and especially criminology, spatter is
6    that blood that's on the wall when Robert De Niro is
7    done with his contract job. Spatter is like if you take
8    a paint brush and flick it, what flies off is spatter.
9    Splatter is when you take a slushy snowball and throw it
10   against the wall.
11       There is no official definition. I have seen
12   some engineers call it burnish marks. I've seen some
13   call it cleaning marks. Some say spatter. Just trying
14   to be precise as to the causation, I call it splatter.
15   Q Sounds good. Understood. Give me one second.
16       All right. So when the insurer filed its
17   claim, there was a reported date of loss of August 10,
18   2022; is that right?
19   A Yes.
20   Q All right. But according to your report, you
21   found that hail falling on August 10, 2022, did not
22   impact the building; isn't that right?
23   A That's correct.
24   Q All right. And why do you disagree with the
25   insured?

8   (Pages 29 to 32)

Worldwide Court Reporters, Inc.
(800) 745-1101

Neil B. Hall   January 16, 2025

Page 33

1          MR. SIMON: Objection, form.
2       A   Oh, I don't know that I do.  Typically, when I
3    receive information, which is typically from a claim
4    file, there is a reported date of loss.  That might be
5    the date the claim was called in.  That might be the
6    date when somebody told the owner there was a storm.
7    That might be the date when the owner in his own mind
8    thinks there was a storm.
9          But unless he eyewitnessed the storm, that
10   date is just a starting point for the analysis.  I don't
11   use that as a done deal.  I still have to research that
12   date of loss.  And when I researched that date of loss,
13   there was no hailstorm on August 2022 that could have
14   caused the damage, but there was a hailstorm on
15   March 22, only several months prior, which would explain
16   all the damage I saw on the roof.
17         And since that storm wasn't after the date the
18   claim was filed but before the date was -- the claim was
19   filed, it seemed logical March 22, 2022, was the actual
20   date of loss.
21      **Q Also in your report you mentioned that -- or
22   you are of the opinion that hail falling on July 12th,
23   2022, did not impact the building; is that right?**
24      A I apologize. I was looking down when you were
25   talking.  I didn't hear you fully.

Page 34

1      **Q   Sure. Sorry about that.**
2         **I said also in your report, you are of the**
3    **opinion that hail falling on July 12th, 2022, did not**
4    **impact the building; is that right?**
5      A That's correct. That's correct.
6      **Q   Okay. You also state that -- and you just**
7    **mentioned this, but you also state that the actual date**
8    **of loss was March 22nd, 2022, and it did impact the**
9    **building; is that right?**
10     A That's correct.
11     **Q Okay. And you are also of the opinion that**
12   **hail falling on March 17, 2021, may have impacted the**
13   **building; is that right?**
14     A It may. I have less confidence that's the
15   actual date based on review of the weather data. There
16   is a possibility, but a lower probability.
17     **Q Okay. But it's still possible, right?**
18     A It's possible, but when -- in reviewing all
19   the facts I had in front of me, I gave less credence to
20   that date and concluded March 22, 2022.
21     **Q Okay. Why weren't you able to exclude the**
22   **possibility of hail falling on March 17, 2021, impacting**
23   **the building?**
24     A Because although the hail swath on the hail
25   map showed all the hail activity, with exception of a

Page 35

1    single half-inch hailstone, all the hail activity was
2    occurring north of the property. The surface wind was
3    moving southeast. So maybe as it fell to the north,
4    that southeast wind brought it to the building.
5          But I don't know what happened between where
6    radar encountered it -- 1,000 to 10,000 feet up -- down
7    to that surface reading, which is 33 feet aboveground so
8    I can't promise you that the wind advection, which is
9    the wind shear, the wind movement -- I can't promise you
10   it routinely drove the hail towards the site.
11         Most of the way down, it might have drove the
12   hail away from the site and only at ground level did it
13   come back moving towards the southeast. So not having a
14   full understanding of how the hail was transported to
15   the ground, I am less confident that it hit the building
16   than if I used March 22, 2022, because that hail swath
17   shows the hail activity was north, south, east, west on
18   all sides of the building.
19         So no matter which way the wind blew the hail,
20   the hail was going to hit the building on March 22,
21   2022; whereas, I couldn't be as positive with March 17,
22   2021.
23     **Q All right. But it's still true that you were**
24   **unable to exclude March 17, 2021, as a possible date of**
25   **hail damage?**

Page 36

1      A   Well, that's -- that's correct --
2          MR. SIMON: Objection, form.
3      A   -- because I -- I'm sorry.  I am being totally
4    transparent. I don't have enough facts to say it hit
5    the building. I don't have enough facts to say it
6    didn't hit the building.  But with the facts I have, I
7    believe it's far less likely that it hit the building
8    than March 22, 2022.
9      **Q Understood.**
10         **But according to your report, you state that**
11   **you couldn't exclude the possibility of May [sic] 17,**
12   **2021, because you didn't include a vertical wind shear**
13   **analysis to make that determination, right?**
14     A Right. And that's what -- just what I've
15   described. The wind shear analysis was the direction
16   that the hail is taking as it falls to the ground.  I
17   only know two things. I know the wind speed, which is
18   measured where the hail was measured by the radar, and I
19   know the ground speed at 33 feet above elevation where
20   it was measured at the nearest airport.
21         In between those two locations, there is
22   plenty of room for the hail to move north, south, east,
23   west at what speed on the way down. I don't know that.
24   That's not important when the hail swath covers the
25   entire area above the building because no matter how the

9  (Pages 33 to 36)

Worldwide Court Reporters, Inc.
(800) 745-1101

Appx.0055

Neil B. Hall    January 16, 2025

Page 37

1   hail falls, it's going to hit the building. It does
2   become important when the swath is directionally on one
3   side of the building and I am trying to confirm if it --
4   if the wind blew it towards the building. I don't have
5   enough information to say that.
6       So I am very, very confident about the
7   March -- whoop -- very, very confident about March 22,
8   2022. I am less confident about July 12th, 2000- -- I'm
9   sorry. Less confident about March 17, 2021, although I
10  keep the door open should somebody provide me with
11  additional information.
12      That additional information would be in the
13  form of what's called a hodograph. A hodograph is what
14  the meteorologists use to make that determination about
15  wind shear at different levels. That's determined by
16  sending up weather balloons. Those weather balloons are
17  typically sent up 6:00 a.m. and 6:00 p.m. They are not
18  sent up in the middle of a storm. So even if I had that
19  information, it may not precisely tell me what happened
20  at the storm location.
21      That said, I don't have a hodograph because
22  none have been produced, so it's a missing bit of
23  information. I don't think it matters, but I pointed
24  out in my report that that information was missing and
25  if somehow that information is disclosed I would like to

Page 38

1   consider it in terms of my date of loss.
2       Q   Okay. So if I am understanding you correctly,
3   you are unable to conduct the wind shear analysis
4   because that's something within the province of
5   meteorology? Is that what you are saying?
6       A   No. What's in the province of meteorology is
7   the practice of sending up the balloons and making that
8   report. Once they have that report and on a piece of
9   paper it says the wind was coming from this azimuth,
10  from -- it was coming from south to north at 25 miles an
11  hour -- once the meteorologist establishes that, that's
12  a known fact that I can use to do my analysis as to
13  where the hail fell. But since the meteorologists
14  haven't produced that fact for me to use, I can't
15  complete my analysis.
16      Q   I understand.
17      But at the end of the day, because March --
18  I'm sorry -- May 17, 2021, cannot be ruled out, it's
19  still a possibility that hail impact from March 17 -- I
20  keep saying March; sorry -- May 17, 2021 impacted the
21  building, right?
22      A   Well --
23      MR. SIMON: Objection, form.
24      A   Let me put it this way: Unlike a criminal
25  case, which is "beyond a reasonable doubt," in my world,

Page 39

1   which is civil litigation, it's "more likely than not."
2   We -- we generally say that that means you are at least
3   50 percent sure. And you will see in my hail maps, if
4   the hail algorithm was less than 50 percent sure, I
5   didn't consider it my analysis because I have got to be
6   more than 50 percent sure.
7       I am more than 50 percent sure that the hail
8   occurred on March 22, 2022. I am less than 50 percent
9   sure it occurred on March 17, 2021. Using that
10  threshold of "more likely than not," I have not
11  considered March 17, 2021, pending any information from
12  anybody else which might cause me to change my mind.
13      Q   All right. And I understand that, but at the
14  end of the day, you did not rule out March 17, '21,
15  correct?
16      A   Yeah. I --
17      MR. SIMON: Objection, form.
18      A   I think I've beat my caveats to death, so I
19  will just agree with you. But yes, for all the reasons
20  that I have explained.
21      Q   Okay. So it's possible that hail impact from
22  March 17, 2021, impacted the building because you could
23  not rule out that date, right?
24      MR. SIMON: Objection, form; asked and
25  answered. Becoming argumentative at this juncture.

Page 40

1       A   Possible, but less probable to the point that
2   it's less than 50 percent probable that it occurred.
3       Q   Okay. So let's talk about the March 22nd,
4   2022, date. Why are you so certain that hail from this
5   date was the actual date of loss?
6       A   Part of it is process of elimination. I
7   vetted all the hailstorms back for two years from the
8   date of loss. I took four dates of loss that I reviewed
9   in detail. Not only did I use an algorithmic hail
10  report -- I used HailStrike; EFI used CoreLogic. But
11  EFI stopped with their algorithmic report.
12      I fact-checked with the National Weather
13  Service the algorithmic report in terms of looking for
14  eyewitness accounts in the storm events database, a
15  citizen volunteer database, and I looked at the radar
16  data at the Severe Weather Data Inventory.
17      I mapped that information on Google Earth.
18  You can do that by directly downloading the information
19  on the website with what's called a KMZ file. When you
20  download with a KMZ file, it takes the latitude and
21  longitude embedded in the file and it automatically
22  populates your Google Earth map. So when you see my
23  maps showing those locations, those are the exact
24  locations that the SWDI radar said the hail occurred
25  when it was encountered by radar.

10   (Pages 37 to 40)

Worldwide Court Reporters, Inc.
(800) 745-1101

Neil B. Hall    January 16, 2025

Page 41

1  So I can use that information to make a
2  determination based on the location of the hail, based
3  on looking at the storm speed and direction, ground
4  speed and direction, and the Maximum Estimated Size of
5  Hail. All that, compared to the ground data I found in
6  field, I can determine which of those hailstorms was
7  the best fit.
8       Is it a perfect fit? It's never a perfect
9  fit, but it's the best fit with all the information I
10 have and makes me more than 50 percent likely it's what
11 occurred.
12      Q Okay. Let me show you a report. One second.
13      So according to your report here, your
14 March 22, 2022, date of loss was based on the data you
15 received from HailStrike; is that right?
16      A No, no, no. At the very beginning of the
17 analysis, I am using HailStrike as a screening device to
18 help me sift through what could be hundreds of storms to
19 pick out the ones that I want to do further analysis on.
20 I also use any eyewitness reports independent of
21 HailStrike to add to that database.
22      Once I have come up with candidate storms, I
23 then take those candidate storms and do a detailed
24 analysis using government source data, which is totally
25 divorced from HailStrike. And, in fact, on occasion I

Page 42

1  have found I don't believe HailStrike's algorithm
2  because I am staring at something different than the
3  government database.
4       Q Okay. But let me go up here one second to the
5  eyewitness report section. And according to your
6  report, there is no eyewitness report regarding
7  March 22nd, 2022, right?
8       A That's correct. And as I say in the report,
9  yes, I do. Eyewitness accounts only tell part of the
10 story. If a weather event was not witnessed or not
11 reported after being witnessed, it would not appear in
12 the database.
13      It's a case of if a tree fell in the forest
14 and nobody heard, did the tree fall? Of course it fell.
15 Nobody heard it; nobody said they heard it. So you can
16 have a hailstorm and nobody saw the hailstones on the
17 ground or nobody reported those hailstones they saw on
18 the ground.
19      So if you have hailstones, that's positive
20 reinforcement there was a hailstorm. If you don't have
21 hailstones reported on the ground, that doesn't mean it
22 didn't occur. It's a case of the absence of evidence
23 isn't evidence of absence.
24      Q All right. I understand that, but because
25 there are no eyewitness reports for March 22nd, 2022,

Page 43

1  your initial inquiry was based on that data coming from
2  HailStrike, right?
3       A Yeah. My -- my initial inquiry was based on
4  HailStrike. Along the way I am fact-checking. When I
5  fact-check the eyewitness account, it was a dead end.
6  There were no eyewitness accounts. So I move on to the
7  Severe Weather Data Inventory, which is my next stop.
8       Q Right. And isn't it true that HailStrike is a
9  commercial weather company that reports hail activity by
10 analyzing radar data from the National Weather Service?
11      A That's correct.
12      Q All right. So HailStrike basically does the
13 same thing that you are going to do in your next step,
14 right?
15      A Not -- not really. HailStrike, CoreLogic, all
16 these companies, they kind of AI -- or by machine
17 learning pull data out of the National Weather Service
18 database. They will report the maximum hail size and
19 its distance from the building. That's not enough for
20 me.
21      Because if somebody says, oh, there was 2-inch
22 hail 1 mile from the property -- example: 2-inch hail
23 is pretty heavy hail. It's not going to be as affected
24 by wind advection as smaller hail. Why? Because of the
25 drag coefficient and because of its mass, it's not going

Page 44

1  to be bullied by that wind as easy as small hail. So
2  large hail tends to fall straight down.
3       But, more importantly, where is the storm
4  moving? Where is the wind blowing? If HailStrike or
5  CoreLogic say the hail was 1 mile from the property or 2
6  miles from the property and the weather data -- I am
7  looking now at the storm speed and I am looking at
8  ground observations at the airports, which is not
9  incorporated in these other reports.
10      If the wind is pushing away from the building,
11 that hail at altitude is going to fall away from the
12 building. If -- if the wind is pushing towards the
13 building, that hail as it falls down is going to be
14 pushed towards the building.
15      So as a result, what the algorithmic report
16 tells you isn't a complete analysis. It's a factoid.
17 It's something I want to use, but I have got to be
18 smarter than the algorithm before I reach my
19 conclusions.
20      Q But you mentioned that after you receive the
21 HailStrike data, you then go onto the National Weather
22 Service to look at additional data, right?
23      A That's correct.
24      Q Right. So my question -- previous question
25 was because HailStrike uses radar data from the National

11 (Pages 41 to 44)

Neil B. Hall   January 16, 2025

Page 45

1  Weather Service, they are essentially doing the same
2  thing that you are doing, even though you may do more.
3     A   Well, I can't be sure. The reason is
4  HailStrike, CoreLogic use algorithms. They take that
5  raw data -- the same raw data I can find, but they run
6  it through their algorithm. Their algorithms are
7  proprietary, meaning they are black boxed. You don't
8  know -- I don't know exactly what those algorithms say;
9  what are the decision rules in those algorithms.
10     I attended a conference in Colorado a few
11  years back where CoreLogic meteorologists said part of
12  their algorithm involved -- if there were no eyewitness
13  reports within a certain number of miles, they
14  discounted the radar data. So that's their approach.
15     By the way, CoreLogic is now on their third
16  algorithm so what I just told you might have been their
17  second algorithm. I don't know what's in their third
18  algorithm.
19     HailStrike, I -- because I use HailStrike, I
20  have called up and spoken to their tech rep several
21  times trying to get in their brains about their
22  algorithm. They will share a little bit. They told me
23  their understanding of why they use the word
24  "intensity," but they don't give me a detailed analysis
25  of their black box algorithm.

Page 46

1     So although I use HailStrike as the starting
2  point -- I'll tell you, I paid 50 bucks for a report I
3  don't fully trust. EFI, when they got their CoreLogic
4  report, shouldn't have fully trusted it. It's a data
5  point with questions to be answered, and you answer
6  those questions by fact-checking the government sources
7  for yourself.
8     Q   Well, if you don't fully trust HailStrike, why
9  even use it in the first place? Why not just go
10  directly to the government sources?
11     A   Because if I went to the government sources
12  directly, the way it's organized, I would have to click
13  on individual hailstorms over the course of two to five
14  years. And most of them are going to tell me -- I have
15  done this. Most of them are going to tell me half-inch
16  hail, which likely melted on the way to the ground; move
17  on to the next hailstorm.
18     It's -- it's a -- the government source is
19  throwing out a large net and bringing in all the fish;
20  whereas, I am concerned with the big fish. I don't want
21  the little fish that slip out through the gill net. I
22  want the big fish that I want to capture. I don't want
23  to capture all the fish. The HailStrike algorithm
24  allows me to capture the big fish.
25     Why do I use HailStrike instead of CoreLogic?

Page 47

1  Because I've found over the years by using different
2  systems HailStrike errs in favor of more storms than I
3  am going to believe occurred. So if I am using
4  HailStrike, I have the opportunity to make the decision
5  what storms I want to use.
6     If I use CoreLogic, there might have been a
7  storm I wanted to use but didn't because their net --
8  their net has -- is so large the big fish are slipping
9  out through the gill net.
10     HailStrike has, in my opinion, the best
11  algorithm to capture hailstorms and give me a head start
12  in my analysis.
13     Q   All right. Isn't it also true that due to
14  environmental factors, such as wind shear, the size and
15  location of a hailstorm is not guaranteed?
16     A   Oh, sure. That's why it's called estimated
17  maximum size hail. The algorithm can't be a hundred
18  percent sure. Eyewitness accounts aren't a hundred
19  percent sure. You can go both ways.
20     You can have people who pick up 1-inch hail
21  that get on social media and want bragging rights and
22  say it's 2-inch hail. On the other hand, you could have
23  well-meaning people who pick up hail after it's been
24  laying on the ground for an hour and it's melted to half
25  its size, and they are reporting 1-inch hail when, in

Page 48

1  fact, it was 2-inch hail. So even eyewitness reports --
2  everything in my business, every fact you receive, you
3  have to use critical thinking to determine its validity.
4     One of the things they taught me in the
5  military when we did interrogations is you make a
6  matrix, a matrix of the informant and the information.
7  You have got good and bad information. You have good
8  and bad informants. You have a matrix.
9     If you have good information with a good
10  informant -- if I have an eyewitness account and it's
11  provided by a National Weather Service employee
12  according to the database, that's good information and a
13  good informant. If I have information which is on
14  Facebook and there is no photograph to verify it, that
15  might be good information, but I question the informant.
16     So you have this matrix that you go through
17  every time you look at every fact to try to help you
18  decide is the information good or bad? Is the informant
19  good or bad? That's a process I tend to use.
20     Q   Okay. So if the size and location of
21  hailstones isn't guaranteed due to environmental
22  factors, how are you able to determine that -- one
23  second. Let me share my screen. All right.
24     A   Huh.
25     Q   All right. So this is the March 22, 2022,

12  (Pages 45 to 48)

Worldwide Court Reporters, Inc.
(800) 745-1101

Neil B. Hall   January 16, 2025

Page 49

1  Google map. And it looks like there is an
2  inch-and-a-quarter size hail that you indicate fell at
3  the property; is that right?
4      A Yes.
5      Q So how will you determine -- how are you sure
6  that an inch-and-a-quarter is the correct size if size
7  is not guaranteed through -- due to environmental
8  conditions?
9          MR. SIMON: Objection to form.
10     A Well, for one, what my map shows are the
11  discrete locations of return signals from the NEXRAD
12  radar. They sent out the micro of energy. It bounces
13  off a signal. It bounces back. If the algorithm isn't
14  sure if it's a large raindrop or if it's hail, it will
15  have less than 50 percent probability. I don't use
16  that.
17         The ones you see in white are less than
18  50 percent probability. So I provided that information,
19  but that's -- that's not to be sure. The ones in yellow
20  are greater than 50 percent probability. Now, the hail
21  swath encompasses the entire area where the hail was
22  detected. So in between those discrete locations, there
23  is also hail fall. Okay?
24         You can see that best on a reflectivity map,
25  which uses color, which colors out that entire page.

Page 50

1  That entire page would be within the hail swath. So I
2  have within a 2-mile radius 1.25-inch hail. Will there
3  be some melt on the way to the ground? Likely, because
4  the radar is hitting above the freeze line.
5         Once it hits the freeze line, it's going to
6  melt slightly on the way to the ground. Maybe it was
7  1-inch. Maybe it was 1-and-an-eighth-inch. So no
8  guarantee it was 1-and-a-quarter. So you want to
9  compare that size to the size of the marks you are
10  seeing on the roof itself. I am not seeing 2- to 3-inch
11  marks. I am not seeing dents in the metal.
12        So I know -- example: If there had have been
13  a hailstorm with 3-inch on the radar, that might be bad
14  information because it doesn't match what I am finding
15  in the field, but here I have hail of 1- to a
16  quarter-inch diameter probably melting to no smaller
17  than 1-inch diameter.
18        1-inch diameter is about the size of the hail
19  strikes I found on the roof. So I have correlation
20  between what the radar found and what I found on the
21  roof.
22     Q Okay. But this inch-and-a-quarter designation
23  here is -- like you said, it's just an estimate, right?
24     A Sure. The National Weather Service themselves
25  will tell you it's the Maximum Estimated Size Hail.

Page 51

1      Q All right. So it could have been smaller?
2      A Could have been smaller; could have been
3  larger. There is other issues involved in how the
4  signal returns. There is calibration of the
5  instrumentation itself. 1.25-inch is probably in the
6  center of the bell curve of probability for the hail at
7  that location. It's called the estimated maximum size,
8  but it's the most likely size based on the algorithm.
9      Q All right. And also the location is not
10  guaranteed. So this 1.25-inch may not even necessarily
11  be right here; isn't that right?
12     A Well, the location is guaranteed in terms of
13  when it was encountered at altitude. There is no
14  guarantee that's the location when it hit the ground.
15     Q Right. Because of environmental factors such
16  as wind?
17     A That's correct.
18     Q Okay. All right. And this is on Page 60 of
19  your report for the record.
20     A Yes.
21     Q All right. And while we are talking about
22  these hail maps, I just wanted to get clarity. In your
23  report you mentioned that you downloaded the weather
24  data and you overlaid said data on the Google images --
25  Google Earth images. So these Google Earth images which

Page 52

1  appear on pages 58 through 62, these are maps that you
2  created, correct?
3      A Right. I created them in the sense I did
4  this. I pulled up Google Earth. I found the location.
5  The red dot on those maps is where the location is. I
6  drew the yellow lines representing the 2-mile and 5-mile
7  radius.
8         I then imported from the National Weather
9  Service database through a KMZ file which populates what
10  you saw initially when you looked at the data without my
11  overlays. You saw those white boxes with Xs. That's
12  how the file populates Google Earth.
13        I then have to go to each location and
14  determine the Maximum Estimated Size Hail at that
15  location, which is based on the KMZ file. And I typed
16  that into the box. Right now you are looking at the
17  eyewitness reports. You will want to scroll down one --
18  one page.
19        Yeah. So on this page I have done three
20  things. Where you have a white box, the KMZ file gave a
21  code 999, which meant the radar had incomplete
22  information in order for the algorithm to reach the
23  determination. It encountered something; likely hail.
24  Why? Could it be a bird? They are not flying in the
25  middle of a thunderstorm. Could it be a large raindrop?

13  (Pages 49 to 52)

Worldwide Court Reporters, Inc.
(800) 745-1101

Neil B. Hall    January 16, 2025

## Page 53

1   Possibly but, again, unlikely. So it's likely hail, but
2   since the algorithm couldn't give me a measurement, I
3   leave it blank.
4        And where you see 0.5 in a white box, the
5   algorithm said we have measured 0.5-inch something, but
6   we are not sure it's hail. So that's why it shows up as
7   a white box with a measurement. Now, keep in mind that
8   the algorithm says it's 0.5-inch encounter and doesn't
9   know if it's hail. That's just the way the algorithm is
10  sent up.
11       What else could it be if it's 0.5-inch in the
12  atmosphere? Too big for a raindrop. Too small for a
13  bird. In the middle of a hailstorm, that's likely hail,
14  but since the algorithm isn't going to tell me that, I
15  have pointed that out on my map.
16       Then what I am left with, where the algorithm
17  encountered hail, the algorithm was more than 50 percent
18  positive it was hail and the algorithm gave me a maximum
19  estimated hail size. That's the boxes in yellow and I
20  populated that box with the Maximum Estimated Size Hail
21  according to the algorithm, which is measured in
22  altitude.
23       Now, could it get -- besides all the
24  measurement problems, could it get bigger? Yes. That
25  hailstone might have been updrafted, increased in size

## Page 54

1   before it fell. Could it have been smaller? That
2   hailstone might have fallen straight to the ground after
3   measurement and, as it fell, melted when it left the
4   freeze zone.
5        So there is all sorts of changes that you can
6   make, but they are minuscule. They are of importance to
7   scientists dealing with millimeters. They are not
8   important to me dealing with a kinetic energy of what I
9   see on this screen.
10  Q And when you mention algorithm, you are
11  talking about the HailStrike algorithm, right?
12       A Various algorithms. HailStrike has an
13  algorithm. CoreLogic has an algorithm. They are called
14  black box algorithms. The National Weather Service has
15  an algorithm. I presume it's available through
16  government sources. I have never reviewed it fully, but
17  I have read narratives of what it contains.
18       And so even the National Weather Service uses
19  algorithms in order to take that raw signal, which is
20  bounced back from the hailstone off the radar -- the
21  NEXRAD radar -- NEXRAD means next generation radar. And
22  they take that information, they run it through their
23  algorithm twice. The first time is to get primary
24  information, which includes -- with Doppler radar, they
25  get velocity. With hail radar, they are going to get

## Page 55

1   reflectivity, they are going to get Maximum Estimated
2   Size Hail.
3        Then they have -- they run it through a second
4   tier of algorithms to get more information, which I am
5   not using in this report. They include things like a
6   vertical precipitation level. There is other algorithms
7   that are more important to the meteorologists than to me
8   where I am stopping in my analysis.
9   Q   Okay. But I am talking about the algorithm
10  that you, yourself, reviewed before you created these
11  maps. So that algorithm is HailStrike's algorithm,
12  right?
13       A Right. The algor- -- going back to the
14  beginning of the analysis, the algorithm that -- my
15  initial analysis, I looked at HailStrike. HailStrike is
16  based on an algorithm.
17       Moving forward, what you are looking at now on
18  this map with the Severe Weather Data Inventory data,
19  that's also based on an algorithm, but that's a
20  government algorithm. That's not the HailStrike
21  algorithm.
22  Q Okay. All right. So because the HailStrike
23  report from March 22nd -- or the HailStrike data from
24  March 22nd, 2022, does not guarantee size and location,
25  how are you certain that the hail swath from that date

## Page 56

1   passed directly across the building?
2        A  Two separate issues. The size is the best --
3   let's call it a best guess -- the best guess of the
4   algorithm, based on a lot of science and math in the
5   algorithm, but it's the best guess of the algorithm.
6        What I can tell you, having read many
7   meteorological reports -- some by meteorologists working
8   the same side, some by meteorologists working the other
9   side -- they will opine to a, quote/unquote,
10  meteorological degree of certainty based on the MESH,
11  the Maximum Estimated Size Hail.
12       So every -- there is a consensus of opinion
13  that this is the best information we have, unless it's
14  overruled by ground truth. Example: If the algorithm
15  said the Maximum Estimated Size Hail by radar was
16  1-inch -- example -- and there was an eyewitness on the
17  ground in the same storm who picked up a piece of 2-inch
18  hail and took a picture of it, we know the algorithm is
19  wrong.
20       Barring those peculiar circumstances,
21  everybody -- engineers, meteorologists -- use the
22  Maximum Estimated Size Hail as a reasonable indication
23  of exactly what it's supposed to be; the Maximum
24  Estimated Size Hail absent any other fact to the
25  contrary. That's in terms of size.

14   (Pages 53 to 56)

Worldwide Court Reporters, Inc.
(800) 745-1101

Neil B. Hall     January 16, 2025

Page 57

1    In terms of position all I can tell you is
2  that all the readings I have done indicate that wind
3  advection, that movement from the atmosphere to the
4  ground, generally occurs over a period of a 2-mile -- 2
5  miles.
6    So what's within -- outside the 2-mile radius
7  is far less likely to hit the property than what's
8  inside the 2-mile radius. I have 1-and-a-quarter-inch
9  hail inside the 2-mile radius on March 22, 2022. The
10 only other time I have hail inside that radius worth
11 discussing is March 17, 2021, which is
12 three-quarter-inch hail.
13    So, logically, even if they both have the same
14 rate of melt to the ground, the 1-and-a-quarter-inch
15 hail is still going to damage that roof; whereas,
16 three-quarter-inch hail in the atmosphere, if it melts,
17 may be too small to damage the roof. So all the
18 information I am looking at in terms of size, in terms
19 of location, in terms of wind movement lead me to
20 March 22, 2022.
21    **Q But there is no way for you to know if hail**
22 **that fell from the freeze zone actually melted, right?**
23    MR. SIMON: Objection, form.
24    A Well, by -- by physics, once -- once it
25 contacts air above 32 degrees Fahrenheit, it's going to

Page 58

1  start to melt. How fast did it melt? You know, that's
2  a separate issue. We have to look at the rate of fall
3  compared to the -- if it was stationary, what's the rate
4  of melt at what temperature.
5    As it -- if it fell, if it's going to fall to
6  the ground in a matter of seconds from the freeze zone
7  to the ground, that's not very much time for it to melt.
8  A little bit, but not very much time. That gets so
9  finicky that although, if challenged, it probably could
10 have been done, I have never seen anybody on either side
11 of the fence perform that analysis.
12    Why? Because when you are done, you are going
13 to have a difference of millimeters in size to the
14 hailstone. And, besides, it's really an onerous task
15 because you don't have all the facts. You are not sure
16 what the terminal velocity was. You are not sure what
17 the Maximum Estimated Size Hail was. So you can -- you
18 are not sure of the rate of melt because you are not
19 sure of the temperature at the different strata as it
20 comes to the ground.
21    So it's a great thought experiment, but in my
22 opinion it's pretty useless for the kind of analysis we
23 have to do in this case.
24    **Q All right. So that kind of supports what I**
25 **was saying; that there is no way for you to know if a**

Page 59

1  **hailstone melted before impact, right?**
2    MR. SIMON: Objection, form.
3    A Oh, I can tell you it melted because the
4  temperature at ground level was less than 32 de- -- was
5  greater than the 32 degrees. So it melted. How much
6  did it melt? I don't know.
7    **Q All right. And I guess I should ask that**
8  **question. You are not sure how much a hailstone would**
9  **melt before it impacts the building, correct?**
10    A That's correct. In my analysis and any
11 analysis I have ever seen done on this subject, there is
12 presumptions that the -- if it's less than half-inch
13 hail in the atmosphere, it's going to be
14 inconsequential. It will either turn to a raindrop or
15 it will be a small piece of hail so small it's
16 inconsequential.
17    So half-inch hail based on the literature --
18 if it's half-inch hail in the atmosphere, we don't even
19 consider it when it hits the ground. Three-quarter-inch
20 hail in the atmosphere is probably the threshold at
21 which we start to say it might do damage when it hits
22 the ground depending on the substrate it's hitting.
23    Will three-quarter-inch hail melting on the
24 way to the ground damage a brand-new mod bit roof? No.
25 Will three-quarter-inch hail melting on the way to the

Page 60

1  ground damage an older roof? Likely.
2    **Q All right. Did you do anything to allocate**
3  **the damage caused by the March 17, 2021, hailstorm?**
4    A No.
5    MR. SIMON: Objection, form.
6    A I have no assurance it ever hit the building,
7  and everything that I have found on that roof was
8  explained by the March 22, 2022, storm.
9    **Q Right. Well, you didn't rule out March 17,**
10 **2021 --**
11    MR. SIMON: Objection, form.
12    **Q -- right?**
13    MR. SIMON: Objection, form; misleading.
14    A I want to be careful because I think I said
15 this some times -- several times. What I found was
16 there was a possibility that it occurred in 2021. There
17 is also a possibility a hailstorm occurred the day the
18 radar was down for maintenance. That's a possibility.
19 So there might have been a hailstorm and no radar
20 evidence because the radar was down for maintenance that
21 day.
22    These are possibilities that are so slim
23 compared to the evidence I found for the 2022 storm that
24 when the day was done, when I completed my analysis, I
25 was willing to opine they were not a consideration.

15  (Pages 57 to 60)

Neil B. Hall    January 16, 2025

---

Page 61

1    Q   Right. But here in your report you state
2    [reading] While I cannot exclude the possibility of hail
3    impacting the building on March 17, 2021, confirmation
4    of this possibility requires the analysis of vertical
5    wind shear using wind hodographs.
6        So you are stating in your report that you
7    could not exclude the possibility of hail falling on --
8    I'm sorry -- hail impacting the building on March 17,
9    2021.
10    A Right. But I -- my job in the scientific
11    method is to create hypotheses and then, using facts,
12    confirm or de-confirm those hypotheses. In this case I
13    have a hypothesis but no facts. To reach a conclusion
14    would be speculation.
15    Q Right.
16    A I challenge the other side, hey, if you can
17    come up with a hodograph that gives me the wind shear to
18    show me that hail impacted that building, then I will
19    consider it. But even if we consider it, we are talking
20    about on 2021 three-quarter-inch hail hitting the
21    building; whereas, on 2022 1-and-a-quarter-inch hail
22    hitting the building.
23        So it still is not at the top of the shortlist
24    of probabilities even though the probability might
25    increase if I had a hodograph, which I don't, and

---

Page 62

1    without which I refuse to reach a conclusion because it
2    would be speculation.
3    Q All right. So that means you did not exclude
4    March 17, 2021, right?
5        MR. SIMON: Objection, form; misleading.
6    A  I do not exclude it in the sense of it's on
7    the shelf. I have excluded it on Page 4 where I
8    concluded the actual date of loss is March 22, 2022. So
9    I transparently left open a possibility. And, like I
10    said, there is a possibility the radar was down. It
11    might have been -- it might have been April 12th, 2020.
12    If I don't have the facts, I can't consider
13    the possibility. If the opposing engineer wishes to
14    disagree with me, let him present his facts. And nobody
15    has given me a fact to make me say that March 17, 2021,
16    was more than a possibility. It hasn't gotten -- it
17    hasn't risen to the level of being greater than a 50
18    percent probability. So in the final analysis, I don't
19    consider it.
20    Q All right. I understand that, and that's not
21    what I am asking you.
22        Your own words state that you cannot exclude
23    the possibility of hail impacting the building on
24    March 17, 2021, right?
25    A Yeah. If I may, in my own words, that's what

---

Page 63

1    I said. I think everything I -- also I've said in this
2    deposition explains what I meant by those words.
3    Q   Right. But at the end of the day, because you
4    don't have all the information you need to exclude
5    March 17, 2021, you cannot exclude it, so it's still a
6    possibility, right?
7        MR. SIMON: Objection, form;
8    mischaracterizes evidence. And this question has been
9    asked and answered 500 times. He has stated his
10    opinion. You are trying to browbeat him into giving an
11    opinion that's not his opinion obviously.
12        So I don't think you have to answer this
13    anymore, Neil. I think it's been beaten with a dead
14    horse.
15    A I will stand by the statement in the report as
16    elaborated on in my deposition.
17    Q Okay. So because you did not exclude
18    March 17, '21, did you do anything to allocate damage
19    caused by a March '21 storm -- hailstorm?
20        MR. SIMON: Same objection.
21    A No. I will tell you this: The reason I
22    considered that storm in the first place was because it
23    was within the time period that if that storm was
24    responsible for the damage, it would have explained the
25    damage in the sense that the bitumen material wasn't yet

---

Page 64

1    gray. So that's why there is a possibility that this
2    storm matters.
3        But as I have said, I have no other -- yeah.
4    I had enough information in the field to create a
5    hypothesis. I don't have enough information to reach a
6    conclusion as to the effect of this storm.
7    Q Did you do anything to allocate the damage
8    caused by the March 22nd, 2022, storm?
9        MR. SIMON: Objection, form.
10    A Yes. You were back and forth between
11    fieldwork and -- what should we call it -- research. So
12    by -- you go back and forth. I look at what I see in
13    the field. Then I look at the field -- the weather
14    research. I use the weather research to go back and
15    double-check the field. Using all the information I
16    had, the analysis I performed is what led me to believe
17    March 22, 2022.
18    Q Okay. But earlier you mentioned that the roof
19    exhibited wear and tear. So did you do anything to
20    allocate which portions of the roof was related to the
21    wear and tear versus the March 22nd, 2022, hailstorm?
22        MR. SIMON: Objection, form; misleading.
23    A No. I generally do that based on what I
24    understand to be Texas court rulings. I have to
25    segregate damage between -- between events and between

---

16   (Pages 61 to 64)

Worldwide Court Reporters, Inc.
(800) 745-1101

Neil B. Hall    January 16, 2025

## Page 65

1    types of damage. The wear and tear on that roof is so
2    obviously a different mode of failure than the hail
3    damage, I didn't feel that was necessary.
4        Example: If I thought there was blisters of
5    1-inch diameter, if I thought there was foot traffic, if
6    I thought somebody had been up there with a hammer,
7    that's the type of causation I would need to segregate
8    from hail damage, but if we are talking about the
9    general condition of the roof based on its age -- 14 to
10    16 years old at the time of the date of loss -- that
11    becomes so obvious I didn't incorporate that into my
12    report.
13        **Q Can we take a five-minute break?**
14        A Yes, sir.
15            THE VIDEOGRAPHER: The time is 11:51 a.m.
16    and we are off the record.
17            (RECESS FROM 11:51 A.M. TO 11:56 A.M.)
18            THE VIDEOGRAPHER: The time is 11:56 a.m.
19    and we are back on the record.
20            MR. ULMER: All right. I will pass the
21    witness. I have no further questions.
22            THE REPORTER: All right. Mr. Simon, do
23    you have anything?
24            MR. SIMON: No. I'm good.
25            THE REPORTER: All right. Do you want to

## Page 66

1    purchase a copy of the transcript, Mr. Simon?
2            MR. SIMON: Sorry. Hold on. I was
3    expecting another round so I had my earbuds out and they
4    were transitioning to being on so I kind of missed
5    everything. I kind of caught the edge of the "no
6    further questions" thing.
7            THE REPORTER: All right. Yes. He said
8    no further questions and you don't have anything,
9    correct?
10            MR. SIMON: Correct.
11            THE REPORTER: Do you want to purchase a
12    copy of Mr. Hall's transcript?
13            MR. SIMON: Not at this time, but the read
14    and sign sent to our office and we will send to him.
15            THE VIDEOGRAPHER: And then before we go
16    off --
17            (OFF-THE-RECORD TECHNICAL DISCUSSION.)
18            THE VIDEOGRAPHER: Before we go off,
19    Mr. Simon, do you want a copy of the video?
20            MR. SIMON: We do not at this time.
21            THE VIDEOGRAPHER: Okay. The time is
22    11:57 a.m. and we are off the record.
23            (DEPOSITION CONCLUDED AT 11:57 A.M.)
24
25

## Page 67

1                CHANGES AND SIGNATURE
2    WITNESS NAME: _____
3    DATE OF DEPOSITION:
4    PAGE    LINE    CHANGE            REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
25    _____

## Page 68

1        I, NEIL B. HALL, have read the foregoing
2    deposition and hereby affix my signature that same is
3    true and correct, except as noted above.
4
5
6
            NEIL B. HALL
7
8
9    THE STATE OF            )
      COUNTY OF            )
10
11        Before me, _____, on
12    this day personally appeared NEIL B. HALL, known to me
13    (or proved to me under oath or through
14    _____) (description of identity
15    card or other document)) to be the person whose name is
16    subscribed to the foregoing instrument and acknowledged
17    to me that they executed the same for the purposes and
18    consideration therein expressed.
19        Given under my hand and seal of office this
20    _____ day of _____, _____.
21
22
23
24        NOTARY PUBLIC IN AND FOR
      THE STATE OF _____
25    COMMISSION EXPIRES: _____

17   (Pages 65 to 68)

Worldwide Court Reporters, Inc.
(800) 745-1101

Neil B. Hall    January 16, 2025

Page 69

1    THE STATE OF TEXAS:
2    COUNTY OF HARRIS:
3        I, Mona S. Whitmarsh, a Certified Shorthand
4    Reporter, hereby certify that the foregoing testimony
5    was given before me after the Witness had been first
6    duly sworn.
7        I further certify that this deposition was
8    transcribed under my direction and is a complete and
9    correct transcript of the proceedings; and that it is
10    being filed with the Court in accordance with the
11    Stipulation of Counsel contained in this deposition.
12        I further certify that I am neither attorney for,
13    related to, nor employed by any of the parties to the
14    lawsuit in which this deposition was taken. Further, I
15    am neither related to nor employed by any attorney of
16    record in this cause; nor do I have a financial interest
17    in the matter.
18        GIVEN UNDER MY HAND AND SEAL OF OFFICE this 20th
19    day of January, 2025.
20        _____
         Mona S. Whitmarsh
21        Texas CSR No. 3986
         Expiration Date: 04/30/26
22
         WORLDWIDE COURT REPORTERS, INC.
23        Firm Registration No. 223
         12621 Featherwood Drive, Suite 290
24        Houston, Texas 77034
         713-572-2000
25        713-572-2009 (fax)

18   (Page 69)

Worldwide Court Reporters, Inc.
(800) 745-1101

Appx.0064

Neil B. Hall    January 16, 2025

Page 70

**A**

**a.m** 1:20,20 5:2
15:2,4 17:24
18:1,1,2 37:17
65:15,17,17,18
66:22,23
**able** 26:20 34:21
48:22
**above-styled**
1:18
**aboveground**
35:7
**absence** 28:19
42:22,23
**absent** 56:24
**account** 43:5
48:10
**accounts** 40:14
42:9 43:6
47:18
**acknowledged**
68:16
**ACTION** 1:5
**active** 13:13
**activity** 34:25
35:1,17 43:9
**actual** 31:16
33:19 34:7,15
40:5 62:8
**add** 17:4 41:21
**added** 15:23
16:3 18:6
23:19,22
**addendum** 17:5
**additional** 37:11
37:12 44:22
**address** 5:25
**adjusters** 22:10
**Adobe** 16:8
**advection** 35:8
43:24 57:3
**affix** 68:2
**age** 65:9
**ago** 11:14 16:7
**agree** 26:4,6,9

26:12 31:15
39:19
**ahead** 24:15
28:10
**AI** 43:16
**air** 57:25
**airport** 36:20
**airports** 44:8
**algor-** 55:13
**algorithm** 39:4
42:1 44:18
45:6,12,16,17
45:18,22,25
46:23 47:11,17
49:13 51:8
52:22 53:2,5,8
53:9,14,16,17
53:18,21 54:10
54:11,13,13,15
54:23 55:9,11
55:11,14,16,19
55:20,21 56:4
56:5,5,14,18
**algorithmic** 40:9
40:11,13 44:15
**algorithms** 45:4
45:6,8,9 54:12
54:14,19 55:4
55:6
**allocate** 60:2
63:18 64:7,20
**allow** 17:8
**allowed** 8:23
20:9 28:15
**allows** 46:24
**altitude** 44:11
51:13 53:22
**American** 9:1
**amount** 13:5
**analysis** 33:10
36:13,15 38:3
38:12,15 39:5
41:17,19,24
44:16 45:24
47:12 55:8,14

55:15 58:11,22
59:10,11 60:24
61:4 62:18
64:16
**analyzing** 43:10
**annotations**
23:17,23
**answer** 27:20
46:5 63:12
**answered** 11:20
39:25 46:5
63:9
**answers** 27:18
**anybody** 22:13
39:12 58:10
**anymore** 63:13
**apologies** 16:12
**apologize** 13:24
33:24
**Apparently** 14:2
**appear** 42:11
52:1
**Appearances**
3:2
**appeared** 68:12
**APPEARING**
2:2
**approach** 45:14
**April** 12:17
62:11
**architect** 6:6,9
6:12 8:13,14
10:10,14
**architects** 10:24
**architecture** 7:9
7:11,11,14,17
7:22,23 10:10
10:18,21,24
11:2
**area** 8:25 21:1
23:25 24:3
27:24 28:1
36:25 49:21
**argue** 22:11
**argues** 22:14

**argument** 22:9
**argumentative**
39:25
**Army** 11:7
**arrived** 20:7
**arrow** 16:15,16
**Artis** 2:8 5:15
**aside** 17:9
**asked** 11:23
39:24 63:9
**asking** 62:21
**aspects** 9:4
**asphalt** 21:10
29:20
**assume** 9:11
37:16 58:10
**assurance** 60:6
**atmosphere**
53:12 57:3,16
59:13,18,20
**attached** 1:25
14:7 18:9 23:8
**attachment**
15:25
**attended** 8:7
45:10
**attorney** 12:25
69:12,15
**audio** 14:18
**August** 32:17,21
33:13
**aulmer@shac...**
2:11
**automatically**
40:21
**available** 54:15
**Avenue** 2:9
**Axis** 1:6 5:16
**azimuth** 38:9

**B**

**B** 1:11,16 3:4
4:3 5:11 6:3
14:12,13 15:8
15:13,14 18:7
18:9 68:1,6,12

**bachelor** 7:10
7:11
**bachelor's** 7:8
**back** 6:25 15:5
15:15,24 17:4
18:3 21:2
35:13 40:7
45:11 49:13
54:20 55:13
64:10,12,14
65:19
**bad** 48:7,8,18,19
50:13
**balloons** 37:16
37:16 38:7
**Barrett** 2:13
**Barring** 56:20
**base** 29:17
**based** 21:23
34:15 41:2,2
41:14 43:1,3
51:8 52:15
55:16,19 56:4
56:10 59:17
64:23 65:9
**basically** 43:12
**beat** 39:18
**beaten** 63:13
**Becoming** 39:25
**beginning** 41:16
55:14
**believe** 11:20
18:14 19:8,23
25:12 31:12
36:7 42:1 47:3
64:16
**bell** 51:6
**best** 9:23 41:7,9
47:10 49:24
56:2,3,3,5,13
**better** 19:20
26:18,20
**beyond** 38:25
**big** 8:17 46:20
46:22,24 47:8

Neil B. Hall   January 16, 2025

53:12
**bigger** 53:24
**bird** 52:24 53:13
**birth** 5:23
**bit** 29:12 37:22
45:22 58:8
59:24
**bitumen** 13:10
20:14,15 21:11
29:15,20,21,24
30:3 63:25
**black** 45:7,25
54:14
**blame** 14:4,20
**blank** 53:3
**blew** 12:6 35:19
37:4
**blisters** 65:4
**blood** 32:6
**blowing** 44:4
**blows** 9:25
**blue** 26:17 27:3
27:10,13,19,23
**Blvd** 2:5
**board** 6:17,23
**Bob** 9:23
**bottom** 13:25
30:10
**Boulevard** 6:3
**bounced** 54:20
**bounces** 49:12
49:13
**box** 16:6,14,16
45:25 52:16,20
53:4,7,20
54:14
**boxed** 45:7
**boxes** 16:2,3,3
16:22 52:11
53:19
**Bradley** 5:22
**bragging** 47:21
**brains** 45:21
**brand-new**
59:24

**bravo** 6:4
**break** 65:13
**bridge** 11:25
**briefly** 20:8
**bringing** 46:19
**brought** 35:4
**browbeat** 63:10
**brush** 32:8
**bucks** 46:2
**building** 10:16
12:1 18:14,18
18:18,21 19:4
20:7 25:22
32:22 33:23
34:4,9,13,23
35:4,15,18,20
36:5,6,7,25
37:1,3,4 38:21
39:22 43:19
44:10,12,13,14
56:1 59:9 60:6
61:3,8,18,21
61:22 62:23
**buildings** 10:15
**built** 11:25
**bullied** 44:1
**bunch** 16:1
**burned** 12:7
**burnish** 32:12
**business** 6:1,2
48:2

**C**

**C** 2:1 4:4 19:21
19:22 20:4
**cake** 8:11
**calibration** 51:4
**call** 20:13 21:10
31:23 32:12,13
32:14 56:3
64:11
**called** 7:12,14
8:23 24:2,16
33:5 37:13
40:19 45:20

47:16 51:7
54:13
**candidate** 41:22
41:23
**cap** 13:10 20:15
29:17,20,22,24
**captions** 24:2
**capture** 46:22
46:23,24 47:11
**card** 68:15
**careful** 60:14
**carpenter** 14:5
**case** 6:14 38:25
42:13,22 58:23
61:12
**cases** 16:8
**caught** 66:5
**causation** 32:14
65:7
**cause** 1:19 39:12
69:16
**caused** 33:14
60:3 63:19
64:8
**caveats** 39:18
**center** 2:5 25:20
26:13 51:6
**certain** 40:4
45:13 55:25
**certainty** 56:10
**Certificate** 3:7
**certifications**
8:2 9:14 10:4,8
**Certified** 1:21
69:3
**certify** 69:4,7,12
**Chad** 2:4 12:14
**chalk** 12:3
**chalked** 21:19
21:22,24
**challenge** 61:16
**challenged** 58:9
**change** 15:21
39:12 67:4
**changed** 15:18

20:23
**changes** 3:6 54:5
67:1
**check** 25:9
**Christian** 2:13
14:17
**circled** 12:3 27:4
**circles** 26:17
27:3,4,5,10,13
27:19
**circling** 18:22
**circumstances**
56:20
**citizen** 40:15
**civil** 1:5,23 7:20
7:25 9:1 39:1
**claim** 32:17 33:3
33:5,18,18
**claimed** 21:1
**clarity** 18:6
51:22
**clean** 31:20
**cleaning** 32:13
**clear** 5:7 14:18
**click** 46:12
**climbed** 12:2
**close** 24:17
**coating** 20:16
**code** 52:21
**coefficient** 43:25
**college** 8:6
**color** 49:25
**Colorado** 45:10
**colors** 49:25
**come** 22:5 35:13
41:22 61:17
**comes** 58:20
**comfortable** 9:4
**coming** 8:10
38:9,10 43:1
**commercial**
10:16 43:9
**COMMISSION**
68:25
**communication**

12:13
**companies**
43:16
**company** 1:6
5:16 43:9
**compare** 50:9
**compared** 41:5
58:3 60:23
**compass** 19:3
**complete** 14:2
38:15 44:16
69:8
**completed** 14:3
60:24
**concentrated**
21:3
**concerned** 46:20
**concluded** 34:20
62:8 66:23
**conclusion**
61:13 62:1
64:6
**conclusions**
44:19
**condition** 13:7,8
65:9
**conditions** 49:8
**conduct** 38:3
**conference** 8:9
11:24,24 45:10
**confess** 12:2
**confidence**
34:14
**confident** 35:15
37:6,7,8,9
**confirm** 15:15
22:19 23:9
37:3 61:12
**confirmation**
61:3
**confirmed** 21:22
**connection**
13:19
**consensus** 22:8
56:12

Neil B. Hall    January 16, 2025

consider 11:10
21:12 31:18
38:1 39:5
59:19 61:19,19
62:12,19
consideration
60:25 68:18
considered
10:21 28:3
39:11 63:22
consists 29:15
29:16
constructed
11:6,15
constructing
11:4
construction
10:5,8 11:13
11:17
consulting 6:6
contact 16:17
contacts 57:25
contained 69:11
contains 54:17
continued 8:12
continuing 8:15
8:16
contract 32:7
contractor
11:11,19
contrary 56:25
copy 27:13 66:1
66:12,19
CoreLogic
40:10 43:15
44:5 45:4,11
45:15 46:3,25
47:6 54:13
corner 4:7,8
16:5 23:14
24:8,17,18,19
24:23 25:19,21
25:22 27:7
31:3
corners 27:6

Corporate 6:3
Corps 11:7
correct 15:19,20
16:13 18:7,23
19:2,6,19
23:16,18 24:12
25:13 26:3,11
26:14 29:1
31:4,5,9 32:23
34:5,5,10 36:1
39:15 42:8
43:11 44:23
49:6 51:17
52:2 59:9,10
66:9,10 68:3
69:9
corrected 21:16
correctly 38:2
correlation
50:19
Counsel 5:3
14:14 15:13
69:11
counted 24:23
countertop
31:20
COUNTY 68:9
69:2
course 7:19 8:16
9:17 42:14
46:13
courses 7:25
9:16
court 1:1 30:22
64:24 69:10,22
cover 29:10,11
31:4,7
covered 11:3
16:3
covering 21:3
covers 28:25
36:24
COVID 6:18
crack 11:1 30:10
cracking 21:17

create 61:11
64:4
created 52:2,3
55:10
credence 34:19
crews 11:8
criminal 38:24
criminology
32:5
critical 48:3
crossing 28:16
CSR 5:7 69:21
current 5:25
curve 51:6
CV 7:7

**D**

D 4:5 23:9,12
Dallas 8:9
damage 20:18
21:6,9,19,21
22:223:5
30:12,14,17
31:7,12 33:14
33:16 35:25
57:15,17 59:21
59:24 60:1,3
63:18,24,25
64:7,25 65:1,3
65:8
dark 27:24
data 34:15 40:16
40:16 41:5,14
41:24 43:1,7
43:10,17 44:6
44:21,22,25
45:5,5,14 46:4
51:24,24 52:10
55:18,18,23
database 40:14
40:15 41:21
42:3,12 43:18
48:12 52:9
date 5:23 13:15
13:17 22:20

32:17 33:4,5,6
33:7,10,12,12
33:17,18,20
34:7,15,20
35:24 38:1
39:23 40:4,5,5
40:8 41:14
55:25 62:8
65:10 67:3
69:21
dates 40:8
day 38:17 39:14
60:17,21,24
63:3 68:12,20
69:19
De 32:6
de- 59:4
de-confirm
61:12
dead 20:12
25:19 43:5
63:13
deal 8:17 16:20
16:20,25 33:11
dealing 54:7,8
death 39:18
decide 21:5,18
48:18
decided 21:8
decision 45:9
47:4
Defendant 1:7
1:17 2:8
definition 32:11
degree 7:8,8,9
7:12,15,16
8:21 23:5
56:10
degrees 8:20
57:25 59:5
dents 50:11
department
7:18 10:15
depending
59:22

depicted 25:7
27:22
deposition 1:10
1:16 63:2,16
66:23 67:3
68:2 69:7,11
69:14
descending
22:21
described 36:15
description 4:1
68:14
designated 13:3
designation 4:3
12:22 50:22
designed 11:12
detail 40:9
detailed 41:23
45:24
detected 49:22
deterioration
28:4
determination
36:13 37:14
41:2 52:23
determine 22:25
41:6 48:3,22
49:5 52:14
determined
37:15
device 41:17
diameter 50:16
50:17,18 65:5
difference 28:15
32:2 58:13
different 16:7
37:15 42:2
47:1 58:19
65:2
differently 16:8
22:11
direction 19:1
36:15 41:3,4
69:8
directionally

Neil B. Hall    January 16, 2025

37:2
**directly** 29:5
  31:3 40:18
  46:10,12 56:1
**disagree** 32:24
  62:14
**discipline** 6:17
**disclosed** 37:25
**discombobula...**
  22:6
**discounted**
  45:14
**discovered**
  16:19
**discrete** 49:11
  49:22
**discussing** 57:11
**DISCUSSION**
  15:3 66:17
**distance** 43:19
**DISTRICT** 1:1
  1:1
**DIVISION** 1:2
**divorced** 41:25
**document** 12:19
  25:11 68:15
**doing** 5:17 20:10
  45:1,2
**door** 37:10
**Doppler** 54:24
**dot** 52:5
**double-check**
  64:15
**doubt** 38:25
**download** 40:20
**downloaded**
  51:23
**downloading**
  40:18
**Dr** 5:15
**drafting** 14:3
**drag** 43:25
**drainage** 20:14
**drawings** 10:17
  10:17,18,20

**drew** 27:4 52:6
**Drive** 69:23
**drove** 35:10,11
**dry** 31:20,23,24
**dual-licensed**
  11:3
**dual-registered**
  10:22
**due** 30:9 47:13
  48:21 49:7
**duly** 1:18 5:12
  69:6
**Dylan** 9:23

---

**E**
**E** 2:1,1 4:6
  10:19 25:1,2,3
**e-mail** 12:15
  17:3,15
**e-mailing** 17:2
**earbuds** 66:3
**earlier** 7:22
  28:18 64:18
**Earth** 40:17,22
  51:25,25 52:4
  52:12
**east** 2:5 26:6
  35:17 36:22
**easy** 44:1
**ed** 8:15,16
**edge** 66:5
**editions** 16:7
**education** 8:12
**effect** 64:6
**effects** 21:15
**EFI** 30:16 40:10
  40:11 46:3
**either** 58:10
  59:14
**elaborated**
  63:16
**electrical** 10:19
**elevation** 28:15
  36:19
**elimination** 40:6

**embedded** 7:17
  40:21
**employed** 69:13
  69:15
**employee** 48:11
**encompasses**
  49:21
**encounter** 53:8
**encountered**
  35:6 40:25
  51:13 52:23
  53:17
**energy** 49:12
  54:8
**engineer** 6:6,7,9
  6:11,13 8:4,13
  13:2 14:12
  62:13
**engineering** 7:9
  7:16,18,19,24
  7:25 8:1,2
  10:25 11:2,24
  12:4,6 15:7
**engineers** 6:17
  7:20 8:22,22
  9:1 10:11,12
  10:23 11:7
  32:12 56:21
**enter** 17:5
**entire** 14:10
  36:25 49:21,25
  50:1
**environmental**
  47:14 48:21
  49:7 51:15
**errata** 13:21
  14:3,8 15:15
**error** 14:1,1
**errors** 13:24
  15:16
**errs** 47:2
**especially** 32:5
**essentially** 13:2
  45:1
**established** 9:9

**establishes**
  38:11
**estimate** 50:23
**estimated** 16:4,6
  16:23,23 41:4
  47:16 50:25
  51:7 52:14
  53:19,20 55:1
  56:11,15,22,24
  58:17
**event** 13:5 22:19
  22:19 42:10
**events** 9:8,8
  40:14 64:25
**eventually** 21:16
**everybody** 56:21
**evidence** 13:11
  13:12 20:17
  42:22,23 60:20
  60:23 63:8
**exact** 40:23
**exactly** 45:8
  56:23
**Examination**
  3:5 5:13
**example** 22:2
  43:22 50:12
  56:14,16 65:4
**exception** 7:20
  34:25
**exclude** 34:21
  35:24 36:11
  61:2,7 62:3,6
  62:22 63:4,5
  63:17
**excluded** 62:7
**executed** 68:17
**Exhibit** 4:2,3,4,5
  4:6,7,8 12:19
  12:21 14:12,13
  15:8,13,14
  18:7,9 19:21
  19:22 20:4
  23:9,12 25:1,2
  25:3,14,16,24

25:25
**exhibited** 64:19
**EXHIBITS** 4:1
**expect** 22:21
**expecting** 66:3
**experience** 11:4
**experiment**
  58:21
**expert** 4:3,4
  12:23 13:2,3
  18:10
**expertise** 8:25
  12:5
**Expiration**
  69:21
**EXPIRES** 68:25
**explain** 11:21
  29:14 33:15
**explained** 39:20
  60:8 63:24
**explains** 63:2
**expose** 21:14
**expressed** 68:18
**eyewitness**
  40:14 41:20
  42:5,6,9,25
  43:5,6 45:12
  47:18 48:1,10
  52:17 56:16
**eyewitnessed**
  33:9

---

**F**
**F** 4:7 25:14,16
**Facebook** 48:14
**faces** 18:18,24
**fact** 9:17 38:12
  38:14 41:25
  48:1,2,17
  56:24 62:15
**fact-check** 43:5
**fact-checked**
  40:12
**fact-checking**
  43:4 46:6

Neil B. Hall    January 16, 2025

Page 74

**factoid** 44:16
**factors** 47:14
  48:22 51:15
**facts** 34:19 36:4
  36:5,6 58:15
  61:11,13 62:12
  62:14
**Fahrenheit**
  57:25
**failure** 65:2
**Fair** 17:17
**fall** 42:14 44:2
  44:11 49:23
  58:2,5
**fallen** 54:2
**falling** 32:21
  33:22 34:3,12
  34:22 61:7
**falls** 36:16 37:1
  44:13
**far** 12:9 36:7
  57:7
**fast** 58:1
**favor** 47:2
**fax** 2:11 69:25
**Featherwood**
  69:23
**Federal** 1:23
**feel** 9:4 65:3
**feet** 22:4 35:6,7
  36:19
**fell** 12:6 31:22
  35:3 38:13
  42:13,14 49:2
  54:1,3 57:22
  58:5
**fence** 58:11
**fiberglass** 29:19
**field** 11:11 41:6
  50:15 64:4,13
  64:13,15
**fieldwork** 64:11
**fifth** 7:13
**figure** 17:19
**file** 33:4 40:19

40:20,21 52:9
  52:12,15,20
**filed** 32:16 33:18
  33:19 69:10
**final** 62:18
**financial** 69:16
**find** 15:22 31:17
  45:5
**finding** 50:14
**fine** 5:18 6:2,24
  7:4,5 17:8
**fined** 6:24
**finicky** 58:9
**fins** 31:13
**firm** 2:4 6:20,22
  12:14 69:23
**first** 5:12 7:12
  7:14 21:7
  31:19 46:9
  54:23 63:22
  69:5
**fish** 46:19,20,21
  46:22,23,24
  47:8
**fit** 41:7,8,9,9
**five** 11:7 18:6
  22:10,10 46:13
**five-minute**
  65:13
**fix** 12:9 14:25
**flat** 20:12,13,14
  22:6 24:18
  25:21
**flick** 32:8
**flies** 32:8
**Floor** 2:9
**flying** 52:24
**following** 13:4
**follows** 5:12
**foot** 65:5
**footnote** 15:24
**forces** 10:13
**forecast** 9:5,7
**foregoing** 68:1
  68:16 69:4

**forensic** 12:5
**forensics** 32:5
**forest** 42:13
**forgot** 15:17
**form** 28:6,11
  33:1 36:2
  37:13 38:23
  39:17,24 49:9
  57:23 59:2
  60:5,11,13
  62:5 63:7 64:9
  64:22
**forte** 9:6
**forth** 64:10,12
**forward** 55:17
**found** 22:2 23:3
  23:11,14 25:18
  28:23 32:21
  41:5 42:1 47:1
  50:19,20,20
  52:4 60:7,15
  60:23
**four** 27:6 40:8
**fracture** 30:6,6
  30:7,17
**fractures** 30:8
**freeze** 50:4,5
  54:4 57:22
  58:6
**frequency** 22:1
  22:16,21,22
**friction** 30:3
**front** 17:9 18:18
  18:21 34:19
**full** 5:20 35:14
**fully** 33:25 46:3
  46:4,8 54:16
**funds** 13:5
**further** 14:25
  41:19 65:21
  66:6,8 69:7,12
  69:14
**future** 9:7

---
**G**
---

**G** 2:8 4:8 25:24
  25:25
**general** 11:10
  65:9
**generally** 9:10
  29:16 39:2
  57:4 64:23
**generation**
  54:21
**gentleman** 17:10
**geology** 18:13
**getting** 20:20,20
**gill** 46:21 47:9
**give** 18:12 23:7
  24:21 30:25
  31:11 32:15
  45:24 47:11
  53:2
**given** 62:15
  68:19 69:5,18
**gives** 22:1,24
  61:17
**giving** 63:10
**glass** 19:7,15,18
  19:24,25 24:9
  25:6,17
**go** 10:15 11:23
  12:7 14:10,22
  14:24,25 15:10
  15:24 17:3,20
  18:13 19:16
  24:15 26:18
  28:10 30:12
  42:4 44:21
  46:9 47:19
  48:16 52:13
  64:12,14 66:15
  66:18
**going** 12:18,19
  14:19 15:10
  18:17 20:4
  22:11 23:1,3,6
  23:7 24:20
  25:15 30:4,5,7
  31:25 35:20

37:1 43:13,23
  43:25 44:11,13
  46:14,15 47:3
  50:5 53:14
  54:25 55:1,13
  57:15,25 58:5
  58:12 59:13
**good** 5:15 32:15
  48:7,7,9,9,12
  48:13,15,18,19
  65:24
**good-sized** 14:1
**Google** 40:17,22
  49:1 51:24,25
  51:25 52:4,12
**Gotcha** 7:2 10:3
  25:23
**gotten** 62:16
**government**
  9:10 41:24
  42:3 46:6,10
  46:11,18 54:16
  55:20
**graduate** 7:24
**graduated** 7:21
  7:23
**granule** 20:16
  28:1 30:11,12
  30:13,13,19
**granules** 21:14
  28:17,19 29:21
  30:2,2,5
**gray** 64:1
**great** 58:21
**greater** 49:20
  59:5 62:17
**ground** 12:7
  35:12,15 36:16
  36:19 41:3,5
  42:17,18,21
  44:8 46:16
  47:24 50:3,6
  51:14 54:2
  56:14,17 57:4
  57:14 58:6,7

Neil B. Hall   January 16, 2025

58:20 59:4,19
59:22,24 60:1
**guarantee** 50:8
51:14 55:24
**guaranteed**
47:15 48:21
49:7 51:10,12
**Gucci** 11:10
**guess** 15:17 19:3
25:20 56:3,3,5
59:7
**gun** 31:18
**guy** 11:24 12:1

---

**H**
**hail** 4:6,7,8,9
12:3 16:4,6,23
20:18 21:6,8,8
21:10,12,13,19
21:21,23 22:2
22:8,21,22
23:2,4,10,14
23:22,24 24:2
24:10,24 25:18
26:1,15 27:14
27:17,21 28:2
28:24 29:4,9
29:13,23 30:12
31:2,7,12,15
31:18,22,23,24
31:24 32:21
33:22 34:3,12
34:22,24,24,25
35:1,10,12,14
35:16,17,19,20
35:25 36:16,18
36:22,24 37:1
38:13,19 39:3
39:4,7,21 40:4
40:9,24 41:2,5
43:9,18,22,22
43:23,24 44:1
44:2,5,11,13
46:16 47:17,20
47:22,23,25

48:1 49:2,14
49:20,21,23
50:1,2,15,18
50:25 51:6,22
52:14,23 53:1
53:6,9,13,17
53:18,19,20
54:25 55:2,25
56:11,15,18,22
56:24 57:9,10
57:12,15,16,21
58:17 59:13,15
59:17,18,20,23
59:25 61:2,7,8
61:18,20,21
62:23 65:2,8
**hailstone** 30:4
35:1 53:25
54:2,20 58:14
59:1,8
**hailstones** 42:16
42:17,19,21
48:21
**hailstorm** 13:5
13:17 33:13,14
42:16,20 46:17
47:15 50:13
53:13 60:3,17
60:19 63:19
64:21
**hailstorms** 40:7
41:6 46:13
47:11
**HailStrike** 40:10
41:15,17,21,25
43:2,4,8,12,15
44:4,21,25
45:4,19,19
46:1,8,23,25
47:2,4,10
54:11,12 55:15
55:15,20,22,23
**HailStrike's**
42:1 55:11
**half** 47:24

**half-inch** 35:1
46:15 59:12,17
59:18
**Hall** 1:11,16 3:4
5:9,11,15,22
18:4 68:1,6,12
**Hall's** 4:4 66:12
**hammer** 11:9
65:6
**hand** 5:10 11:9
47:22 68:19
69:18
**hang** 10:9
**happened** 12:8,8
12:8 35:5
37:19
**hard** 27:12
31:20
**HARRIS** 69:2
**head** 47:11
**hear** 33:25
**heard** 42:14,15
42:15
**hearing** 14:17
14:18
**heavy** 22:22
43:23
**heavy-gauge**
29:11
**help** 22:19 41:18
48:17
**hereto** 1:25
**hey** 61:16
**high** 23:5
**hit** 14:5,5 35:15
35:20 36:4,6,7
37:1 51:14
57:7 60:6
**hits** 12:3 22:13
30:4 50:5
59:19,21
**hitting** 50:4
59:22 61:20,22
**hodograph**
37:13,13,21

61:17,25
**hodographs**
61:5
**Hold** 18:15 66:2
**holding** 16:20
**home** 6:1
**hoods** 28:24
**hopefully** 13:20
**horse** 63:14
**hour** 38:11
47:24
**hours** 8:11,15
**house** 11:18
**Houston** 1:2
2:10 69:24
**Huh** 48:24
**hundred** 22:4
47:17,18
**hundred-story**
12:1
**hundreds** 41:18
**HVAC** 31:12,16
**hypotheses**
61:11,12
**hypothesis**
61:13 64:5

---

**I**
**icing** 8:10
**identified** 20:24
20:25
**identity** 68:14
**III** 2:8
**images** 51:24,25
51:25
**imbed** 29:21
**impact** 30:4
32:22 33:23
34:4,8 38:19
39:21 59:1
**impacted** 34:12
38:20 39:22
61:18
**impacting** 21:13
34:22 61:3,8

62:23
**impacts** 59:9
**importance** 54:6
**important** 10:22
12:5 36:24
37:2 54:8 55:7
**importantly**
22:24 44:3
**imported** 52:8
**impregnated**
29:19
**impression**
31:24
**inch-and-a-qu...**
49:2,6 50:22
**incidental** 10:23
10:25
**include** 36:12
55:5
**includes** 17:6
54:24
**incomplete**
52:21
**inconsequential**
59:14,16
**incorporate**
65:11
**incorporated**
44:9
**increase** 61:25
**increased** 53:25
**independent**
41:20
**INDEX** 3:1
**indicate** 49:2
57:2
**indicating** 19:4
27:10
**indication** 21:7
22:1 56:22
**indications**
21:21
**individual** 46:13
**industry** 22:14
32:4

---

inferred 13:16
informant 48:6
  48:10,13,15,18
informants 48:8
information
  16:8,9,10,12
  16:17 23:18
  33:3 37:5,11
  37:12,19,23,24
  37:25 39:11
  40:17,18 41:1
  41:9 48:6,7,9
  48:12,13,15,18
  49:18 50:14
  52:22 54:22,24
  55:4 56:13
  57:18 63:4
  64:4,5,15
initial 43:1,3
  55:15
initially 12:13
  52:10
inquiry 43:1,3
inside 57:8,9,10
inspection 20:6
instance 1:17
instrument
  68:16
instrumentation
  51:5
Insurance 1:6
  5:16
insured 32:25
insurer 32:16
intensity 45:24
intercepted
  12:15
interest 69:16
interior 20:9
  21:4
interpret 9:3
interrogations
  48:5
interrupt 14:14
introduce 12:19

19:21 25:1
introduced 15:8
introducing
  14:11 15:11
Inventory 40:16
  43:7 55:18
investigation
  20:11 21:9
INVESTMENT
  1:3
involved 12:12
  45:12 51:3
involves 7:12
issue 58:2
issues 51:3 56:2

## J

January 1:12,19
  5:1 69:19
Jay 2:4 12:14,14
  17:3
job 12:7 32:7
  61:10
jsimon@cwils...
  2:6
July 33:22 34:3
  37:8
juncture 39:25

## K

keep 10:13
  37:10 38:20
  53:7
kind 11:1 14:15
  27:18 43:16
  58:22,24 66:4
  66:5
kinetic 54:8
kitchen 31:20
KMZ 40:19,20
  52:9,15,20
know 9:24 10:1
  16:19,25 17:14
  22:13 33:2
  35:5 36:17,17

36:19,23 45:8
  45:8,17 50:12
  53:9 56:18
  57:21 58:1,25
  59:6
known 38:12
  68:12

## L

La 20:8,8,23
Lake 5:7
landscape 8:14
large 44:2 46:19
  47:8 49:14
  52:25
larger 51:3
latitude 40:20
law 2:4 8:22
  12:14
lawsuit 69:14
laying 47:24
lead 21:16 28:19
  57:19
leak 13:17
leaks 13:14
  20:24
learn 8:16 10:11
  10:12
learned 10:10
learning 43:17
learns 10:14
leave 31:24,25
  53:3
led 64:16
left 16:5 53:16
  54:3 62:9
let's 24:4,22
  26:15 40:3
  56:3
letterhead 6:21
level 7:14 20:3
  35:12 55:6
  59:4 62:17
levels 37:15
license 6:20

licensed 6:7,10
  6:12 8:4
licenses 8:12
light 22:20
likewise 30:24
limit 9:8
line 50:4,5 67:4
lines 52:6
liquid 31:23
listed 13:1
literature 59:17
litigation 39:1
little 14:19
  26:20 27:7
  45:22 46:21
  58:8
living 11:22
LLC 1:3
LLP 2:9
located 5:7
location 13:16
  26:25 28:16
  37:20 41:2
  47:15 48:20
  51:7,9,12,14
  52:4,5,13,15
  55:24 57:19
locations 14:4
  27:13,21 36:21
  40:23,24 49:11
  49:22
logical 33:19
logically 57:13
long 6:10 8:24
longitude 40:21
look 6:14 9:25
  20:19 25:10
  27:7 30:11,12
  44:22 48:17
  58:2 64:12,13
looked 20:17
  40:15 52:10
  55:15
looking 16:21
  22:20 24:1

25:12 27:6,12
  27:12 30:18
  33:24 40:13
  41:3 44:7,7
  52:16 55:17
  57:18
looks 26:22 49:1
loss 13:15,17
  22:20 28:1
  30:12,13,13,19
  32:17 33:4,12
  33:12,20 34:8
  38:1 40:5,8,8
  41:14 62:8
  65:10
lot 56:4
Louisiana 6:4
lower 34:16
lowest 6:24
Ls 27:7

## M

machine 1:22
  43:16
maintain 8:12
maintenance
  13:13 60:18,20
making 38:7
man 32:3
manual 9:2,2
map 4:6 34:25
  40:22 49:1,10
  49:24 53:15
  55:18
mapped 40:17
maps 39:3 40:23
  51:22 52:1,5
  55:11
March 33:15,19
  34:8,12,20,22
  35:16,20,21,24
  36:8 37:7,7,9
  38:17,19,20
  39:8,9,11,14
  39:22 40:3

Appx.0071

41:14 42:7,25
48:25 55:23,24
57:9,11,20
60:3,8,9 61:3,8
62:4,8,15,24
63:5,18,19
64:8,17,21
**mark** 21:12
31:25
**marked** 12:21
14:13 19:22
23:12 25:2,14
25:25 26:23,25
27:17
**markings** 27:23
**marks** 32:12,13
50:9,11
**mass** 43:25
**master's** 7:8,13
**mat** 29:18,19
30:9,17
**match** 50:14
**material** 63:25
**math** 56:4
**matrix** 48:6,6,8
48:16
**matter** 12:12
13:19 22:17
30:3 35:19
36:25 58:6
69:17
**matters** 37:23
64:2
**maximum** 16:4
16:6,23 41:4
43:18 47:17
50:25 51:7
52:14 53:18,20
55:1 56:11,15
56:22,23 58:17
**McKINLEY** 2:9
**mean** 8:7,10
13:12 30:5,6
42:21
**meaning** 19:18

45:7
**means** 12:6 39:2
54:21 62:3
**meant** 52:21
63:2
**measured** 36:18
36:18,20 53:5
53:21
**measurement**
53:2,7,24 54:3
**media** 47:21
**Medical** 2:5
**melt** 50:3,6
57:14 58:1,1,4
58:7,18 59:6,9
**melted** 46:16
47:24 54:3
57:22 59:1,3,5
**melting** 50:16
59:23,25
**melts** 57:16
**membrane**
21:14
**mention** 54:10
**mentioned**
23:10 33:21
34:7 44:20
51:23 64:18
**MESH** 56:10
**met** 20:7
**metal** 28:24,24
29:9,11,24
31:4,6,7 50:11
**meteorological**
9:9,21 56:7,10
**meteorologist**
9:6,13,22,22
38:11
**meteorologists**
37:14 38:13
45:11 55:7
56:7,8,21
**meteorology**
8:19,20,21 9:4
9:11,11,12,14

38:5,6
**method** 61:11
**micro** 49:12
**middle** 37:18
52:25 53:13
**mile** 43:22 44:5
**miles** 38:10 44:6
45:13 57:5
**military** 11:6,15
11:16,17 48:5
**millimeters** 54:7
58:13
**mind** 17:2 33:7
39:12 53:7
**minuscule** 54:6
**minute** 24:21
**mischaracteri...**
63:8
**misleading**
60:13 62:5
64:22
**missed** 66:4
**missing** 16:16
37:22,24
**mistake** 24:6
**mod** 59:24
**mode** 30:14 65:2
**modified** 13:10
20:14,15 21:11
29:12,14
**Mona** 1:20 5:6
69:3,20
**months** 7:22
33:15
**morning** 5:15
**move** 36:22 43:6
46:16
**movement** 30:9
35:9 57:3,19
**moving** 35:3,13
44:4 55:17
**muddy** 14:15

---
**N**
---

**N** 2:1

**name** 5:6,15,20
67:2 68:15
**narratives** 54:17
**National** 9:16,19
40:12 43:10,17
44:21,25 48:11
50:24 52:8
54:14,18
**natural** 8:23
**Navy** 11:8
**nearest** 36:20
**necessarily** 23:6
25:8,19 51:10
**necessary** 13:6
65:3
**need** 9:21,24
63:4 65:7
**Neil** 1:11,16 3:4
4:4 5:11,22
63:13 68:1,6
68:12
**neither** 69:12,15
**net** 46:19,21
47:7,8,9
**never** 41:8 54:16
58:10
**new** 8:17
**NEXRAD** 9:18
49:11 54:21,21
**Niro** 32:6
**non-meteorol...**
9:19,20
**north** 16:15,16
19:4 21:2
26:10 35:2,3
35:17 36:22
38:10
**NORTON** 2:9
**NOTARY** 68:24
**noted** 21:7,8
68:3
**notice** 16:1,5,7
**noticed** 21:10
**number** 16:6
18:17 19:17

21:14,23 25:16
26:19 30:25
45:13
**numbered** 1:19

---
**O**
---

**oath** 68:13
**objected** 28:10
**objection** 28:6
33:1 36:2
38:23 39:17,24
49:9 57:23
59:2 60:5,11
60:13 62:5
63:7,20 64:9
64:22
**observations**
44:8
**observed** 11:13
11:17 29:5
31:2
**obvious** 65:11
**obviously** 63:11
65:2
**occasion** 41:25
**occupation** 6:5
**occur** 30:9 42:22
**occurred** 31:19
39:8,9 40:2,24
41:11 47:3
60:16,17
**occurring** 35:2
**occurs** 57:4
**odd** 32:3
**OFF-THE-RE...**
15:3 66:17
**office** 12:14,15
16:17 17:9
66:14 68:19
69:18
**official** 32:11
**oh** 8:7 15:25
23:19 28:12
33:2 43:21
47:16 59:3

Neil B. Hall    January 16, 2025

**Okay** 6:10,16
    7:3,78:5 11:4
    11:20 12:18
    13:18 14:10
    15:1,23 17:8
    17:11 18:4,15
    18:18 20:4,19
    21:5,18,25
    23:7,20,23
    24:6,20 25:15
    26:9 27:15,18
    27:23 28:3,18
    28:22 29:2,14
    29:23 30:21
    31:10 34:6,11
    34:17,21 38:2
    39:21 40:3
    41:12 42:4
    48:20 49:23
    50:22 51:18
    55:9,22 63:17
    64:18 66:21
**old** 13:10 16:18
    65:10
**older** 60:1
**once** 38:8,11
    41:22 50:5
    57:24,24
**onerous** 58:14
**ones** 41:19 49:17
    49:19
**open** 37:10 62:9
**opine** 56:9 60:25
**opinion** 15:19
    33:22 34:3,11
    47:10 56:12
    58:22 63:10,11
    63:11
**opportunity**
    47:4
**opposing** 62:13
**opposite** 4:9
    23:25
**ORAL** 1:10,16
**order** 52:22

54:19
**organized** 46:12
**original** 13:6,8
**outside** 8:25
    31:22 57:6
**overlaid** 51:24
**overlap** 28:14
**overlays** 52:11
**overruled** 56:14
**owner** 33:6,7

**P**
**P** 2:1,1 10:18
**p.m** 37:17
**page** 3:1 4:1
    13:1,25 14:6
    16:21 18:14
    19:16 24:1,5
    49:25 50:1
    51:18 52:18,19
    62:7 67:4
**pages** 12:24 15:7
    15:11 18:6
    52:1
**paid** 7:5 46:2
**paint** 32:8
**paper** 38:9
**paragraph**
    15:17 24:5
**parapet** 4:9
    23:25 26:2,16
    28:25 29:6,10
    29:11 31:4,7
**paraphrasing**
    9:18
**part** 15:17 17:19
    40:6 42:9
    45:11
**particular** 20:19
**parties** 69:13
**pass** 65:20
**passed** 12:16
    56:1
**PE** 6:21,23
**peculiar** 56:20

**pending** 39:11
**penetrate** 29:23
    29:24 30:1
**penetration**
    21:17 28:19
**penthouse** 19:7
    19:11,23 20:3
    24:9,9,19 25:6
    25:17
**people** 32:4
    47:20,23
**percent** 39:3,4,6
    39:7,8 40:2
    41:10 47:18,19
    49:15,18,20
    53:17 62:18
**perfect** 41:8,8
**perform** 58:11
**performed**
    64:16
**period** 6:22
    28:13 31:22
    57:4 63:23
**person** 68:15
**personally** 68:12
**photo** 4:5,6,7,8,9
    19:17 23:8
    25:3,16 26:4
    26:16,19,23
    27:13 29:2,4
    30:24,25
**photograph**
    23:18 48:14
**photographs**
    24:2
**photos** 23:15
    24:10 27:22
    31:10
**physical** 8:23
**physics** 57:24
**pick** 41:19 47:20
    47:23
**picked** 56:17
**picture** 18:17
    19:21 27:16

56:18
**piece** 12:3 38:8
    56:17 59:15
**pieces** 9:7
**place** 31:19 46:9
    63:22
**plaintiff** 1:4 2:3
    12:23
**plaintiff's** 4:3
    13:2,4
**please** 5:9,21
**plenty** 36:22
**PLLC** 2:4
**plumbing** 10:19
**point** 21:5 24:21
    31:12 33:10
    40:1 46:2,5
**pointed** 30:15
    30:20 37:23
    53:15
**populated** 53:20
**populates** 40:22
    52:9,12
**portions** 64:20
**position** 57:1
**positive** 35:21
    42:19 53:18
**possibilities**
    60:22
**possibility** 34:16
    34:22 36:11
    38:19 60:16,17
    60:18 61:2,4,7
    62:9,10,13,16
    62:23 63:6
    64:1
**possible** 6:25
    29:8 34:17,18
    35:24 39:21
    40:1
**Possibly** 53:1
**practice** 8:22
    9:2,3,12 10:23
    10:24,24 11:1
    38:7

**precipitation**
    31:23 55:6
**precise** 32:14
**precisely** 37:19
**prepared** 13:18
    13:20
**present** 62:14
**presume** 20:15
    54:15
**presumptions**
    59:12
**pretty** 14:1
    43:23 58:22
**previous** 20:24
    44:24
**primary** 54:23
**principles** 9:9
**prior** 33:15
**probabilities**
    61:24
**probability**
    34:16 49:15,18
    49:20 51:6
    61:24 62:18
**probable** 40:1,2
**probably** 32:3
    50:16 51:5
    58:9 59:20
**problem** 16:19
**problems** 53:24
**Procedure** 1:24
**proceedings**
    69:9
**process** 40:6
    48:19
**produced** 1:17
    37:22 38:14
**product** 29:19
**professional**
    7:12,15 9:12
**program** 9:2
    13:13
**promise** 35:8,9
**property** 13:4,6
    13:15 35:2

43:22 44:5,6
49:3 57:7
**property's** 13:8
**proprietary**
45:7
**proved** 68:13
**provide** 37:10
**provided** 48:11
49:18
**province** 38:4,6
**provisions** 1:24
**PUBLIC** 68:24
**published** 23:17
**pull** 16:8 29:2
30:25 31:11
43:17
**pulled** 52:4
**pulling** 16:9
**purchase** 66:1
66:11
**purposes** 68:17
**pursuant** 1:23
**pursuit** 8:24
**pushed** 44:14
**pushes** 30:10
**pushing** 44:10
44:12
**put** 10:1,14 11:7
11:8 16:14
23:17 38:24
**putting** 9:6
**puzzle** 9:7

**Q**

**quarter-inch**
50:16
**question** 11:21
11:23 27:18,19
44:24,24 48:15
59:8 63:8
**questions** 46:5,6
65:21 66:6,8
**quick** 14:15
**quickly** 25:12
**quipped** 13:23

**quote/unquote**
56:9

**R**

**R** 2:1
**R-i-c-o-w-i**
30:23
**radar** 9:3,19
15:25 35:6
36:18 40:15,24
40:25 43:10
44:25 45:14
49:12 50:4,13
50:20 52:21
54:20,21,21,24
54:25 56:15
60:18,19,20
62:10
**radiation** 21:15
**radius** 50:2 52:7
57:6,8,9,10
**raindrop** 49:14
52:25 53:12
59:14
**raise** 5:9
**rate** 57:14 58:2
58:3,18
**raw** 45:5,5 54:19
**reach** 44:18
52:22 61:13
62:1 64:5
**read** 54:17 56:6
66:13 68:1
**reading** 35:7
61:2
**readings** 57:2
**real** 14:15
**really** 19:11
43:15 58:14
**rear** 19:4
**reason** 22:18
30:11 45:3
63:21 67:4
**reasonable**
38:25 56:22

**reasons** 39:19
**recall** 20:22
**receive** 7:4 33:3
44:20 48:2
**received** 12:13
13:21 41:15
**RECESS** 18:1
65:17
**recognizes** 9:20
**record** 1:24 5:2
5:6,21 12:24
14:23 15:2,5
17:4,21,25
18:3,6 23:16
51:19 65:16,19
66:22 69:16
**red** 52:5
**refer** 20:3
**referenced**
19:24 23:15
24:10
**reflectivity**
49:24 55:1
**refuse** 62:1
**regarding** 13:3
15:18 42:6
**Registration**
69:23
**reinforcement**
42:20
**related** 21:1
64:20 69:13,15
**remaining** 26:1
**Remote** 1:13
**remove** 28:16
30:4
**removed** 30:2
**removes** 21:13
**renew** 6:19
**rep** 45:20
**repair** 13:6,13
**repaired** 11:18
21:1
**repairs** 13:12,12
**replace** 22:12,25

23:1,6
**replacing** 22:9
22:14
**report** 4:4 6:20
9:25 10:1,2
13:14,20,23
14:3,7,12 15:7
15:22,24 16:2
16:15,18 17:5
17:6 18:10,15
18:16 19:17,24
23:8,13 24:5
24:11 25:4,12
25:16 26:18,19
28:23 30:15,16
30:19,20 32:20
33:21 34:2
36:10 37:24
38:8,8 40:10
40:11,13 41:12
41:13 42:5,6,6
42:8 43:18
44:15 46:2,4
51:19,23 55:5
55:23 61:1,6
63:15 65:12
**reported** 1:22
32:17 33:4
42:11,17,21
**reporter** 1:21
5:3,5 14:14,21
14:24 30:23
65:22,25 66:7
66:11 69:4
**Reporter's** 3:7
**REPORTERS**
69:22
**reporting** 47:25
**reports** 13:18
15:23 16:14
41:20 42:25
43:9 44:9
45:13 48:1
52:17 56:7
**represent** 5:16

**representing**
52:6
**required** 8:11
**requires** 12:4
61:4
**research** 33:11
64:11,14,14
**researched**
33:12
**researching** 9:8
**resend** 16:25
**residential**
10:16
**responsible**
63:24
**result** 13:17
44:15
**retired** 11:16
**return** 49:11
**returns** 51:4
**review** 34:15
**reviewed** 40:8
54:16 55:10
**reviewing** 25:11
34:18
**RICOWI** 30:15
30:19,20,23
**right** 5:5,10 6:5
7:7 11:14,20
12:11,25 14:6
15:6,14,25
17:16 18:5,9
18:12,13,16,19
18:21 19:1,3,7
19:8,9,13,15
19:16,20,20
20:2,5 21:18
23:15,19,21,24
24:4,6,8,11,13
24:16,16,22,24
24:24 25:1,6,9
25:15,20,24
26:2,4 27:2,2,4
27:9 28:20,22
28:22,25 29:4

Neil B. Hall    January 16, 2025

29:6,8 30:24
31:8,10,13
32:16,18,20,22
32:24 33:23
34:4,9,13,17
35:23 36:13,14
38:21 39:13,23
41:15 42:7,24
43:2,8,12,14
44:22,24 47:13
48:23,25 49:3
50:23 51:1,9
51:11,11,15,18
51:21 52:3,16
54:11 55:12,13
55:22 57:22
58:24 59:1,7
60:2,9,12 61:1
61:10,15 62:3
62:4,20,24
63:3,6 65:20
65:22,25 66:7
**rights** 47:21
**rise** 28:14
**risen** 62:17
**river** 11:25
**Robert** 32:6
**roof** 4:5 10:5,8
10:11,12,13,20
11:1,5,11,13
11:17 12:2
13:10,14,16
19:13,16,18,25
20:2,10,12,13
20:14,17,20,21
21:2,3,6,9 22:2
22:5,6,12,14
22:22,25 23:1
23:6 24:18
25:20,22 26:7
26:10,13 27:24
29:12,15,24
30:1 31:3
33:16 50:10,19
50:21 57:15,17

59:24 60:1,7
64:18,20 65:1
65:9
**roofing** 11:18
**roofs** 11:6,9,15
**room** 22:11
36:22
**rooms** 20:9
**round** 66:3
**routinely** 35:10
**rule** 22:24 39:14
39:23 60:9
**ruled** 38:18
**rules** 1:23 5:4
45:9
**rulings** 64:24
**run** 45:5 54:22
55:3

**S**

**S** 1:20 2:1 10:18
69:3,20
**saw** 19:23 21:21
33:16 42:16,17
52:10,11
**saying** 11:25
38:5,20 58:25
**says** 10:1 16:6
23:13 38:9
43:21 53:8
**school** 7:17,17
7:19,22,23,24
7:25 10:11
**schooling** 10:12
**science** 7:10
8:24 56:4
**scientific** 61:10
**scientists** 54:7
**Scott** 2:4
**screen** 12:18
16:10 18:5
48:23 54:9
**screening** 41:17
**scroll** 52:17
**scrolling** 15:13

**Seabees** 11:8
**seal** 68:19 69:18
**second** 11:14
12:20 14:23
18:5,12,15
23:7 24:4,21
25:24 28:22
29:3 31:1,11
32:15 41:12
42:4 45:17
48:23 55:3
**seconds** 58:6
**secretary** 12:16
16:24
**section** 42:5
**sections** 24:23
**see** 15:11,22
16:1,16 22:21
24:4 27:9
30:10,13,18,19
39:3 40:22
49:17,24 53:4
54:9 64:12
**seeing** 12:22
50:10,10,11
**seen** 32:11,12
58:10 59:11
**segregate** 64:25
65:7
**self-reported**
6:23
**seminars** 8:5,7,8
**send** 17:4,6,13
17:15,15 66:14
**sending** 37:16
38:7
**sense** 12:10 52:3
62:6 63:25
**sent** 16:2,10
17:10 37:17,18
49:12 53:10
66:14
**separate** 56:2
58:2
**separately** 23:9

**September** 5:24
**Service** 9:17,20
40:13 43:10,17
44:22 45:1
48:11 50:24
52:9 54:14,18
**set** 10:17
**Severe** 40:16
43:7 55:18
**severity** 21:22
**SHACKELF...**
2:9
**shape** 21:13
22:6
**share** 12:18 18:4
23:8 45:22
48:23
**shear** 35:9 36:12
36:15 37:15
38:3 47:14
61:5,17
**sheet** 13:11,21
14:4,8 15:15
20:15 29:17,17
29:20,22,25
**shelf** 62:7
**Shores** 5:7
**shorthand** 1:21
1:22 69:3
**shortlist** 61:23
**shortly** 13:15
**show** 12:23
14:11 16:3,11
16:21 20:17
25:15 27:21
41:12 61:18
**showed** 13:11
15:22 34:25
**showing** 15:6
40:23
**shows** 7:7 16:6
35:17 49:10
53:6
**shrinking** 21:16
**sic** 36:11

**side** 19:5,9,12
21:2,2 25:7,8
25:17,20 26:5
26:5,7,10 37:3
56:8,9 58:10
61:16
**sides** 35:18
**sift** 41:18
**sign** 66:14
**signal** 49:13
51:4 54:19
**signals** 49:11
**signature** 3:6
67:1 68:2
**signed** 6:20
12:25
**signify** 27:20,25
**Simon** 2:4 12:15
13:1 17:12,14
17:18,23 28:6
28:10 33:1
36:2 38:23
39:17,24 49:9
57:23 59:2
60:5,11,13
62:5 63:7,20
64:9,22 65:22
65:24 66:1,2
66:10,13,19,20
**simply** 13:12
15:16
**single** 35:1
**sir** 5:23 10:6
14:9 15:9,21
18:11 23:20
65:14
**site** 35:10,12
**sitting** 30:2
**six** 7:21 8:4
12:23
**six-page** 12:22
**size** 16:4,6,23
21:12 41:4
43:18 47:14,17
47:25 48:20

49:2,6,6 50:9,9
50:18,25 51:7
51:8 52:14
53:19,20,25
55:2,24 56:2
56:11,15,22,24
56:25 57:18
58:13,17
**skip** 17:18
**skyscraper** 12:2
**Slidell** 6:4
**slightly** 50:6
**slim** 60:22
**slip** 46:21
**slipping** 47:8
**slope** 20:13
**sloped** 22:5
**slushy** 32:9
**small** 28:14 44:1
53:12 57:17
59:15,15
**smaller** 43:24
50:16 51:1,2
54:1
**smarter** 44:18
**smoking** 31:18
**snowball** 32:9
**social** 47:21
**Society** 9:1
**somebody** 33:6
37:10 43:21
65:6
**someone's** 19:24
**sorry** 6:1 10:6,7
18:20 20:20
24:15 28:8
30:25 34:1
36:3 37:9
38:18,20 61:8
66:2
**sorts** 54:5
**sounding** 14:15
**Sounds** 32:15
**source** 41:24
46:18

**sources** 9:10
46:6,10,11
54:16
**south** 4:9 18:19
18:24 19:1
23:25 26:2,16
35:17 36:22
38:10
**southeast** 4:7
19:12 23:14
24:23 25:8
26:5 35:3,4,13
**SOUTHERN**
1:1
**southwest** 4:8
19:8 24:8,17
24:18,19 25:7
25:19,21,22
26:5 31:3
**spatter** 31:16,18
32:2,4,5,7,8,13
**speaker** 14:20
**speaking** 8:8
**speculation**
61:14 62:2
**speed** 36:17,19
36:23 41:3,4
44:7
**spent** 20:10
**splatter** 31:25
32:1,9,14
**spoke** 28:8
**spoken** 45:20
**sponge** 31:21
**square** 6:3 21:23
21:25 22:3,3,4
22:7,13,17
23:2,4 27:6,8
**squares** 21:20
21:22,24 26:6
26:10,13,23
27:1
**stamp** 6:21
**stand** 63:15
**standing** 10:13

**staring** 42:2
**start** 47:11 58:1
59:21
**started** 13:16
16:7,13
**starting** 33:10
46:1
**state** 1:21 5:20
6:7 10:23 11:1
13:4 34:6,7
36:10 61:1
62:22 68:9,24
69:1
**stated** 1:24 63:9
**statement** 63:15
**states** 1:1 8:4
10:23
**stating** 61:6
**stationary** 58:3
**step** 17:8,18
43:13
**Stipulation**
69:11
**stipulations** 3:3
5:3
**stop** 15:25 16:24
43:7
**stopped** 40:11
**stopping** 55:8
**storm** 13:9
20:25 21:2
33:6,8,9,17
37:18,20 40:14
41:3 44:3,7
47:7 56:17
60:8,23 63:19
63:22,23 64:2
64:6,8
**storms** 41:18,22
41:23 47:2,5
**story** 42:10
**straight** 44:2
54:2
**strata** 58:19
**stray** 8:25

**strike** 21:12
23:2 28:2
**strikes** 4:6,7,8,9
21:10 22:2,8
22:22 23:4,10
23:14,22,24
24:3,10,24
25:18 26:1,15
27:14,17,21
28:24 29:5,9
29:13 31:2
50:19
**structural** 10:18
**structure** 19:12
19:16,25
**Structures** 20:2
**subject** 59:11
**subjected** 6:16
**subscribed**
68:16
**subsequent**
15:23 16:13
**substantive**
13:25 15:18
**substrate** 20:16
59:22
**sufficient** 21:13
30:14
**Suite** 2:5 6:3
69:23
**super** 14:18
**superimposed**
16:22
**supervised** 11:8
11:12
**supports** 58:24
**supposed** 56:23
**sure** 17:23 26:17
34:1 39:3,4,6,7
39:9 45:3
47:16,18,19
49:5,14,19
50:24 53:6
58:15,16,18,19
59:8

**surface** 35:2,7
**SURPLUS** 1:6
**surveying** 7:20
**susceptible**
29:13
**suspended** 7:4,6
**swath** 34:24
35:16 36:24
37:2 49:21
50:1 55:25
**SWDI** 40:24
69:6
**sworn** 1:18 5:12
69:6
**system** 10:20
13:10 20:15,17
22:9,15 23:6
29:13,16,17
30:8 31:16
**systems** 10:11
10:12 11:1
47:2

---

**T**

**T** 2:4
**take** 7:19 8:11
8:14,16 25:9
27:16 32:7,9
41:23 45:4
54:19,22 65:13
**taken** 1:13,18
9:16 20:22
26:22 69:14
**takes** 40:20
**talk** 24:22 26:15
40:3
**talking** 12:1
14:8 15:16
33:25 51:21
54:11 55:9
61:19 65:8
**task** 58:14
**taught** 8:8 48:4
**tear** 13:11 28:4
28:7,13 64:19
64:21 65:1

Neil B. Hall    January 16, 2025

Page 82

tech 45:20
**TECHNICAL**
15:3 66:17
technically 7:23
**TECHNICIAN**
2:13
tell 9:25 12:7,11
37:19 42:9
46:2,14,15
50:25 53:14
56:6 57:1 59:3
63:21
tells 44:16
temperature
58:4,19 59:4
ten 22:10
tend 48:19
tends 44:2
tensile 30:9,9
terminal 58:16
terms 38:1 40:13
51:12 56:25
57:1,18,18,19
test 21:19,22,23
21:24,25 22:3
22:3,13,16
23:2,4 26:6,9
26:12,23,25
27:6,7
testified 5:12
28:18
testify 13:3
testimony 69:4
Texas 1:1,222:5
2:9,10 5:7,8
6:8,11,13,17
6:19,21,22,23
8:22 10:22,25
10:25 64:24
69:1,21,24
Thank 5:5,18
thesis 7:13
thing 14:10
22:23 43:13
45:2 66:6

things 36:17
48:4 52:20
55:5
think 6:14,24
23:17 26:18
31:19 37:23
39:18 60:14
63:1,12,13
thinking 48:3
thinks 33:8
third 45:15,17
thought 14:2
58:21 65:4,5,6
three 21:19
52:19
three-quarter-...
57:12,16 59:19
59:23,25 61:20
threshold 22:12
39:10 59:20
throw 32:9
throwing 46:19
thumb 22:24
thumbs 14:5
thunderstorm
52:25
tier 55:4
tiles 20:23
time 5:2 6:18,20
6:22 7:18 8:16
13:9 15:1,4
17:24 18:2
20:10 28:13
48:17 54:23
57:10 58:7,8
63:23 65:10,15
65:18 66:13,20
66:21
times 30:16
45:21 60:15,15
63:9
titled 9:18
today 5:1,17
told 6:25 33:6
45:16,22

Tony 20:8
tools 9:21
top 29:20,21
30:2 61:23
totally 36:3
41:24
traffic 65:5
training 10:4,7
transcribed 69:8
transcript 66:1
66:12 69:9
transitioning
66:4
transparent
36:4
transparently
62:9
transported
35:14
tree 42:13,14
true 35:23 43:8
47:13 68:3
trust 46:3,8
trusted 46:4
truth 56:14
try 48:17
trying 17:19
32:13 37:3
45:21 63:10
turn 59:14
twice 54:23
two 8:8 14:4
30:16 36:17,21
40:7 46:13
56:2
two-ply 20:15
29:16
type 29:18 65:7
typed 52:15
types 65:1
typically 29:18
30:7,17 33:2,3
37:17
typo 13:24
typos 15:16

**U**
Ulmer 2:8 3:5
5:4,14,16
14:15 15:6
17:22 18:4
65:20
ultraviolet 21:15
unable 35:24
38:3
undergraduate
8:1
underlying
21:14
underneath
30:18
underside 30:8
understand 9:3
38:16 39:13
42:24 62:20
64:24
understanding
35:14 38:2
45:23
Understood
25:23 32:15
36:9
UNITED 1:1
units 20:23
UNITY 1:3
unrelated 28:1
updrafted 53:25
upper 16:5
use 8:23 9:10,18
9:21 33:11
37:14 38:12,14
40:9 41:1,20
44:17 45:4,19
45:23 46:1,9
46:25 47:5,6,7
48:3,19 49:15
56:21 64:14
useless 58:22
uses 44:25 49:25
54:18
usually 22:4,4,7

**V**
valid 6:21
validity 48:3
Various 54:12
velocity 54:25
58:16
vent 28:24
verify 48:14
versus 32:1
64:21
vertical 36:12
55:6 61:4
vetted 40:7
video 2:13 66:19
videoconference
1:13,23
VIDEOGRAP...
5:1 14:22 15:1
15:4 17:20,24
18:2 65:15,18
66:15,18,21
VIDEOTAPED
1:10,16
virtue 10:9
volunteer 40:15
VS 1:5

**W**
walk 20:5
walked 20:8
wall 10:9 19:18
19:25 32:6,10
want 14:22
16:19,24,25
17:12,20 18:13
22:25 23:9
41:19 44:17
46:20,22,22,22
47:5,21 50:8
52:17 60:14
65:25 66:11,19
wanted 47:7
51:22
wasn't 6:21,22
33:17 63:25

Neil B. Hall   January 16, 2025

Page 83

| | | | | |
|---|---|---|---|---|
| water 21:17 28:19 | Wilson 2:4 12:14 | 25:21 27:12 32:3 39:16 | 10:00 1:20 5:2 10:13 15:2,4 | 2- 50:10 2-inch 43:21,22 |
| way 9:23,24 35:11,19 36:23 38:24 43:4 45:15 46:12,16 50:3,6 53:9 57:21 58:25 59:24,25 | wind 9:24 28:16 28:16 35:2,4,8 35:9,9,19 36:12,15,17 37:4,15 38:3,9 43:24 44:1,4 44:10,12 47:14 51:16 57:2,19 | 43:3 52:19 62:25 64:3 year 7:13 8:12 8:15 years 11:7,7 13:10 16:7 40:7 45:11 46:14 47:1 | 10:18 17:24 18:1 10:42 18:1,2 11 24:2,7 26:1 26:15 11:51 65:15,17 11:56 65:17,18 11:57 1:20 66:22 66:23 | 47:22 48:1 56:17 2-mile 50:2 52:6 57:4,6,8,9 20 8:11 23:4 27:22 2000 6:15,15 2000- 37:8 |
| ways 47:19 wear 13:11 28:3 28:5,13 64:19 64:21 65:1 | 61:5,5,17 windstorm 8:9 13:5 | 65:10 yellow 16:22 49:19 52:6 | 12 4:2 12621 69:23 127 6:24 | 2010 6:15 2020 62:11 2021 34:12,22 |
| weather 9:3,17 9:20,25 34:15 37:16,16 40:12 40:16 42:10 43:7,9,10,17 44:6,21 45:1 48:11 50:24 51:23 52:8 54:14,18 55:18 64:13,14 | wishes 62:13 witness 1:17 12:23 14:19 17:12,17 25:11 28:8,12 30:22 65:21 67:2 69:5 witnessed 42:10 42:11 | 53:19 --- Z --- zone 54:4 57:22 58:6 zoom 1:22 2:2 18:17 --- 0 --- | 12th 33:22 34:3 37:8 62:11 13 23:15 14 4:3 13:965:9 14- 29:12 15 11:7 16 1:12 4:9 13:9 23:21,24 24:7 26:19 65:10 | 35:22,24 36:12 37:9 38:18,20 39:9,11,22 57:11 60:3,10 60:16 61:3,9 61:20 62:4,15 62:24 63:5 2022 32:18,21 33:13,19,23 34:3,8,20 |
| weatherman 9:24 website 6:19 40:19 | Witnesses 4:3 word 32:1 45:23 words 62:22,25 63:2 | 0.5 53:4 0.5-inch 53:5,8 53:11 04/30/26 69:21 | 16-year-old 29:12 16th 1:19 5:1 17 27:22 34:12 | 35:16,21 36:8 37:8 39:8 40:4 41:14 42:7,25 48:25 55:24 |
| Webster 2:5 weeks 8:8 welcome 5:19 well-meaning 47:23 | work 7:1 8:1,24 worker 11:11 working 9:5 56:7,8 world 38:25 | --- 1 --- 1 4:6 13:1 14:5 18:17 23:8 43:22 44:5 | 34:22 35:21,24 36:11 37:9 38:18,19,20 39:9,11,14,22 57:11 60:3,9 | 57:9,20 60:8 60:23 61:21 62:8 64:8,17 64:21 2023 12:17 |
| went 6:19 20:9 46:11 weren't 34:21 west 25:20 35:17 36:23 | WORLDWIDE 69:22 worth 57:10 wouldn't 13:23 22:21 25:7 wrong 56:19 | 1- 50:15 1-and-a-quart... 50:8 57:8,14 61:21 1-and-an-eigh... | 61:3,8 62:4,15 62:24 63:5,18 18 5:24 27:22 19 4:4 22:2,8,13 23:3,14,21 | 2025 1:12,19 5:2 69:19 20th 69:18 21 23:4,21 24:10 25:18 27:22 |
| wet 31:24 white 16:2,14,16 49:17 52:11,20 53:4,7 | --- X --- Xs 16:2 52:11 | 50:7 1-inch 47:20,25 50:7,17,18 56:16 65:5 | 24:23 27:22 29:4,9 1923 6:3 1948 5:24 | 31:2 39:14 63:18,19 22 27:22 33:15 33:19 34:20 |
| Whitmarsh 1:20 5:6 69:3,20 whoop 37:7 willing 60:25 | --- Y --- yeah 8:7,10 11:12 14:21 17:2 23:21,21 | 1,000 35:6 1.25-inch 50:2 51:5,10 10 22:4,4,7,7 32:17,21 10,000 35:6 | 1992 11:16 --- 2 --- 2 3:2 13:25 14:5 44:5 57:4 | 35:16,20 36:8 37:7 39:8 41:14 48:25 57:9,20 60:8 |

Neil B. Hall   January 16, 2025

Page 84

| | | | | |
|---|---|---|---|---|
| 62:8 64:17 | **7** | | | |
| **223** 69:23 | **7** 18:14 | | | |
| **22nd** 34:8 40:3 | **70458** 6:4 | | | |
| 42:7,25 55:23 | **713-572-2000** | | | |
| 55:24 64:8,21 | 69:24 | | | |
| **23** 4:5,8 24:10 | **713-572-2009** | | | |
| 25:16 30:25 | 69:25 | | | |
| **25** 4:6,7,8 38:10 | **717** 2:9 | | | |
| **27** 12:17 24:10 | **77002** 2:10 | | | |
| **27th** 2:9 | **77034** 69:24 | | | |
| **290** 69:23 | **77598** 2:5 | | | |
| | **78** 6:13 | | | |
| **3** | **8** | | | |
| **3** 19:17 30:25 | **8** 4:7 19:16 | | | |
| **3-inch** 50:10,13 | 23:15 25:3 | | | |
| **31** 31:10 | 26:4 29:2,4 | | | |
| **32** 57:25 59:4,5 | **81** 6:13 | | | |
| **33** 35:7 36:19 | **832-415-1801** | | | |
| **36** 31:10 | 2:10 | | | |
| **398** 65:7 69:21 | **832-565-9030** | | | |
| **4** | 2:11 | | | |
| **4** 24:1,5 62:7 | **833-942-0678** | | | |
| **4:23-cv-02455** | 2:6 | | | |
| 1:5 | **9** | | | |
| **455** 2:5 | **999** 52:21 | | | |
| **5** | | | | |
| **5** 3:3,5 | | | | |
| **5-mile** 52:6 | | | | |
| **50** 39:3,4,6,7,8 | | | | |
| 40:2 41:10 | | | | |
| 46:2 49:15,18 | | | | |
| 49:20 53:17 | | | | |
| 62:17 | | | | |
| **500** 63:9 | | | | |
| **555** 2:5 | | | | |
| **56** 14:6 15:7 | | | | |
| **58** 52:1 | | | | |
| **6** | | | | |
| **6:00** 37:17,17 | | | | |
| **60** 8:14 51:18 | | | | |
| **62** 52:1 | | | | |
| **67** 3:6 | | | | |
| **69** 3:7 | | | | |

Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ONE UNITY INVESTMENT, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:23-CV-02455 |
| | § | JURY |
| AXIS SURPLUS INSURANCE | § | |
| COMPANY, | § | |
| | § | |
| *Defendant.* | § | |

**<u>UNSWORN DECLARATION OF NEIL HALL</u>**

| | |
|---|---|
| State of Louisiana | § |
| | § |
| Parish of St, Tammany | § |

"My name is Neil B. Hall of GROUNDTRUTH FORENSICS. I am a licensed Architect and Professional Engineer in Texas. I am of sound mind and capable of making this Declaration. I am over the age of twenty-one and have never been convicted of a felony or crime of moral turpitude. The information contained herein is based on my personal knowledge and my review of files and records maintained by my company. I certify that the facts and statements contained in this Declaration are true and correct.

I have been retained as an expert witness in this matter by Plaintiff. Based on my education, training, and experience, I am qualified to provide opinions regarding wind and hail damage to structures and to distinguish wind and hail damage from other causes of damage. I have been deposed in this matter.

I reviewed documentation provided by the Chad T. Wilson Law Firm, along with documents which I independently acquired, in order to form opinions concerning the nature, cause and extent of building damage associated with the One Unity Investment, LLC property located at 10080 Bellaire Boulevard, Houston, Texas 77072. Those items are further identified in my report. I personally inspected the property on May 19, 2023, to assist in formulating my opinions. On July 24, 2023, I issued a report of my findings and conclusions, a true and correct copy is attached hereto as Exhibit 1. My resume, testifying and publication history, and rate schedule are attached hereto as Exhibit 2. All of the aforementioned items are correct summaries of my experience which qualifies me to render these opinions.

My report contains a true and accurate account of my findings with respect to this matter and a summary of my reasons therefore and the materials upon which I relied in formulating my opinions. I am incorporating the report and my deposition taken January 16, 2025, as stated

herein. As stated in my report, I believe the property sustained damages from a hail storm on March 22, 2022, (as opposed to a "reported" date of loss on August 10, 2022) (Depo, 33:12-16). To make repairs associated with the damages from the March 22, 2022, storm requires the repairs noted on Page 5 of my report. Damages to the property from other events were considered in my evaluation, but not included in my repair recommendations as those were solely related to the storm damage which I believe occurred as a result of the March 22, 2022 storm, as explained below.

I reviewed a Motion for Summary Judgment prepared by Mr. Mark J. Pierce and dated January 17, 2025. The Motion states I conceded a second hail event (occurring March 17, 2021 outside the policy period) could have impacted the building, "however, he did not rule out the same, and he failed to allocate such damage". I investigated all reported hail storms from August 10, 2020, (two years prior to the "reported" date of loss) to May 19, 2023, (the day of my inspection). I investigated with even greater detail four "most likely" candidate storms of which I concluded two did not impact the building, one (March 17, 2021) possibly impacted the building and one (March 22, 2022) most likely impacted the building. I was able to conclude "more likely than not" the March 22, 2022 storm damaged the building based on available weather data indicated the hail storm on that date passed directly overhead of the property. The March 17, 2021, storm *did not* pass directly overhead of the property. While I considered the *possibility* this hailstorm impacted the building, without additional (and unavailable) wind information, I could not reach a conclusion that hailstones from the March 17, 2021, storm "more likely than not" traveled under the influence of wind thus impacting the building. The only storm occurrence for which I could confidentially opine "more likely than not" was the March 22, 2022, storm. Whereas the Insurance Company' engineer only used a commercially-sourced algorithmic report to investigate potential hail storms, I additionally used government-sourced data to "fact check" commercially-sourced algorithmic reports.

The Motion claims I did not allocate damage because I "did not rule out" the possibility of a second hailstorm. Here is the point at which I responded to that question:

Q: "All right. Did you do anything to allocate the damage caused by the March 17, 2021, hailstorm?

A: No. I have no assurance it ever hit the building and everything that I have found on that roof was explained by the March 22, 2022, storm.

Q: Right Well, you didn't rule out March 17, 2021, right?

A: I want to be careful because I think I said this some times – several times. What I found was there was a possibility that it occurred in 2021. There is also a possibility that it occurred [any] day the radar was down for maintenance. That's a possibility. So there might have been a hailstorm and no radar evidence because the radar was down for maintenance that day.
These are possibilities that are so slim compared to the evidence I found for the 2022 storm that when the day was done, when I completed my analysis, I was willing to opine they were not a consideration.
Q: Right. But here in your report you state [reading] While I cannot exclude the possibility of hail impacting the building on March 17, 2021, confirmation of this possibility requires the analysis of vertical wind shear using wind hodographs.

So you are stating in your report that you could not exclude the possibility if hail falling on – I'm sorry – hail impacting the building on March 17, 2021.

A: Right. But I – my job in the scientific method is to create hypotheses and then, using facts, confirm or deconfirm those hypotheses. In this case [the March 17, 2021, storm] I have a hypothesis but no facts. To reach a conclusion [as to the March 17, 2021, storm] would be speculation" (Depo, 60:2-61:14).

I could not – and did not – *totally* rule out the *possibility* that a second storm damaged the property because I needed more facts to say yes or no. I have a possibility a storm occurred, a lesser possibility it impacted the building, and an even lesser possibility the impact caused damage. So I have a *possibility* of a *possibility* of a *possibility*. I did not "allocate damage" for the March 17, 2021, storm because such damage was hypothetical: "It [the storm] hasn't risen to the level of being greater than 50 percent *probability*. So in the final analysis, I don't consider it [meaning the allocation of damage from the hypothetical storm] (62: 16-19).

In addition, the Motion states I failed to allocate damage attributable to wear and tear. In deposition I was asked:

Q: "So did you do anything to allocate which portions of the roof was related to the wear and tear versus the March 22, 2022, hailstorm?

A: No. I generally do that based on what I understand to be Texas court rulings, I have to segregate damage between – between events and between types of damage. The wear and tear on that roof is so obviously a different mode of failure than hail damage, I didn't feel that was necessary (Depo, 64:18-65:3).

Had I found blisters, foot traffic or mechanical damage, I would have been obliged to segregate that type of damage. The "wear and tear" I observed concerned the general condition of the roof as opposed to discrete marks that might be misconstrued as hail-caused impacts"

The Motion included two (2) EFI reports. I had not previously seen the Supplemental EFI report dated September 23, 2024, which is EFI's critique of my July 24, 2023, report, which is included as Appendix B to the Motion's Exhibit B-1. It should be noted that the version of my report reviewed by EFI is missing information on my radar maps. The page of my report immediately preceding the radar maps warns:

"Note: Using different editions of software may result in lost data. If the white rectangle around the North arrow at the lower right hand corner of a map is missing, please contact admin@gt.forensics.com  or 985-690-6008 for further assistance".

I regret the need for this warning, but the "glitch" caused by different editions of software is beyond my control. My office never received a communication from EFI, by which I presume either EFI never completely read my report, or upon recognizing the problem never requested my office for the missing information. Either way, I question EFI's ability to confidently conclude "after reviewing the Groundtruth Report, the conclusions reached by EFI in EFI Report 023.05310 dated March 20, 2023, remain unchanged". I have attached as Exhibit 3 the version of my radar maps in the EFI Supplemental Report and as Exhibit 4 the version of my radar maps as presented in my July 24, 2023, report.

I personally attest that all the facts stated in this Declaration are true and accurate to the best of my knowledge, under the penalty of perjury.

This is the end of the declaration."

Executed tins/0     day of ___FeBRUDRy, 2025.

NEIL B. HALL, PhD, PE, AIA

**DECLARATION IN LIEU OF CERTIFICATION BY NOTARY PURSUANT TO 28 U.S.C. See 1746**

"My name is Neil Hall. My date of birth is the 18th day of September, 1948. My Business Address is 1923 Corporate Square Boulevard, Ste. B, Slidell, Louisiana 70458 in the United States of America. 1 declare under the penalty of perjury that the foregoing instrturient is true and correct."

Executed in St. Tammany Parish, Louisiana on this 18th day of February, 2025.

NEIL **B.** HALL, PhD, PE, AIA

**EXHIBIT 1**

# GROUNDTRUTH FORENSICS

**BUILDING PERFORMANCE • FAILURE ANALYSIS • DAMAGE ASSESSMENT**

## BUILDING DAMAGE ASSESSMENT
### (INITIAL REPORT)

## ONE UNITY INVESTMENT, LLC
## 10080 BELLAIRE BOULEVARD
## HOUSTON, TEXAS 77072

**PREPARED BY:**

**Neil B. Hall, PhD, PE, AIA**
**Texas PE License 83670**
**Texas Architect License 21077**

**REPORT NUMBER 23-0078**

**DATE OF REPORT:**
**PAY 24, 2023**



Texas Engineering Firm Registration F-10716

Texas Architect Firm Registration BR 3458

1923 Corporate Square Boulevard, Ste B   •   Slidell, Louisiana 70458
Phone 985-690-6008   •   neilbhall@gmail.com

## BACKGROUND

The One Unity Investment, LLC commercial building ("the building") is located at 10080 Bellaire Boulevard in Houston, Harris County, Texas 77072. The building was damaged by hail on <u>August 10, 2022</u>. As requested by Jay M. Simon of the Chad T. Wilson Law Office on <u>April 27, 2023</u>, I inspected the property on <u>May 19, 2023</u>, after which I wrote this report documenting my site inspection; my analysis, findings and conclusions concerning the cause and extent of damage to the building; and my recommendations to restore the building to a code-compliant, pre-loss condition. My conclusions are based on my education, training and experience as a Texas licensed Architect and Professional Engineer and a total of 50 years experience in design and construction. A short biographical sketch is enclosed in **Attachment C**. In conjunction with forming my opinions I relied on the facts presented in the following documents:

<u>Received from Law Office:</u>

· Straight Line Global Photo Sheets (Brandon Allen) taken November 29, 2022
· EagleviewTM report dated February 6, 2023
· Plaintiff Photo Sheets taken February 13, 2023
· Plaintiff cost estimate printed February 15, 2023
· Other material less pertinent to my analysis but retained on file

<u>Other documents reviewed:</u>

· Harris County Property Search (https://hcad.org/property-search/real-property/real-property-search-by-address)
· Codes and standards referenced in this report
· Weather data referenced in this report
· 2001 Houston Commercial Energy Code
· 2021 International Building Code with Houston amendments
· 2021 International Existing Building Code with Houston amendments
· 2021 International Energy Conservation Code
· Weather data described in this report

## WEATHER DATA

Conclusions as to the validity of weather events are best reached by combining radar-detected meteorological data and physical facts collected in the field. The meteorological data presented in this report was prepared by trained meteorologists in public and private practice. The physical facts described in this report are based on the collected photographs. The use of meteorological data described in this report is consistent with the standard practice of forensic engineering. Weather data discussed in this report is provided in **Attachment B**.

<u>Reported Date of Loss</u>

The reported date of loss on file with the carrier is <u>August 10, 2020</u>, which I used as the starting point in my analysis.

2

**Eyewitness Reports**

I checked the NCEI Storm Events Database and the Community Collaborative Rain, Hail & Snow Network (CoCoRaHS) database for eyewitness hail reports in Harris County from August 10, 2020, (two years prior to the reported date of loss) to May 19, 2023, (the date of my inspection).

Out of 24 eyewitness reports in the Storm Events Database, one (1) report was within 5 miles and no reports were within 2 miles of the building. The only report in the CoCoRaHS database was more than 5 miles from the building. The database reports and a map plotting each location are included in **Attachment B**.

Eyewitness accounts only tell part of the story. If a weather event was not witnessed or not reported after being witnessed, it would not appear in a database. The reported size of a hailstone may be inaccurate or not representative of the size of a hailstone before it melted on the ground. The NCEI warns:

"...county, state and federal emergency management officials, local law enforcement officials, skywarn spotters, NWS damage surveys, newspaper clipping services, the insurance industry and the general public. ...An effort is made to use the best available information but because of time and resource constraints, information from these sources may be unverified... **The NWS does not guarantee the accuracy or validity of the information**" (https://www.ncdc.noaa.gov/stormevents/faq.jsp).

**Forensic Weather Reports**

HailStrikeTM (and other commercial weather companies like CoreLogicTM) report hail activity at a particular address in part by analyzing National Weather Service NEXRAD radar data using propriety algorithms. Each separately listed event on a HailStrikeTM report represents a hail event detected by radar at altitude (typically 10,000 feet depending on the dish angle and distance-to-target). Due to environmental conditions such as wind shear and "melt zones", radar-detected hail reports do not guarantee the size or location of individual hail stones even if hail reached ground level. For the search period August 10, 2020, to May 19, 2023, HailStrikeTM identified hail activity in 5 storms "at location" and in 10 storms "within two miles". (There are more line items than storms in the HailStrikeTM report because HailStrikeTM considers each radar station report to be a separate event.)

**NOAA's Severe Weather Data Inventory**

Commercial hail reports like HailStrikeTM and CoreLogicTM are useful for screening historical data, but their proprietary algorithms do not provide the transparency needed for users to understand the nature of inputs or how these inputs are converted to outputs. It is my practice to fact-check commercial hail reports by directly researching NOAA's Severe Weather Data Inventory (SWDI) (https://www.ncei.noaa.gov/products/severe-weather-data-inventory).

I downloaded the SWDI KMZ files for March 17, 2021, (based on the eyewitness report and HailStrikeTM reported size and intensity), March 22, 2022, (based on HailStrikeTM reported size and intensity), July 12, 2022, (based on HailStrikeTM reported size and intensity) and August 10, 2022, (the reported date of loss), I overlaid the KMZ downloads on the GoogleEarthTM images in **Attachment B**:

**∙ March 17, 2021**: The map shows a 0.5"-1.25" hail swath north of the building moving east at 17 mph. As hail fell it was influenced by surface winds moving southeast at 35 mph. (Storm speed and

3

direction based on HailStrikeTM. Surface wind speed and direction based on Houston Sugarland Memorial Airport ASOS located 8 miles southwest of the building). Hail falling on March 17, 2021, may have impacted the building.

: **March 22, 2022**: The map shows a 0.5"-1.25" hail swath moving east-northeast across the building at 41 mph. As hail fell it was influenced by surface winds moving south-southeast at 49 mph. Hail falling on March 22, 2022, impacted the building.

: **July 12, 2022**: The map shows a 0.5"-1.75" hail swath north of the building moving east-southeast at 19 mph. As hail fell it was influenced by surface winds moving north-northeast at 28 mph. Hail falling on July 12, 2022, did not impact the building.

: **August 10, 2022**: The map shows a very weak hail swath north of the building. If any hail fell at all, it was influenced by surface winds moving west at 44 mph. Hail falling on August 10, 2022, did not impact the building.

While I cannot exclude the *possibility* of hail impacting the building on March 17, 2021, confirmation of this possibility requires the analysis of vertical wind shear using wind hodographs. Such analysis is beyond the scope of this report. The hailstorm on March 22, 2022, does not require wind shear analysis because the hail swath passed directly across the building location. I conclude the actual date of loss is **March 22, 2022**.

## SITE INSPECTION

I inspected the building on May 19, 2023, accompanied by Virgil Hall, who provided logistical support but who did not otherwise participate in the site inspection. I met and interviewed Mr. Tony La (Owner) on site. Photos taken by me during the site inspection and selected photos taken by others are included in **Attachment A**. The photos show general conditions and are not intended to delimit the full extent of damage observed by me or documented by others. A complete set of photographs is retained on file.

Photos 1-2 are aerial photos of the building. Photo 3 shows the front elevation. The building was built in 2008. The roof is covered by a modified bitumen (mod-bit) membrane (Photo 4). To my knowledge the mod-bit covering is original to the building. I noted elastomeric repairs at the base of the north parapet (Photos 5-7). Mr. La informed me the elastomeric coating was applied in response to recent roof leaks.

I chalked three (3) 10'x10' test squares. I considered a hail strike to be a mark the size and shape of impacting hail with sufficient granule loss as to expose the underlying bitumen to the deleterious effects of solar UV radiation, leading to drying, cracking and water intrusion. I counted 19 hail strikes in the test square at the southeast corner (Photos 8-13), 11 hail strikes opposite the south parapet (Photos 16-22) and 21 hail strikes at the southwest corner (Photos 23-27). I found no hail strikes on the metal vent hoods and parapet caps. (However, the parapet caps must be removed to replace the mod-bit which covers the parapets and terminates under the caps). Hail flattened the condenser fins on several HVAC units (Photo 31-35).

4

## REPAIR RECOMMENDATIONS

In order to restore the building to a pre-loss condition, I recommend removing and replacing the mod-bit roof covering down to deck. I did not core the roof covering but as the 2001 Houston Commercial Energy Code required R-15 insulation above deck (based on ASHRAE 90.1) it is reasonable to assume it is necessary to tear off 2-ply mod-bit and the equivalent of 3-inch polyiso insulation board and replace with 2-ply mod-bit and 4.5-inch polyiso insulation board to meet current code. I recommend installing a <0.01 perm vapor retarder between the concrete deck and the polyiso insulation. The parapet caps shall be removed, the mod-bit cap sheet flashed along the parapets and terminated at the top of the parapet after which new parapet caps shall be installed.

The hail-damaged condenser fins on the HVAC units can be combed. The units shall be removed and reset to accommodate the new roof installation. The HVAC pedestals, roof vents and scuppers must be raised to accommodate the change in roof profile due to the added thickness of the polyiso insulation board.

## DISCLOSURES AND LIMITATIONS

Data referenced but not included in this report remains available in the project file. I reserve the right to review additional information should it becomes available and to revise this report based on the analysis of new information. Nothing in this report precludes the discovery of damage by others to include completed repairs and hidden or time-sensitive damage. Cost estimates for repair based on the description of damage provided in this report may require additional scope of work to allow for issues such as constructability, matching and compliance with law and ordinance.

## ATTACHMENTS

**Attachment A**:     Photographs
**Attachment B**:     Weather Data
**Attachment C**:     Biographical Sketch

**END OF REPORT 23-0078**

Respectfully submitted,

Neil B. Hall, PhD, PE, AIA
Texas PE License 83670
Texas Architect License 21077

5

**<u>ATTACHMENT A</u>**

**PHOTOGRAPHS**



**Photo 1: Oblique looking north**



**Photo 2: Oblique looking south**



**Photo 3: Front elevation**



**Photo 4: Looking west**



Photo 5: Along north parapet



Photo 6: Along north parapet



Photo 7: Along north parapet



**Photo 8: 19 hail strikes in test square at southeast corner**



**Photo 9: Hail strike**



**Photo 10: Hail strike**



**Photo 11: Hail strike**



Photo 12: Hail strikes



Photo 13: Hail strike



**Photo 14: Looking toward northwest corner**



**Photo 15: Looking north**



**Photo 16: 11 hail strikes in test square opposite south parapet**



**Photo 17: Hail strike**



**Photo 18: Hail strike**



**Photo 19: Hail strike**



**Photo 20: Hail strike**



**Photo 21: Hail strike**



Photo 22: Hail strike





**Photo 24: Hail strike**



**Photo 25: Hail strike**



**Photo 26: Hail strikes**



**Photo 27: Hail strikes**



**Photo 28: Scrape mark**



**Photo 29: No hail strikes on vent hood**



**Photo 30: No hail strikes on parapet cap**



**Photo 31: HVAC unit**



**Photo 32: Hail strikes flattened condenser fins**



**Photo 33: HVAC unit**



**Photo 34: Hail strikes flattened condenser fins**



**Photo 35: Hail strikes flattened condenser fins**



**Photo 36: Certain HVAC units have hail guards**

**<u>ATTACHMENT B</u>**

**WEATHER DATA**

STORM EVENTS DATABASE

7/23/23, 6:46 PM                    Storm Events Database - Search Results | National Centers for Environmental Information

# Storm Events Database

## Search Results for Harris County, Texas

Event Types:  Hail

24 events were reported between 08/10/2020 and 05/19/2023 (1013 days)

### Summary Info:

| | |
|---|---|
| Number of County/Zone areas affected: | 1 |
| Number of Days with Event: | 7 |
| Number of Days with Event and Death: | 0 |
| Number of Days with Event and Death or Injury: | 0 |
| Number of Days with Event and Property Damage: | 0 |
| Number of Days with Event and Crop Damage: | 0 |
| Number of Event Types reported: | 1 |

### Column Definitions:

'Mag': Magnitude, 'Dth': Deaths, 'Inj': Injuries, 'PrD': Property Damage, 'CrD': Crop Damage

*Click on Location below to display details.*

*Available Event Types have changed over time. Please refer to the  Database Details  for more information.*

Select: All Hail                                                         Sort By: Date/Time (Oldest)

| Location | County/Zone | St. | Date | Time | T.Z. | Type | Mag | Dth | Inj | PrD | CrD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Totals:** | | | | | | | | 0 | 0 | 0.00K | 0.00K |
| BUNKER HILL | HARRIS CO. | TX | 03/17/2021 | 10:07 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| HOWELLVILLE | HARRIS CO. | TX | 03/17/2021 | 10:11 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| EUREKA SPGS | HARRIS CO. | TX | 03/17/2021 | 10:12 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| WEST UNIVERSITY PLAC | HARRIS CO. | TX | 03/17/2021 | 10:12 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| WEST UNIVERSITY PLAC | HARRIS CO. | TX | 03/17/2021 | 10:12 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| EUREKA SPGS | HARRIS CO. | TX | 03/17/2021 | 10:15 | CST-6 | Hail | 0.75 in. | 0 | 0 | 0.00K | 0.00K |
| TOMBALL | HARRIS CO. | TX | 04/15/2021 | 18:10 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| HOUSTON HOOKS ARPT | HARRIS CO. | TX | 04/15/2021 | 18:15 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| HOUSTON HOOKS ARPT | HARRIS CO. | TX | 04/15/2021 | 18:20 | CST-6 | Hail | 1.50 in. | 0 | 0 | 0.00K | 0.00K |
| ACRE HOMES | HARRIS CO. | TX | 06/15/2021 | 16:58 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| ENGLEWOOD | HARRIS CO. | TX | 06/15/2021 | 17:00 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| ACRE HOMES | HARRIS CO. | TX | 06/15/2021 | 17:07 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| DEER PARK | HARRIS CO. | TX | 06/15/2021 | 17:40 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| DEER PARK | HARRIS CO. | TX | 03/27/2023 | 22:40 | CST-6 | Hail | 1.25 in. | 0 | 0 | 0.00K | 0.00K |
| DEER PARK | HARRIS CO. | TX | 03/27/2023 | 22:55 | CST-6 | Hail | 1.75 in. | 0 | 0 | 0.00K | 0.00K |
| BAY OAKS | HARRIS CO. | TX | 03/27/2023 | 22:55 | CST-6 | Hail | 1.75 in. | 0 | 0 | 0.00K | 0.00K |
| BAYSIDE TERRACE | HARRIS CO. | TX | 03/27/2023 | 23:08 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| KATY | HARRIS CO. | TX | 04/05/2023 | 17:04 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| DELHI | HARRIS CO. | TX | 04/05/2023 | 17:05 | CST-6 | Hail | 2.00 in. | 0 | 0 | 0.00K | 0.00K |
| BARKER | HARRIS CO. | TX | 04/05/2023 | 17:05 | CST-6 | Hail | 1.50 in. | 0 | 0 | 0.00K | 0.00K |
| BARKER | HARRIS CO. | TX | 04/05/2023 | 17:06 | CST-6 | Hail | 2.00 in. | 0 | 0 | 0.00K | 0.00K |
| BARKER | HARRIS CO. | TX | 04/05/2023 | 17:12 | CST-6 | Hail | 2.00 in. | 0 | 0 | 0.00K | 0.00K |
| BAYSIDE TERRACE | HARRIS CO. | TX | 04/15/2023 | 21:20 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| GENOA | HARRIS CO. | TX | 04/27/2023 | 03:51 | CST-6 | Hail | 1.00 in. | 0 | 0 | 0.00K | 0.00K |
| **Totals:** | | | | | | | | 0 | 0 | 0.00K | 0.00K |

Appx. 0110

## Storm Events Database

**Event Details:**

| | |
|---|---|
| Event | **Hail** |
| Magnitude | **0.75 in.** |
| State | **TEXAS** |
| County/Area | **HARRIS** |
| WFO | **HGX** |
| Report Source | **Public** |
| NCEI Data Source | **CSV** |
| Begin Date | **2021-03-17 10:07 CST-6** |
| Begin Location | **1NW BUNKER HILL** |
| Begin Lat/Lon | **29.74/-95.54** |
| End Date | **2021-03-17 10:07 CST-6** |
| End Location | **1NW BUNKER HILL** |
| End Lat/Lon | **29.74/-95.54** |
| Deaths Direct/Indirect | **0/0 (fatality details below, when available...)** |
| Injuries Direct/Indirect | **0/0** |
| Property Damage | **0.00K** |
| Crop Damage | **0.00K** |
| Episode Narrative | **A severe thunderstorm produced hail across Harris County as a cold front traversed SE Texas.** |
| Event Narrative | **Penny sized hail was reported.** |

ADS AND OTHER EXTRANEOUS MATERIAL REMOVED FOR CLARITY

Appx.0111

**<u>CoCoRaHS DATABASE</u>**

7/23/23, 6:55 PM                                CoCoRaHS - Community Collaborative Rain, Hail & Snow Network



Home | Countries | States | View Data | Maps | My Data Entry | Login

## View Data : List Hail Reports

### View Data

- Daily Precip Reports
- Daily Comments Reports
- Significant Weather Reports
- Multiple Day Reports
- Condition Monitoring Reports
- Condition Monitoring Charts
- Soil Moisture
- ET Reports

- Days with Hail
- Search Hail Reports
- Station Hail Reports
- Station Precip Summary

- Water Year Summary
- Station Precip Summary
- Station Snow Summary
- Rainy Days Report
- Total Precip Summary

- Station Water Balance
- Water Balance Summary
- Water Balance Charts

- List Stations

### FROST Data

- Frost
- Optics
- Snowflake
- Thunder

### Main Menu

- Home
- About Us
- Join CoCoRaHS
- Contact Us
- Donate

### Resources

- FAQ / Help
- Education
- Training Slide-Shows
- Videos
- Condition Monitoring
- Evapotranspiration
- Soil Moisture
- NCEI Normals

- Volunteer Coordinators
- Hail Pad Distribution/Drop-off
- Help Needed
- Printable Forms

**Search Hail Reports**

**Station Fields:** [                    ]  ☐ Station Number  Station Name
**Location:** USA [ ▾ ]  Texas [ ▾ ]  HRR - Harris [ ▾ ]
**Hail Stone Size:** Select Category [ ▾ ]  Any Size [ ▾ ]
**Date Range:**
**Start Date:** 8/10/2020    **End Date:** 5/19/2023
[ Search ]

**Searched:** Stations in Harris, Texas. Report dates between 8/10/2020 and 5/19/2023.

Showing 1 Records.

| Date ▲ | Time | Station Number | Station Name | Average | Largest | Photo | State | County | View |
|--------|------|----------------|--------------|---------|---------|-------|-------|--------|------|
| 4/5/2023 | 6:25 PM | TX-HRR-27 | Bunker Hill Village 3.6 NNW | | 1/4" Pea Size | NA | -- | TX | Harris | ▤ |

Showing 1 Records.

**HAILSTRIKE REPORT**

HailStrike
4011 W Plano Pkwy
Suite #105
Plano, TX 75093
**support@hailstrike.com**



To order additional OneSite
reports, visit our website at
http://onesitereport.com or
contact us

Report No. 55803

| Property Owner Information | Property Information |
|---|---|
| Property Owner: | Date of Report:**07-24-2023** |
| Phone: | Claim No.: |
| Address:**10080 Bellaire Boulevard** | Carrier: |
| City:**Houston** | Property Age: |
| State:**TX** | Roof Age: |
| Zip:**77072** | Roof Type: |
| County:**Harris** | |

**Historical Storm Activity At Location**  **Lat:** 29.705 **Lon:** -95.5597

All times in the America/Chicago time zone.

| Date of Storm | Storm Start | Intensity | Max Size | Storm Speed | Storm Direction |
|---|---|---|---|---|---|
| 2022-08-18 | 05:28 PM | 3.5 | 1.00" | 23 MPH | NE |
| 2022-03-22 | 03:25 AM | 4.5 | 1.25" | 41 MPH | ENE |
| 2021-08-12 | 05:03 PM | 4.5 | 1.00" | 21 MPH | S |
| 2021-06-02 | 06:11 PM | 3.5 | 1.00" | 23 MPH | ESE |
| 2021-06-02 | 03:33 PM | 5.5 | 1.00" | 24 MPH | ESE |
| 2021-03-17 | 08:46 AM | 7.5 | 1.00" | 17 MPH | E |
| 2019-08-23 | 01:31 PM | 3.5 | 2.25" | 8 MPH | SE |
| 2019-06-29 | 01:05 PM | 4.5 | 1.25" | 26 MPH | NNE |
| 2019-06-29 | 05:42 AM | 5.5 | 1.25" | 15 MPH | SSE |
| 2017-03-29 | 09:58 AM | 5.5 | 1.00" | 4 MPH | ESE |
| 2017-03-29 | 09:30 AM | 5.5 | 1.00" | 18 MPH | ENE |
| 2017-01-20 | 05:53 PM | 6.5 | 1.00" | 37 MPH | ENE |
| 2017-01-20 | 03:25 PM | 3.5 | 1.00" | 41 MPH | ENE |
| 2016-04-17 | 08:03 PM | 3.5 | 1.50" | 15 MPH | ENE |
| 2016-04-17 | 07:27 PM | 4.5 | 1.50" | 15 MPH | S |
| 2016-01-08 | 04:45 PM | 6.5 | 2.00" | 39 MPH | ENE |
| 2016-01-08 | 03:06 PM | 5.5 | 2.00" | 31 MPH | ENE |
| 2015-08-11 | 02:51 PM | 5.5 | 1.00" | 19 MPH | N |
| 2015-08-11 | 12:44 PM | 4.5 | 1.00" | 28 MPH | NE |
| 2015-05-30 | 11:26 AM | 3.5 | 1.00" | 18 MPH | NE |
| 2015-05-25 | 04:18 PM | 8.5 | 2.00" | 37 MPH | ENE |
| 2015-05-25 | 08:55 AM | 4.5 | 2.00" | 29 MPH | E |
| 2015-04-25 | 02:53 AM | 4.5 | 1.00" | 50 MPH | E |
| 2014-10-06 | 08:59 AM | 4.5 | 1.50" | 14 MPH | N |
| 2014-07-03 | 01:16 PM | 3.5 | 1.25" | 7 MPH | E |
| 2013-03-31 | 09:00 AM | 3.5 | 0.75" | 22 MPH | SSE |
| 2013-03-19 | 08:27 PM | 8.5 | 0.50" | 37 MPH | ESE |

| 2012-08-07 | 09:00 AM | 4.5 | 1.00" | 18 MPH | NE |
| 2012-06-29 | 09:28 AM | 4.5 | 0.75" | 22 MPH | SSE |
| 2012-06-28 | 09:03 AM | 3.5 | 0.50" | 10 MPH | ESE |
| 2012-05-11 | 09:04 AM | 7.5 | 0.50" | 15 MPH | E |
| 2012-05-11 | 09:01 AM | 8.5 | 0.50" | 16 MPH | E |
| 2012-04-20 | 10:26 AM | 4.5 | 0.75" | 24 MPH | E |
| 2012-04-02 | 09:04 AM | 6.5 | 1.25" | 7 MPH | E |
| 2012-01-09 | 08:02 AM | 5.5 | 2" | 21 MPH | ENE |
| 2012-01-09 | 08:01 AM | 10.0 | 2" | 28 MPH | ENE |
| 2011-09-29 | 11:34 AM | 3.5 | 1.50" | 13 MPH | NNE |
| 2011-09-29 | 09:04 AM | 6.5 | 1.50" | 17 MPH | NNE |
| 2011-09-29 | 09:04 AM | 5.5 | 1.50" | 20 MPH | N |
| 2011-07-24 | 09:00 AM | 4.5 | 1.00" | 15 MPH | NE |
| 2011-06-05 | 03:00 PM | 5.5 | 1.00" | 19 MPH | ENE |
| 2010-09-25 | 09:01 AM | 6.5 | 1" | 10 MPH | ESE |
| 2010-08-31 | 10:40 AM | 5.5 | 1" | 3 MPH | ESE |
| 2010-08-23 | 02:34 PM | 6.5 | 2" | 8 MPH | NE |

**Historical Storm Activity Within 2 Miles**

| Date of Storm | Intensity | Max Size | Storm Speed | Storm Direction |
|---|---|---|---|---|
| 2023-07-02 | 4.5 | 1.00" | 6 MPH | ENE |
| 2023-06-23 | 4.5 | 1.00" | 8 MPH | NNE |
| 2023-06-23 | 4.5 | 1.00" | 10 MPH | NNE |
| 2023-01-07 | 4.5 | 1.25" | 16 MPH | ESE |
| 2022-09-07 | 3.5 | 1.00" | 16 MPH | NNE |
| 2022-08-18 | 4.5 | 1.00" | 15 MPH | ESE |
| 2022-07-14 | 4.5 | 1.00" | 13 MPH | SE |
| 2022-07-12 | 5.5 | 1.00" | 19 MPH | ESE |
| 2022-07-12 | 6.5 | 1.00" | 18 MPH | E |
| 2022-03-22 | 5.5 | 1.25" | 42 MPH | ENE |
| 2022-03-22 | 4.5 | 1.25" | 47 MPH | NE |
| 2021-08-16 | 4.5 | 1.25" | 5 MPH | ESE |
| 2021-08-16 | 4.5 | 1.25" | 3 MPH | NNE |
| 2021-05-28 | 4.5 | 1.00" | 25 MPH | ESE |
| 2021-05-18 | 3.5 | 1.00" | 32 MPH | E |
| 2021-05-16 | 8.5 | 1.00" | 14 MPH | E |
| 2021-05-16 | 4.5 | 1.00" | 23 MPH | NNE |
| 2021-03-17 | 3.5 | 1.00" | 61 MPH | ENE |
| 2019-09-10 | 4.5 | 1.00" | 7 MPH | SE |
| 2018-10-31 | 3.5 | 1.00" | 37 MPH | ENE |

| 2018-10-31 | 3.5 | 1.00 | 37 MPH | ENE |
| 2018-05-22 | 7.5 | 1.00" | 21 MPH | NE |
| 2018-04-03 | 4.5 | 1.00" | 46 MPH | ESE |
| 2017-07-08 | 4.5 | 1.00" | 15 MPH | E |
| 2017-05-21 | 3.5 | 3.00" | 8 MPH | E |
| 2017-03-29 | 5.5 | 1.00" | 27 MPH | ENE |
| 2017-03-24 | 4.5 | 1.00" | 32 MPH | ENE |
| 2017-01-20 | 7.5 | 1.25" | 35 MPH | E |
| 2016-09-10 | 4.5 | 1.00" | 4 MPH | N |
| 2016-06-18 | 4.5 | 1.50" | 13 MPH | ENE |
| 2016-04-21 | 5.5 | 1.25" | 29 MPH | NE |
| 2016-04-21 | 4.5 | 1.25" | 18 MPH | N |
| 2016-04-17 | 3.5 | 1.00" | 25 MPH | ENE |
| 2015-08-25 | 4.5 | 1.25" | 23 MPH | NE |
| 2015-08-16 | 8.5 | 1.00" | 12 MPH | NE |
| 2015-08-16 | 5.5 | 1.00" | 15 MPH | SE |
| 2015-08-11 | 5.5 | 1.00" | 25 MPH | NE |
| 2015-05-30 | 4.5 | 1.00" | 6 MPH | NNE |
| 2015-05-30 | 5.5 | 1.00" | 15 MPH | E |
| 2015-05-25 | 3.5 | 2.00" | 62 MPH | E |
| 2015-05-24 | 4.5 | 1.00" | 53 MPH | S |
| 2015-04-19 | 4.5 | 1.00" | 27 MPH | ESE |
| 2015-04-16 | 5.5 | 1.00" | 25 MPH | E |
| 2015-04-16 | 4.5 | 1.00" | 23 MPH | E |
| 2014-09-07 | 4.5 | 1.00" | 24 MPH | ESE |
| 2014-08-11 | 5.5 | 1.25" | 18 MPH | E |
| 2014-07-03 | 7.5 | 1.25" | 8 MPH | ESE |
| 2014-07-03 | 4.5 | 1.25" | 23 MPH | ENE |
| 2014-07-02 | 3.5 | 1.25" | 16 MPH | NE |
| 2013-10-26 | 6.5 | 1.00" | 32 MPH | ESE |
| 2013-06-09 | 4.5 | 1.00" | 26 MPH | ENE |
| 2013-04-27 | 6.5 | 1.25" | 14 MPH | ESE |
| 2013-03-31 | 3.5 | 0.75" | 27 MPH | SE |
| 2012-11-05 | 6.5 | 1.00" | 44 MPH | SE |
| 2012-09-12 | 4.5 | 1.00" | 24 MPH | ESE |
| 2012-08-17 | 3.5 | 1.50" | 10 MPH | SSE |
| 2012-08-07 | 3.5 | 1.00" | 16 MPH | ENE |
| 2012-07-07 | 5.5 | 1" | 26 MPH | E |
| 2012-06-28 | 3.5 | 0.50" | 2 MPH | NE |

| | | | | |
|---|---|---|---|---|
| 2012-06-28 | 4.5 | 0.50" | 6 MPH | N |
| 2012-06-16 | 3.5 | 0.50" | 14 MPH | NNE |
| 2012-06-16 | 3.5 | 0.50" | 17 MPH | NE |
| 2012-05-11 | 6.5 | 0.50" | 15 MPH | E |
| 2012-04-20 | 5.5 | 0.75" | 23 MPH | E |
| 2012-04-20 | 3.5 | 0.75" | 24 MPH | E |
| 2012-04-02 | 4.5 | 1.25" | 19 MPH | NE |
| 2012-04-02 | 8.5 | 1.25" | 20 MPH | NE |
| 2012-04-02 | 4.5 | 0.50" | 31 MPH | N |
| 2012-02-17 | 3.5 | 0.50" | 34 MPH | E |
| 2012-02-03 | 6.5 | 0.50" | 2 MPH | E |
| 2012-02-03 | 4.5 | 0.50" | 22 MPH | E |
| 2012-02-03 | 4.5 | 0.50" | 11 MPH | NE |
| 2011-11-15 | 5.5 | 1.00" | 33 MPH | NE |
| 2011-07-06 | 3.5 | 1.00" | 8 MPH | N |
| 2011-06-05 | 4.5 | 1.00" | 20 MPH | ENE |
| 2010-07-25 | 5.5 | 1" | 5 MPH | ENE |
| 2010-07-18 | 3.5 | 1" | 19 MPH | E |
| 2010-07-17 | 3.5 | 1" | 16 MPH | ESE |
| 2010-07-06 | 4.5 | 1" | 9 MPH | E |
| 2010-05-28 | 3.5 | 1" | 12 MPH | NE |



**VERIFY THIS REPORT**

**Enter this code at:**
hailstrike.com/verify

Dynamic Weather Solutions, Inc. ("DWS") accumulates and compiles reporting data from various sources Including, but not limited to: National Weather Service ("NWS"), the Storm Prediction Center ("SPC"), the National Climatic Data Center ("NCDC"), internet sources, and live witness resources. This report and the reports we provide (the "Content") represent the most accurate representation for storm activity based upon such resources. Although extra steps have been taken to ensure the accuracy of these reports, we cannot guarantee the absolute accuracy of the information being provided, nor can we be held responsible for inaccurate data that we receive, including errors in the reporting sources, the sources' equipment, or the accuracy of their information. DWS specifically disclaims all warranties, express or implied, including without limitation the warranties of merchantability, fitness for a particular purpose, and non-infringement with respect to the Content. In no event will DWS be liable for any general, special, indirect, incidental or consequential damages, even if DWS has been advised of the possibility of such damages.

**User's access and use of the Content constitutes User's acceptance of the terms and conditions contained herein and any Terms of Use and/or Privacy Policy related to the Content.**

Weather Data Verified By





Copyright © 2010-2023 Dynamic Weather Solutions, Inc. All rights reserved.
HailStrikeTM is a trademark of Dynamic Weather Solutions, Inc.

**<u>HAIL MAPS</u>**

Note: Using different editions of software may result in lost data. If the white rectangle around the
North arrow at the lower right hand corner of a map is missing, please contact admin@gt-forensics.com
or 985-690-6008 for further assistance.



EYEWITNESS REPORTS

Within 2 and 5 miles of property
August 10, 2020, to May 19, 2023







**SWDI NEXRAD SIGNATURES**

JULY 12, 2022
Within 2 and 5 miles of property
Number in box shows maximum estimated size hail (MESH)
Empty box indicates incomplete information
"X" outside 5 mile radius not considered for mapping

Greater than 50% hail probability

Less than 50% hail probability
or incomplete information

About 9:45 AM local time

Surface wind
moving NNE at
28 mph

STORM
MOVING ESE
AT 19 MPH

1.75
.75
1.0
1.5
1.0
0.5
0.5
0.75
0.5
0.5
0.5
0.5

4 mi

N

Google Earth



**SWDI NEXRAD SIGNATURES**

AUGUST 10, 2022
Within 2 and 5 miles of property
Number in box shows maximum estimated size hail (MESH)
Empty box indicates incomplete information
"X" outside 5 mile radius not considered for mapping

Less than 50% hail probability
or incomplete information

About 6 PM local time

Surface wind
moving west at
44 mph

0.5

0.5

0.5

5 mi

Google Earth

**WIND DATA**

U.S. Department of Commerce
National Oceanic & Atmospheric Administration
National Environmental Satellite, Data, and Information Service

**Local Climatological Data**
**Daily Summary**
**March 2021**
Generated on 07/24/2023

National Centers for Environmental Information
151 Patton Avenue
Asheville, North Carolina 28801

Current Location: Elev: 77 ft. Lat: 29.6197° N Lon: -95.6575° W
Station: **HOUSTON SUGARLAND MEM, TX US WBAN: 72254312977 (KSGR)**

| Date | Temperature (F) | | | | | | | Degree Days (base 65F) | | Sun (LST) | | Weather | Precipitation (in) | | | Pressure (inHg) | | Wind | | Maximum Wind Speed = MPH | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | Direction = Degrees | | |
| | Max | Min | Avg | Dep | ARH | ADP | AWB | Heat | Cool | Rise | Set | Weather Type | TLC | Snow Fall | Snow Depth | Avg Stn | Avg SL | AVg Speed | Peak Speed | Peak Dir | Sust. Speed | Sust. Dir |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 01 | 73 | 53 | 63 | 4.3 | | | | 2 | 0 | 0649 | 1822 | RA BR | 0.64 | 0.0 | 0 | 29.96 | | 12.7 | 36 | 030 | 26 | 030 |
| 02 | 67 | 50 | 59 | 0.2 | | | | 6 | 0 | 0648 | 1823 | RA | 0.01 | 0.0 | 0 | 30.06 | | 10.8 | 27 | 360 | 21 | 020 |
| 03 | 70 | 42* | 56 | -3.0 | | | | 9 | 0 | 0646 | 1823 | | 0.00 | 0.0 | 0 | 30.06 | | 4.5 | 14 | 160 | 13 | 150 |
| 04 | 73 | 44 | 59 | -0.2 | | | | 6 | 0 | 0645 | 1824 | | 0.00 | 0.0 | 0 | 29.97 | | 6.5 | 20 | 160 | 16 | 150 |
| 05 | 79 | 55 | 67 | 7.6 | | | | 0 | 2 | 0644 | 1825 | BR | 0.00 | 0.0 | 0 | 29.88 | | 7.7 | 25 | 020 | 21 | 020 |
| 06 | 72 | 54 | 63 | 3.4 | | | | 2 | 0 | 0643 | 1825 | | 0.00 | 0.0 | 0 | 30.11 | | 11.3 | 25 | 030 | 21 | 030 |
| 07 | 70 | 43 | 57 | -2.8 | | | | 8 | 0 | 0642 | 1826 | | 0.00 | 0.0 | 0 | 30.25 | | 7.0 | 21 | 120 | 16 | 140 |
| 08 | 75 | 43 | 59 | -1.0 | | | | 6 | 0 | 0641 | 1827 | | 0.00 | 0.0 | 0 | 30.28 | | 6.9 | 21 | 150 | 17 | 150 |
| 09 | 77 | 60 | 69 | 8.8 | | | | 0 | 4 | 0640 | 1827 | | 0.00 | 0.0 | 0 | 30.14 | | 12.7 | 29 | 150 | 23 | 160 |
| 10 | 80 | 62 | 71 | 10.6 | | | | 0 | 6 | 0639 | 1828 | RA HZ | 0.01 | 0.0 | 0 | 29.99 | | 13.6 | 35 | 160 | 24 | 170 |
| 11 | 82 | 70 | 76 | 15.4 | | | | 0 | 11 | 0637 | 1828 | | 0.00 | 0.0 | 0 | 30.02 | | 13.7 | 29 | 170 | 22 | 140 |
| 12 | 85 | 69 | 77 | 16.2 | | | | 0 | 12 | 0636 | 1829 | | T | 0.0 | 0 | 30.07 | | 14.4 | 32 | 150 | 23 | 140 |
| 13 | 83 | 67 | 75 | 14.0 | | | | 0 | 10 | 0635 | 1830 | | 0.00 | 0.0 | 0 | 29.96 | | 14.3 | 32 | 160 | 24 | 150 |
| 14 | 76 | 58 | 67 | 5.8 | | | | 0 | 2 | 0634 | 1830 | RA BR | 0.28 | 0.0 | 0 | 29.81 | | 9.4 | 31 | 160 | 25 | 150 |
| 15 | 82 | 59 | 71 | 9.6 | | | | 0 | 6 | 0633 | 1831 | RA FG BR | 0.02 | 0.0 | 0 | 29.80 | | 3.8 | 15 | 170 | 13 | 170 |
| 16 | 82 | 68 | 75 | 13.4 | | | | 0 | 10 | 0632 | 1832 | RA FG BR | T | 0.0 | 0 | 29.68 | | 8.4 | 22 | 170 | 18 | 170 |
| 17 | 81 | 58 | 70 | 8.2 | | | | 0 | 5 | 0630 | 1832 | TS RA FG BR | | | | | | | | | | |
| 18 | 69 | 50 | 60 | -2.0 | | | | 5 | 0 | 0629 | 1833 | | 0.00 | 0.0 | 0 | 30.04 | | 12.7 | 34 | 320 | 24 | 350 |
| 19 | 69 | 45 | 57 | -5.2 | | | | 8 | 0 | 0628 | 1833 | | 0.00 | 0.0 | 0 | 30.16 | | 9.7 | 23 | 340 | 18 | 340 |
| 20 | 70 | 43 | 57 | -5.4 | | | | 8 | 0 | 0627 | 1834 | | 0.00 | 0.0 | 0 | 30.16 | | 6.2 | 22 | 030 | 15 | 020 |
| 21 | 73 | 44 | 59 | -3.6 | | | | 6 | 0 | 0626 | 1835 | | 0.00 | 0.0 | 0 | 30.02 | | 7.0 | 37 | 210 | 17 | 140 |
| 22 | 77 | 60 | 69 | 6.2 | | | | 0 | 4 | 0624 | 1835 | RA | T | 0.0 | 0 | 29.73 | | 12.7 | 32 | 150 | 26 | 140 |
| 23 | 84 | 58 | 71 | 8.0 | | | | 0 | 6 | 0623 | 1836 | TS RA | 0.16 | 0.0 | 0 | 29.66 | | 4.8 | 23 | 350 | 16 | 350 |
| 24 | 71 | 60 | 66 | 2.8 | | | | 0 | 1 | 0622 | 1836 | RA BR | 0.02 | 0.0 | 0 | 29.57 | | 10.2 | 25 | 100 | 20 | 100 |
| 25 | 80 | 56 | 68 | 4.6 | | | | 0 | 3 | 0621 | 1837 | BR | 0.00 | 0.0 | 0 | 29.70 | | 8.9 | 27 | 340 | 21 | 340 |
| 26 | 86* | 51 | 69 | 5.4 | | | | 0 | 4 | 0620 | 1838 | BR HZ | 0.00 | 0.0 | 0 | 29.80 | | 9.0 | 22 | 140 | 18 | 140 |
| 27 | 85 | 72 | 79 | 15.2 | | | | 0 | 14 | 0618 | 1838 | BR | 0.00 | 0.0 | 0 | 29.77 | | 9.9 | 28 | 160 | 22 | 170 |
| 28 | 76 | 50 | 63 | -1.0 | | | | 2 | 0 | 0617 | 1839 | RA BR | 0.11 | 0.0 | 0 | 30.08 | | 7.6 | 33 | 010 | 25 | 020 |
| 29 | 75 | 46 | 61 | -3.2 | | | | 4 | 0 | 0616 | 1839 | BR | 0.00 | 0.0 | 0 | 30.02 | | 6.6 | 16 | 080 | 15 | 140 |
| 30 | 84 | 65 | 75 | 10.6 | | | | 0 | 10 | 0615 | 1840 | BR | T | 0.0 | 0 | 29.82 | | 11.9 | 30 | 190 | 24 | 180 |
| 31 | 79 | 61 | 70 | 5.4 | | | | 0 | 5 | 0614 | 1841 | RA BR | T | 0.0 | 0 | 30.06 | | 10.5 | 34 | 040 | 28 | 040 |
| | 76.9 | 55.4 | 66.2 | | | | | | | | | Monthly Averages \| Totals | 1.83 | | | 29.95 | 30.06 | 9.6 | | | | |
| | 4.6 | 4.1 | 4.4 | | | | | | | | | Departure from Normal (1981-2010) | -1.42s | | | | | | | | | |

| Degree Days | | | | | Number of days with... | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Monthly | | Season-to-date | | Temperature | | | | | Precipitation | | Snow | | Weather | |
| | Total | Departure | Total | Departure | Max | | Min | | | | | | | | |
| | | | | | >=90° | <=32° | <=32° | <=0° | >=0.01" | >=0.1" | >=1" | T-Storms | Heavy Fog | |
| Heating | 75 | -82 | 1029 | | 0 | 0 | 0 | 0 | 9 | 5 | 0 | 2 | 1 | |
| Cooling | 111 | 53 | 180 | | | | | | | | | | | |

| Date of 5-sec to 3-sec wind equipment change | | Sea Level Pressure | | | | | Greatest... | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Date | Time | 24-Hr... | | | Snow Depth |
| 2007-06-22 | | Maximum | 30.47 | 08 | 1128 | Precip | Snowfall | | |
| | | Minimum | 29.56 | 25 | 0219 | 0.65 | | | |
| | | | | | | | | Date | |
| | | | | | | 01-02 | | | |

| Station Augmentation |
|---|
| Name:N/A Lat: N/A Lon: N/A Elevation: N/A Distance: N/A Elements: N/A Equipment: N/A |

U.S. Department of Commerce
National Oceanic & Atmospheric Administration
National Environmental Satellite, Data, and Information Service

**Local Climatological Data
Daily Summary
March 2022**
Generated on 07/24/2023

National Centers for Environmental Information
151 Patton Avenue
Asheville, North Carolina 28801

Current Location: Elev: 77 ft. Lat: 29.6197° N Lon: -95.6575° W
Station: **HOUSTON SUGARLAND MEM, TX US WBAN: 72254312977 (KSGR)**

| Date | Temperature (F) | | | | | | | Degree Days (base 65F) | | Sun (LST) | | Weather | Precipitation (in) | | | Pressure (inHg) | | Wind | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | Maximum Wind Speed = MPH | | | |
| | | | | | | | | | | | | | | | | | | | Direction = Degrees | | | |
| | Max | Min | Avg | Dep | ARH | ADP | AWB | Heat | Cool | Rise | Set | Weather Type | TLC | Snow Fall | Snow Depth | Avg Stn | Avg SL | Avg Speed | Peak Speed | Peak Dir | Sust. Speed | Sust. Dir |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 01 | 73 | 36 | 55 | -3.7 | | | | 10 | 0 | 0649 | 1822 | BR HZ | 0.00 | 0.0 | 0 | 30.11 | | 3.0 | 20 | 150 | 15 | 140 |
| 02 | 77 | 41 | 59 | 0.2 | | | | 6 | 0 | 0648 | 1823 | BR HZ | 0.00 | 0.0 | 0 | 30.07 | | 3.8 | 19 | 110 | 15 | 140 |
| 03 | 79 | 55 | 67 | 8.0 | | | | 0 | 2 | 0646 | 1823 | HZ | 0.00 | 0.0 | 0 | 30.05 | | 5.7 | 21 | 300 | 17 | 140 |
| 04 | 80 | 60 | 70 | 10.8 | | | | 0 | 5 | 0645 | 1824 | BR HZ | 0.00 | 0.0 | 0 | 29.99 | | 10.7 | 29 | 150 | 23 | 140 |
| 05 | 83 | 69 | 76 | 16.6 | | | | 0 | 11 | 0644 | 1825 | RA HZ | T | 0.0 | 0 | 29.89 | | 13.1 | 35 | 180 | 25 | 160 |
| 06 | 85 | 71 | 78 | 18.4 | | | | 0 | 13 | 0643 | 1825 | BR HZ | T | 0.0 | 0 | 29.83 | | 14.1 | 35 | 170 | 26 | 170 |
| 07 | 75 | 53 | 64 | 4.2 | | | | 1 | 0 | 0642 | 1826 | RA | 0.06 | 0.0 | 0 | 29.99 | | 13.7 | 32 | 010 | 24 | 020 |
| 08 | 53 | 47 | 50 | -10.0 | | | | 15 | 0 | 0641 | 1827 | TS RA BR HZ | 0.26 | 0.0 | 0 | 29.90 | | 11.5 | 27 | 020 | 20 | 020 |
| 09 | 62 | 45 | 54 | -6.2 | | | | 11 | 0 | 0640 | 1827 | | 0.00 | 0.0 | 0 | 29.89 | | 6.8 | 24 | 010 | 20 | 020 |
| 10 | 76 | 42 | 59 | -1.4 | | | | 6 | 0 | 0639 | 1828 | | 0.00 | 0.0 | 0 | 29.83 | | 6.6 | 21 | 160 | 18 | 160 |
| 11 | 65 | 40 | 53 | -7.6 | | | | 12 | 0 | 0637 | 1828 | | T | 0.0 | 0 | 29.93 | | 13.5 | 44 | 330 | 30 | 350 |
| 12 | 60 | 33* | 47 | -13.8 | | | | 18 | 0 | 0636 | 1829 | | 0.00 | 0.0 | 0 | 30.32 | | 7.0 | 38 | 360 | 29 | 010 |
| 13 | 68 | 35 | 52 | -9.0 | | | | 13 | 0 | 0635 | 1830 | | 0.00 | 0.0 | 0 | 30.17 | | 7.9 | 28 | 130 | 21 | 160 |
| 14 | 81 | 58 | 70 | 8.8 | | | | 0 | 5 | 0634 | 1830 | TS RA | 0.07 | 0.0 | 0 | 29.98 | | 11.8 | 41 | 290 | 29 | 300 |
| 15 | 76 | 53 | 65 | 3.6 | | | | 0 | 0 | 0633 | 1831 | BR | 0.02 | 0.0 | 0 | 29.99 | | 9.1 | 34 | 310 | 21 | 310 |
| 16 | 81 | 47 | 64 | 2.4 | | | | 1 | 0 | 0632 | 1832 | HZ | 0.00 | 0.0 | 0 | 29.87 | | 5.9 | 22 | 190 | 17 | 180 |
| 17 | 79 | 55 | 67 | 5.2 | | | | 0 | 2 | 0630 | 1832 | BR HZ | 0.00 | 0.0 | 0 | 29.68 | | 11.3 | 30 | 140 | 23 | 160 |
| 18 | 73 | 57 | 65 | 3.0 | | | | 0 | 0 | 0629 | 1833 | BR HZ | 0.00 | 0.0 | 0 | 29.91 | | 12.3 | 36 | 330 | 24 | 330 |
| 19 | 79 | 44 | 62 | -0.2 | | | | 3 | 0 | 0628 | 1833 | | 0.00 | 0.0 | 0 | 30.08 | | 5.0 | 26 | 070 | 17 | 040 |
| 20 | 78 | 45 | 62 | -0.4 | | | | 3 | 0 | 0627 | 1834 | | 0.00 | 0.0 | 0 | 30.03 | | 9.3 | 31 | 150 | 23 | 140 |
| 21 | 79 | 66 | 73 | 10.4 | | | | 0 | 8 | 0626 | 1835 | RA HZ | 0.13 | 0.0 | 0 | 29.77 | | 16.8 | 41 | 160 | 31 | 150 |
| 22 | 76 | 52 | 64 | 1.2 | | | | 1 | 0 | 0624 | 1835 | TS RA BR | 1.38 | 0.0 | 0 | 29.68 | | 12.9 | 49 | 340 | 31 | 350 |
| 23 | 71 | 46 | 59 | -4.0 | | | | 6 | 0 | 0623 | 1836 | | 0.00 | 0.0 | 0 | 29.90 | | 7.4 | 28 | 300 | 20 | 350 |
| 24 | 71 | 47 | 59 | -4.2 | | | | 6 | 0 | 0622 | 1836 | | 0.00 | 0.0 | 0 | 29.91 | | 8.2 | 30 | 310 | 21 | 280 |
| 25 | 85 | 45 | 65 | 1.6 | | | | 0 | 0 | 0621 | 1837 | | 0.00 | 0.0 | 0 | 29.98 | | 3.2 | 17 | 070 | 14 | 140 |
| 26 | 87* | 53 | 70 | 6.4 | | | | 0 | 5 | 0620 | 1838 | FG BR | 0.00 | 0.0 | 0 | 29.93 | | 8.8 | 22 | 190 | 16 | 180 |
| 27 | 85 | 60 | 73 | 9.2 | | | | 0 | 8 | 0618 | 1838 | | 0.00 | 0.0 | 0 | 29.91 | | 11.1 | 27 | 220 | 20 | 230 |
| 28 | 84 | 61 | 73 | 9.0 | | | | 0 | 8 | 0617 | 1839 | | 0.00 | 0.0 | 0 | 29.93 | | 10.9 | 33 | 170 | 22 | 170 |
| 29 | 85 | 72 | 79 | 14.8 | | | | 0 | 14 | 0616 | 1839 | | T | 0.0 | 0 | 29.67 | | 18.3 | 39 | 170 | 29 | 160 |
| 30 | 86 | 61 | 74 | 9.6 | | | | 0 | 9 | 0615 | 1840 | RA | 0.11 | 0.0 | 0 | 29.52 | | 13.7 | 37 | 300 | 28 | 170 |
| 31 | 78 | 50 | 64 | -0.6 | | | | 1 | 0 | 0614 | 1841 | | 0.00 | 0.0 | 0 | 29.79 | | 5.7 | 28 | 020 | 18 | 020 |
| | 76.5 | 51.6 | 64.1 | | | | | | | | Monthly Averages \| Totals | | 0.11 | | | 29.91 | 30.03 | 9.6 | | | | |
| | 4.2 | 0.3 | 2.3 | | | | | | | | Departure from Normal (1981-2010) | | | | | -3.14s | | | | | | |

| | Degree Days | | | | Number of days with... | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Monthly | | Season-to-date | | Temperature | | | | | Precipitation | | Snow | Weather | | | |
| | Total | Departure | Total | Departure | Max | | Min | | | | | | | | | |
| | | | | | >=90° | <=32° | <=32° | <=0° | >=0.01" | >=0.1" | >=1" | T-Storms | Heavy Fog | | | |
| Heating | 117 | -40 | 974 | | 0 | 0 | 0 | 0 | 1s | 1s | | 3 | 1 | | | |
| Cooling | 87 | 29 | 128 | | | | | | | | | | | | | |

| Date of 5-sec to 3-sec wind equipment change | | Sea Level Pressure | | | | Greatest... | | |
|---|---|---|---|---|---|---|---|---|
| 2007-06-22 | | | | Date | Time | 24-Hr... | | Snow Depth |
| | | Maximum | 30.53 | 12 | 1121 | Precip | Snowfall | |
| | | Minimum | 29.53 | 30 | 0323 | 0.11 | | |
| | | | | | | | | Date |
| | | | | | | 30-30 | | |

Station Augmentation
Name:N/A Lat: N/A Lon: N/A Elevation: N/A Distance: N/A Elements: N/A Equipment: N/A

U.S. Department of Commerce
National Oceanic & Atmospheric Administration
National Environmental Satellite, Data, and Information Service

**Local Climatological Data**
**Daily Summary**
**July 2022**
Generated on 07/24/2023

National Centers for Environmental Information
151 Patton Avenue
Asheville, North Carolina 28801

Current Location: Elev: 77 ft. Lat: 29.6197° N Lon: -95.6575° W
Station: **HOUSTON SUGARLAND MEM, TX US WBAN: 72254312977 (KSGR)**

| Date | Temperature (F) | | | | | | | Degree Days (base 65F) | | Sun (LST) | | Weather | | Precipitation (in) | | | Pressure (inHg) | | Wind | | Maximum Wind Speed = MPH | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | Direction = Degrees | | |
| | Max | Min | Avg | Dep | ARH | ADP | AWB | Heat | Cool | Rise | Set | Weather Type | TLC | Snow Fall | Snow Depth | Avg Stn | Avg SL | AVg Speed | Peak Speed | Peak Dir | Sust. Speed | Sust. Dir | | |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | | |
| 01 | 90 | 78 | 84 | 0.9 | | | | 0 | 19 | 0526 | 1927 | TS RA | T | 0.0 | 0 | 29.82 | | 7.5 | 18 | 180 | 14 | 160 | | |
| 02 | 97 | 78 | 88 | 4.8 | | | | 0 | 23 | 0526 | 1927 | TS RA | 0.05 | 0.0 | 0 | 29.83 | | 9.7 | 28 | 200 | 21 | 170 | | |
| 03 | 99 | 76 | 88 | 4.8 | | | | 0 | 23 | 0527 | 1927 | | 0.00 | 0.0 | 0 | 29.91 | | 7.7 | 25 | 150 | 18 | 150 | | |
| 04 | 100 | 76 | 88 | 4.7 | | | | 0 | 23 | 0527 | 1927 | | 0.00 | 0.0 | 0 | 29.91 | | 9.1 | 24 | 210 | 18 | 170 | | |
| 05 | 100 | 77 | 89 | 5.7 | | | | 0 | 24 | 0528 | 1927 | | 0.00 | 0.0 | 0 | 29.87 | | 9.1 | 24 | 160 | 20 | 150 | | |
| 06 | 99 | 76 | 88 | 4.6 | | | | 0 | 23 | 0528 | 1927 | | 0.00 | 0.0 | 0 | 29.85 | | 8.2 | 25 | 180 | 15 | 170 | | |
| 07 | 99 | 77 | 88 | 4.6 | | | | 0 | 23 | 0528 | 1926 | RA | T | 0.0 | 0 | 29.86 | | 7.2 | 25 | 170 | 20 | 177 | | |
| 08 | 102 | 76 | 89 | 5.6 | | | | 0 | 24 | 0529 | 1926 | | 0.00 | 0.0 | 0 | 29.90 | | 6.8 | 26 | 160 | 21 | 170 | | |
| 09 | 103 | 78 | 91 | 7.5 | | | | 0 | 26 | 0529 | 1926 | | 0.00 | 0.0 | 0 | 29.90 | | 6.7 | 24 | 180 | 18 | 180 | | |
| 10 | 105* | 79 | 92 | 8.5 | | | | 0 | 27 | 0530 | 1926 | | 0.00 | 0.0 | 0 | 29.78 | | 8.0 | 27 | 180 | 20 | 180 | | |
| 11 | 103 | 82 | 93 | 9.5 | | | | 0 | 28 | 0530 | 1926 | TS RA | T | 0.0 | 0 | 29.72 | | 8.8 | 25 | 190 | 18 | 200 | | |
| 12 | 103 | 80 | 92 | 8.4 | | | | 0 | 27 | 0531 | 1925 | TS RA | 0.22 | 0.0 | 0 | 29.77 | | 5.7 | 28 | 190 | 21 | 200 | | |
| 13 | 101 | 77 | 89 | 5.4 | | | | 0 | 24 | 0531 | 1925 | | T | 0.0 | 0 | 29.85 | | 6.2 | 32 | 140 | 25 | 140 | | |
| 14 | 100 | 77 | 89 | 5.4 | | | | 0 | 24 | 0532 | 1925 | TS RA | 0.05 | 0.0 | 0 | 29.91 | | 5.5 | 35 | 360 | 25 | 350 | | |
| 15 | 91 | 75 | 83 | -0.6 | | | | 0 | 18 | 0532 | 1924 | TS RA | T | 0.0 | 0 | 29.93 | | 7.1 | 26 | 160 | 20 | 140 | | |
| 16 | 100 | 74 | 87 | 3.4 | | | | 0 | 22 | 0533 | 1924 | | 0.00 | 0.0 | 0 | 29.88 | | 6.5 | 23 | 190 | 17 | 180 | | |
| 17 | 100 | 74* | 87 | 3.3 | | | | 0 | 22 | 0533 | 1924 | BR | 0.00 | 0.0 | 0 | 29.84 | | 6.6 | 26 | 160 | 21 | 170 | | |
| 18 | 102 | 77 | 90 | 6.3 | | | | 0 | 25 | 0534 | 1923 | | 0.00 | 0.0 | 0 | 29.85 | | 9.1 | 26 | 210 | 17 | 200 | | |
| 19 | 101 | 79 | 90 | 6.3 | | | | 0 | 25 | 0535 | 1923 | | 0.00 | 0.0 | 0 | 29.83 | | 10.2 | 29 | 170 | 22 | 170 | | |
| 20 | 103 | 78 | 91 | 7.3 | | | | 0 | 26 | 0535 | 1922 | | 0.00 | 0.0 | 0 | 29.80 | | 10.4 | 29 | 170 | 22 | 170 | | |
| 21 | 102 | 76 | 89 | 5.3 | | | | 0 | 24 | 0536 | 1922 | | 0.00 | 0.0 | 0 | 29.82 | | 8.1 | 26 | 180 | 21 | 180 | | |
| 22 | 99 | 76 | 88 | 4.3 | | | | 0 | 23 | 0536 | 1921 | TS RA | 0.01 | 0.0 | 0 | 29.88 | | 6.4 | 31 | 130 | 21 | 130 | | |
| 23 | 98 | 76 | 87 | 3.3 | | | | 0 | 23 | 0537 | 1921 | TS RA | 0.02 | 0.0 | 0 | 29.91 | | 6.8 | 29 | 150 | 21 | 150 | | |
| 24 | 99 | 76 | 88 | 4.3 | | | | 0 | 23 | 0537 | 1920 | | 0.00 | 0.0 | 0 | 29.91 | | 8.1 | 24 | 140 | 21 | 150 | | |
| 25 | 99 | 76 | 88 | 4.2 | | | | 0 | 23 | 0538 | 1920 | | 0.00 | 0.0 | 0 | 29.91 | | 8.2 | 26 | 170 | 20 | 160 | | |
| 26 | 99 | 75 | 87 | 3.2 | | | | 0 | 22 | 0539 | 1919 | TS | 0.00 | 0.0 | 0 | 29.88 | | 7.8 | 28 | 160 | 22 | 160 | | |
| 27 | 97 | 77 | 87 | 3.2 | | | | 0 | 22 | 0539 | 1919 | TS RA | 0.54 | 0.0 | 0 | 29.88 | | 5.3 | 24 | 190 | 18 | 200 | | |
| 28 | 96 | 76 | 86 | 2.2 | | | | 0 | 21 | 0540 | 1918 | TS RA BR | 0.66 | 0.0 | 0 | 29.87 | | 6.9 | 39 | 180 | 30 | 170 | | |
| 29 | 95 | 76 | 86 | 2.2 | | | | 0 | 21 | 0540 | 1917 | TS RA | 0.25 | 0.0 | 0 | 29.92 | | 6.3 | 48 | 250 | 29 | 240 | | |
| 30 | 96 | 76 | 86 | 2.2 | | | | 0 | 21 | 0541 | 1917 | | 0.00 | 0.0 | 0 | 29.96 | | 7.6 | 25 | 160 | 20 | 160 | | |
| 31 | 99 | 75 | 87 | 3.2 | | | | 0 | 22 | 0542 | 1916 | | 0.00 | 0.0 | 0 | 29.96 | | 7.5 | 28 | 170 | 21 | 160 | | |
| | 99.3 | 76.7 | 88.0 | | | | | | | | | Monthly Averages \| Totals | 1.80 | | | 29.86 | 29.98 | 7.6 | | | | | | |
| | 6.3 | 2.5 | 4.4 | | | | | | | | | Departure from Normal (1981-2010) | -2.56s | | | | | | | | | | | |

| Degree Days | | | | | | | | | Number of days with... | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Monthly | | Season-to-date | | Temperature | | | | | | | Precipitation | | Snow | | Weather | |
| | Total | Departure | Total | Departure | Max | | Min | | | | | | | | | | |
| | | | | | >=90° | <=32° | <=32° | <=0° | >=0.01" | >=0.1" | | >=1" | | T-Storms | Heavy Fog | | |
| Heating | 0 | 0 | 0 | 0 | 31 | 0 | 0 | 0 | 8 | 4 | | 0 | | 12 | | | |
| Cooling | 713 | 136 | 2287 | | | | | | | | | | | | | | |

| Date of 5-sec to 3-sec wind equipment change | | Sea Level Pressure | | | | Greatest... | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Date | Time | 24-Hr... | | | Snow Depth |
| 2007-06-22 | | Maximum | 30.12 | 31 | 1101 | Precip | Snowfall | | |
| | | Minimum | 29.74 | 11 | 1743 | 0.88 | | | |
| | | | | | | | | Date | |
| | | | | | | 27-28 | | | |

**Station Augmentation**
Name:N/A Lat: N/A Lon: N/A Elevation: N/A Distance: N/A Elements: N/A Equipment: N/A

Appx. 0129

U.S. Department of Commerce
National Oceanic and Atmospheric Administration
National Environmental Satellite, Data, and Information Service

**Local Climatological Data**
**Daily Summary**
**August 2022**
Generated on 07/24/2023

National Centers for Environmental Information
151 Patton Avenue
Asheville, North Carolina 28801

Current Location: Elev: 77 ft. Lat: 29.6197° N Lon: -95.6575° W
Station: **HOUSTON SUGARLAND MEM, TX US WBAN: 72254312977 (KSGR)**

| Date | Temperature (F) | | | | | | | Degree Days (base 65F) | | Sun (LST) | | Weather | Precipitation (in) | | | Pressure (inHg) | | Wind | Maximum Wind Speed = MPH | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | Direction = Degrees | | |
| | Max | Min | Avg | Dep | ARH | ADP | AWB | Heat | Cool | Rise | Set | Weather Type | TLC | Snow Fall | Snow Depth | Avg Stn | Avg SL | AVg Speed | Peak Speed | Peak Dir | Sust. Speed | Sust. Dir |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 01 | 95 | 76 | 86 | 2.2 | | | | 0 | 21 | 0542 | 1915 | TS RA | T | 0.0 | 0 | 29.93 | | 7.2 | 28 | 200 | 22 | 180 |
| 02 | 100 | 76 | 88 | 4.2 | | | | 0 | 23 | 0543 | 1915 | | 0.00 | 0.0 | 0 | 29.88 | | 9.7 | 24 | 180 | 20 | 170 |
| 03 | 99 | 78 | 89 | 5.2 | | | | 0 | 24 | 0543 | 1914 | | 0.00 | 0.0 | 0 | 29.82 | | 10.5 | 29 | 200 | 21 | 180 |
| 04 | 100 | 77 | 89 | 5.2 | | | | 0 | 24 | 0544 | 1913 | TS | 0.00 | 0.0 | 0 | 29.83 | | 8.4 | 22 | 180 | 16 | 190 |
| 05 | 92 | 77 | 85 | 1.2 | | | | 0 | 20 | 0545 | 1912 | RA | 0.05 | 0.0 | 0 | 29.87 | | 4.6 | 20 | 120 | 16 | 150 |
| 06 | 93 | 75 | 84 | 0.2 | | | | 0 | 19 | 0545 | 1911 | TS RA BR | 0.39 | 0.0 | 0 | 29.93 | | 4.8 | 26 | 170 | 22 | 160 |
| 07 | 97 | 76 | 87 | 3.2 | | | | 0 | 22 | 0546 | 1911 | | 0.00 | 0.0 | 0 | 29.98 | | 7.2 | 27 | 130 | 21 | 140 |
| 08 | 98 | 75 | 87 | 3.2 | | | | 0 | 22 | 0546 | 1910 | TS | 0.00 | 0.0 | 0 | 29.95 | | 6.4 | 28 | 130 | 21 | 170 |
| 09 | 98 | 75 | 87 | 3.2 | | | | 0 | 22 | 0547 | 1909 | TS | 0.00 | 0.0 | 0 | 29.92 | | 6.1 | 24 | 160 | 18 | 160 |
| 10 | 100 | 74 | 87 | 3.2 | | | | 0 | 22 | 0547 | 1908 | TS RA BR | 0.62 | 0.0 | 0 | 29.95 | | 5.0 | 44 | 080 | 30 | 060 |
| 11 | 95 | 74 | 85 | 1.3 | | | | 0 | 20 | 0548 | 1907 | TS | 0.00 | 0.0 | 0 | 29.89 | | 5.7 | 21 | 150 | 17 | 150 |
| 12 | 96 | 77 | 87 | 3.3 | | | | 0 | 22 | 0549 | 1906 | TS RA | 0.02 | 0.0 | 0 | 29.86 | | 5.5 | 27 | 360 | 20 | 360 |
| 13 | 94 | 78 | 86 | 2.3 | | | | 0 | 21 | 0549 | 1905 | | T | 0.0 | 0 | 29.85 | | 9.8 | 32 | 130 | 22 | 130 |
| 14 | 93 | 79 | 86 | 2.3 | | | | 0 | 21 | 0550 | 1904 | RA | 0.01 | 0.0 | 0 | 29.86 | | 8.4 | 36 | 160 | 26 | 150 |
| 15 | 97 | 76 | 87 | 3.4 | | | | 0 | 22 | 0550 | 1903 | | 0.00 | 0.0 | 0 | 29.84 | | 7.7 | 22 | 160 | 17 | 150 |
| 16 | 99 | 74 | 87 | 3.4 | | | | 0 | 22 | 0551 | 1902 | | 0.00 | 0.0 | 0 | 29.82 | | 6.1 | * | | 16 | 150 |
| 17 | 100* | 75 | 88 | 4.4 | | | | 0 | 23 | 0551 | 1901 | | T | 0.0 | 0 | 29.84 | | 5.2 | 25 | 190 | 18 | 200 |
| 18 | 99 | 74 | 87 | 3.5 | | | | 0 | 22 | 0552 | 1900 | TS RA | 0.23 | 0.0 | 0 | 29.84 | | 4.9 | 49 | 360 | 28 | 060 |
| 19 | 82 | 74* | 78 | -5.5 | | | | 0 | 13 | 0553 | 1859 | TS RA BR | 0.75 | 0.0 | 0 | 29.86 | | 4.7 | 16 | 170 | 14 | 150 |
| 20 | 91 | 76 | 84 | 0.6 | | | | 0 | 19 | 0554 | 1858 | TS RA | 0.03 | 0.0 | 0 | 29.91 | | 6.6 | 31 | 150 | 23 | 160 |
| 21 | 93 | 77 | 85 | 1.7 | | | | 0 | 20 | 0554 | 1857 | TS RA BR | 0.32 | 0.0 | 0 | 29.91 | | 8.5 | 29 | 180 | 18 | 180 |
| 22 | 94 | 79 | 87 | 3.7 | | | | 0 | 22 | 0555 | 1856 | | 0.00 | 0.0 | 0 | 29.81 | | 9.8 | 26 | 170 | 20 | 220 |
| 23 | 93 | 77 | 85 | 1.8 | | | | 0 | 20 | 0555 | 1855 | RA | T | 0.0 | 0 | 29.77 | | 6.4 | 17 | 320 | 13 | 180 |
| 24 | 87 | 76 | 82 | -1.1 | | | | 0 | 17 | 0555 | 1854 | RA BR | 1.05 | 0.0 | 0 | 29.82 | | 5.2 | 24 | 270 | 16 | 270 |
| 25 | 94 | 77 | 86 | 3.0 | | | | 0 | 21 | 0556 | 1853 | | 0.00 | 0.0 | 0 | 29.83 | | 3.8 | 17 | 340 | 14 | 160 |
| 26 | 91 | 76 | 84 | 1.1 | | | | 0 | 19 | 0557 | 1852 | TS RA | 0.61 | 0.0 | 0 | 29.82 | | 5.5 | 24 | 160 | 18 | 160 |
| 27 | 92 | 76 | 84 | 1.2 | | | | 0 | 19 | 0557 | 1851 | | 0.02 | 0.0 | 0 | 29.77 | | 5.9 | 20 | 180 | 17 | 160 |
| 28 | 93 | 76 | 85 | 2.3 | | | | 0 | 20 | 0558 | 1850 | TS RA | 0.00 | 0.0 | 0 | 29.73 | | 6.5 | 14 | 130 | 14 | 130 |
| 29 | 86 | 76 | 81 | -1.6 | | | | 0 | 16 | 0558 | 1848 | TS RA BR | 1.30 | 0.0 | 0 | 29.80 | | 7.3 | 30 | 170 | 18 | 190 |
| 30 | 90 | 77 | 84 | 1.6 | | | | 0 | 19 | 0559 | 1847 | TS RA | 0.01 | 0.0 | 0 | 29.87 | | 6.3 | 31 | 260 | 22 | 270 |
| 31 | 92 | 76 | 84 | 1.7 | | | | 0 | 19 | 0559 | 1846 | TS | T | 0.0 | 0 | 29.88 | | 2.7 | 27 | 050 | 20 | 040 |
| | 94.3 | 76.1 | 85.2 | | | | | | Monthly Averages \| Totals | | | | 5.41 | | | 29.85 | 29.96 | 6.5 | | | | |
| | 0.8 | 2.9 | 1.8 | | | | | | Departure from Normal (1981-2010) | | | | 1.27s | | | | | | | | | |

| Degree Days | | | | | | Number of days with... | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Monthly | | Season-to-date | | Temperature | | | | | | Precipitation | | Snow | Weather | | |
| | Total | Departure | Total | Departure | Max | | | Min | | | | | | | | |
| | | | | | >=90° | <=32° | <=32° | <=0° | | >=0.01" | >=0.1" | >=1" | T-Storms | Heavy Fog | | |
| Heating | 0 | 0 | 0 | 0 | 28 | 0s | 0 | 0 | | 14 | 8 | | 14 | | | |
| Cooling | 626 | 57 | 2913 | | | | | | | | | | | | | |

| Date of 5-sec to 3-sec wind equipment change | Sea Level Pressure | | | | Greatest... | | | |
|---|---|---|---|---|---|---|---|---|
| 2007-06-22 | | | Date | Time | 24-Hr... | | Snow Depth | |
| | Maximum | 30.13 | 07 | 0840 | Precip | Snowfall | | |
| | Minimum | 29.79 | 23 | 1806 | 1.30 | | | |
| | | | | | Date | | | |
| | | | | | 29-29 | | | |

| Station Augmentation |
|---|
| Name:N/A Lat: N/A Lon: N/A Elevation: N/A Distance: N/A Elements: N/A Equipment: N/A |

**<u>ATTACHMENT C</u>**

**BIOGRAPHICAL SKETCH**

# Neil B. Hall, PhD, PE, AIA

Neil grew up in the South Bronx, sold hot dogs at the Bronx Zoo, graduated from the Bronx High School of Science, and was a 3-sewer hitter no matter what his brother-in-law says. He graduated from the City College of New York with two degrees in Architecture, was commissioned a 1nd Lieutenant in the Army Corps of Engineers, graduated Airborne and Ranger Schools, was awarded the Special Forces Officer "3" Prefix, and served as an Engineer Advisory Team Leader and Operational Detachment ("A" Team) Executive Officer with 1st Special Forces (Abn), Okinawa, Japan with deployments to the Philippines, Taiwan and Micronesia. He served as Executive Officer of a 500-man Construction Company at Fort Hunter Ligget, CA and Assistant Operations Officer with the 1xth Engineer Battalion (C)(C) at Fort Ord, CA. Transferring to the Navy Civil Engineer Corps, he served as Project Manager for the Long Beach Naval Shipyard Modernization Program, Planning Officer at Subic Bay Naval Complex, Philippines and Marine Corps Bases, Okinawa, and a Seabee Detachment Commander in Honduras.

Neil received a Master of Science in Systems Management from the University of Southern California and a Master of Landscape Architecture from the University of Pennsylvania. He was appointed a Visiting Research Associate in the College of Urban and Regional Planning at the University of the Philippines and wrote his dissertation on urban planning in developing countries. After receiving a PhD in Urban Studies from the University of New Orleans he was appointed a Visiting Associate Professor in the Geography Department at the University of /owa. He was a consulting engineer and New Orleans Branch Manager for CHOA Corporation (now EF/) and a consulting engineer with Engineering Systems, /nc. (ES/) and RTC of Louisiana. He is the Owner and Principal of **GROUNDTRUTH FORENSICS**, a consulting firm specializing in building performance, failure analysis and damage assessment. Neil is a licensed Architect in FL, PA, CT, CO, SD, NJ, /L, O<, USV/ and TX; licensed /nterior Designer in FL; licensed Professional Engineer in TX, MN, NY, NJ, USV/ and MS (for trial testimony); and licensed Landscape Architect in MN and TX.

Neil is a member of the American Institute of Architects, American Society of Civil Engineers, Structural Engineering Institute, Construction Specifications Institute, International Institute of Building Enclosure Consultants, American Society of Safety Professionals and Association of State Floodplain Managers. He served as a member of FEMA♂s Building Performance Appraisal Team (BPAT) for Hurricane Georges. He is a U.S. Department of Energy Certified Wind /nvestigator, an ASFM Certified Floodplain Manager, NFPA 1033 Certified Fire /nvestigator, and a Designated Disaster Service Worker with the State of California's Safety Assessment Program.

Neil is a member of the SEI/ASCE Standards Committee for the Structural Condition Assessment of Existing Buildings. The committee is responsible for the publication of the Guideline for Structural Condition Assessment of Existing Buildings (SEI/ASCE 11) and the Guideline for Condition Assessment of the Building Envelope (SEI/ASCE 30). He is a member of the ASCE Committee developing a national consensus standard on estimating wind speeds in tornados and other windstorms. Neil served 3 years as a member of the AIA's Knowledge Center for Building Performance. Besides the University of /owa, he has held teaching positions with the University of Maryland (mathematics), Tulane University (architecture), Central Texas College (engineering graphics), and Troy State University (project management).

**EXHIBIT 2**

# GROUNDTRUTH FORENSICS

Neil B. Hall, Ph.D., AIA, CFM
1923 Corporate Square Boulevard
Slidell, Louisiana 70458
985-690-6008         neilbhall@gmail.com

## Summary

Neil Hall served as a commissioned officer in both the Army Corps of Engineers and the Navy Civil Engineer Corps. He holds two degrees in Architecture, graduate degrees in Systems Management and Landscape Architecture and a Ph.D. in Urban Studies. He is a licensed Architect, Interior Designer, Civil Engineer and Landscape Architect; a Certified Floodplain Manager; and a NFPA 1033 Certified Fire Investigator.  Since 1995, Neil has specialized in the investigation of building performance, structural health and failure analysis. He has been qualified by Federal and State Courts as an Expert Witness in the fields of Architecture, Landscape Architecture, Civil and Structural Engineering, Mold Remediation, Highway Design, Traffic Safety and Building Codes.

## Civilian Education

- Ph.D. in Urban Studies, University of New Orleans (1993)
- Diploma, International Program for Port Planning and Management (1991)
- Diploma, U.S. Army Command and General Staff College (1986)
- Master of Landscape Architecture, University of Pennsylvania (1983)
- Master of Science, USC Institute of Systems and Safety Management (1980)
- B.S. and Bachelor of Architecture, City College of New York (1972)
- Diploma, Bronx High School of Science (1966)

## Positions Held

- **GROUNDTRUTH FORENSICS**, Slidell, Louisiana
  Owner and Senior Consultant, 2003 - present
- RTC of Louisiana, Baton Rouge, Louisiana
  Senior Consultant, 2002 - 2003
- Engineering Systems Inc., Metairie, Louisiana
  Senior Consultant, 1999 – 2002
- Neil B. Hall, Ph.D., Metairie, Louisiana
  Senior Consultant, 1998 – 1999
- CH&A Corporation (EFI), Metairie, Louisiana
  District Manager and Senior Engineer, 1994 - 1998
- University of Iowa, Iowa City, Iowa
  Visiting Associate Professor, 1993 - 1994
- University of New Orleans, New Orleans, Louisiana
  Ph.D. Candidate, 1992 – 1993
- United States Navy Civil Engineer Corps
  Commissioned Officer, 1976 – 1992
- United States Army Corps of Engineers
  Commissioned Officer, 1972 – 1976
- Mario Dini, AIA, New York, New York
  Architectural Draftsman, 1970 – 1972

**History of Registrations and Certifications**

- o Licensed Architect (first licensed 1978): FL, TX, PA, NJ, SD, CT, CO, IL, OK, USVI
- o Licensed Civil Engineer (first licensed 1981): MN, TX, MS, NY, NJ, USVI
- o Licensed Landscape Architect (first licensed 1986): MN, TX
- o Licensed Interior Designer (first licensed 2015): FL
- o Certified Fallout Shelter Analyst (1972)
- o Certified Floodplain Manager (2011)
- o NFPA 1033 Certified Fire Investigator (1997)
- o AICP Certified Planner (1991)
- o State of California, Safety Assessment Program "Disaster Service Worker" (2015)
- o Certified OSHA HAZWOP training in accordance with 29CFR1910.120(e)
- o Certified CXLT User (English XL VIT slipmeter) (2019)
- o Certified Third-party EIFS Inspector (2000)
- o Certified Microbial Remediation Supervisor (2001)
- o Certified Level 1 Infrared Thermographer (2004)

**Experience in Design, Construction and Contract Administration**

- o Directed construction operations for military engineering units ranging from independent civic action teams to heavy equipment construction battalions.

- o Fast-tracked $100 million to build 5,000 housing units and community support facilities on–time and under-cost at Marine Corps Bases in Okinawa, Japan.

- o Supervised facilities inspection program involving more than $6 billion in buildings and structures to develop the backlog of essential maintenance and repair for US military bases.

- o Successfully negotiated $120 million in design contracts and contract change orders.

- o Developed first Naval Facilities Engineering Command construction bid package integrating construction drawings, material surveys and bilingual specifications.

- o President of NAVFAC Design Responsibility Board tasked with arbitrating Pacific Theater contract disputes between U.S. Government, design firms and construction contractors under the provisions of the Federal Acquisition Regulations (FAR).

**Experience in Building Science and Forensic Engineering**

- o Inspected thousands of buildings and structures damaged by hail, windstorms, hurricanes, tornados, cold weather and floods.

- o Inspected more than 200 foundation slabs in relation to underslab plumbing leaks, high plasticity clays and sinkhole damage.

- o Qualified in federal, state and local courts as an expert witness in the fields of architecture, civil engineering, landscape architecture, building code compliance, roof consultant, traffic engineering and highway safety.

- o Member, FEMA's Building Performance Assessment Team for Hurricane Georges.

- o Testified in 62 Federal and State trials and more than 600 depositions, hearings and examinations under oath.

- o Served as Appraiser and Umpire in Insurance Disputes.

2

**Experience in Urban and Regional Planning**

o Supervised international staff of 100 architects and engineers responsible for planning and programming $300 million in Pacific Theater construction.

o Master planned remote construction camps in the Philippines, Honduras, South Korea, and Diego Garcia (British Indian Ocean Territory).

o Developed $60 million strategic plan for Naval Air Propulsion Center, New Jersey using participatory planning techniques (Master's thesis at no cost to the taxpayer)

o Directed $1 billion in comprehensive masterplanning for US military installations in Japan, netting $200 million in host-nation funds.

o Negotiated and surveyed international boundary to protect an environmentally sensitive old growth rain forest in the Philippines.

**Experience in Project Management**

o Project managed $50 million construction program in Guam, Palau, Northern Marinas, Federated States of Micronesia and the Marshall Islands.

o Administered $15 million flood rehabilitation program in four provinces of the Philippines for the US Agency for International Development.

o Project managed $150 million fire protection and industrial modernization program at Long Beach Naval Shipyard, California.

o Developed and taught graduate level course in Project Management including operations research, network analysis techniques and environmental impacts.

o Directed multinational earthquake relief operation in Taiwan.

**Military Experience**

o Honor Graduate, U.S. Army Engineer Officer School (1972).

o Honor Graduate, U.S. Navy Civil Engineer Corps Officer School (1976).

o KC Team Leader, 539th Engineer Detachment and Executive Office SFOD 24, 1st Battalion, 1st Special Forces Group (Abn), Okinawa, Japan (1972-1974).

o Executive Office, USACDEC Engineer Company, Fort Hunter Ligget, California (1974-1975).

o Assistant Operations Office, 14th Engineer Battalion (C)(C), Fort Ord, California (1975-1976).

o Project Manager, Public Works Department, Long Beach Naval Shipyard, CA (1976-1978).

o Planning Officer, Public Works Center, Subic Bay, Philippines (1978-1981).

o Graduate Student, University of Pennsylvania (1981-1983).

o Planning Officer, Public Works Department, Marine Corps Base Camp Butler, Okinawa, Japan (1983-1987).

o Department Head, Enlisted Personnel Management Center, New Orleans, LA (19877-1992).

3

o Graduate, Army Airborne School and Ranger School (Fort Benning, GA) and Special Forces Officer Course, Civil Affairs Officer Course, Psychological Warfare Course and Internal Defense/Internal Development Course (JFK Institute for Military Assistance, Fort Bragg, NC).

o Awarded the Meritorious Service Medal on separate occasions by the Army, Navy and USMC.

o Foreign awards include Philippine Presidential Unit Citation, Republic of the Philippines jump wings, Republic of China jump wings and Republic of China rough terrain jump wings.

## Academic Credentials

o Visiting Associate Professor, University of Iowa, Geography Department (1993-94).
o Adjunct Professor, Troy State University, Graduate School (1989-1993).
o Visiting Research Associate, University of the Philippines, School of Urban and Regional Planning (1992).
o Research Intern, DoD Equal Opportunity Management Institute (1991).
o Adjunct Professor, Tulane University, School of Architecture (1988-1990).
o Adjunct Professor, Northwood University (1983-1992).
o Adjunct Professor, University of Phoenix (1988-1992).
o Adjunct Professor, Concordia University of Wisconsin (1984-1985).
o Finalist, White House Fellows Program (1984).
o Adjunct Professor, University of Maryland (1981-1983).
o Adjunct Professor, Central Texas College (1977-1978).

## Publications

o Hall (2001). *A Mold Primer for Architects.* AIArchitect. Washington, D.C, 8 pages.

o Hall (1994, April). *Conflicts and Contradictions in Development Planning: The Birth of the Subic Bay Metropolitan Authority.* Colloqui: Cornell's Journal of Planning and Urban Studies, 24 pages.

o Hall (1992). *The Problem of Idiographic and Nomothetic Space: Towards a Metatheory of Urbanism.* Division of Urban Research and Policy Studies Working Paper No. 10, University of New Orleans, 104 pages.

o Hall (1986). *Quality Circles: Their Use as Motivators in Design Management.* Navy Civil Engineer, 25 (2), pp. 26-28.

o Hall and Rendorio, F. (1981). *Local Tropical Plants.* U.S. Navy Public Works Center, Subic Bay, Philippines, 48 pages.

## Unpublished Papers and Selected Conference Presentations

o *Looking the Gift Horse in the Mouth: Integrating the Naval Construction Force (NCF) and the Marine Air-Ground Task Force (MAGTF).* (1990). Accepted for publication by Proceedings, the Journal of the US Naval Institute. Not published at my request due to Operation Desert Shield/Desert Storm.

o *Design and Planning of Post-Modern Landscapes.* (November 4, 1994). Annual Convention of Association of Collegiate Schools of Planning, University of Arizona.

o *The Birth of the Subic Bay Metropolitan Authority.* (October 15, 1995). Annual Convention of the Association of American Geographers, Chicago, Illinois.
o *The Architects Role in Disaster Assistance.* (May 2, 2007). Annual Conference,

4

American Institute of Architects, San Antonio, Texas.

o *Deconstructing Strategic Management in Development Practice.* (April 5, 1994). Conference on "Deconstructing and Reconstructing International Development" sponsored by the Program for International Development, Centre for International Comparative Studies, University of Iowa.

o *The "New Hong Kong": A Short History of Olongapo City in the Philippines.* (February 6,1994). Guest Lecture Series, School of Business and Management at Sierra University, Loma Linda, California.

o *Mold in a Building is not Mold in a Petri Dish or Why Tomorrow's Mold Claims Won't Be Your Daddy's Mold Claims.* (2006). Reprinted in "Fear and Loathing in the World of Insurance Claims: Essays and Articles on Indoor Mold, Building Dampness and other things that go bump in the night" (2007).

o *Did you get peanut butter on my chocolate? or Did I Get Chocolate on Your Peanut Butter? (Emerging Issues in Water Damage Restoration and Mold Remediation.* (2006). Reprinted in "Fear and Loathing in the World of Insurance Claims: Essays and Articles on Indoor Mold, Building Dampness and other things that go bump in the night" (2007).

o *Differentiating Between Wind and Flood Damage in Hurricane Katrina.* (February 5-6, 2008). 9th Annual Windstorm Insurance Conference, Jacksonville, Florida.

o *Tornados, Gust Fronts and Building Damage.* (February 1-2, 2012). 13th Annual Windstorm Insurance Conference, Jacksonville, Florida.

o *Cosmetic and Functional Damage (Part One).* (October 18, 2016). First Party Claims Conference, Warwick, Rhode Island.

o Additional speaking engagements include American Institute of Architects, CLE International; Louisiana Claims Association; Water Loss Institute; Florida Windstorm Association; Windstorm Network Association; International Code Conference; University of Texas (Arlington) Building Professional Institute; LSU Building Contractors Institute; Metropolitan Safety Council of New Orleans, Risk & Insurance Magazine; Society of American Military Engineers; American Trial Lawyers Association (Mississippi, New Orleans and National; National Association of Public Insurance Adjusters; Florida Association of Public Insurance Adjusters.

## Professional Affiliations

o American Society of Civil Engineers
  - Associate Member, ASCE Standards Committee on Estimating Wind Speeds in Tornados and Other Windstorms.
o American Institute of Architects
  - Prior member, AIA Knowledge Center for Building Performance
o Structural Engineering Institute
  - Prior member, ASCE/SEI Standards Committee for the Structural Condition Assessment and Rehabilitation of Existing Buildings *(Guideline for Structural Condition Assessment of Existing Buildings [SEI/ASCE 11] and Guideline for Condition Assessment of the Building Envelope [SEI/ASCE 30].*
o American Society of Safety Professionals
o Association of State Floodplain Managers
o American Association of Wind Engineers
o International Institute of Building Enclosure Consultants
o Construction Specifications Institute
o National Fire Protection Association
o National Roofing Contractors Association

5

- o Windstorm Network
- o International Code Council
- ∥ United Architects of the Philippines (first foreign corresponding member)

As of November 1, 2024

6

NEIL B. HALL, PhD, PE, AIA
Trial and Deposition Testimony (Four Year) for Federal Rule 26
As of December 13, 2024

**Dina Miqdadi, Plaintiff, v. Travelers Personal Insurance Company, Defendant, in the United States District Court for the Northern District of Texas, Dallas Division, Civil Action no, 3:24-cv-1274-L, December 13., 2024.**

    **Deposition Testimony** for plaintiff in case involving hail damage to a clay tile roof. Plaintiff attorneys are Chad T. Wilson and Joseph Milensky of the Chad T. Wilson Law Firm PLLC, Webster, Texas. Defense attorneys are Alissa Puckett and Wm. Lance Lewis of Quilling, Selander, Lownds, Winslett & Moser, P.C.., Dallas, Texas.

**Inspirational Church of God in Christ San Antonio, Plaintiff, v. Church Mutual Insurance Company, Defendant, in the United States District Court for the Western District of Texas, San Antonio Division, Civil Action 5:22-cv-01367-JKP-RBH, December 11, 2024.**

    **Deposition Testimony** for plaintiff in case involving hail damage to a gravel-covered BUR. Plaintiff attorneys are Chad T. Wilson and Patrick C. McGinnis of the Chad T. Wilson Law Firm PLLC, Webster, Texas. Defense attorneys are Steve D. Grossman, Marc Sheiness and Td F. Newman of Sheiness, Glover & Grossman, L.L.L., Houston, Texas.

**Roy and Lee Ann Harrison, Plaintiffs, v. State Farm Lloyds, Defendant, in the District Court of Tarrant County, Texas, 348th Judicial District, Cause No. 348-345971-23, December 10, 2024.**

    **Deposition Testimony** for plaintiff in case involving hail damage to a residential property and segregation of damage between two hailstorms. Plaintiff attorneys are Chad T. Wilson and Joseph Milensky of the Chad T. Wilson Law Firm PLLC, Webster, Texas. Defense attorneys are Susan E. Egeland, Matthew C, Sapp, and Max A. Moran of Faegre, Drinker, Biuddle & Reath, LLP, Dallas, Texas.

**Gregory D. Hendrix & Sara Hendrix, Plaintiffs, v. State Farm Lloyds, Defendant in the United States District Court for the Southern District of Texas, Houston Division, Civil ActionNo. H-23-2876, Jury, December 3, 2024**

    **Trial Testimony** for plaintiff in case involving hail damage to a residential roof. Plaintiff attorneys are Chad T. Wilson and Joseph Milensky of the Chad T. Wilson Law Firm PLLC, Webster, Texas. Defense attorneys are M. Micah Kessler and Caitlin D. Coleman of Nistico, Crouch & Kessler, P.C., Houston, Texas. Judge is the Honorable Sim Lake.

**Maria Mercedes Badia Tavas, Hector Luis Badia, and Isabel Christina Badia Hewett in their capacity as co-agents on behalf og Hector J. Badia and Irene M. Badia, Plaintiffs v. State Farm Fire and Casualty Company, Defendant, in the United States District Court for the Southern District of Mississippi, Southern Division, Civil Actyion No. 1:24-cv-75-LG-BWR, November 25, 2024.**

    **Deposition Testimony** in case involving water damage to a residence. Plaintiff attorney is Lindsey A. Topp of Hair Shunnarah Trial Attorneys, LLC. Defense attorney is John A. Banahan of Bryan. Nelson, Schroeder, C astigiola & Banahan, PLLC, Pascagoula, Mississippi.

**Andre Baugh versus State Farm Fire and Casualty Company, in the United States District Court, Eastern District of Louisiana, Civil Action No.: 2-23-cv-02291, November 22, 2024.**

    **Deposition Testimony** in case involving Hurricane Ida damage to a two-story residence. Plaintiff attorney is Alex Dunn of Hair Shunnarah Trial Attorneys, LLC, Metairie, Louisiana. Defense attorneys are David A. Strauss and Meagham Jeansonne Norris of Strauss Massey Dinnenn, LLC, New Orleans, Louisiana.

**Karen Jane Allen and Gerald Glenn Allen, Plaintiffs, v. State Farm Lloyds, Defendant, in the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:24-cv-00352 Jury, November 19, 2024.**

    **Deposition Testimony** for plaintiff in case involving wind damage to a residential building and ensuing water damage. Plaintiff attorneys are Chad T. Wilson and Joseph Milensky, Chad T. Wilson Law Firm, Webster, Texas. Defense attorneys are Morgan Y. Bird and M. Micah Kessler of Nistico, Crouch & Kessler, PC, Houston, Texas.

1

**Murrary Valene and Radiation Protection Products, Inc. versus Louisiana Citizens Property Insurance Corporation, in the 24th Judicial District Court for the Parish of Jefferson, State of Louisiana, Docket No. 844-819, Division "H", November 15, 2024.**

**Deposition Testimony** in case involving Hurricane Ida damage to five commercial buildings. Plaintiff attorney is Ashley Schmidt of Hair Shunnarah Trial Attorneys, LLC, Metairie, Louisiana. Defense attorneys are Alan J. Yacoubian and Donald R. Klotz, Jr. of Johnson, Yacoubian & Paysse, New Orleans, Louisiana.

**Falls at Imperial Oaks HOA, Inc., Plaintiff, v. Ace American Insurance Company, Defendants, in the United States District Court for the Southern District of Texas, Houston Division, Civil Ac tion No. 4:23-cv-02982 (Jury), November 8, 2024.**

**Deposition Testimony** in case involving wind and hail damage to Homeowners Association buildings. Plaintiff attorneys are Chad Wilson and Jay S. Simon, Chad T. Wilson Law Firm, Webster, Texas. Defense attorney is Gregory S. Hudson of Cozen O'Connor, Houston, Texas.

**North Village Green Condominium Assoication, Inc., Plaintiff, v. Westchester Surplus Lines Insurance Company, Defendant, in the United State District Court, Southern District of Texas, Houston Division, Civil Action No. 4L24-cv-00961, November 6, 2024.**

**Deposition Testimony** in case involving wind and hail damage to seven residential condominium buildings. Plaintiff attorneys are Chad T. Wilson and Amanda Fulton of the Chad T. Wilson Law Firm, PLLC, Webster, Texas. Defense attorneys are Eric K. Bowers and Alexander Joseph Masotto of Zelle LLP, Dallas, Texas.

**William Myers v. State Farm Fire and Casualty Company, in the United States District Court, Middle District of Louisiana, Docket No. 23-01366, Judge: Shelly D. Dick, Magistrate Judge: Richard L, Bourgeois, Jr., October 24, 2024.**

**Deposition Testimony** for plaintiff in case involving hail damage to a laminated shingled residential roof. Plaintiff attorney is Alex Dunn, Jr. of Hair Shunnarah Trial Attorneys, LLC, Metairie, Louisiana. Defense attorneys are Darrin M. O'Connor and Ashley G. Haddad of Porteious, Hainkel & Johnson, Covington, Louisiana.

**Sonyia Byrd, Plaintiff, v. Atlantic Casualty Insurance Company, Defendant, in the United States District Court for the Northern District of Texas, Fort Worth Division, C.A. No. 4:24-cv-00437-P, October 21, 2024**

**Deposition Testimony** for plaintiff in case involving hail damage to insulation underlying a TPO membrane. Plaintiff attorney IS Van Shaw of Shaw Welch Powell, Dallas, Texas. Defence attorneys are Steven S. Reilly and Peter Thompson of Blue Williams, Houston, Texas.

**Deborah C. Sahuque and Louis R. Sahuque, III versus State of Louisiana through the Louisiana Stadium and Exposition District and SMG, in Civil District Court for the Parish of Orleans, State of Louisiana, No.: 2018-6473, Division: "L-6", October 16, 2024.**

**Deposition Testimony** for plaintiff in case involving a tripping hazard in the Superdome Parking Lot. Plaintiff attorneys are Perry W. Manning, Sr. of the Law Office of Perry W. Manning, Sr., Metairie, Louisiana and Christopher T. Whelen of Huber Thomas, New Orleans, Louisiana. Defense attorneys are Liz Murrill, Attorney General and Rene B. Pitre, Assistant Attorney General, Louisiana Department of Justice, LitigationDivision, New Orleans, Louisiana.

**Girish Patel vs. QBE Specialty Insurance Company, in United States District Court, Eastern District of Louisiana, Case No. 2.22-cv-03984-BSL-DPC, October 11, 2024.**

**Deposition Testimony** for plaintiff in case involving distinguishing between Hurricane Zeta damage and Hurricane Ida damage to a residential property. Plaintiff attorney is Thomas Myers of Hair Shunnarah Trial Attorneys, LLC, Metairie, Louisiana. Defense attorneys are Jared L. Shurman, Robert I. Siegel, Kristina V, Bison and William P. Worsely of Gieger, Laborde & Laperouse, LLC, New Orleans, Louisiana.

**In the Matter of Arbitration between: Waterville USA, Inc., Claimant, v. The Terminix International Company, L.P.m Joe Perkins, and Rhett Vaughn, Respondents, Baldwin County, Alabama Circuit Court, Case No. 05-CV-2021-900201.00, October 10, 2024.**

2

**Deposition Testimony** for plaintiff in case involving termite damage to five buildings and structures at a water park, including consideration for FEMA Substantial Damage 50% Rule. Plaintiff attorneys are Mary Beth Mantiply of Mantiply & Associates Law Firm, Montrose, Alabama and Tom O'Hara of O'Hara Watkins Law Firm, Daphne, Alabama. Defense attorneys are Reid Carpenter and James W. Gibson of Lightfoot, Franklin & White, LLC, Birmingham, Alabama.

**Elizabeth Molbert v. Kenko Bulkhead and Marine SVSC, LLC, et al, in the 14th Judicial District Court for the Parish of Calcasieu, State of Louisiana, No. 2018-1247, Division G, September 17-18, 8, 2024.**

**Trial Testimony** involving defective construction and ensuing collapse of a river bulkhead. Plaintiff attorney is Robert C. McCorquodale Stutes & Lavergne Law Firm, Lake Charles, Louisiana. Defense attorney is David J. Calogero, Lafayette, Louisiana. Judge is Honorable G. Michael Canady.

**Jimmy E. Creel and Gail L. Creel vs State Farm Lloyds, in the United States District Court, Southern District of Texas, Houston Division, C.A. No. 4:23-cv-02755 (Jury), September 5, 2024.**

**Deposition Testimony** for plaintiff in case involving hail damage to a residential roof. Plaintiff attorneys are Chad T. Wilson, Joseph Milensky and Brandon Schilter of the Chad T. Wilson Law Firm PLLC, Webster, Texas. Defense attorneys are Dale "Rett" Holidy and James A. Tatem, III of Germer PLLC, Houston, Texas.

**Shaikh Development, LLC d/b/a Carson Crest Apartments, and Carson Crest Apartments LLC d/b/a Carson Crest Apartments, Plaintiffs, vs. Axis Surplus Insurance Company, Defendant, in the United States District Court, Northern District of Alabama, Case No.: 2:23-CV-00215-NAD, July 12, 2024.**

**Deposition Testimony** for plaintiff in case involving windstorm damage to ten apartment buildings in Birminhgham, Alabama. Plaintiff attorneys are Steven W. Mullins of The Mullins Law Firm, LLC, Mobile, Alabama and Michael Duffy of Merlin Law Group, Tampa, Florida. Defense attorneys are Michael A. Montgomery and Samantha P. Wuschke of Butler Weinmuller Katz Craig LLP, Tampa, Florida.

**Dr. Kurt Gitter and Alice Yelen versus Privilege Underwriters Reciprocal Exchange ("Pure"), Lisa Vicknair, Hub International Gulf South Limited ("Hub"), and ABC Insurance Company, in the Civil District Court for the Parish of Orleans, State of Louisiana, Division "L-6", No. 2023-6989, Hurricane Case, July 10, 2024.**

**Deposition Testimony** for plaintiff in case involving damage to two residential buildings caused by Hurricane Ida. Plaintiff attorneys are Douglas K. Gitter, Attorney at Law, Metairie, Louisiana and Jake J. Weinstock, Cosse Law Firm, LLC, New Orleans. Defense attorneys are John W. Joyce, Laurence D. LeSueur, and Michael C. Gretchen of Barrasso, Usdin, Kupperman, Freeman & Sarver, LLC, New Orleans, Louisiana.

**Dorothy Rutley versus Rouse Custom Construction, a Limited Liability Company, Bryant Hammet & Associates, LLC and ABC Insurance Company, in the 24th Judicial District Court for the Parish of Jefferson, State of Louisiana, No. 826-600, Division "F", July 8, 2024.**

**Deposition Testimony** for plaintiff in case involving improper construction of a stairs resulting in personal injury. Plaintiff attorneys are Sean Reagan and Matthew McCarthy of Reagan Law Group, New Orleans, LA and Stephen Kreller of Kreller Law, New Orleans, LA. Defense attorneys are Kelley E. Theard, John Jerry Glas and Cartherine R. Filippi of Deutch Kerrigan, LLP, New Orleans, Louisiana.

**Gregory D. Hendrix & Sara Hendrix, Plaintiffs, v. State Farm Lloyds, Defendant in the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. H-23-2876, Jury, July 3, 2024.**

**Deposition Testimony** for plaintiff in case involving hail damage to a residential roof. Plaintiff attorneys are Chad T. Wilson and Joseph Milensky of the Chad T. Wilson Law Firm PLLC, Webster, Texas. Defense attorneys are M. Micah Kessler and Caitlin D. Coleman of Nistico, Crouch & Kessler, P.C., Houston, Texas.

**George Conwill versus Certain Underwriters at Lloyds London, in the United States District Court, Southern District of Mississippi, Cause No. 1:23cv348-TBM-RPM, June 28, 2024.**

3

**Deposition Testimony** for plaintiff in case involving storm damage to a residential property. Plaintiff attorneys are Shane P. Welch of Hair Shunnarah Trial Attorneys (now Fortius Law Group, PLLC, Washington, DC) and Gus Fontenot of Maples & Fontenot, LLP, Mobile, Alabama. Defense attorney is M. Garner Berry of Chartwell Law, Ridgeland, Mississippi.

**Christina Scalco versus Ochsner Clinic Foundation and/or Elmwood Fitness Center, 24**[th] **Judicial District Court for the Parish of Jefferson, State of Louisiana, No. 816-035, Division "N", June 18, 2024.**

**Deposition Testimony** for plaintiff in case involving a slip on a ceramic tile stairs adjacent to a swimming pool. Plaintiff attorneys are Kurt A. Offner and Ricardo "Rico" Alvendia of Alvendia, Kelly, Demarest, New Orleans, Louisiana. Defense attorneys are T. Gregory Schafer and Joseph L. Lowenthal, Jr. of Jones Walker, LLP, New Orleans, Louisiana.

**Norman Nguyen, Plaintiff, v. State Farm Lloyds and Eric Hume, Defendants, in the Judicial Court of Montgomery County, Texas, County Court at Law #6, Cause No. 23-07-09797, June 17, 2024.**

**Deposition Testimony** for plaintiff in case involving hail damage to a shingled roof. Plaintiff attorneys are Chad T. Wilson, Michael D. Jack and Brandon Shilter of the Chad T. Wilson Law Firm PLLC, Webster, Texas. Defense attorneys are M. Micah Kessler and Melanie D. Medina of Nistico, Crouch & Kessler, PC, Houston, Texas.

**Mark A. Hajda and Sheryl Hajda vs. State Farm Lloyds, in the United States District Court, Southern District of Texas, Houston Division, C.A. Bo. 4:23-cv-02475 (JURY), June 14, 2024.**

**Deposition Testimony** for plaintiff in case involving hail damage to a shingled roof. Plaintiff attorneys are Chad T. Wilson and Joseph Milensky of the Chad T. Wilson Law Firm PLLC, Webster, Texas. Defense attorneys are Dale M. "Rett" Hoidy and Jim Tatem of Germer PLLC, Houston, Texas.

**Faye Arnez, Plaintiff, v. United Services Automobile Association, Defendant, in the District Court of Montgomery County, Texas, 457**[th] **Judicial District, Cause No. 23-11-17207, June 5, 2024.**

**Deposition Testimony** for plaintiff in case involving hail damage to a shingled roof. Plaintiff attorneys are Chad T. Wilson and Joseph Milensky of the Chad T. Wilson Law Firm PLLC, Webster, Texas. Defense attorneys are Sarah J. Allen and Yara L. Calcano of Doyle, Restrepo, Harvin & Robbins, LLP, Houston, Texas.

**Carleton J. Shockman, Plaintiff, v. State Farm Lloyds, Defendant, in the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:22-cv-2020, Jury, May 23, 2024.**

**Deposition Testimony** for plaintiff in case involving hail damage to a shingled roof. Plaintiff attorneys are Chad T. Wilson and Joseph Milensky of the Chad T. Wilson Law Firm PLLC, Webster, Texas. Defense attorneys are M. Micah Kessler and Morgan Y. Bird of Nistico, Crouch & Kessler, P.C., Houston, Texas.

**Kim and Tung Le, Plaintiffs, v. State Farm Lloyds and Corey Hunt, Defendants, in the District Court of Dallas County, Texas, 160**[th] **Judicial District, Cause No. DC-23-08626, April 25, 2024**

**Deposition Testimony** for plaintiff in case involving building damage due to foundation movement caused by a plumbing leak. Plaintiff attorneys are Chad T. Wilson and Joseph Milensky of the Chad T. Wilson Law Firm PLLC, Webster, Texas. Defense attorneys are Susan E. Egeland, Matthew C. Sapp, Kristin L. Perry and Max Moran of Fargre, Drinker, Bidddle & Reath, LLP, Dallas Texas.

**Catherine S. Latino, wife of/and Joseph C. Latino, Jr. vs. Van's Transmissions, Inc. KTDN, LLC, Dung Van Nguyen, and Atlantic Casualty Insurance Company, in the Civil District Court for the Parish of Orleans, State of Louisiana, No. 2022-01537, Div. E., March 21, 2024.**

**Deposition Testimony** for plaitiff in a case involving a slip-and-fall at an Auto Repair facility. Plaintiff attorney is John A. Venezia of Venezia & Associates, New Orleans. Defense attorneys are Wade A, Langlois, III and Kaylyn Blosser Handy of Gaudry, Ranson, Higgins & Gremillion, LLC, Gretna, Louisiana.

4

**Amy Crain and Kenneth Crain, Plaintiffs, v. Bankers Standard Insurance Company and Benjamin Carey, Defendants, in the United States District Court for the Northern District of Texas, Fort Worth Division, Civil Action No. 4:23-cv-00710-O, March 20, 2024.**

    **Deposition Testimony** for plaintiff in a case involving wind and hail damage to a concrete tile roof and interior water damage. Plaintiff attorney is George B. Murr of Murr Law, PLLC, Houston, Texas. Defense attorneys are Eric K. Bowers and Claire . Fialcowitz of Zelle ZZP, Dallas, Texas.

**Ishavion Singleton as mother and next friend of K.S., a minor, Plaintif v. Carnival Corporation, Defendant in the United State District Court, Southern District of Florida, Case No. 1:23-cv-22421-JEM, March 19, 2024.**

    **Deposition Testimony** for plaintiff in case involving personal injury to a minor attempting to exist a waterslide facility on a Cruise ship. Plaintiff attorney is Peter G. Walsh of David W. Winger & Associates, PA, Hollywood, Florida., Defense attorneys are Michael J. Drahos and Ashley N. Geoese of GrayRobinson, P.A. of West Palm Beach, Florida.

**April Point South Property Owner's Association, Inc., Plaintiff, v. Third Coast Insurance Company, Defendant, in the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4.23-CV-02654 (Jury), March 15, 2024.**

    **Deposition Testimony** in case involving hail damage to 31 two-story condominium buildings. Plaintiff attorneys are Amada Fulton and Chad T. Wilson of the Chad T. Wilson Law Firm PLLC, Webster, Texas. Defense attorneys are Stephen R. Wedemeyer, Kail W. Hidalgo and Stephn E, Holombek of Shackelford, Bowen, McKinley & Norton, LLP, Houston, Texas.

**Danette Hagman vs. State Farm Lloyds, in the United States District Court, Southern District of Texas, Houston Division, C.A. No. 4-23-cv-00932 (Jury), March 14, 2024.**

    **Deposition Testimony** in case involving hail damage to a residential structure. Plaintiff attorneys are Chad T. Wilson and Joseph Milensky of the Chad T. Wilson Law Firm PLLC, Webster, Texas. Defense attorneys are Dale M. "Rett" Holidy, James A. Tatem and Rachel Crutchfield of Germer PLLC, Houston, Texas.

**Louise Hicks, Plaintiff v. State Farm Lloyds and David Munden, Defendants, in the County Court at Law, Navarro County, Texas, Cause No. C22-30468-CV, February 29, 2024.**

    **Deposition Testimony** in case involving wind and hail damage to a residential roof. Plaintiff attorneys are Chad T. Wilson and Joseph Milensky of the Chad T. Wilson Law Firm PLLC, Webster, Texas. Defense attorneys are Susan E. Egeland, Matthew C. Sapp and Max A. Moran of faegre, Drinker, Biddle & Reath, LLP, Dallas Texas.

**Kimberly Helton and Jefferson Helton, Plaintiffs, v. Certain Underwriters at Lloyd's, London, Defendants, in the United States District Court for the Southern District of Alabama, Mobile Division, Case No. 1:23-cv-00051-JB-MU, February 21, 2024.**

    **Deposition Testimony** in case involving Hurricane Sally wind versus flood damage to a residential structure. Plaintiff attorneys are Peter S. Mackey of Burns, Cunningham & Mackey, P.C., Mobile Alabama and F. Inge Johnstone of Johnstone Trial Law, LLC, Birmingham. Alabama. Defense attorneys are Carelton "Put" Ketcham, III and Graham R. Pulvere of Wilson, Elser, Moskowitz, Edelman & Dicker, LLP of Birmingham, Alabama.

**Lawrence and Laura Higley, Plaintiffs vs. State Farm Florida Insurance Company, Defendant, in the Circuit Court for the Seventh Judicial Circuit in and for Volusia County, Florida, Case No. 2022 30862 CICI, January 17, 2024, continued February 16, 2024.**

    **Deposition Testimony** in case involving damage to a residence and airplane hangar caused by Hurricanes Irma and Ian. Plaintiff attorney is Alex Pujol of the Merlin Law Group, Tampa, Florida. Defense attorneys are Burks A. Smith, III, Esq. and Limerly T, Van der Riet, Esq. of Traub, Lieberman, Straus & Shrewsberry LLP, St. Petersburg, Florida.

5

**Rosie Stasek (Hansen), Plaintiff, v. State Farm Lloyds, Defendant, in the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:22-CV-3833. February 8, 2024.**

**Deposition Testimony** in case involving hail damage to a residential roof. Plaintiff attorneys are Chad T. Wilson and Joseph Milensky of the Chad T. Wilson Law Firm, Webster, Texas. Defense Attorneys are M. Micah Kessler and Jazmine J. Ford of Nistico, Crouch & Kessler, PC, Houston, Texas.

**William E. Harris and Marian C. Harris, Petitioners, versus State Farm Fire and Casualty Compacy, Defendant, in the United States District Court, Eastern District of Louisiana, Civil Action No,: 2:23-cv-00040, January 24, 2024.**

**Deposition Testimony** in case involving Hurricane Ida damage to a residence in Luling, LA. Plaintiff attorneys are Stephen M. Huber and Christopher T. Whelen of Huber Thomas, New Orleans, Louisiana. Defense attorneys are Kellen J. Matthews, E. Gregg Barrios and Christopher D. Joseph, J. of Adams and Reese LLP of Baton Rouge, Louisiana.

**Houk Air Conditioning, Inc. DBA Houk Air Conditioning, 833 Street LLC DBA Houk Air Conditioning, Plaintiff v. The Cincinnati Insurance Company and Georrge Bahls II, Defendant. In the United States District Court for the Northern District of Texas, Fort Worth Division, January 15, 2024.**

**Deposition Testimony** in case involving freeze-and-thaw damage to a gravel BUR roof. Plaintiff attorneys are Chad T. Wilson, Amanda Fulton and Joseph Milensky of the Chad T. Wilson Law Firm, Webster, Texas. Defense Attorneys are Patrick M. Lemp and Robert G. Wall of Segal, McCambridge, Singer & Mahoney, Austin, Texas and David J. Metzler of Cowles & Thompson, PC, Dallas, Texas.

**Alison Pulliam and Jon Pulliam vs. United States Automobile Association d/b/a/ USAA, in the 23rd Judicial District Court for the Parish of Ascension, State of Louisiana, January 4, 2024.**

**Deposition Testimony** involving Hurricane Ida damage to a residence. Plaintiff attorney is Lindsey A. Topp of Hair Shunnarah Trial Attorneys, LLC. Defense attorneys are Francis H, Brown , II and Farren L. Davis of McGlinchey Stafford, New Orleans, Louisiana.

**Elizabeth Molbert v. Kenko Bulkhead and Marine SVSC, LLC, et al, in the 14th Judicial District Court for the Parish of Calcasieu, State of Louisiana, No. 2018-1247, Division G, November 8, 2023.**

**Deposition Testimony** involving defective construction and ensuing collapse of a river bulkhead. Plaintiff attorney is Robert C. McCorquodale Stutes & Lavergne Law Firm, Lake Charles, Louisiana. Defense attorney is David J. Calogero, Lafayette, Louisiana.

**Wiliam Douglas c/o The Havens Group, Inc., Plaintiff. v/ Landmark American Insurance Company, Defendant, in the United States District Court, Western District of Texas, Midland/Odessa Division, Civil Action No. 7.22-cv-167, November 2, 2023.**

**Deposition Testimony** in case involving wind and hail damage to a TPO roof membrane over polyiso board, LWC and steel deck. Plaintiff attorneys are Chad T. Wilson and Patrick C. McGinnis of Chad T. Wilson Law Firm, Webster, Texas. Defense attorneys are Jay W. Brown, Daniel P. Pellegrin, Jr. and Matthew Sullivan of Shacekelford, Bowen, McKinley & Norton, LLP, Houston, Texas.

**AVSD Productions, Plaintiff, vs. Massachusetts Bay Insurance Company, Defendant, in the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No.: 3-23-CV-00816-B, November 1 2023.**

**Deposition Testimony** in case involving hail damage to a PVC roof membrane on a commercial building. Plaintiff attorneys are Chad T. Wilson and Amanda J. Fulton of the Chad T. Wilson Law Firm, Webster, Texas. Defense attorney is Peri H. Alkas of Phelps Dunbar LLP, Houston, Texas.

**Qentan Tobolka and Sophia R. Tobolla, Paintiff v. Liberty Mutual Personal Insurance Company, Defendant, in the United States District Court for the Eastern District of Oklahoma, Civil Action No. 22-cv-347-RAW-JAR, October 19, 2023.**

6

**Deposition Testimony** in case involving hail damage to metal roof on residential building and storage facilities. Plaintiff attorney is Patrick C. McGinnis of Chad T. Wilson Law Firm, Webster, Texas. Defense attorneys are William W. O'Connor and Kristen P. Evans of Hall Estill, Attorneys at Law, Tulsa, Oklahoma.

**Carol Plate, Plaintiff v. State Farm Lloyds, Defendant, in the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:22-cv-03940, October 17, 2023.**

**Deposition Testimony** in case involving hail damage to a residential building and two storage buildings. Plaintiff attorneys are Chad T. Wilson and Joseph Milensky of the Chad T. Wilson Law Firm PLLC, Webster, Texas. Defense attorneys are M. Micah Kessler and Jazmine J. Ford of Nistico, Crouch & Kessler, P.C., Houston, Texas.

**Maria Vega, Plaintiff v. State Farm Lloyds, Defendant, in the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:22-cv-03561, October 16, 2023.**

**Deposition Testimony** in case involving a water pipe break due to freeze and interior water damage. Plaintiff attorneys are Chad T. Wilson and Joseph Milensky of the Chad T. Wilson Law Firm PLLC, Webster, Texas. Defense attorneys are M. Micah Kessler and Jazmine J. Ford of Nistico, Crouch & Kessler, P.C., Houston, Texas.

**David McGaha and Melissa B. McGaha versus Franklin Homes, Inc., Gulf Coast Mobile Homes, Inc,, Landry Mobile Home Transporters, Inc., and NTA, Inc. in the 25 Judicial District Court for the Parish of Plaquemines, State of Louisiana, No. 60, 788, Division "A", October 9, 2023.**

**Deposition Testimony** in case involving fraud and misrepresentation in the design, manufacture and sale of a modular home subsequently damaged during Hurricane Isaac. Plaintiff attorney is John Redmann of the Law Offices of John Redmann, Gretna, LA. Defense attorneys are Lamont Domingue of Voorhies & Labbe, Lafayette, LA and Alex J. Granier and Wayne R. Maldonado of Ungarino & Maldonado, Metairie, LA

**Benjamin Clabaugh and Kristin Stewart, Husband and Wife, Plaintiffs, v. Homeowners Choice Property & Casualty Insurance Company, Inc. Defendant, in the Circuit Court in and for Escambia County, Florida, Case Number: 2021 CA 002546, Division E, September 19, 2023.**

**Trial Testimony** in case involving Hurricane Sally damage to a residential dwelling and applicability of the FEMA 50% rule in Santa Rosa Island Authority jurisdiction. Plaintiff attorney is Steven J. Baker, Esq., Pensacola, Florida. Defense attorney is Michelle L. Hendrix of Vernis & Bowling of Northwest Florida, P.A., Pensacola, Florida. Judge is the Honorable Jan Shackelford.

**P. Juarez Enterpruses, L.L.C. D/B/A Golden Corral #938, Plaintiff, vs. Independent Specialty Insurance Company; Certain Underwriters at Lloyd's and other Insurers Subscribing to Binding Authority B6045105622021; and Kyle Morris Zapalac , Defendant, in the District Court of 94 Judivial District, Nueces County, Texas, Casue No. 2022DCV-3877-C, September 15, 2023.**

**Deposition Testimony** in case involving whether wind damage to a restaurant building was caused by Tropical Storm Nicholas in 2021 or Hurricane Harvey in 2017. Plaintiff attorney is George Murr of Murr Law P.L.L.C., Houston Texas, Defense attorneys are C. ustin Broome and Roy E. Lambert of Hermes Law, P.C., Dallas, Texas.

**Textile Properties. LLC, Plaintiff, v. Certain Underwriters at Lloyd's. London, Defendant, in the District Court of Harris County, Texas, 11 Judicial District, Cause No. 2021-41005, September 11, 2023.**

**Deposition Testimony** in case involving wind and hail damage to a commercial building with mod-bit roofing. Plaintiff attorneys are Chad T. Wilson and Amanda J. Fulton of the Chad T. Wilson Law Firm, Webster, Texas. Defense attorneys are Jay W. Brown, Hilary C. Borow and Savannah H. Benac of Shacelford, Bowen, McKinley & Norton, LLP, Houston, Texas.

**William Douglas and V Douglas, Plaintiffs, v. Covington Specialty Insurance Company, Defendant, in the United States District Court, Western District of Texas, Midland/Odessa Division, Civil Action No. 7:22-cv-00175, August 30, 2023.**

7

**Deposition Testimony** in case involving hail damage to a TPO covered metal roof at a Shopping Center. Plaintiff attorneys are Chad T. Wilson and Patrick C. McGinnis of the Chad T. Wilson Law Firm, Webster, Texas. Defense attorneys are Jay W. Brown, Matthew Sullivan and Gisela Aguilar of Shackelford, Bowen. McKinley & Norton, LLP , Dallas, Texas.

**Sally J. Reaves and Timothy Adams, Plaintiffs, v. Esurance Insurance Company, and Tracy Counasse, Defendants, in the District Court, 116th Judicial District, Dallas Count, Texas, Cause No. DC-21-15055, August 28, 2023.**

**Deposition Testimony** in case involving hail damage to a laminated shingled roof on a residential structure. Plaintiff attorney is Michael D. Jack of the Chad T. Wilson Law Firm, Webster, Texas. Defense attorney is Ryan Kelley of Lisa Chastain & Associates, Dallas, Texas.

**Darvin Tanner and Meisha Mizell, Plaintiffs v. State Farm Fire and Casualty Company, Defendant in the United States District Court for te Southern District of Mississippi, Southern Division, Civil Action No.:1:22cv322-HSO-RPM, June 30, 2023.**

**Deposition Testimony** in case involving Hurricane Zeta damage to a residential structure. Plaintiff attorneys are Lindsey Topp and Galen M. Hair, Hair Shunnarah Trial Attorneys, LLC, Metairie, LA. Defense attorneys are Calen J. Wills and Steven Mullen of Bryan, Nelson, Schroeder, Castigliola & Banahan, PLLC, Pascagoula., Mississippi.

**Rosie Hansen, Plaintiff v. State Farm Lloyds and Jorge Baca, Defendants, in the District Court of Harris County, Texas, 125th Judicial District, Cause No. 2022-53753, June 29, 2023.**

**Deposition Testimony** in case involving hail damage to a residential roof. Plaintiff attorneys are Joseph Milensky and Chad T. Wilson of the Chad T. Wilson Law Firm, Webster, Texas. Defense attorneys are M. Micah Kessler and Jaszime J. Ford of Nistico, Crouch & Kessler, Houston, Texas.

**Ella M. Koscik as trustee of the Ella M. Koscik Revocable Trust Agreement dated September 14, 2012, Plaintiff/Counter-Defendant, v. Compass Builders of Florida, LLC, a Florida Limited Liability Company, Defendant/Counter-Plaintiff, in the Circuit County of the First Judicial Circuit, in and for Walton County, Florida, Case No.: 2022-CA-124 (consolidated with Case No.: 2022-CA-136), June 26, 2023.**

**Deposition Testimony** in case involving construction defects and construction delay concerning the renovation of a condominium unit. Plaintiff attorney for Ms. Koscik is Daniel W. Uhlfelder, Esq. of Daniel W. Uhlfelder, P.A., Santa Rosa Beach, Florida. Defense attorney for Compass is Bruce P. Anderson of Bruce P. Anderson Law, Destin Florida.

**8300 Buckeye Delaware LLC, Plaintiff, v. UPS Supply Chain Solutions, Inc,; United Parcel Services of America, Inc. and UPINSCO, Inc., Defendants, in the United States District Court for the Northern District of Texas, Fort Worth Division, C.A. No. 4-22-cv-00726-O, June 22, 2023.**

**Deposition Testimony** in case involving hail damage to a TPO covered roof. Plaintiff attorney is Ryan K. McComber of Figan + Davenport, LLP, Dallas, Texas.   Defense attorneys are Diana Brooks and Shayla Smith of Diana Brooks Law PLLC, McKinney, Texas.

**Flemming Hoff, Plaintiff, v. Meridian Security Insurance Company and Brandon Cormier, Defendants, in the United States District County for the Southern District of Texas, Houston Division, Civil Action No: 4:23-cv-00041, June 15, 2023.**

**Deposition Testimony** in case involving hail damage to a residential roof. Plaintiff attorneys are Joseph Milensky and Chad T. Wilson of the Chad T. Wilson Law Firm, Webster, Texas. Defense attorney is Patrick M. Kemp of Segal, McCambridge, Singer & Mahoney, Austin, Texas.

**Mary Duran vs. TMA, C&P, LLC and ABC Insurance Company in the 19th Judicial District Court for the Parish of East Baton Rouge, Docket No.: C-688998, Division : "22", April 4, 2023.**

**Deposition Testimony** in case involving misstep at a one-step stair. Plaintiff attorneys are John W. Redmann and Kelly Rizzo of the Law Offices of John W. Redmann, LLC, Gretna, Louisiana. Defense attorneys are Daniel R.

8

Atkinson, Jr., Julie E. Vaicius and Eerin O. Braud of the Law Offices of Julie E. Vaicius, Metairie, Louisiana and Roy Maughan. Jr. and Connor Thomas of the Maughan Law Firm, Baton Rouge, Louisiana

**Nicholas Cooner v. State Farm Fire & Casualty Company, Case No. 619-8243, Shreveport, Louisiana, March 29, 2023.**

**Deposition Testimony** in case involving hail damage to an asbestos-shingle roof. Plaintiff attorneys are Gretchen Lilejerg Casey and Galen M. Hair, Hair Shunnarah Trial Attorneys, LLC, Metairie, LA. Defense attorney is Sarah Eits Assad of Casten & Pearce, APLC, Shreveport, Louisiana.

**Lily Howard vs. Super 2 Foods and/or Brookshire Grocery Company, John Doe and ABC Insurance Company, Case Number 6:22-cv-1482 in the United States District Court, Western Division of Louisiana, Lafayette Division, March 14, 2023.**

**Deposition Testimony** in case involving slip-and-fall on a wet floor in a grocery store. Plaintiff attorneys are Cassie P. Gailmor and Kurt A. Offner of Alvendia, Kelly and Demarest, LLC, New Orleans, Louisiana. Defense attorneys are Franklin "Drew" Hoffman and Laura Beth "LB" Matthews of Faircloth, Melton, Sobel & Bash, LLC of Alexandria, Louisiana.

**Leland Broussard and Gerry Broussard versus State Farm Fire and Casualty Company, in United States District Court, Western District of Louisiana, Civil Action No.: 2-21-cv-03322, Judge: James D. Cain, Jr., Magistrate Judge: Kathleen Kay, March 9, 2023.**

**Deposition Testimony** in case involving Hurricane Laura damage to a one-family residence in Lake Charles, Louisiana. Plaintiff attorney is Asley Schmidt of Insurance Claim HQ; Hair Shunnarah Trial Attorneys; Insurance Claim Lawyers, Inc., Metairie, Louisiana. Defense attorneys are Robert Peyton, Peter J, Wayne and Megan T. Jaynes of Wanek Kirsch Davies, LLC , New Orleans, Louisiana.

**Charna Williams and Brandon Williams, Plaintiffs v. State Farm Fire and Casualty Company, Defendant, in the United States District Court for the Southern District of Alabama, Southern Division, Case No. 22-cv-112-KD-B, February 16, 2023.**

**Daubert Hearing** in case involving wind-caused damage to a residence during Hurricane Zeta. Plaintiff attorney is Stephen Mullins, Esq. of the Mullins Law Firm, LLC, Mobile, Alabama. Defense attorneys are Samantha N. Gunnoe and Thomas Ryan Luna of Hemsing, Leach, Herlon, Newman & Rouse, PC, Mobile, Alabama. Judge is the Honorable Kristi K. DuBose. Motion to Exclude Testimony of Plaintiff's Expert Neil B. Hall by State Farm Fire and Casualty Company was denied.

**Terry Sesvold and Carglyn Sesvold, Plaintiff v. First Protective Insurance Company, d/b/a Frontline Insurance, in the Circuit Court of the 16   Judicial Circuit in and for Monroe County, Florida, Case No. 19 CA 44 M, January 21, 2023.**

**Deposition Testimony** in case involving Hurricane Irma wind versus flood damage to a residence in the Florida Keys. Plaintiff attorney is William C. Harris of the Merlin Law Group, PA, Tampa, Florida. Defense attorney is Jay M. Levy, Esq. of Jay M. Levy, P.A., Miami, Florida.

**Alice Ladkin, Plaintiff v. State Farm Farm Lloyds, Defendant, in the District Court of Tarrant County, Texas 96th   Judicial District, Cause No. 096-2=324346-21, January 10, 2023.**

**Trial Testimony** in case involving wind and hail damage to a residential roof. Plaintiff attorneys are Chad Wilson and Jay S. Simon, Chad T. Wilson Law Firm, Webster, Texas. Defense attorneys are Rachel E. Wall and Gem Jones of Nistico, Crouch & Kessler, PC , Houston, Texas. Judge is the Honorable J. Patrick Gallagher.

**Christopher Irving vs Meridian Security Insurance Company, et al, in the United States District Court, Northern District of Texas, Fort Worth Division, Civil Action No. 4:21-cv-1341, January 9, 2023.**

**Trial Testimony** in case involving hail damage to a residential metal roof. Plaintiff attorneys are Evan Lane "Van" Shaw and Jeremy B. "Beau" Powell of the Law Offices of Van Shaw, Dallas, Texas. Defense attorney is Clinton J. Wolbert of Phelps Dunbar, LLP, Houston, Texas. Judge is the Honorable Reed O'Connor.

9

**New Hope Missionary Baptist Church: The Vision Center, Plaintiff vs. Church Mutual Insurance Company and David Gosnell, Defendants in the Circuit Court of Adams County, Mississippi, Civil Action No. 19-KV-0075-B, January 4, 2023.**

      **Deposition Testimony** in case involving wind and hail damage to metal and shingle roofs. Plaintiff Attorney is Michelle C. Le of the Law Offices of Michelle C. Le, PLLC, San Antonio, Texas. Defense Attorneys are Walter H. Boone and Donald Alan Windham, Jr. of Balch & Binham, Jackson, Mississippi.

**Benjamin Clabaugh and Kristin Stewart, Husband and Wife, Plaintiffs, v. Homeowners Choice Property & Casualty Insurance Company, Inc. Defendant, in the Circuit court in and for Escambia County, Florida, Case Number: 2021 CA 002546, Division E, December 16, 2022.**

      **Deposition Testimony** in case involving Hurricane Sally damage to a residential dwelling and applicability of the FEMA 50% rule in Santa Rosa Island Authority jurisdiction. Plaintiff attorney is Steven J. Baker, Esq., Pensacola, Florida. Defense attorney is Michelle L. Hendrix of Vernis & Bowling of Northwest Florida, P.A., Pensacola, Florida.

**Pavarti Lodging, LLC, Claimant, v. Certain Underwriters at Lloyd's London, Indian Harbor Insurance Co., QBE Specialty Insurance Co., Steadfast Insurance Co., General Security Indemnity Co. of Arizona, United Specialty Insurance Co., Lexington Insurance Co., Safety Specialty Insurance Co., Old Republic Union Insurance Co., Respondents, voluntary deposition for Formal Arbitration, December 2, 2022.**

      **Deposition Testimony** in pre-litigation case involving Hurricane Sally structural damage to roof trusses in a commercial hotel. Attorney for Claimant is Eric Dickey, Williams Law, Tampa, Florida. Attorneys for Respondents are J. Michael Frimley, Jr. and William K. Johnson of Galloway, Johnson, Tompkins, Burr & Smith, PLC, Fort Lauderdale, Florida.

**Mohamed Bakri, Plaintiff vs. Nautilus Insurance Company, Defendant, in the United States District Court of the Northern District of Texas, Dallas Division, Case No. 3:21-cv-02001-N, November 1, 2022.**

      **Deposition Testimony** in case involving wind and hail damage to six commercial buildings. Plaintiff attorneys are Chad T. Wilson, Patrick McGinnis and Boone Moyle of Chad T. Wilson Law Firm, Webster, Texas. Defense attorneys are Randall G. Walters and Brad Dickens of Walters, Balido & Crain, LLP, Dallas, Texas.

**Charna Williams and Brandon Williams, Plaintiffs v. State Farm Fire and Casualty Company, Defendant, in the United States District Court for the Southern District of Alabama, Southern Division, Case No. 22-cv-112-KD-B, October 28, 2022.**

      **Deposition Testimony** in case involving wind-caused damage to a residence during Hurricane Zeta. Plaintiff attorney is Stephen Mullins, Esq. of the Mullins Law Firm, LLC, Mobile, Alabama. Defense attorneys are Samantha N. Gunnoe and Thomas Ryan Luna of Hemsing, Leach, Herlon, Newman & Rouse, PC, Mobile, Alabama.

**Kelly Bienvenu, Plaintiff versus Family Dollar, Inc., Family Dollar Stores of Louisiana. Inc., John Doe an d ABC Insurance Company, in the United States District Court, Eastern District of Louisiana, Civil Action No.: 21-2329, October 18, 2022.**

      **Deposition Testimony** for plaintiff in case involving a trip and fall over a pallet in a retail store. Plaintiff attorneys are Cassie P. Gailmor and Roderick "Rico" Alvendia of Alvendia, Kelly and Demarest, LLC, New Orleans, Louisiana. Defense attorneys are Jack E. Truitt, Michelle Mayne Davis, Laureen A. Duncan and Kaylin K. Storey of The Truitt Law Firm, Covington, Louisiana.

**Wanda Herrington versus DG Louisiana, L.L.C. dba DollarGeneral Store No. 14815, John Doe, and ANC Insurance Company, in the United States District Court, Eastern District of Louisiana, Case No. 2:22-cv-1034, October 14, 2022.**

      **Deposition Testimony** for plaintiff in case involving slip and fall on a polished concrete floor in a retail store. Plaintiff attorneys are Cassie P. Gailmor and Roderick "Rico" Alvendia of Alvendia, Kelly and Demarest, LLC, New Orleans, Louisiana and Joseph B. Rochelle of The Law Office of Joseph Rochelle, Destrehan, Louisiana. Defense attorney is Trevor C. Davies of Wanek, Kirsch and Davies, New Orleans, Louisiana.

**Martin Frey vs. Inland Buildings, Schulte Building Systems, Inc. and Michael J. Gurley, PE, Arbitration Hearing, October 4, 2022.**

        **Formal Arbitration Testimony** for plaintiff in case involving design errors and omissions and improper designation of Engineer of Record for the fabrication and construction of a metal building. Plaintiff attorneys are John Bowlin and Brittany Schuchmann of Watson, Bowlin and Callender, PLLC.

**Phillips Food Mart A&M Group, Inc. d/b/a & Abed Ammouri. Plaintiffs v. Atain Specialty Insurance Company, Defendant, in the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:21-cv-2088, September 16, 2022.**

        **Deposition Testimony** in case involving wind and hail damage to the roof and coolers of a convenience store. Plaintiff attorneys are Chad T. Wilson, Patrick McGinnis and Vickers Cunningham of Chad T. Wilson Law Firm, Webster, Texas. Defense attorneys are Michael D. Feller, Matt R. Pickelman and Jonathan A. Lautin of Quilling, Selander, Lownds, Winslett & Moser, PC, Dallas, Texas.

**Christopher Irving vs Meridian Security Insurance Company, et al , in the United States District Court, Northern District of Texas, Fort Worth Division, Civil Action No. 4:21-cv-1341. August 31, 2022.**

        **Deposition Testimony** in case involving hail damage to a residential metal roof. Plaintiff attorneys are Evan Lane "Van" Shaw and Jeremy B. "Beau" Powell of the Law Offices of Van Shaw, Dallas, Texas. Defense attorney is Clinton J. Wolbert of Phelps Dunbar, LLP, Houston, Texas.

**3003 Moffitt, Inc., Plaintiff v. Westchester Surplus Lines Insurance Company and Athai Lac, Defendants, in the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:21-cv-02073, August 3, 2022.**

        **Deposition Testimony** in case involving roof and interior damage to a commercial building during Tropical Storm Imelda. Plaintiff attorneys are Chad Wilson and Amanda Fulton, Chad T. Wilson Law Firm, Webster, Texas. Defense attorneys are Frank A. Piccolo and Caroline T. Webb of Chafe McCall, LLP, Houston, Texas.

**In the Arbitration of Pathway Ventures Ltd, Claimant vs. United Specialty Insurance Company, Interstate Fire & Casualty Company, and Certain Underwriters at Lloyd's, London, Respondents, July 27, 2022.**

        **Deposition Testimony** in case involving 15 low-slope roofs with concrete decks and BUR and mod-bit coverings damaged by Hurricane Irma.. Plaintiff attorneys are Ken Lakin and Tracy Kramer of the Lakin Law Firm, LLC, Miami, Florida. Defense attorneys are Vincent P. Beilman, III, Richard M. Singer and J. Bret Morace of Wood, Smith, Henning & Berman, LLP, Boca Raton, Florida.

**Alice Ladkin, Plaintiff v. State Farm Lloyds, Defendant, in the District Court of Tarrant County, Texas 96th Judicial District, Cause No. 096-2=324346-21, July 8, 2022.**

        **Deposition Testimony** in case involving wind and hail damage to a residential roof. Plaintiff attorneys are Chad Wilson and Jay S. Simon , Chad T. Wilson Law Firm, Webster, Texas. Defense attorneys are Rachel E. Wall and Gem Jones of Nistico, Crouch & Kessler, PC , Houston, Texas.

**Sari David-Lange, Plaintiff, vs. Safeco Insurance Company of Indiana and Jerry Leon Palmer, Defendants, in the United States District Court for the Northern District of Texas, Abilene Division, Civil Action No. 1:21-cv-00080-C, June 23, 2022.**

        **Deposition Testimony** in case involving wind and hail damage to a metal roof attached to SIP panels on a residential dwelling.  Plaintiff attorneys are Chad Wilson and Patrick McGinnis, Chad T. Wilson Law Firm, Webster, Texas. Defense attorneys are Mark D. Tillman and Colin Bathelor of Tillman Batchelor, LLP, Irving Texas.

**Charles and Cheryl James, Plaintiffs, v. Allstate Vehicle and Property Insurance Company, Defendant, in the United States District Court, Southern District of Texas, Houston Division, Civil Action No.: 4-21-cv-01814, June 3, 2022.**

11

**Deposition Testimony** in case involving wind and hail damage to a residential dwelling. Plaintiff attorneys are Chad Wilson and Amanda Fulton, Chad T. Wilson Law Firm, Webster, Texas. Defense attorneys are Susan E. Egeland, Sara E, Iman, Samuel T. Scott, Jr. and Kristin Perry, Fargre, Drinker, Biddde & Reath, LLP, Dallas Texas.

**Kenneth Kessler, Plaintiff, v. Allstate Fire and Casualty Insurance Company and William Van Mason, Defendants, in the District Court of Tarrant County, Texas 153 Judicial Court, Cause No. 153-322887-21, June 2, 2022.**

**Deposition Testimony** in case involving wind and hail damage to a residential dwelling. Plaintiff attorneys are Chad Wilson and Patrick C. McGinnis, Chad T. Wilson Law Firm, Webster, Texas. Defense attorneys are Susan E, Egeland, Sara E, Iman, Samuel T. Scott, Jr. and Kristin Perry, Fargre, Drinker, Biddde & Reath, LLP, Dallas Texas.

**Mitchell Holzer vs. State Farm Lloyds and Matthew Bonner, in the District Court for Fort Bend County, Texas, 458th Judicial District, Cause No, 19-DCV-264085, May 10, 2022.**

**Trial Testimony** in case involving hail damage to an asphalt shingle roof. Plaintiff attorneys are Armanda Fulton and Chad T. Wilson of the Chad T. Wilson Law Firm, PLLC, Webster, Texas. Defense attorneys are Dale M. "Rett" Holiday and James A. Tatem of Germer PLLC, Houston, Texas. Judge is Honorable Robert Rolnick.

**Upper Padre Partners, Ltd v. Texas Windstorm Insurance Association, in the District Court of Nueces County, Texas, 319 Judicial District, Cause No. 2020DCV0-916-G, April 26, 2022.**

**Trial Testimony** in a case involving Hurricane Harvey damage to the Schlitterbahn Corpus Christi Waterpark resort hotel and amusement rides. Plaintiff attorneys are Andrew Mytelka, Angue Olalde and Chelsi Honeycutt of Greer, Herz & Adams, LLP, League City, Texas. Defense attorneys are Andrew T. McKinney, IV, Tory F. Taylor and Allison Hooker of McKinney Taylor, PC, Houston, Texas. Judge is the Honorable David Stilth.

**Northstar Hotels Group, Inc. and Spring Somerset Holding, LLC vs The Hartford Mutual Insurance Company, Superior Court of New Jersey, Law Di vision, Somerset County, Docket No, SOM-L-330-20, April 12, 2022.**

**Deposition Testimony** in case involving freeze-and-thaw damage to a gravel-cover BUR. Plaintiff attorney is Travis A. Gold of the Law Offices of Gold & Gold, Hatboro, PA. Defense attorney is Gregory C. Kunkle, Esq. of Thomas, Thomas & Hafer, LLP, Hampton, NJ.

**Carol D. Clemans and Warren E, Clemans versus The Board of Directors of the Louisiana State Museum, in Civil District Court for the Parish of Orleans, State of Louisiana, Division "G", No. 18-1347, Section 11, April 6, 2022.**

**Deposition Testimony** in case involving slip on a stair tread. Plaintiff attorney is William A. Barousse of The Voorhies Law Firm, New Orleans, Louisiana. Defense attorneys are Andre C. Gaudin and Brandi F. Ermon of Burglass & Tankerseley, LLC of Metairie, Louisiana (for Friends of the Cabilido, Inc.) and Courtney H. Payton, Assistant Attorney General, Louisiana Department of Justice (for the State of Louisiana through the Board of Directors of the Louisiana State Museum).

**Larry and Deanna Friedrich, Plaintiffs, v. Allstate Vehicle and Property Insurance Company, et al., Defendants, in the United States District Court, Southern District of Texas, Houston Division, Civil Action No. 4-20-cv-03510, March 10, 2022.**

**Deposition Testimony** in case involving hail damage to an asphalt shingled roof. Plaintiff attorneys are Chad T. Wilson and Amanda Fulton of the Chad t. Wilson Law Firm, LLC, Webster, Texas. Defense attorneys are Susan E. England and Sara E. Inman of Faegre, Drinbker, Biddle & Reath, LLP, Dallas, Texas.

**Earnest Hill v. Liberty Mutual Insurance Company and Michael Eric Butts, in the District County of Harris County, 80 Judicial District Court, Cause No. 2019-77920, January 18, 2022.**

**Deposition Testimony** in case involving water damage from a plumbing leak. Plaintiff attorneys are Patrick McGinnis and Joseph Milensky of the Chad T. Wilson Law Firm, LLC, Webster, Texas. Defense attorneys are Kamy Schiffman and J, Mark Kressenberg of Thompson, Coe, Cousins & Irons, LLP, Houston Texas.

12

—

**Upper Padre Partners, Ltd v. Texas Windstorm Insurance Association, in the District Court of Nueces County, Texas, 319 Judicial District, Cause No. 2020DCV0-916-G, December 16, 2021.**

    **Deposition Testimony** in a case involving Hurricane Harvey damage to the Schlitterbahn Corpus Christi Waterpark resort hotel and amusement rides. Plaintiff attorneys are Joe A.C. Fulcher, Angue Olalde and Chelsi Honeycutt of Greer, Herz & Adams, LLP, League City, Texas. Defense attorneys are Andrew T. McKinney, IV, Tory F. Taylor and Allison Hooker of McKinney Taylor, PC, Houston, Texas.

**Israel Robinson, et al v. Willowbrook Apartments Partnership, et al, in the Civil District Court of Orleans Parish, Louisiana, Case No. 2018-406, November 19, 2021.**

    **Deposition Testimony** in a case involving a drowning fatality in a retention pond. Plaintiff attorneys are Jason P. Franco and Daryl A. Gray of Wright & Gray, New Orleans, Louisiana. Defense attorneys are Jamie F. Landry and Cynthia G. Sonnier of Lewis, Brisbois, Bisgaard & Smith, LLP, Lafayette, Louisiana.

**Dana C. Palmer, Plaintiff v. Tower Hill Signature Insurance Company, Defendant in the Circuit Court of the Fourteenth Judicial Court in and for Bay County, Florida, Case No. 19003118CA, November 16, 2021.**

    **Trial Testimony** in case involving wind and ensuing water damage to a house caused by Hurricane Michael. Plaintiff attorneys are Javier Delgado and W. Anthony Loe of the Merlin Law Group, West Palm Beach, Florida. Defense attorney was Todd LaDouceur of Galloway, Johnson, Tompkins, Burr and Smith, PLC, Pensacola, Florida. Judge was the Honorable William S. Henry.

**James A. and Gail M. Macari, Plaintiffs, v. Liberty Mutual Insurance Company and David James Meaders, Defendants, in the District Couty of Harris County, 333 Judicial District, Case No. 2019-56484, November 9, 2020.**

    **Deposition Testimony** in case involving water (plumbing) and insect damage to a residential dwelling. Plaintiff attorneys are Chad T. Wilson and Donald C. Green ,II of the Chad T. Wilson Law Firm, LLC, Webster, Teas. Defense attorneys are J. Mark Kressenberg and Kamy Schiffman of Thompson, Coe, Cousins & Irons, LLP, Houston, Texas.

**Nelida Dominguez and Juan Marba, Plaintiffs, v/ Allstate Vehicle and Property Insurance Company and Donnie Joe Mercantel,Defendants, in the United States District Court, Southern District of Texas, Houston Division, Civil Action No.: 4:20-CV-03464, October 7, 2021.**

    **Deposition Testimony** in case involving damage caused by a commercial explosion. Plaintiff attorneys are Plaintiff attorneys are Chad T. Wilson and Armanda J. Fulton of the Chad T. Wilson Law Firm, LLC, Webster, Texas. Defense attorneys are Susan E. Egeland and Sara E. Inman of Faegre, Drinker, Biddle & Relath LLP, Dallas, Texas.

**Aaron Puckett, Plaintiff, v. State Farm Lloyds, Defendant, in the District Court of Tarrant County, Texas, 342 Judicial District, Cause No. 342-307000-19, September 15-16, 2021.**

    **Trial Testimony** for plaintiff in case involving wind and hail damage to a residential roof. Plaintiff attorneys are Chad T. Wilson and Armanda J. Fulton of the Chad T. Wilson Law Firm, LLC, Webster, Texas. Defense attorneys are Michael Klein and Travis Plummer of Dykema Gossett, Austin, Texas. Judge is Honorable Kimberly Fitzpatrick.

**Nelson and Alicia Juarbe, Plaintiffs v. Allstate Vehicle and Property Insurance Company, et. al., Defendants, in United States District Court, Southern District of Texas, Houston District, Civil Action No.: 4-20-CV-01035, August 26, 2021.**

    **Deposition Testimony** in case involving hail damage to a laminated asphalt singled roof. Plaintiff attorneys are Chad T. Wilson and Amanda Fulton of the Chad T. Wilson Law Firm, PLLC, Webster, Texas. Defense attorneys are Susan E. Egeland, Sara E. Inman and Harden H.. Brown of Faegre, Drinker, Biddle & Reath, LLP, Dallas Texas.

**Linda Veach, Plaintiff, v. State Farm Lloyds, Defendant, in the United States District Court, Northern District of Texas, Dallas Division, Civil Action No. 3:19-CV-2312-S, August 24, 2021.**

    **Trial Testimony** for plaintiff in case involving hail damage to an asphalt shingled roof.  Plaintiff attorneys are Chad T. Wilson and Robert House, Chad T, Wilson Law Firm, PPLC, Webster, Texas. Defense attorneys are Michael Klein and Travis Plummer of Dykema Gossett, Austin, Texas. Magistrate Judge is Honorable Rebecca Rutherford.

13

**Mark Lowry and Venessa Lowry, Plaintiffs vs John Thomas Whiddon, Surflife Investments, LLC, Destin Exclusive Real Estate, LLC, Johnny D. Harris, and Hourglass Home Inspections, Inc. in the Circuit Court of the First Judicial Circuit, in and for Walton County, Florida, Case No. 20-CA-112.**

**Deposition Testimony** in case involving shoddy and defective workmanship, misrepresentations and incomplete home inspection of house purchased by Plaintiffs. Plaintiff attorneys are Daniel W. Uhlfelder and Scott J. Welnerof Daniel W. Uhlfelder., P.A, Santa Rosa Beach, FL. Defense attorneys are A . Benjamin Gordon and Jonathan V. Schlechter of AnchorsGordon, P.A., Fort Walton Beach, FL and Michael J. DeCandio of Marshall, Dennehey, Warner, Coleman & Goggin, P.C., Jacksonville, FL.

**Hugh D. Mauldin, Jr. and Marian M. Mauldin, Plaintiffs v. United Services Automobile Association and Cooper Ogle, Defendants in the Judicial Court of Montgomery County, Texas, 284 Judicial District Court, Cause No. 21-01-00289.**

**Deposition Testimony** in case regarding hail damage to a laminated shingle roof. Plaintiff attorneys are Chad T. Wilson and Amanda Fulton of the Chad T. Wilson Law Firm, PLLC, Webster, Texas. Defense attorneys are Lisa A. Songy, Jeffrey S. Valliere and Genesis M. Reed of Tollefson, Bradley, Mitchell & Melendi, LLP, Dallas, Texas.

**Bobby McArthur Bell, Jr. and Keyya Bell, Plaintiffs, vs. American Security Insurance Company, Defendant, in the United States District Court, Eastern District of Arkansas, Central Division, Case No. 4:20-CV-00276-JM, May 7, 2021.**

**Deposition Testimony** in case regarding flood damage to residence. Plaintiff attorney is David A. Hodges, Esq., Law Office of David Hodges, Little Rock, Arkansas. Defense attorney is Michael Heister, Esq., Quattlebaum, Grooms & Tull, PLLC, Little Rock, Arkansas.

**LN Parkwood Company, Plaintiff, vs. Texas Farmers Insurance Company, Defendant, in the United States District Court, Southern District of Texas, Houston Division, Case No. 4:18-cv-04219, December 18, 2020.**

**Trial Testimony** in case regarding flood damage to 78 residential homes in Houston, Texas. Plaintiff attorneys are Rajan Pandit, John D. Carter and Henry J. Roth of the Pandit Law Firm, New Orleans, Louisiana. Defense attorneys are Joseph J. Aguida, Jr. and Bradley K. Jones of Nielsen & Treas, LLC, New Orleans, LA and Houston, TX. Judge is Hon. Lee H. Rosenthal. (Case settled after being sworn in and prior to testimony).

**Shihab M. Diais and Khalwa A. Diais, Plaintiff, v. Liberty Mutual Insurance Company, Defendant, in the United States District Court, Western District of Texas, Midland/Odessa Division, Cause No. 7:20-CV-00008, April 19, 2021.**

**Deposition Testimony** for plaintiff in case involving hail damage to a residential metal roof. Plaintiff attorneys are Chad T. Wilson and Patrick C. McGinnis of the Chad T. Wilson Law Firm, PLLC, Webster, Texas. Defense attorney is Daniel H. Hernandez of Ray, Pena, McChristian PC, El Paso, Texas.

**Succession of Arthur Russell, et al v. State Farm Fire & Casualty Company; No. 623,316 – B; 1st JDC, Caddo Parish, Louisiana, April 14, 2021.**

**Deposition Testimony** for plaintiff in case involving hail damage to a residential metal roof. Plaintiff attorneys are Joseph F. LaHatte, III of LaHatte Law Firm, LLC, Metairie, LA and Galen M. Hair, Hair Shunnarah Trial Attorneys, LLC, Metairie, LA. Defense attorney is Marshall R. Peace, Casten & Pearce, Shreveport, Louisiana.

**Tri Nguyen and Minh Lam vs. Allstate Texas Lloyd's, Jarrod Michael Dorion, and Quan Hong Pham; in the 295th Judicial District of Harris County, Texas, Cause No. 2017-07517, June 29, 2018.**

**Trial Testimony** for plaintiff in case involving wind and hail damage to a residential dwelling. Plaintiff attorneys are Amanda Fulton and Chad T. Wilson of the Chad T. Wilson Law Firm, PLLC, Webster, Texas. Defense attorney is John M. Causey of Hope & Causey, P.C., Conroe, Texas. Judge is Honorable Donna Roth.

14

**Rodney Luneau and Shannon Luneau versus Sports Plus, LLC, Siomon Cho, 828 Canal, LLC, and Nationwide Mutual Insurance Company, in the Civil District Court for the Parish of Orleans, State of Louisiana, No. 2018-10339, Division "C-10", March 26, 2021.**

**Deposition Testimony** in case involving slip on a commercial building staircase. Plaintiff attorneys are John W. Redmann and Kelly Rizzo of the Law Offices of John W. Redmann, LLC, Gretna, Louisiana. Defense attorneys are Mark E. Young and Meredith R. Durham of Plauche, Maseilli, Parkerson LLP, New Orleans, Louisiana.

**Henry & Karen Maly, Plaintiffs, v. State Farm Lloyds and Naaman Canada, Defendants, in the District Court of Montgomery County, Texas, 284th Judicial District, Cause No. 20-06-07172, March 6, 2021.**

**Deposition Testimony** in case involving wind and hail damage to residence. Plaintiff attorneys are Jeremiah Jones and Chad T. Wilson of the Chad T. Wilson Law Firm, PLLC, Webster, Texas. Defense attorneys are Jazimine J. Ford, Tyffeni Nguyen, Gwen Hills and M. Micah Kessler of Nistico, Crouch & Kessler, PC, Houston, Texas.

**Sea Gulls Condo Association, Inc. vs. Arch Specialty Insurance Company, Sworn Statement in Examination under Oath (Part Two), March 2, 2021.**

**Examination under Oath** concerning Hurricane Irma damage to a Condominium building in the Florida Keys. Attorney representing Sea Gulls is Kelly Kubiak of the Kubiak Law Group, PLLC, Tampa, Florida. Attorney representing Arch Specialty Insurance Company is Janice C. Buchman, Esq. of Butler, Weihmuller, Katz and Craig, LLP, Tampa, Florida.

**Sea Gulls Condo Association, Inc. vs. Arch Specialty Insurance Company, Sworn Statement in Examination under Oath (Part One), February 17, 2021.**
**Examination under Oath** concerning Hurricane Irma damage to a Condominium building in the Florida Keys. Attorney representing Sea Gulls is Kelly Kubiak of the Kubiak Law Group, PLLC, Tampa, Florida. Attorney representing Arch Specialty Insurance Company is Janice C. Buchman, Esq. of Butler, Weihmuller, Katz and Craig, LLP, Tampa, Florida.

**Mitchell Holzer vs. State Farm Lloyds and Matthew Bonner, in the District Court for Fort Bend County, Texas, 240th Judicial District, Cause No, 19-DCV-264085, February 26, 2021.**

**Deposition Testimony** in case involving hail damage to an asphalt shingled roof. Plaintiff attorneys are Armanda Fulton and Chad T. Wilson of the Chad T. Wilson Law Firm, PLLC, Webster, Texas. Defense attorneys are Dale M. "Rett" Holidy and James A. Tatem of Germer PLLC, Houston, Texas.

**Kristina Niles, Plaintiff, v. Texas Farmers Insurance Company, Defendant, in the United States District Court, Southern District of Texas, Houston Division, Civil Action No.: 4:19-CV-02150, February 23, 2021.**

**Deposition Testimony** in case involving flooding of pier-and-beam residence. Plaintiff attorney is T. Scott Edwards of the Voss Law Center, The Woodlands, Texas. Defense attorney is Keith M. Detweiler of Nielsen & Treas, LLC , Metairie, Louisiana.
**Leon McKee and Helen McKee versus Centauri Specialty Insurance Company, in the United States District Court, Western District of Louisiana, Case No. 5:20-CV-345. February 19, 2021.**

**Deposition Testimony** in case involving hail damage to a slate roof. Plaintiff attorney is J. Cole Sartin, The Sartin Law Firm, LLC, Shreveport, Louisiana. The defense attorneys are James P, Nader, Charles R. Rumbleym abd Benjamin J. Russel of Lobman, Carnahan, Batt, Angelle & Nader, New Orleans, Louisiana.

**Michelle and James Small, Plaintiffs, v. USAA Casualty Insurance Company and Taylor Matthew Eason, Defendants, in the District Court of Montgomery County, Texas, 284th Judicial District, Cause No. 19-11-15874, February 9, 2021.**

**Deposition Testimony** in case involving wind and hail damage to a residential building with an asphalt shingle roof. Plaintiff attorneys are Chad T. Wilson and Tara Peveto of the Chad T. Wilson Law Firm, PLLC, Webster, Texas. Defense attorneys are Sarah J. Allen and Tillman Grogan, IV of Doyle, Restrepo, Harvin & Robbins, L.L.P., Houston, Texas.

15

**John and Joanne Hill, Plaintiffs, v. State Farm Lloyds and Matthew Renfro, Defendants, in the District Court of Montgomery County, Texas, 457th Judicial District, Cause No. 20-04-04598, January 27, 2021.**

**Deposition Testimony** in case involving wind and hail damage to residential dwelling. Plaintiff attorneys are Chad T. Wilson and Amada Fulton of the Chad T. Wilson Law Firm, PLLC, Webster, Texas. Defense attorney is M. Micah Kessler of Nistico, Crouch & Kessler, PC, Houston, Texas.

**Robert Blake cv. Uptown Café, LLC, et al, in the Civil District Court for the Parish of Orleans, State of Louisiana, No. 2018-8142, Section E-16, January 25, 2021.**

**Deposition Testimony** in case involving a stair-step trip in a restaurant. Plaintiff attorneys are Kurt A. Offner and Ricardo "Rico" Alvendia of Alvendia, Kelly & Demarest, New Orleans, Louisiana. Defense attorneys are Tomas G. Buck and Brett W. Tweedel of Blue Williams, LLP, Metairie, Louisiana.

**Garages of Texas @ Willow Bend, LLC, and Mini/USA Equities, Inc. D/B/A Cornerstone Development Corporation, Plaintiffs, v. CCG Commercial Construction Group, LLC and North Dallas Construction, LLC, Defendants, In the District Court 191st Judicial District, Dallas County, Texas, January 15, 2021.**

**Deposition Testimony** in case involving defective construction of six metal building roofs. Plaintiff attorneys are Chad T. Wilson and Patrick C, McGinnis, Chad T. Wilson Law Firm, PLLC and George N. Wilson, III and Gina Mills, Thompson Coe, Dallas Texas. Defense attorneys are Jerry L. Ewing and Michelle A. Koledi of Walters, Balido & Crain, LLP, Dallas, Texas.

**Jose Garduno, Plaintiff v. Allstate Vehicle and Property Insurance Company, Defendant, in the United States District Court, Eastern Division of Texas, Sherman District, Civil Action No.: 4:20-cv-00224, January 8, 20121.**

**Deposition Testimony** in case regarding wind and hail damage to a residential roof. Plaintiff attorneys are Amanda Fulton and Chad T. Wilson of the Chad T. Wilson Law Firm, LLC, Webster, Texas. Defense attorneys are Susan E. Egeland, Sara E. Imnan and W. Neil Rambin of Faegre, Drinker, Biddle & Reath, LLP, Dallas Texas.

**William Hicks, Sr., Plaintiff, v. Allstate Vehicle and Property Insurance Company and Eddie Blagg, Defendants. In the United States District Court, Southern District of Texas, Houston Division, Civil Action No.: 4-20-cv-01436. January 5, 2021.**

**Deposition Testimony** in case regarding wind and hail damage to a residential dwelling. Plaintiff attorneys are Tara Peveto and Chad T. Wilson of the Chad T. Wilson Law Firm, LLC, Webster, Texas. Defense attorneys are Susan E. Egeland, Sara E. Imnan and W. Neil Rambin of Faegre, Drinker, Biddle & Reath, LLP, Dallas Texas.

**Michael J. Hoover, Plaintiff, v. Allstate Texas Lloyds, Defendant, in the United States District Court, Southern District of Texas, Houston Division, Civil Action No.: 4-20-CV-01035, January 5, 2021.**

**Deposition Testimony** in case regarding wind and hail damage to a residential dwelling. Plaintiff attorneys are Tara Peveto and Chad T. Wilson of the Chad T. Wilson Law Firm, LLC, Webster, Texas. Defense attorneys are Susan E. Egeland, Sara E. Imnan, W. Neil Rambin and Matthew C. Sapp of Faegre, Drinker, Biddle & Reath, LLP, Dallas Texas.

**LN Parkwood Company, Plaintiff, vs. Texas Farmers Insurance Company, Defendant, in the United States District Court, Southern District of Texas, Houston Division, Case No. 4:18-cv-04219, December 18, 2020.**

**Deposition Testimony** in case regarding flood damage to 78 residential homes in Houston, Texas. Plaintiff attorneys are Rajan Pandit, John D. Carter and Henry J. Roth of the Pandit Law Firm, New Orleans, Louisiana. Defense attorneys are Joseph J. Aguida, Jr. and Bradley K. Jones of Nielsen & Treas, LLC, New Orleans, LA and Houston, TX.

16

**<u>COMPENSATION SCHEDULE FOR NEIL B. HALL & ASSOCIATES, LLC</u>**
**<u>(d/b/a GROUNDTRUTH FORENSICS)</u>**
(effective February 6, 2024)

**<u>Hourly Rates</u>:**

Site inspection, research and report preparation: $300/hour plus travel expenses
Testimony in trial and deposition: $385/hour*
Preparation for trial and deposition: $300/hour**
Appraiser and Umpire work: $385/hour plus travel expenses
Travel time all work: $300/hour plus travel expenses***

\* Unless otherwise agreed to or established by law, deposition time is charged to the deposing Attorney. (In Texas, deposition time is charged to the retaining attorney for State cases and the deposing Attorney for Federal cases). Trial time is charged to the retaining Attorney.

\*\* Unless otherwise agreed to or established by law, preparation for trial and deposition testimony is charged to the retaining Attorney.

\*\*\* Including travel to/from deposition or trial.

\*\*\*\* Time billed by quarter hour.

\*\*\*\*\* Jobs accepted prior to January 1, 2024 are grandfathered at original rates.

**<u>Overhead Charges</u>:**

General overhead (administrative salaries, rent, utilities, insurance, telecommunications, equipment, books, conferences, training, office supplies, etc.) is included in the hourly rate.

Project overhead (research material, transportation, lodging, meals, etc.) is charged at cost. When more than one job is inspected during a single field trip, travel expenses are pro-rated between jobs.

**<u>Other Charges</u>:**

Mileage:                          $ 0.67/mile
Non-testifying technician:        $ 65/hour
File retrieval:                   $ 65 admin charge for file retrieval

1

**EXHIBIT 3**

**<u>HAIL MAPS</u>**

Note: Using different editions of software may result in lost data. If the white rectangle around the North arrow at the lower right hand corner of a map is missing, please contact admin@gt-forensics.com or 985-690-6008 for further assistance.



Case 4:23-cv-02455     Document 7-6     Filed on 01/30/25 in TXSD     Page 117 of 135

**EYEWITNESS REPORTS**

Within 2 and 5 miles of property
August 10, 2020, to May 19, 2023



Case 4:23-cv-02455     Document 7-6     Filed on 01/30/25 in TXSD     Page 118 of 135

**SWDI NEXRAD SIGNATURES**

MARCH 17, 2021
Within 2 and 5 miles of property
Number in box shows maximum estimated size hail (MESH)
Empty box indicates incomplete information
"X" outside 5 mile radius not considered for mapping

5 mi

Google Earth



Case 4:23-cv-02455    Document 7-6    Filed on 01/30/25 in TXSD    Page 119 of 135

**SWDI NEXRAD SIGNATURES**

MARCH 22, 2022
Within 2 and 5 miles of property
Number in box shows maximum estimated size hail (MESH)
Empty box indicates incomplete information
"X" outside 5 mile radius not considered for mapping

Google Earth

5 mi



**SWDI NEXRAD SIGNATURES**

JULY 12, 2022
Within 2 and 5 miles of property
Number in box shows maximum estimated size hail (MESH)
Empty box indicates incomplete information
"X" outside 5 mile radius not considered for mapping

Google Earth

4 mi



Case 4:23-cv-02455    Document 7-6    Filed on 01/30/25 in TXSD    Page 121 of 135

**SWDI NEXRAD SIGNATURES**

AUGUST 10, 2022
Within 2 and 5 miles of property
Number in box shows maximum estimated size hail (MESH)
Empty box indicates incomplete information
"X" outside 5 mile radius not considered for mapping

**EXHIBIT 4**

HAU MAPS

Note: Using different editions of software may result in lost data. If the white rectangle around the
North arrow at the lower right hand corner of a map is missing, please contact admin@gt-forensics.com
or 985-690-6008 for further assistance.



EYEWITNESS REPORTS

Within 2 and 5 miles of property
August 10, 2020, to May 19, 2023



SWDI NEXRAD SIGNATURES

MARCH 17, 2021
Within 2 and 5 miles of property
Number in box shows maximum estimated size hail (MESH)
Empty box indicates incomplete information
"X" outside 5 mile radius not considered for mapping

50% or greater hail probability

Less than 50% hail probability
or incomplete information

Eyewitness report

About 10 AM local time

Surface wind
moving SE at 35
mph

STORM
MOVING
EAST AT 17

5 mi

Google Earth

Appx.0167



SWDI NEXRAD SIGNATURES

MARCH 22, 2022
Within 2 and 5 miles of property
Number in box shows maximum estimated size heil (MESH)
Empty box indicates incomplete information
"X" outside 5 mile radius not considered for rinapping

50% or greater heil probability

Less than 50% halt probability
or incomplete information

About 5:30 AM local time

1.25
0.5

1.25    1.25

0.5    0.5

0.5

.75

0.5

0.5

Surface wind
moving SSE at
49 mph

STORM
MOVING ENE
AT 41 MPH

0.5

Google Earth

5 mi

N



SWDI NEXRAD SIGNATURES

JULY 12, 2022
Within 2 and 5 miles of property
Number in box shows maximum estimated size hail (MESH)
Empty box indicates incomplete information
"X" outside 5 mile radius not considered for mapping

Greater than 50% hail probability

Less than 50% hail probability
or incomplete information

About 9:45 AM local time

Surface wind
moving NNE at
28 mph

STORM
MOVING ESE
AT 19 MPH

1.75
.75    1.5
1.0    1.0
0.5
0.5
0.75
0.5

0.5
0.5

Google Earth

4 mi

N



SWDI NEXRAD SIGNATURES

AUGUST 10, 2022
Within 2 and 5 miles of property
Number in box shows maximum estimated size hail (MESH)
Empty box indicates incomplete information
"X" outside 5 mile radius not considered for mapping

Less than 50% hail probability
or incomplete information

About 6 PM local time

Surface wind
moving west at
44 mph

0.5

0.5

0.5

Google Earth

5 mi

N

Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ONE UNITY INVESTMENT, LLC | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:23-cv-02455 |
| | § | |
| AXIS SURPLUS INSURANCE COMPANY, | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

### DEFENDANT AXIS SURPLUS INSURANCE COMPANY'S
### DESIGNATION OF EXPERT WITNESSES

TO:     Plaintiff: One Unity Investments, LLC, by and through its attorney of record, Chad T. Wilson and Jay Scott Simon, of CHAD T. WILSON LAW FIRM, PLLC, 455 East Medical Center Blvd, Ste. 555, Webster, TX 77598.

Pursuant to the Federal Rules of Civil Procedure, Defendant, AXIS Surplus Insurance Company ("AXIS"), serves this Designation of Expert Witnesses. Pursuant to the Court's Scheduling Order (Doc. 6), a party with the burden of proof on a claim or defense must designate expert witnesses and otherwise comply with Rule 26(a)(2) no later than September 1, 2024. The Scheduling Order also provides that the party without the burden of proof must designate its expert witnesses by no later than October 16, 2024. In this regard, please note that most or all of the expert witnesses designated herein will offer testimony, if any, that is more germane to items upon which AXIS does not have the burden of proof, but that such testimony may also include items upon which AXIS has the burden of proof and, to that extent, the following designations are being made in an abundance of caution at this time.

Page **1** of **7**

Accordingly, the mere identification of any claims, defenses, issues, knowledge, possible testimony, and/or opinions herein should not be interpreted to mean that AXIS has the burden of proof on all such items identified herein.

SHACKELFORD, MCKINLEY & NORTON, LLP

By: */s/ Bruce R. Wilkin*
**Bruce R. Wilkin**
Texas Bar No. 24053549
bwilkin@shackelford.law
**Artis G. Ulmer, III**
Texas Bar No. 24118569
aulmer@shackelford.law
717 Texas Avenue, 27th Floor
Houston, Texas 77002
Phone: (832) 415-1801
Fax: (832) 565-9030

**ATTORNEYS FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

I hereby certify that, on the 30th day of August 2024, a true and correct copy of the foregoing was electronically transmitted to all counsel of record.

*/s/ Bruce R. Wilkin*
Bruce Wilkin

**I.    AXIS'S RETAINED EXPERTS:**

**1.    Nar Sripadanna, P.E.**
EFI Global
14950 Heathrow Forest Pkwy, Ste. 520
Houston, TX 77032
(281) 358-4441

Mr. Sripadanna is an employee of Efi Global, which was retained by AXIS to inspect Defendant, One Unity Investments, LLC's ("One Unity") property and investigate the loss. He is expected to testify consistently with his opinions, observations, findings, and conclusions contained in his attached report. *See* Exhibit A. Due to the nature of these proceedings, and as explained above, the attached report is being provided to address the items upon which it is possible that AXIS carries or may carry the burden of proof. Mr. Sripadanna will amend and/or supplement his report on or before the next applicable deadline to expand upon and/or address additional items after receipt of Plaintiff's expert reports, pursuant to the Court's Scheduling Order.

Mr. Sripadanna will testify about the condition of the roof and structure of Plaintiff's property. He may also testify as to the damages attributable to the hail storm that was reported to be on August 10, 2022; damages not attributable to the hail event; pre-existing damages; causes and effects of water and other damage to the building; causation issues; repairs to the building; review of applicable records; Plaintiff's failure to mitigate damage and/or faulty mitigation of damage; timing of occurrences; and occurrences outside the policy period. He may also testify about the building design and construction; ordinary wear and tear; maintenance; and gradual deterioration. He may also testify as to the reasonableness of the prior repair to the property and the proper scope of repair, if any.

Mr. Sripadanna may also testify in response to opinions, testimony, or evidence offered by Plaintiff or any of its fact and expert witnesses, as well as anyone else who has inspected or assessed the subject property, concerning any of the above or related issues, including, but not limited to, the opinions, statements and conclusions set forth in Plaintiff's experts' reports.

Mr. Sripadanna may utilize drawings, photographs, charts, diagrams, and other demonstrative or illustrative aides to assist in explaining his opinions and testimony. Additionally, he may use or create a Rule 1006 FRE summary to assist in the presentation of his testimony. The documents provided to and reviewed by him are identified in his reports.

Mr. Sripadanna's opinions and testimony are based on his specialized knowledge, skill, education, training, and experience, as well as his analysis of the facts at issue, inspection of the property, and his review of pertinent documents and information obtained during the claim adjustment and lawsuit, including, but not limited to, claim files, engineering reports, estimates, discovery responses and document productions.

*See* Mr. Sripadanna's report, its exhibits, and any additional or supplemental reports for additional information. AXIS reserves the right to have Mr. Sripadanna amend and/or supplement his reports, opinions, and testimony based on receipt of additional documents and testimony when they are provided.

## II.     NON-RETAINED EXPERTS:

**1.     The Corporate Representative**
AXIS Surplus Insurance Company
c/o Bruce R. Wilkin
SHACKELFORD BOWEN MCKINLEY & NORTON LLP
717 Texas Ave., 27ᵗʰ Floor
Houston, TX 77002
(832) 415-1773

The Corporate Representative is the in-house claims adjuster for AXIS concerning Plaintiff's insurance claim made the basis of this litigation. He or she was not retained or specially employed to provide expert testimony in this litigation, and he or she is not an employee of AXIS whose duties regularly involve giving expert testimony. The Corporate Representative is a fact witness who has expertise and thus is a fact and expert witness. AXIS identifies him or her as a mixed fact/expert witness to permit him or her to offer opinions related to relevant facts and issues in this matter.

The Corporate Representative is qualified to offer opinion testimony on standard industry practices in handling numerous property claims and related coverage issues, based on his or her knowledge, training, education and years of experience in the insurance industry and qualifications as an insurance claims adjuster.

The Corporate Representative offers no report at this time because he or she is not an employee of AXIS whose duties regularly involve giving expert testimony, nor has he or she been specially employed to provide expert testimony as defined under Fed. R. Civ. P. 26(a)(2)(B). The general substance of the Corporate Representative's impressions and opinions may be reflected in his or her claim documentation, correspondence, and other documents produced by AXIS in this litigation, as well as his or her deposition testimony.

The Corporate Representative is expected to testify based on his or her experience as an insurance claims professional, as well as his or her knowledge of the adjustment of the claim at issue here. He or she may offer opinions as to claims estimating, scope, and cost of repair or replacement, including applicable deductibles, actual cash value and replacement cost, valuation provisions, ordinance or law provisions, property damage, adjusting, claims handling, insurance coverage issues, policy coverages, policy exclusions and limitations and other relevant policy terms and provisions.

The Corporate Representative's expertise includes insurance coverage and claims handling. The Corporate Representative may also be called on to render opinions on the claims handling in this matter; that the claims handling by AXIS was done in good faith; that Plaintiff's

Page **4** of **7**

claim was promptly and properly investigated by AXIS; that AXIS promptly, properly and reasonably communicated its claims decisions; and the monies paid by AXIS under the Policy.

The Corporate Representative may testify as to Policy provisions, including, but not limited to, the coverages, conditions, definitions, limitations, and exclusions to coverage and all related issues. He or she may also testify as to any relevant coverage issues.

The Corporate Representative may also testify regarding Plaintiff's claimed monetary damages, including the policy provisions that limit coverage under the AXIS Policy. The Corporate Representative may further testify regarding the duties in the event of a loss under the AXIS Policy, including prompt notice, documentation, protection/preservation, quickly resuming operations, and cooperation, and the prejudice that may result from a claimant's failure to comply. He or she may further testify that the Policy only pays to the extent of an insured's interest in the allegedly damaged property. The Corporate Representative may testify as to any other related issues.

The Corporate Representative may also respond to any opinions, testimony, or evidence offered by Plaintiff or any of its expert witnesses concerning any of the above or related areas. He or she may also offer expert opinions in response to any rebuttal reports or deposition testimony of Plaintiff's expert witnesses, as well as any additional documents that are produced or provided to him or her.

The Corporate Representative's opinions and testimony are based on his or her specialized knowledge, skill, education, training, and experience, as well as his or her personal knowledge of pertinent documents and information obtained during the claim adjustment and lawsuit, including claim files, the policy, discovery responses, documents produced, and any testimony offered in this lawsuit and/or other lawsuits in which Plaintiff is a party.

The Corporate Representative may utilize drawings, photographs, charts, diagrams, and other demonstrative or illustrative aides to assist in explaining his or her opinions and testimony. Additionally, he or she may use or create a Rule 1006 FRE summary to assist in the presentation of his testimony.

2.      **Brandon Allen**
        Straight Line Global
        PO Box 51584
        Jacksonville, FL 32240
        (800) 754-9622

Mr. Allen is an employee of Straight Line Global ("Straight Line"), the independent adjuster retained by AXIS to assist with the inspection of Plaintiff's property, the investigation of Plaintiff's insurance claim, and the adjustment of Plaintiff's insurance claim made the basis of this litigation. He was not retained or specially employed to provide expert testimony in this litigation, and he is not an employee of Straight Line whose duties regularly involve giving expert testimony. Mr. Allen is a fact witness who has expertise and thus is a fact and expert witness.

Page **5** of **7**

AXIS identifies him as a mixed fact/expert witness to permit him to offer opinions related to relevant facts and issues in this matter.

Mr. Allen is qualified to offer opinion testimony on standard industry practices in handling numerous claims and related issues, based on his knowledge, training, education and years of experience in the insurance industry and qualifications as an insurance claims adjuster.

Mr. Allen offers no report at this time because he is not an employee of Straight Line whose duties regularly involve giving expert testimony, nor has he been specially employed to provide expert testimony as defined under Fed. R. Civ. P. 26(a)(2)(B). The general substance of Mr. Allen's impressions and opinions may be reflected in his claim documentation, reports, correspondence, and other documents, which have been previously produced in this lawsuit as AXIS 000154-000164; 000187-000277; 000307-000393; and 000698-000702.

Mr. Allen may testify regarding his inspections of the property; the claim process; claims handling; extent and nature of damages; conditions of the property; the insurance policy; the building design and construction; exterior and architectural items and finishes; building systems; building maintenance, including deferred maintenance; damages attributable to the hail event; damages not attributable to the hail event; pre-existing damages; causation issues; causes and effects of water and other damage to the building; review of applicable records; pricing of repairs/replacements; the process to identify and access to damages associated with hail events; and the process and methods to assess, document, measure, and scope damages to repair the alleged damages.

Mr. Allen may testify as to policy provisions, including, but not limited to, the coverages, conditions, definitions, limitations, and exclusions to coverage and all related issues. He may also testify as to any relevant coverage issues.

Mr. Allen may further testify regarding Plaintiff's claimed monetary damages, including, but not limited to, those that are covered under the AXIS Policy and those that are not or are limited or sublimited. He may also testify as to Plaintiff's failure to mitigate its damage, lack of proper repairs/replacements, and the incurrence of unrelated and/or unreasonable costs and expenses for remediation and other repairs.

Mr. Allen may further testify regarding the duties in the event of a loss under the AXIS Policy, including prompt notice, documentation, protection/preservation, and cooperation, and the prejudice that may result from a claimant's failure to comply. Mr. Allen may testify as to any other related issues.

Mr. Allen may also testify in response to any opinions, testimony, or evidence offered by Plaintiff or any of its expert witnesses concerning any of the above or related areas, as well as the opinions, statements and conclusions set forth in Plaintiff's experts' reports. He may also offer expert opinions in response to any rebuttal reports or deposition testimony of Plaintiff's expert witnesses, as well as any additional documents that are produced or provided to him.

Mr. Allen's opinions and testimony are based on his specialized knowledge, skill, education, training, and experience, as well as his personal knowledge of pertinent documents and information obtained during the claim adjustment and lawsuit, including claim files, the Policy, discovery responses, documents produced, and any testimony in this lawsuit.

Mr. Allen may utilize drawings, photographs, charts, diagrams, and other demonstrative or illustrative aides to assist in explaining his opinions and testimony. Additionally, he may use or create a Rule 1006 FRE summary to assist in the presentation of his testimony.

### RESERVATION OF CERTAIN RIGHTS

AXIS reserves the right to call any expert designated by Plaintiff provided such expert is deemed qualified to testify and permitted to testify by the Court. AXIS's reservation of its right to elicit such testimony from any expert designated by Plaintiff shall not be construed as a waiver of AXIS's right to challenge the timeliness of Plaintiff's designation of any such expert or challenge the qualifications of any such expert under the Federal Rules of Evidence.

AXIS reserves the right to elicit expert testimony from any fact witness in this case who may prove through discovery to have reliable, expert opinions relevant to the issues in this lawsuit.

AXIS reserves the right to seek expert opinions by way of cross-examination or otherwise from any expert designated by any other party to this lawsuit.

AXIS reserves the right to withdraw or de-designate the designation of an expert prior to testimony and to positively aver that such previously designated expert will not be called as a witness at trial and to re-designate same as a consulting expert who cannot be called by opposing counsel.

AXIS reserves the right to call un-designated rebuttal expert witnesses whose testimony cannot reasonably be foreseen until the presentation of evidence against AXIS.

AXIS reserves the right to call as a witness any custodian of documents and/or witnesses required to authenticate documents, including business records or other records whose admissibility is disputed by any party.

AXIS reserves the right to elicit any expert testimony, or any lay opinion testimony, at the time of trial from any qualified person which would be of benefit to the Court or jury to determine material issues of fact pursuant to the Federal Rules of Civil Procedure.

AXIS reserves the right to amend or supplement its designation of testifying experts with additional experts and/or additional opinions and conclusions as discovery in this case progresses.